John C. Hueston, State Bar No. 164921
jhueston@hueston.com
Moez M. Kaba, State Bar No. 257456
mkaba@hueston.com
Steven N. Feldman, State Bar No. 281405
sfeldman@hueston.com
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:   (213) 788-4340
Facsimile:   (888) 775-0898

Attorneys for Plaintiff
MONSTER ENERGY COMPANY, a Delaware
Corporation

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>VITAL PHARMACEUTICALS, INC., d/b/a VPX Sports, a Florida corporation; and JOHN H. OWOC a.k.a. JACK OWOC, an individual,<br><br>Defendants. | Case No. 5:18-cv-1882<br><br>**PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT FOR:**<br><br>1. **Violation of the Lanham Act**<br>2. **Unfair Competition**<br>3. **False Advertising**<br>4. **Trade Libel**<br>5. **Intentional Interference with Contractual Relations**<br>6. **Intentional Interference with Prospective Economic Advantage**<br>7. **Conversion**<br>8. **Larceny**<br>9. **False Patent Marking**<br>10. **Violation of the California Uniform Trade Secrets Act**<br>11. **Violation of the Defend Trade Secrets Act**<br>12. **Violation of the Computer Fraud and Abuse Act**<br><br>**DEMAND FOR JURY TRIAL** |

5521379

Plaintiff Monster Energy Company ("Monster") brings this action against Defendants Vital Pharmaceuticals, Inc., d/b/a VPX Sports ("VPX"), and John H. Owoc a.k.a. Jack Owoc ("Owoc") (collectively, "Defendants") and alleges as follows:

## I.  INTRODUCTION

1.      Fueled by flagrant consumer deception and systematic anti-competitive businesses practices, BANG energy drink has experienced significant market growth. Monster brings this suit to halt these practices, and hold Defendants VPX and Owoc accountable.

2.      VPX and Owoc's bad acts are damaging, dangerous, and despicable. Defendants lie to consumers, promising that BANG, for example, will build lean muscle and improve brain function.  They cheat government regulators, ignoring health and safety laws that provide essential protections to the public.  They steal from competitors, rewarding employees for poaching valuable in-store shelf space to which competitors have a contractual right.  And they brazenly misappropriate confidential and trade secret information, promising Monster employees jobs and high incomes if they bring Monster's proprietary information to VPX.

3.      In fact, BANG's main pitch to consumers is a hoax.  The product's chief marketing draw is its "Super Creatine," a chemical compound that Owoc claims can, among other things, fight depression and reverse "mental retardation."  As it turns out, BANG's "Super Creatine" compound is neither "super" nor "creatine."  In fact, despite what Bang prominently claims on its cans, ***there is no creatine in BANG***. And even VPX's own research shows that unlike real creatine, the "Super Creatine" compound is essentially useless when ingested by consumers.

4.      Aside from being false, Defendants' claims about what Super Creatine can do also directly violate U.S. Food and Drug Administration ("FDA") regulations prohibiting manufacturers from making unauthorized health claims about their products.

5.     But Defendants' unfair conduct doesn't stop with false advertising and illegal labeling.  They have also systematically interfered with competitors'—chiefly, Monster's—sales and contractual rights, by rewarding employees and distributors for stealing valuable in-store shelf space.  Monster's shelf space is BANG's primary target.

6.     Defendants know that this shelf space is not theirs to take.  In the beverage industry, shelf space is often determined by contract between retailers and product vendors.  Those contracts are extremely valuable, impact consumer behavior, and typically take years to earn.  By short-circuiting this normal competitive process, VPX is not only stealing a contractual right from Monster, it is also effectively stealing sales and goodwill.

7.     VPX and Owoc are also attempting to steal Monster's trade secrets and employees.  Recently, a VPX manager for the BANG product offered a long-time Monster employee a job with one express precondition: steal Monster's confidential information, including proprietary pricing data.  When the Monster employee stopped the conversation and told the VPX manager that his request was unethical, the VPX manager terminated the phone call.

8.     While VPX's tactics were repelled on that occasion, other attempts by VPX to steal Monster's trade secrets and employees appear to have succeeded.  VPX recently hired three Monster employees, and in one instance, Monster discovered that the former employee had not only lied about returning his Monster-issued electronic devices and proprietary documents, but had also downloaded five USB sticks of confidential and proprietary information shortly before his departure.  That former employee had no legitimate business reason to download or store those reams of data and did so contrary to Monster policy and his contractual obligations.

9.     Monster has also confirmed that the former employee accessed and likely used the stolen data for VPX's gain.  Metadata analysis has shown that he continued to open the stolen files after he departed Monster and ***even after*** he began

- 3 -

1  working at VPX.

2      10.    VPX and Owoc's unfair conduct related to BANG is part of a larger

3  pattern of rule breaking.  Over the years, VPX and Owoc have been reprimanded by

4  the FDA for putting dangerous and untested chemicals in their products; censured by

5  the Better Business Bureau for making false claims about their products' potency;

6  credibly accused of creating sham "studies" to prove up their products; and sued over

7  a hundred times for conduct ranging from wage-and-hour violations to unlawful

8  discrimination to shirking on debts.

9      11.    The most unfortunate part of Bang's wide-ranging illegal scheme is that

10  it appears to have worked.  VPX's refusal to play by the rules has artificially boosted

11  its sales at the expense of competitors and consumers alike.  This suit will put an end

12  to these practices, and protect Monster, its consumers, and the public.

13                          **II.  PARTIES**

14      12.    Monster is a Delaware corporation with its principal place of business at

15  1 Monster Way, Corona, California 92879.  Monster develops, markets, and sells

16  energy drinks.  Monster's products are sold throughout the United States, including

17  California, and more than 150 other countries.  Monster is the best-selling energy

18  drink brand in the United States by both unit count and dollar value.  Since 2002,

19  Monster has spent over $5 billion advertising, promoting, and marketing its brand

20  and products.

21      13.    Defendant VPX is a Florida corporation with its principal place of

22  business at 1600 North Park Drive, Weston, Florida 33326.  VPX also develops,

23  markets, sells, and distributes energy drinks.

24      14.    Defendant John H. Owoc is the founder, CEO, Chief Scientific Officer,

25  and owner of VPX.  He is a citizen of Florida.

26

27

28

### III.  JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction because the parties are diverse and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332. Additionally, the Court has subject matter jurisdiction because the case involves federal law (the Lanham Act, 35 U.S.C. § 292, 18 U.S.C. § 1836 *et. seq*, and 18 U.S.C. § 1030 *et. seq.*) and related state claims (such as California's Unfair Competition Law).  *See* 28 U.S.C. §§ 1331, 1338.

16.     This Court has personal jurisdiction over VPX because it conducts business in the State of California.  Among other things, VPX sells and distributes BANG to California residents and businesses through a network of fifteen direct store distributors in California, retailers, direct sales on the internet (*e.g.*, www.bang-energy.com), and other means; VPX advertises and promotes BANG to California residents and businesses through the internet, social media, BANG labels, and other forms of marketing; VPX has employees and/or independent contractors in California; and VPX has instructed employees to interfere with Monster's contractual rights to in-store shelf space at California retail locations.[1]

17.     California is a particularly important market for VPX.  An industry publication recently reported that while BANG holds only a 4% market share nationally, it is approaching a 10% share in West Coast markets.

18.     This Court has jurisdiction over Owoc because he has directed the VPX activities described above and herein.  As VPX's founder, CEO, and Chief Scientific Officer, Owoc personally oversees all of its corporate operations, including product development, testing, quality control, manufacturing, distribution, marketing, media, and sales.  Owoc is an integral part of VPX's day-to-day operations and has been

---

[1] Based on Monster's initial investigation, it appears that Defendants have tortiously interfered with Monster's contractual rights throughout California, including in Sacramento, Woodland, Roseville, Yuba City, Orangeville, Studio City, Culver City, Watsonville, Escalon, Fresno, Los Angeles, Rio Linda, Auburn, Oceanside, Livermore, Fremont, King City, Hayward, Garden Grove, Anaheim, Fremont, Rocklin, and Corona.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

1  since its inception.  Moreover, as shown below, Owoc personally appears in many of
2  VPX's advertisements and aggressively promotes BANG on his own social media
3  accounts, including @bangenergy.ceo on Instagram.  Owoc also serves as a director
4  on the board of Virun, Inc., which is headquartered in Pomona, California.

5       19.     Venue is proper because a substantial portion of the events or omissions
6  giving rise to this action occurred and are occurring in this District.  *See* 28 U.S.C.
7  §§ 1391(b)-(c).

## IV.    FACTUAL BACKGROUND

### *A.     VPX's and Owoc's History of Flouting the Rules*

10      20.     VPX began producing dietary supplements in 1993.  Starting with its
11 very first products, VPX has recklessly shot first and asked questions later.  As an
12 early profile of the company explained: "A drug company, like Pfizer or Merck,
13 typically needs eight years to get a product from the lab to the consumer.  In a mere
14 two months, a VPX energy drink can go from Owoc's brain to machines that each
15 churn out 230 bottles a minute—and then to store shelves."  VPX's company ethos
16 was as follows: "Get something to market, get it there fast, and make sure it tingles."

17      21.     VPX's decision to follow that mantra has proven disastrous for
18 consumers.  VPX "exploded to prominence with the help of energy and weight-loss
19 products containing ephedra"—an unsafe supplement later banned by the FDA after
20 it was "conclusively linked to cases of healthy adults suddenly falling ill or even
21 dying."  *See* HARVARD MED. SCH., *Why The FDA Banned Ephedra* (March 2004).
22 Even after the fallout from the FDA ban, Owoc was unapologetic for including this
23 deadly supplement in his products.  When asked about the tragic case of a 23-year-
24 old professional athlete who died after taking ephedra, Owoc was dismissive of
25 ephedra's impact: "[He] was a fat guy exercising in the heat."  Never mind that the
26 autopsy said otherwise.[2]

---

[2] Murray Chase, *Pitcher's Autopsy Lists Ephedra as One Factor*, N.Y. TIMES (March 14, 2003).

- 6 -

5521379

22. After the ban on ephedra, VPX turned its attention to its Redline drink—a product designed to induce involuntary shivering as a means to lose weight. "It is a physiological fact that when you shiver, your body releases a large amount of stored body fat in an attempt to bring body temperature back to normal," explained VPX in Redline's marketing material.

23. In 2015, VPX earned a Warning Letter from the FDA for selling adulterated and illegal dietary supplements. The FDA had discovered that VPX was selling products containing a synthetic stimulant called DMBA that had never been studied in humans and could pose "a significant or unreasonable risk of illness or injury." The FDA ordered VPX to "immediately cease" all distribution.

24. VPX has continued to put untested and potentially dangerous chemicals in its products. VPX products are the subject of a current enforcement action by the Oregon Attorney General. That action alleges that several VPX products contain BMPEA—a synthetic chemical "similar to amphetamine," "never studied in humans," linked to "hemorrhagic stroke," and banned by the World Anti-Doping Agency. Despite the Oregon enforcement action, those VPX products are still offered for sale.

### B. *VPX and Owoc's Track Record of Consumer Deception*

25. VPX has engaged in consumer deception from the start. Even its name is deceptive: Vital *Pharmaceuticals* is ***not*** a pharmaceutical company.

26. VPX's company logo and nickname are likewise designed to confuse consumers. The VPX mark mimics the well-known R symbol for prescription drugs:



PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

In Owoc's words, "the acronym VP(x) actually stands for Vital Pharmaceuticals with the X appearing lower than VP similar to how it appears in RX." The FDA has explained why this misleads: "use of the prescription drug symbol 'Rx' . . . may deceive consumers into thinking they are purchasing a prescription drug without a prescription."

27.     VPX's deceptive tactics do not end with its name. VPX's entire business is built around making bold—but false—claims about the health benefits of its products.

28.     Indeed, a cornerstone of VPX and Owoc's deception is weaponized faux "science," designed to impress and confuse the public. They have gone to great lengths to manufacture an image as a "science" company. In their early years, VPX even included a "syringe-like device with some products to lend a hard-core feel."

29.     VPX's basic formula is to make an impressive-sounding proclamation about the benefits of a product, then cite official-looking "studies" that VPX itself funded as purported proof of that claim. Given that the VPX studies are illegitimate, VPX apparently assumes that consumers either won't bother reading the studies or don't have the scientific acumen to understand them.

30.     VPX's marketing ploy has been denounced by the National Advertising Division (NAD)—an independent investigative arm of the Better Business Bureau—on three separate occasions.

31.      In 2010, for example, the NAD reviewed VPX's claims that its "Meltdown" product was the "World's 1st Fat Burning Drink" and was "University Proven To Burn Fat for 6+ and Increase Fat Utilization by 56%." VPX had also claimed that "a study presented at the June 2008 International Society of Sports Nutrition Conference . . . left scientists scratching their heads" about how "Meltdown is over 273% better than the infamous caffeine plus ephedrine stack."

32.     None of that was true. The NAD found that VPX "overstated the results of the research," misleadingly drew comparisons to "unrelated studies," and used

- 8 -

5521379

1  data "insufficiently reliable to support the claims."

2      33.    As another example, Owoc often touts the "unprecedented 27 Double-

3  Blind Placebo Controlled Gold Standard University Human Test Subject Studies

4  validating [VPX's] products' safety and effectiveness" available on VPX's website

5  (*see* https://bang-energy.com/vpx-university-studies/).   This entire paragraph is

6  false.

7      34.    Every study listed on the website was funded by VPX—hardly the

8  independent and "unprecedented" validation Owoc's statement implies.  Moreover,

9  there are only 24 studies (all VPX funded), not 27.  Three of the studies listed on

10  VPX's website are duplicates, included either out of disregard for details or a

11  conscious attempt to inflate the purported body of research supporting VPX

12  products.

13      35.    Moreover, all but three of the studies on VPX's website are published

14  by the so-called "International Society of Sports Nutrition" (ISSN).  In 2008, when

15  VPX first began publishing with the ISSN, ISSN's "CEO" was Jose Antonio.  Mr.

16  Antonio also happened to be a paid employee of VPX and held the title of "Sports

17  Science Director."  He remained on the VPX payroll through at least 2013.   During

18  this time, VPX ran 20 "studies" with ISSN.  To this day, the ISSN website

19  prominently lists VPX as one of the organization's sponsors.  Mr. Antonio also

20  continues to affiliate with VPX, and recently appeared in multiple videos on Owoc's

21  Instagram page to promote a new "study" regarding BANG that ISSN apparently

22  intends to publish.

23

24

25

26

27

28

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

36.     Another critical part of VPX's consumer deception is the myth it has created about Owoc.  As noted above, Owoc is the founder, CEO, "Chief Scientific Officer," and owner of VPX.  Owoc directs VPX's business activities, purportedly "invents" its products, and plays a key role in VPX's marketing efforts.  Defendants have used Owoc's control over VPX to further mislead consumers, portraying him as a credentialed scientist who consumers can trust for health advice:



37.     In VPX's own words: "VPX is orchestrated by the world's leading authority, author, and developer of performance enhancing supplementation and physique-altering nutrition, Founder and CEO, Jack Owoc."

38.     Another VPX press release suggests that consumers should trust Owoc's "unrivaled scientific acumen," because he has "9 years of teaching, 6 different science disciplines, 7 issued patents, and 27 university studies under [his] belt."

39.     In fact, Owoc's lone "scientific" credential is having been a (substitute) teacher in a local school district.  Owoc does not appear to hold a degree in any scientific discipline.  Nor has he held a position at any research university, worked as a research scientist, or presided over any university studies.

1    40.    Owoc holds views that would be, to say the least, unconventional for a
2  world-leading scientist.  He is part of the anti-vaccination movement, having posted
3  a list on Facebook of "30 Scientific Studies Showing the Link between Vaccines and
4  Autism."   He also believes that microwaves pose an urgent health risk, imploring his
5  followers to "Destroy your Microwave before it Destroys YOU!"  (Microwaves
6  apparently cause "a breakdown of the human 'life-energy field.'")

7    41.    Owoc's representations that he is an "author" are equally misleading.
8  At one time or another, he has claimed to have written at least six books: "SUPER
9  CREATINE," "BANG: The Death of Concentrates," "BANG: Bodybuilding
10  Blueprint," "BANG: The Future of Muscle Appearance & Performance
11  Enhancement," "Meltdown Body Redesign," and "The Meltdown Anti-Diet"
12  (sometimes called the "Bang Anti-Diet").  These books do not exist.  Or if they do,
13  they are locked up where only VPX and Owoc can read them.  Owoc has now been
14  promising to release his "Anti-Diet" book for over three years.

15    *C.*    *VPX and Owoc's Promotion of BANG*

16    42.    Owoc and VPX save their most deceptive marketing for their most
17  popular product: the BANG energy drink.[3]

18    43.    BANG is labeled and marketed as "potent brain and body fuel."
19  According to VPX and Owoc, Bang will "beef up [both] your muscles and your
20  brain."  For example, VPX and Owoc claim that BANG can simultaneously provide
21  "an 11.2% increase in the collegiate athlete's ability to perform repetitions" and also
22  deliver "ingredients [that] have been proven to improve brain function."

23

24

25

26

27  [3] VPX began selling BANG to consumers in 2012.  VPX currently produces and sells
28  over a dozen flavors of BANG, including caffeine-free flavors.

44.    VPX attributes most of the health benefits in BANG to one ingredient: Super Creatine.  "Super Creatine" is VPX's marketing name for a creatyl-L-leucine molecule, and VPX identifies it as BANG's primary draw.  The words "Super Creatine" are prominently placed at the top of each BANG can and are nearly as conspicuous as the BANG brand name itself:



PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

45.     Owoc tells consumers that Super Creatine is what sets BANG apart from competitors.  On social media, Owoc offered to answer consumer questions as part of his effort to do "#CEO stuff" (Owoc's words).  He was asked: "What's the benefit of drinking bang over Monster zero or other sugar free energy drinks?"  His first answer? "***Super Creatine*** which is a patented creatine-amino acid peptide that's stable [in] water."

46.     According to Owoc and VPX, the Super Creatine compound is an elixir.  Here are some of the things they have claimed about it:

- Super Creatine can "reverse Sarcopenia (loss of skeletal muscle)."
- Super Creatine has "anti-depressive effects."
- Super Creatine "increases cell swell which increases protein synthesis."
- Super Creatine can provide "6.9 Pounds of Water-Retention-Free Lean Mass in just 4 Weeks!"
- Super Creatine increases "cognition" and "attention span."
- Super Creatine "increases IGF-1 and satellite cell activation (IGF-1 and satellite cells are essential for muscle growth)."
- Super Creatine can "increase [users'] I.Q."
- Super Creatine is "neuroprotective in the brain" and has "antioxidant effects in the brain."

Or as Owoc sums it all up, Super Creatine "can make you ripped like Rambo and smart like Picasso."

47.     All of those claims, however, pale in comparison to this one: that Super Creatine "helps with all forms of dementia, including Alzheimer's, Parkinson's, Huntington's, and other forms of dementia."  The cure to these tragic diseases has evaded the medical profession for decades.  It isn't hiding in a can of BANG.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

48.     Owoc uses junk science to support these claims.  As he explained on YouTube: "As you age, you have 'Creatine Transport Deficiency Syndrome,' where creatine does not cross the 'Blood Brain Barrier' as well as it does when you are younger.  Because of this, as you age you become mentally retarded. . . .  We have great news though.  *We could possibly **reverse that** with these new creatine peptides that I've patented*."[4]



49.     Owoc in fact asserts that his "patented" Super Creatine compound "can cross the 'Blood Brain Barrier' 20 times more efficiently than regular creatine," which is what makes it so effective at fighting "Alzheimer's, Parkinson's, Huntington's, and other forms of dementia."

---

[4] https://www.youtube.com/watch?v=_hYcTX9jYr0&feature=youtu.be

1        *D.*    *Super Creatine Provides No Health Benefit to Consumers*

2        50.    If Owoc's promises about BANG's Super Creatine sound too good to be

3 true, that's because they are.  BANG's Super Creatine has proven to have three

4 scientific flaws—any one of which renders the Super Creatine in BANG impotent

5 and VPX's advertising misleading.

6        51.    *First*, Super Creatine is not creatine.  Creatine is an amino acid that

7 naturally occurs in the human body.  Athletes commonly take creatine supplements

8 in the form of creatine monohydrate.  Super Creatine—a marketing name that VPX

9 created—refers to creatyl-L-leucine, which is a fundamentally different molecule.

10       52.    And contrary to statements on BANG's label, ***there is no creatine in***

11 ***BANG***.  Dr. Neil Spingarn—a pharmacologist with a Ph.D. from Yale University

12 and more than 40 years of experience—has tested multiple formulations of BANG to

13 determine its creatine content.  Each time, Dr. Spingarn could not detect any amount

14 of creatine in BANG.  *See* <u>Exhibit A</u>.

15       53.    *Second*, the Super Creatine compound is functionally useless.  Studies

16 show that Super Creatine does not break down at the acidity levels of stomach acid,

17 meaning it passes through the body largely unutilized.[5]  And even when the Super

18 Creatine compound is exposed to acidity levels in which it can break down, it does

19 not release creatine.  Research has instead demonstrated—and VPX's own data

20 supports—that the Super Creatine compound transforms directly into a waste

21 compound called creatinine (not creatine)[6]—which VPX has described as a "useless

22 substance."

23

_____

24 [5] Reddeman, R., et al. "A Toxicological Assessment of Creatyl-L-Leucine," 37 INT.

25 J. TOXICOLOGY 171-187 (2018) at 171 (citing Owoc, J., et al. "Effect of Pepsin on Creatyl L-Glutamine (CLG), 2014, unpublished data).

26 [6] *See, e.g.*, Burov, S, *et al.* "Creatinyl Amino Acids – New Hybrid Compounds with Neuroprotective Activity," 17 J. PEPTIDE SCI. 620-626 (2011) at Figure 5; *see also*

27 Reddeman, R., et al. "A Toxicological Assessment of Creatyl-L-Leucine," 37 INT. J. TOXICOLOGY 171-187 (2018) at 179.

28                                       (Continued...)

54.     *Third*, even if Super Creatine could break down into creatine, there is not enough of it in BANG to materially impact the body.  While VPX conceals how much Super Creatine is in BANG, product testing shows that there are fewer than 40 *milligrams* in one can.  That is roughly ***100 times less than the amount of creatine necessary to provide a measurable health benefit***.[78]  VPX knows this.   It advises consumers that "researchers found that athletes looking to get the most gains in size and strength should include 4-6 grams [4,000 to 6,000 milligrams] of creatine before and 4-6 grams [4,000 to 6,000 milligrams] of creatine after exercise."  Moreover, VPX cited studies in its patent application that analyze creatine supplementation regimens at even higher levels—some of which were ***500 times*** the dose included in BANG.[9]

55.     VPX's marketing of "Super Creatine" is misleading for all of the independent reasons above.  When consumers hear "*Super* Creatine," they reasonably expect to receive all the benefits of creatine and possibly more.  But in truth, those consumers receive no health benefit whatsoever from Super Creatine.

---

[7] *See* https://efsa.onlinelibrary.wiley.com/doi/pdf/10.2903/j.efsa.2011.2303 ("The Panel considers that in order to obtain the claimed effect, 3 g of creatine should be consumed daily.");
https://ods.od.nih.gov/factsheets/ExerciseAndAthleticPerformance-HealthProfessional/

[8] This value is a weight-to-weight comparison of creatyl-L-leucine in a can of BANG versus the beneficial daily dose of creatine.  When compared using a molecule-to-molecule basis, BANG performs even worse, having about ***165 times*** fewer molecules of creatyl-L-leucine than the amount of creatine molecules required for a beneficial effect.

[9] Rawson et al., *Effects of Creatine Supplementation and Resistance Training on Muscle Strength and Weightlifting Performance*, J. OF STRENGTH & CONDITIONING RESEARCH, 2003, Vol. 17(4), 822-831; Buford et al., *International Society of Sports Nutrition position stand: creatine supplementation and exercise*, J. OF THE INT'L SOCIETY OF SPORTS NUTRITION, Aug. 2007, Vol. 4(6).

- 16 -

56.     VPX contributes to this confusion by purposefully conflating the worthless "Super Creatine" compound with real creatine.  Each can of BANG states: "Power up with BANG's potent brain & body-rocking fuel: *Creatine*, Caffeine, CoQ10 & BCAAs," even though there is no actual creatine in BANG:



57.     Similarly, in an article published by VPX entitled "*The Benefits of Taking Super Creatine Pre- and Post-Workout*," VPX cites studies and research about regular creatine yet claims those health effects for the Super Creatine compound.  On Defendants' social media, most posts about BANG end with the hashtag "#creatine" or "#IceColdCreatine."

58.     VPX further stokes this confusion by referring to BANG as a "pre-workout" drink.  Many BANG energy drink advertisements, for example, include the hashtag #PreWorkout.  But as VPX's own studies and products show, pre-workout

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

1   drinks typically contain thousands of milligrams of real creatine, not dozens of

2   milligrams of a different, worthless chemical.

3        59.    Consumers care about the quantity of the active ingredients in their pre-

4   workout drinks.  They have asked Owoc on social media how much "Super

5   Creatine" is in BANG.  He doesn't respond.  "Unfortunately, that is proprietary

6   information," Owoc says.

7        E.    *VPX and Owoc Falsely Mark BANG as "Patented"*

8        60.    Keeping with their pattern of using weaponized faux "science" to

9   confuse the public, VPX and Owoc rely heavily on the false claim that the "Super

10  Creatine" in BANG is patented technology.  Owoc often directs consumers to U.S.

11  Patent Number 8,445,466 (the "'466 patent"), which Owoc claims is his patent on

12  the Super Creatine compound.  Owoc says that he and "many others" believe that

13  patent to be "the most important patent ever awarded" in the "history of sports

14  nutrition," and gloats that "Monster has no answer to contend with Jack Owoc's

15  Patented Super Creatine."

16       61.    VPX and Owoc print the '466 patent number on each can of BANG—

17  *twice*.  They also include on each can substantially the entire title of the '466 patent

18  and an image of the U.S. patent seal.  This is far more than what is required under 35

19  U.S.C. § 287(a) for sufficient patent marking and reflects VPX and Owoc's

20  intentional use of the '466 patent number as part of a broader marketing campaign.

21       62.    By printing the '466 patent number on each can of BANG, VPX and

22  Owoc represent that the beverage actually practices the '466 patent.  It does not and

23  stating that it does is false.

24       63.    Each claim of the '466 patent requires "***a biologically active*** form of

25  creatine."   Although the term "biologically active" is not defined in the '466 patent,

26  the context of the '466 patent—which describes at length the significant health

27  benefits of real creatine—makes clear that a "biologically active" form of creatine

28  must be one that provides at least some health benefit to a person who consumes it.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

1    But there is no evidence that Super Creatine carries any health benefit, either by itself

2    or because it breaks down into creatine in the human body.

3          64.    VPX and Owoc can point to no study showing that creatyl-L-leucine

4    provides any health benefit to humans.  Indeed, even the VPX-published January

5    2019 article entitled "The Benefits of Taking Super Creatine Pre and Post-Workout"

6    pointed to no such evidence, and instead relied on studies about real creatine—not

7    "Super Creatine."  Presumably, if Defendants had *any* evidence supporting the claim

8    that creatyl-L-leucine carries health benefits, they would have cited the evidence in

9    that article.

10          65.    In fact, VPX's own data suggests that creatyl-L-leucine provides no

11    health benefit.   As part of its unsuccessful bid to persuade the Patent Office that the

12    claims of the '466 patent were valid, VPX disclosed its testing of Super Creatine.[10]

13    That testing showed that when Super Creatine breaks down, it breaks down into

14    useless creatinine—not creatine.[11]  In addition, a study commissioned by VPX that

15    relied on Owoc for information, acknowledged that "the digestive and metabolic fate

16    of CLL [creatyl-L-leucine] is unknown," and described the possibility that "some

17    level of ingested CLL may be digested or catabolized into L-leucine and creatine" as

18    only "a hypothetical potential."[12]

19          66.    It is therefore clear that VPX and Owoc have no reasonable basis to

20    claim, and knew it was false to state, that "Super Creatine" practices the '466 patent.

21    Instead, they make that claim to deceive the public, and as part of a broader

22    marketing scheme to falsely hold VPX out as a company that is scientifically and

23    technologically superior to its competitors.

24    _____

25    [10] *See, e.g.*, Declaration of Liangxi Li in Support of Appeal Brief filed August 29, 2018 in Re-Exam Application No. 90/013,933, Exhibit C.

26    [11] *See id.*

27    [12] Reddeman, R., et al. "A Toxicological Assessment of Creatyl-L-Leucine," 37 INT. J. TOXICOLOGY 171-187 (2018) at 179; *see also id.* at 184 ("[I]t is unknown whether

28    CLL is digested to creatine in the digestive tract or absorbed and metabolized to creatine in vivo, and if so, to what extent.").

- 19 -

67.     But there's more: the patent upon which Owoc and VPX rely so heavily *has been finally rejected by the U.S. Patent Office during a reexamination proceeding*.  In February 2018, a panel of three patent examiners finally rejected all pending claims in the '466 patent as "obvious" in light of prior disclosures by other inventors, and in March 2019, the U.S. Patent Trial and Appeals Board affirmed the final rejection of all pending claims in the '466 patent.

68.     Yet that has not stopped VPX or Owoc from continuing to mark each can of BANG with the '466 patent number.  Even the flavors of BANG that were released *after* the Patent Office rejected the Super Creatine patent are marked with it. This is the back of the "FROSE ROSE" can, released February 14, 2019:



69.     Nor did the final rejection of the '466 patent's claims stop VPX from including the '466 patent in its marketing materials.  In December 2018, for example, Owoc posted on social media that his "[competitors] wouldn't have a clue as to what small changes to make in order to create an epic and brilliant tasting beverage innovation with cutting-edge patented ingredients like Super Creatine."  And on January 24, 2019, Owoc again referred consumers to "my patented super creatine."

70.     In fact, VPX and Owoc have continued to advertise the '466 patent today even after the patent's *final* rejection on March 5, 2019 by the U.S. Patent Trial

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

and Appeals Board.  On March 18, 2019, for example, Owoc advertised a BANG product as "fast, potent, effective, and delicious" and containing "☑Patented Super Creatine." And VPX's website continues to provide the following description of a BANG product: "The very definition of BANG® screams scientific BREAKTHROUGH! Infused with Patented water-stable SUPER CREATINE® — BANG® triggered a major PARADIGM SHIFT among the performance and bodybuilding authorities and has now become the most disruptive scientific innovation in the 30-year history of Sports Nutrition!"

71.    One informed consumer recently asked Owoc on Instagram:  "Really interested in the US Patent office canceling the Super Creatine patent. Tell me that's bullshit . . . "  Once again, when faced with a hard question, Owoc didn't respond.

*F.*     *VPX and Owoc Ignore Health and Safety Regulations*

72.    There's a reason VPX's health claims about its "magnificent invention" have stood out in the marketplace.  Other retailers refrain from making such claims because they're illegal.

73.    Congress and the FDA have enacted comprehensive protections governing the production and distribution of food.  21 U.S.C. § 301 *et seq.*   These laws and regulations are essential to protect the public.  VPX and Owoc not only ignore them, they have put their antipathy towards these regulations on the record. Following the defeat of a federal dietary supplement statute in 2010, Owoc posted on the VPX website: "The fact is that American consumers love their dietary supplements and want less, not more regulation. . . Therefore I declare all organizations and individuals who threaten the great Dietary Supplement Industry as UNAMERICAN! WE THE PEOPLE DEMAND AN END TO YOUR TOMFOOLERY!"

**1.     Super Creatine is Not "Generally Recognized as Safe"**

74.    One critical FDA regulation ensures that dangerous new chemicals can't make their way into foods.  *See* 21 CFR 170.30.  That regulation requires that any

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

substance deliberately added to food receive pre-clearance from the FDA *unless* that substance is "Generally Recognized as Safe" (GRAS) by qualified experts.  To qualify as GRAS, a product must be proven safe under the conditions of its intended use with the same quality and quantity of scientific evidence required to obtain FDA preclearance.  *Id.*

75.     Super Creatine is not GRAS.  Even the single study published about Super Creatine[13], which was paid for by VPX, is at best equivocal about Super Creatine's safety.[14]  The authors noted, for example, that the Super Creatine compound is a "novel ingredient" whose "metabolic fate . . . is unknown."  In other words, the study acknowledges that no one is sure how the Super Creatine compound reacts with the body.

76.     The authors also noted that "no formal toxicological, pharmacokinetic, or human studies on the combined compound have been published."  Therefore, the authors wrote that "[f]uture investigations of CLL in pharmacokinetics and nonrodent species would be valuable additions to the currently available research."  But the time for safety studies on "nonrodent species" was years ago—*before* VPX put Super Creatine in BANG.

77.     Moreover, the study uncovered several "statistically significant" adverse health effects associated with Super Creatine use.  Rodents exposed to the Super Creatine compound suffered, among other things, negative impacts on their "organ weight to brain ratio," "organ weight to body ratio," and blood composition (including decreases in "mean hemoglobin" and "platelet count").

---

[13] *See* Reddeman *supra* n. 5.

[14] GRAS status cannot be based on non-public information.  *See* Final Rule on GRAS Substances, 81 Fed. Reg. 54960, 54966 (Aug. 17, 2016) ("[T]here could be no basis for a conclusion of GRAS status if trade secret information (or other non-public information) is necessary for qualified experts to reach a conclusion that the notified substance is safe under the conditions of its intended use.").

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

### 2. VPX and Owoc Make Unlawful Health Claims

78. Other FDA regulations prevent consumers from being misled about their health. To that end, the FDA generally prohibits food manufacturers from claiming that their product can treat or reduce the risk of a disease or a health-related condition. *See* 21 C.F.R. § 101.14. The FDA provides a narrow exception to this general prohibition: it authorizes certain "Health Claims" when a clear scientific relationship has been proven between a substance and a disease. To illustrate, the FDA allows claims about Calcium and Osteoporosis, *see* 21 C.F.R. § 101.72, and about some vegetables and coronary heart disease, *see* 21 CFR § 101.77.

79. VPX and Owoc flout these regulations. Ignoring the fact that the FDA does not authorize Health Claims for creatine—much less "Super Creatine" (which does not include creatine)—Owoc and VPX repeatedly claim that Super Creatine can, among other things, "reverse Sarcopenia," help fight depression, and reverse "mental retardation."[15]

80. The FDA likewise does not authorize any Health Claims for Alzheimer's, Parkinson's, Huntington's, or dementia.[16] Those currently incurable diseases are entirely off limits.

81. In a recent update to consumers, the FDA described why Health Claims like the ones made by Owoc and VPX about Alzheimer's are both incorrect and insidious.[17] The FDA explained that products claiming to "prevent, treat, delay, or even cure Alzheimer's disease . . . fly in the face of true science." What that true

---

[15] *See* FDA, Authorized Health Claims That Meet the Significant Scientific Agreement (SSA) Standard (last accessed March 26, 2019), *available at* https://www.fda.gov/food/labelingnutrition/ucm2006876.htm (listing the approved Health Claims).

[16] *Id.*

[17] *See* FDA, Watch Out for False Promises About So-Called Alzheimer's Cures (last accessed March 26, 2019), *available at* https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm631046.htm.

(Continued...)

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

science shows is that "no cure or treatment has been shown to stop or reverse the progression of the disease."  Anyone claiming otherwise is a "scam artist" taking "advantage of people when they are most vulnerable and looking for a miracle cure."[18]

82.    Much of the FDA consumer update on Alzheimer's could have been written about Owoc and VPX:

| FDA Guidance | Owoc's Statement |
|---|---|
| "Question any product that also claims to be a 'scientific breakthrough.'" | "People, this is a magnificent invention! Remember, take your BANG drink!" |
| "Another red flag is that many of the claims made by these companies about the supposedly curative powers of their products are often not limited to Alzheimer's disease." | Super Creatine "increases cognition, it delays mental fatigue, it has antidepressant effects, and has antioxidant effects on the brain. *It has all these positive things!*" |
| Companies cannot promise to "reverse mental decline associated with dementia." | "We could possibly reverse [mental retardation] with these new creatine peptides that I've patented." |

### 3.    VPX and Owoc Make Unlawful Structure/Function Claims

83.    The FDA permits truthful and scientifically sound claims that describe the role of a dietary ingredient in the human body.  *See* 21 CFR § 101.93.  These are called "Structure/Function Claims" and do not require FDA preclearance.  For example, a manufacturer may lawfully state that "fiber maintains bowel regularity."

84.    The claims VPX and Owoc make about BANG fall outside these narrow guideposts.  Indeed, Owoc goes well beyond describing the connection between basic ingredients and their proven biological properties; instead, he makes specific claims about VPX's unique products.  He has stated, for example, that VPX "can

---

[18] *Id.*

5521379

1   possibly reverse [mental retardation] *with these new creatine peptides I've invented*."

2   Other claims flunk the Structure/Function standard because they are not backed by

3   sufficient scientific proof.   For example, VPX's claim that BCAAs are "potent brain

4   . . . fuel" is contradicted by all reputable science.[19]

5           *G.*    *VPX and Owoc Falsely Disparage Competing Energy Drinks*

6        85.     VPX and Owoc also falsely disparage their competitors while touting

7   BANG's false and misleading claims.  Again, VPX anchors their false statements in

8   "science."  Printed on every can of BANG is the following: "Make no Mistake –

9   BANG is not your stereotypical high sugar, life-sucking soda masquerading as an

10   energy drink!  High sugar drinks spike blood sugar producing metabolic mayhem

11   causing you to crash harder than a test dummy into a brick wall."

12        86.     In a May 10, 2017 press release entitled "*The BANG Revolution*," Owoc

13   claimed that BANG stands alone as the world's healthiest energy drink.   While

14   promoting BANG's purported—but false—health benefits, Owoc described other

15   energy drinks as "***health robbing***" and "***health destroying***."  Owoc claimed that,

16   with BANG, "no longer do people have to ***sacrifice their health*** for a great tasting

17   beverage."

18        87.     Owoc and VPX also repeatedly and misleadingly compare BANG—a

19   diet, no-sugar product—with their competitors' non-diet products.  Yet they never

20   disclose to consumers that their comparison involves unlike goods.  Through this

21   apples-to-oranges comparison, Owoc and VPX create the false impression that all

22   other energy drinks are high in sugar and calories.  This impression is false.

23        88.     In fact, more than one-third of Monster-branded energy drink offerings

24   are either low sugar or sugar free.  This includes two of Monster's best-selling and

25

26   ———————————

27   [19] *See* European Food Safety Authority, Scientific Opinion (last accessed March 26, 2019), *available at*

      https://efsa.onlinelibrary.wiley.com/doi/pdf/10.2903/j.efsa.2010.1790 at 3 ("[T]he

28   Panel concludes that a cause and effect relationship has not been established between the consumption of BCAA and improvement of cognitive function after exercise.").

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

most popular products: Monster Ultra Zero and Lo-Carb Monster Energy.

89.    VPX and Owoc's attacks on Monster have gotten more explicit with time.  In a recent VPX press release entitled "*BANG's JACK OWOC BLASTS MONSTER ENERGY INTO SUBMISSION!*," VPX included the following graphic:



VPX stacked the deck, opting against comparing itself to one of Monster's many no-sugar and no-calorie options, and instead cherry-picking a comparator that competes with different energy drinks entirely (full-sugar energy drinks).

90.    Most recently, Owoc posted an animated video on his Instagram account ("bangenergy.ceo") showing a can of BANG knocking over a can of Monster and declaring in baritone: "*CHECKMATE BITCH!*"  Owoc wrote a comment providing the purported basis for BANG's victory: that "HIGH SUGAR 'ENERGY DRINKS' . . . MAY INCREASE THE RISK OF BREAST CANCER, HEART ♡ DISEASE, OBESITY, BLOOD PRESSURE, METABOLIC SYNDROME, FATTY LIVER, DIABETES, REDUCED ENERGY ETC.!"[20]



91.    Again, none of Owoc's disparaging remarks about Monster are supported by science.  In fact, the only study Owoc cited states the exact opposite—that the consumption of Monster is "***not*** associated with adverse cardiovascular or renal effects in healthy young college-aged students."[21]

---

[20] https://www.instagram.com/p/BupPT4KHonI/

[21] Wilson, T., et al. Effects of Monster Energy Drink on Cardiovascular and Renal Functioning Young Adults. (2016) Int J Food Nutr Sci 3(2): 350-353.

5521379

92.     VPX and Owoc make other false distinctions between BANG and its competition.  For example, Owoc claimed that BANG is the "only" energy drink with "no artificial ingredients."  That's nonsense.  Almost every ingredient in BANG is artificial—including Super Creatine—and the BANG can itself states it contains "artificial flavors."

*H.*      *VPX and Owoc Have Deceived Consumers and Harmed Competitors*

93.     Owoc and VPX's efforts to mislead consumers have worked.  VPX started selling BANG in 2012.  Today, sales of BANG account for nearly 4% of the energy drinks sold in the United States.  Owoc claims that BANG is on track to generate more than $2 billion in sales in 2019.  And BANG experienced a 784.2% growth in sales in 2018 alone.

94.     Comments on VPX's own social media sites and other review websites show that BANG's rapid growth is a result of consumer deception, faux science, false patent marking, and false comparisons with Monster and other competitors.

95.     Some consumers are drawn in by VPX's representations that it is a "science" company.  One reviewer of the product wrote: "So if you're trying to work out to gain muscle, become super physically fit, do some hardcore workouts, Bang is going to be right for you.  *I mean it's made by a sports nutritional supplement company so that's what you can expect from it.*"  Another wrote: "This is not a normal energy drink like monster or red bull.  This is a pre-workout system."  Another recommended BANG because it was supported by "*Real Science*" and is "way better for you than *any other energy drink* on the market."  Countless others parrot Owoc in stating that they choose BANG for the "overall healthiness compared to *all* the other energy drinks out there."

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

96.     Given VPX and Owoc's emphasis on Super Creatine, other consumers are naturally drawn to the product thinking that it contains significant amounts of real creatine.  For example, consumers have said the following about BANG:

- "Want some creatine? Get a bang."
- "It's the best creatine I ever had from the bottom of my heart."
- "Is there really any benefits to Bang over Monster? . . . Bang has Super Creatine."
- "They are packed full of creatine so they make a great preworkout drink."
- "I like this product as a pre workout drink for the gym.  The creatine helps with pumps, gives good energy and have great lifts when taking it."
- "[I]t acts as my creatine supplement too!"
- "I noticed the 'Super-Creatine' around the rim lol I normally take a more traditional pre workout but found these on sale so I figured I'd try them."
- "The creatine in there is actually something very special . . . It is the world's only water stable creatine. . . . It also has a fatty acid chain that makes it easier to cross the blood brain barrier.  The focus of the super creatine is not for muscle function, but for cognition . . . by combining this form of creatine with creatine, it works synergistically for mental focus."
- "They add BCAAs plus something called Super Creatine to this formula so you can feed your muscles. Creatine in a Ready to Go Drink is a big deal because creatine usually cannot survive (stay potent) in water until BANG patented their Super Creatine."

Each and every one of these consumers has been deceived.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

97.    VPX's misconduct has also distorted the retail market.  One online retailer recently announced that it would not carry Monster's performance energy drink because it did not contain "Super Creatine."  That retailer issued the following statement about its decision:

## WHAT IS THE BIGGEST DIFFERENCE?

The new Monster Reign Energy Drink is comparable to VPX Bang Energy, but what is the biggest difference?

**SUPER CREATINE**

That is the number one difference between Bang Energy and Monster Reign Energy Drink. Unfortunately, we will not be selling Monster's Energy Drink but we do have all the flavors of Bang Energy! Try it now!

Buy Bang Energy!

98.    It is therefore clear that VPX's false claims are doing damage in the marketplace.  Or you can just take Owoc's word for it.  He wrote that "Monster has no answer to contend with Jack Owoc's Patented Super Creatine – perhaps the most significant and prestigious invention in the history of the beverage industry."  Put another way, Owoc himself believes that BANG is succeeding because of Super Creatine.

I.    *VPX and Owoc Use "Guerilla Tactics" to Interfere with Monster's Contractual Rights*

99.    Owoc and VPX's illegal tactics are not limited to their marketing, advertising, and labelling.  They have also instructed their representatives across the country to engage in "guerilla tactics" to frustrate the normal competitive process.

100.    One critical way that VPX and Owoc have short-circuited the normal competitive process is by stealing in-store shelf space from competitors.  In the beverage industry, shelf-space is often a matter of contract between retailers and manufacturers.  So when a distributor for Brand X goes to re-stock Store Y, he knows exactly where to place his product in Store Y's cooler.  He also knows where

he cannot put his product.  Stores circulate diagrams of whose drinks go where—called "planograms"—to manufacturers and distributors.

101.   It can take a long time to earn prime space in the planogram.  To maximize sales, stores want the best products in the best shelf space.  Thus, products placed at eye level—the location most likely to be noticed by a consumer—are those with track records of success.

102.   Product placement is not only reflective of consumer preference, but also influences it.  An eye-level placement is an important signal to a consumer that a given product is proven and popular.  And at a more basic level, eye-level placement ensures that a product will be seen.  Because of these dynamics, shelf-space location materially impacts a product's sales.

103.   This all creates powerful incentives for a bad actor to steal a competitor's contractual right to shelf space, and that is exactly what VPX has done.  According to former VPX employees, VPX has directed BANG representatives to displace competing energy drinks—primarily Monster—from their contractually guaranteed shelf space and replace it with BANG.  Those BANG representatives were also required to document the theft with photographs, which were then distributed widely within VPX.  Indeed, VPX employees were *rewarded* for taking part in this illegal conduct.

104.   According to a former VPX employee, Monster had the biggest target on its back.  Monster has contracts for in-store shelf space with some of the largest retailers in the United States, including Walmart, Circle K, AMPM, and American Gas & Oil, as well as numerous local retailers.  These contracts cost Monster more than $90 million annually.  Not only does Monster have premier shelf space at these locations, it also has the most shelf space to steal because of its popularity.

105.   Owoc has essentially admitted to orchestrating this scheme.  He posted on social media: "In life when they tell you there's no shelf space – make your own shelf space! When multibillion-dollar competitors pay for space *retaliate with a*

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

1   *vengeance*."  Later, he posted a picture of a retail store and commented: "It can be a

2   ***hostile takeover*** or we can do things nicely – either way the time has cometh upon us

3   to assume control."

4        106.   Across the country, Monster representatives have observed the effects of

5   VPX's tactics.  Based on Monster's preliminary investigation, VPX's concerted

6   effort to steal Monster's space has been observed almost daily for several months

7   from coast to coast in the contiguous United States, including in Arkansas,

8   California, Delaware, Florida, Illinois, Louisiana, Maryland, Michigan, Minnesota,

9   Missouri, New Mexico, Nevada, New Hampshire, Ohio, South Carolina, and

10  Texas.[22]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  _____

[22] In one example, a Monster representative discovered that VPX had replaced half of
27  a shelf of Monster product with BANG.  After asking a store employee for
    information, the Monster representative learned that VPX had transferred all of the
28  displaced Monster product to a storage room and put them in a cardboard box labeled
    "expired," even though the product was fresh and not expired.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

107. Below are two examples, where VPX snuck BANG into cooler space reserved exclusively for Monster products:





PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

108.   VPX also designed a cover up for this theft.  According to a former employee, VPX told BANG representatives not to worry about the propriety of these actions, since any violation would be blamed on the store manager.

109.   VPX and Owoc are in line to profit from this rule breaking.  The shelf space that they stole from Monster and other competitors has both short-term and long-term payoffs.  In the short-term, that shelf space converts into increased brand awareness, sales, and profits—all of which have enabled VPX's ill-gotten growth.  In the long-term, VPX can parlay their artificial sales numbers into other benefits.

110.   Planograms, for example, are re-negotiated between retailers and manufacturers annually based largely on the prior year's sales numbers.  Because VPX elbowed its way into significant sales over the last year, VPX is likely to gain a toehold in retail stores across the country when the planograms are re-negotiated. VPX has similarly used its artificial sales numbers to get picked up by a major distribution company—which will compound the effects of VPX's unfair competition for years to come.

### J.       VPX and Owoc Pirate Monster's Trade Secrets

111.   Shelf space isn't the only thing that VPX and Owoc steal from competitors.  They steal trade secrets too.

112.   Monster's pricing model—one of its most valuable trade secrets—is the industry's gold standard.  Because of Monster's advanced supply-chain strategies and sophisticated analytics, its pricing data is extremely valuable.  Monster protects this data as confidential and diligently safeguards it from misappropriation.

113.   VPX and Owoc have targeted this valuable data with precision.  They have designed to steal Monster's pricing information by offering Monster employees plum jobs, insisting that they bring Monster's confidential pricing data to VPX as a precondition of employment, and falsely assuring those employees that it is okay to do so.

114.   In fact, VPX has offered Monster employees exorbitant salary increases,

demonstrating that VPX is paying for not just a new employee but also all of the Monster information, including its confidential and proprietary data, that the employee can provide.

115. VPX recently attempted this very scheme. Late last year, a long-time Monster employee was contacted by Pat McMahon, VPX's National Account Manager for the BANG product. McMahon's recruiting efforts came with a catch: the Monster employee would be required to steal Monster's pricing information and bring it to VPX.

116. The Monster employee told McMahon that he had crossed the line and halted the conversation. McMahon insisted that such behavior was acceptable, and in the process admitted that he himself stole Red Bull's pricing information when he moved from Red Bull to VPX earlier in 2018. Unpersuaded, the Monster employee told McMahon that he would never betray an employer like that. McMahon then ended the conversation, reaffirming to the Monster employee that stealing Monster's pricing data was a non-negotiable prerequisite.

117. While that one attempt to steal Monster's trade secrets was stymied, other attempts by VPX appear to have worked. Indeed, Monster has confirmed that at least one of its former employees has misappropriated its trade secrets for VPX's benefit.

118. That former employee's misappropriation was multi-faceted. He interviewed at VPX on December 4, 2018 and immediately thereafter began forwarding several commercially sensitive Monster e-mails to his personal address. Before leaving Monster, he loaded five USB drives with additional Monster proprietary and confidential data, including valuable pricing-information trade secrets. And upon his departure, in violation of Monster policy, the employee failed to return his Monster-issued devices—which contained additional commercially sensitive and confidential information—despite representing that he had done so.

119. That former Monster employee has exploited Monster's confidential

- 35 -

5521379

1    data while working at VPX.  After he began work at VPX, his Monster-issued device

2    has been active and in use.  Moreover, a metadata analysis has shown that he

3    continued to open the stolen files on the USB drives after he departed Monster and

4    *even after* he began working at VPX.

5         *K.*     *VPX and Owoc's Illegal Acts Irreparably Harm Monster*

6         120.   By engaging in the false advertising, intentional interference with

7    Monster's contractual rights, and other illegal acts described above, VPX has sold

8    more BANG and taken more market share from competitors—primarily Monster—

9    than it otherwise would have been able to realize.  In 2018 alone, BANG experienced

10   a 784.2% growth in sales.  And a national publication recently reported that BANG's

11   sales increased nearly 900% from mid-February to mid-March 2019, while Monster

12   experienced a 1.7% decrease in sales.  Even according to Owoc, the stakes are

13   substantial and the timing is urgent.  As he recently proclaimed, "Bang Energy is

14   positioned to potentially take over a billion dollars in market share from Monster in

15   2019."

16                       **FIRST CAUSE OF ACTION**

17         **(Violation of Section 43(a) of the Lanham Act, 15 § U.S.C.)**

18         121.   Monster incorporates all other allegations in this complaint.

19         122.   Defendants have made false and misleading statements of fact about

20   BANG energy drinks.  Those statements misrepresent the nature, characteristics,

21   and/or qualities of BANG and are expressly false, impliedly false, or both.

22   Defendants have misrepresented the health benefits of BANG.  BANG cannot, for

23   instance, reverse "mental retardation" or treat Alzheimer's.  They have also deceived

24   consumers about BANG's contents.  For example, BANG does not contain *any*

25   creatine, much less some "super" form of it, or provide any of the health benefits

26   associated with creatine.

27         123.   Defendants have knowingly induced and/or caused third parties—

28   including retailers—to engage in additional acts of false advertising by repeating

1    Defendants' false statements.

2        124.   Defendants knew or should have known that their advertising activities

3    were false, misleading, and deceptive.

4        125.   Defendants' false and misleading statements have deceived and have the

5    tendency to deceive a substantial segment of their intended audience about matters

6    material to purchasing decisions.  Defendants' violations have caused harm to the

7    public and, unless restrained, will further damage the public.

8        126.   Defendants' BANG energy drinks are offered in interstate commerce.

9    Similarly, Defendants' false and misleading statements were and are made in

10   commercial advertising and promotion in interstate commerce.

11       127.   Defendants' violations have proximately harmed Monster.  As a result

12   of Defendants' violations, Monster has suffered and will continue to suffer damage

13   to its business and goodwill.  Monster has and will lose sales and profits and incur

14   increased advertising and marketing costs.

15       128.   Monster's immediate, irreparable injuries have no adequate remedy at

16   law, and Monster is entitled to injunctive relief and up to three times its actual

17   damages and/or an award of Defendants' profits, as well as costs and Monster's

18   reasonable attorney fees under 15 U.S.C. §§ 1116–17.

19                    **SECOND CAUSE OF ACTION**
20   **(Violation of California's Unfair Competition Law ("UCL") under
     California Business and Professions Code §§ 17200, *et seq.*)**

21       129.   Monster incorporates all other allegations in this complaint.

22       130.   California's UCL provides a private right of action against any person

23   who engages in "unfair competition."  Any person who has "suffered injury in fact

24   and has lost money or property as a result of the unfair competition" may bring suit.

25   The UCL has three "prongs," prohibiting any "unlawful," "fraudulent" or "unfair"

26   business act or practice.

27       131.   Defendants have violated the "unlawful prong" because their conduct

28   violates several state and federal laws and regulations.  Defendants' marketing of

                                     - 37 -

1   BANG violates: (1) California's False Advertising Law; (2) the Federal Lanham Act;

2   (3) the Federal Food, Drug, and Cosmetic Act ("FDCA") and implementing

3   regulations; and (4) California's Sherman Food, Drug, and Cosmetic Law, which

4   incorporates the FDCA labelling law into California law.

5         132.   Defendants have violated the "fraudulent prong" by misleading the

6   public.  Defendants have systematically overstated the health benefits of BANG.

7   BANG cannot, for instance, reverse "mental retardation" or treat Alzheimer's.  They

8   have also deceived consumers about BANG's contents.  For example, BANG does

9   not contain *any* creatine, much less some "super" form of it, or provide any of the

10  health benefits associated with creatine.

11        133.   Defendants have violated the "unfair prong" because their conduct

12  violates public policy.  As embodied in California's False Advertising Law and

13  Sherman Law, California has a strong policy in favor of truthful advertising—

14  particularly when public health is on the line.  Defendants' conduct also violates this

15  prong because it is unethical and unscrupulous.  Defendants have implemented a

16  scheme to harm competitors by making false claims about competing products and

17  stealing in-store shelf space.

18        134.   Defendants' unlawful, unfair, and fraudulent practices have caused and

19  continue to cause substantial and irreparable competitive and commercial injury to

20  Monster.  Monster has lost and will continue to lose sales, profits, goodwill, and

21  advertising as a result of Defendants' conduct.  Monster also has incurred and will

22  incur increased advertising and marketing costs to counteract defendants' unlawful

23  conduct.

24        135.   These substantial injuries are not outweighed by any countervailing

25  benefits to consumers, particularly because of California's policy in favor of truthful

26  advertising.

27        136.   Unless restrained, Defendants will continue to cause further competitive

28  and commercial harm to Monster.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

137.   Monster has no adequate remedy at law and is entitled to injunctive relief and restitution under Section 17203 of the California Business and Professions Code.

### THIRD CAUSE OF ACTION
**(Violation of California's False Advertising Law ("FAL") under California Business and Professions Code §§ 17500, *et seq.*)**

138.   Monster incorporates all other allegations in this complaint.

139.   California's FAL prohibits "untrue or misleading" statements in "any advertising device . . . or in any other manner or means whatever, including over the internet" concerning "any circumstance or manner of fact" about a product.

140.   Defendants advertise in the state of California and this District with the intent to increase the sale of BANG in California and to induce the public into purchasing BANG.

141.   Defendants conduct violates the FAL.  They have made false and misleading descriptions of fact about BANG energy drinks.  Those statements misrepresent the nature, characteristics, and/or qualities of BANG and are expressly false, impliedly false, or both.  Defendants have systematically overstated the health benefits of BANG.  BANG cannot, for instance, reverse "mental retardation" or treat Alzheimer's.  They have also deceived consumers about BANG's contents.  For example, BANG does not contain *any* creatine, much less some "super" form of it, or provide any of the health benefits associated with creatine.

142.   Defendants knew or should have known that their advertising activities are false, misleading, and deceptive.

143.   Defendants' false and misleading statements have deceived and have the tendency to deceive a substantial segment of their intended audience about matters material to purchasing decisions.

144.   Defendants' violations have proximately harmed Monster.  As a result of Defendants' violations, Monster has suffered and will continue to suffer damage

1  to its business and goodwill.  Monster has lost and will continue to lose sales and

2  profits and incur increased advertising and marketing costs.

3      145.   Defendants have acted with oppression, fraud, or malice, entitling

4  Monster to an award of punitive damages.

5      146.   Defendants have acted willfully, in bad faith, and with malice.  Unless

6  restrained, Defendants will continue to cause further irreparable competitive and

7  commercial injury to Monster.

8      147.   Monster has no adequate remedy at law and is entitled to injunctive

9  relief and restitution pursuant to Section 17203 of the California Business and

10  Professions Code.

11                    **FOURTH CAUSE OF ACTION**

12                         **(Trade Libel)**

13      148.   Monster incorporates all other allegations in this complaint by reference.

14      149.   Defendants have published false statements that disparage the quality of

15  Monster's products.  Defendants have claimed, for example, that Monster drinks are

16  "health destroying," have "zero effect on performance," and increase the risk of

17  breast cancer and heart disease.  And they have published false materials that mislead

18  consumers into believing that all Monster drinks are, among other things, "a high

19  sugar, life-sucking soda."

20      150.   Defendants knew or should have known that their statements were false

21  and would be relied on by consumers in making purchasing decisions.  They knew or

22  should have known that consumers would reasonably understand their statements to

23  mean that Monster drinks are inferior to BANG.

24      151.   As a proximate result of Defendants' false statements and consumers'

25  reliance thereon, Monster has suffered direct financial harm. Monster has suffered

26  and will continue to suffer special damages in the form of lost sales and profits, loss

27  of goodwill, and increased advertising and marketing costs.

28

## FIFTH CAUSE OF ACTION
### (Intentional Interference with Contractual Relations )

152.   Monster incorporates all other allegations in this complaint.

153.   Monster has contractual relations with retailers of energy drinks across the United States, including Walmart, Circle K, AMPM, and American Gas & Oil, as well as with individual stores affiliated with brands like Shell, Chevron, and Harman Star Mart.  These contracts determine what shelf space Monster is entitled to at each retailer.

154.   At all relevant times, Defendants knew or should have known of these contracts.  It is well known in the beverage industry that shelf space is allocated by contract.  Furthermore, the in-store diagrams showing the placement of products—called planograms—are often circulated to all manufacturers and distributors and posted inside retail locations.

155.   Defendants intentionally and improperly have interfered and continue to interfere with Monster's contractual relations with retailers.  They have instructed employees to engage in the "guerilla tactic" of unlawfully converting Monster's contractually guaranteed shelf space for Defendants' own use.

156.   There is no legitimate justification for Defendants' tortious interference with Monster's contractual relations with retailers.

157.   As a proximate result of Defendants' interference, Monster has suffered and will suffer irreparable harm and monetary damages by, among things, (i) losing revenue and profits, (ii) losing sales of its products, (iii) damage to its reputation and goodwill, and (iv) damage to its relationships with retailers.

158.   Defendants have acted willfully, in bad faith, with malice, or with the intent to oppress Monster.  Monster is entitled to injunctive relief, compensatory damages, and punitive damages.

## SIXTH CAUSE OF ACTION
### (Intentional Interference with Prospective Economic Relations)

159.   Monster incorporates all other allegations in this complaint.

- 41 -

5521379

160.   Monster has contractual relations with retailers of energy drinks across the United States, including Walmart, Circle K, AMPM, and American Gas & Oil, as well as with individual stores affiliated with brands like Shell, Chevron, and Harman Star Mart.  These contracts determine what shelf space Monster is entitled to at each retailer.

161.   At all relevant times, Defendants knew or should have known of these contracts and Monster's reasonable business expectancy of the economic benefits arising from such contracts. It is well known in the beverage industry that shelf space is allocated by contract.  It is also well known that these contracts are re-negotiated annually based on the prior year's sales.  Furthermore, the in-store diagrams showing the placement of products—called planograms—are often circulated to all manufacturers and distributors and posted inside retail locations.

162.   Defendants intentionally and improperly have interfered and continue to interfere with Monster's economic relations with retailers.  They have instructed employees to engage in the "guerilla tactic" of unlawfully converting Monster's contractually guaranteed shelf space for Defendants' own use.

163.   There is no legitimate justification for Defendants' tortious interference with Monster's economic relations with retailers.

164.   As a proximate result of Defendants' interference, Monster has suffered and will suffer irreparable harm and monetary damages by, among things, (i) losing revenue and profits, (ii) losing sales of its products, (iii) damage to its reputation and goodwill, and (iv) damage to its relationships with retailers.

165.   Defendants have acted willfully, in bad faith, with malice, or with the intent to oppress Monster.  Monster is entitled to injunctive relief, monetary damages to compensate for the loss benefits of its reasonable business expectancies, consequential damages caused by Defendants' intentional interference, compensatory damages, and punitive damages.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

## SEVENTH CAUSE OF ACTION
### (Conversion)

166.   Monster incorporates all other allegations in this complaint.

167.   At all relevant times, Monster had and continues to have a property interest in its contractual right to occupy shelf space in certain retail stores across the country.

168.   Without Monster's consent, Defendants have intentionally and substantially interfered with Monster's property right.  Defendants have unilaterally taken possession of Monster's shelf space, prevented Monster from accessing it, and used it for their own product.

169.   As a result of Defendants' interference, Monster has suffered and will suffer irreparable harm and monetary damages by, among things, (i) losing revenue and profits, (ii) losing sales of its products, (iii) damage to its reputation and goodwill, and (iv) damage to its relationships with retailers.

170.   Defendants have acted with oppression, fraud, or malice, entitling Monster to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Violation of California Penal Code Section 496)

171.   Monster incorporates all other allegations in this complaint.

172.   California Penal Code section 496 provides that "[e]very person who . . . receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, . . . or aids in concealing . . . any property from the owner, knowing the property to be so stolen or obtained," is liable to the property owner for "three times the amount of the actual damages, . . . cost of suit, and reasonable attorney's fees."

173.   At all relevant times, Monster had and continues to have property interests in its contractual right to occupy shelf and cooler space in certain retail stores across the country.

5521379

174.   As alleged herein, Defendants have knowingly stolen or taken Monster's property.  Defendants have also concealed property from Monster that they knew had been stolen from Monster.  After stealing Monster's property, Defendants schemed to prevent Monster from learning of the theft by blaming store managers.

175.   Defendants have used Monster's property for Defendants' benefit. Defendants did so with the intent to not only take away Monster's contractual rights, but also to divert Monster's sales and goodwill to Defendants.

176.   As a result, Monster has suffered and will suffer irreparable harm and monetary damages by, among things, (i) losing revenue and profits, (ii) losing sales of its products, (iii) damage to its reputation and goodwill, and (iv) damage to its relationships with retailers.

177.   Defendants acted with oppression, fraud, malice, and in conscious disregard of Monster's property rights.  Monster is entitled to compensatory damages, treble damages under Penal Code section 496(c), and punitive damages.

### NINTH CAUSE OF ACTION
### (False Patent Marking under 35 U.S.C § 292)

178.   Monster incorporates all other allegations in this complaint.

179.   35 U.S.C. § 292(a) and (b) provide that "[w]hoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word 'patent' or any word or number importing that the same is patented, for the purpose of deceiving the public" shall be liable to "[a] person who has suffered a competitive injury as a result" for "damages adequate to compensate for the injury."

180.   Defendants have claimed and continue to claim that the "Super Creatine" in BANG practices the '466 patent, both by marking BANG cans with the patent number and by referencing the patent in BANG-related advertising.

181.   The claim that "Super Creatine" practices the '466 patent is false: "Super Creatine" is not "biologically active," as required by the patent claims.

PLAINTIFF MONSTER ENERGY COMPANY'S FIRST AMENDED COMPLAINT

5521379

182.   At all relevant times, Defendants have had no basis for claiming that "Super Creatine" is "biologically active," and instead made those claims for the purpose of deceiving the public.

183.   As a result of Defendants' false claims, Monster has suffered and will suffer competitive injury including: (i) lost revenue and profits, (ii) lost sales of its products, and (iii) damage to its reputation and goodwill.

## TENTH CAUSE OF ACTION
### (Violation of the California Uniform Trade Secrets Act
### Under Cal. Civ. Code § 3426 *et seq.*)

184.   Monster incorporates all other allegations in this complaint.

185.   Monster's has developed numerous valuable and protectable trade secrets, including its confidential and proprietary pricing information and data.

186.   These trade secrets, including but not limited to Monster's confidential and proprietary pricing information and data, derive independent economic value from not being generally known to the public or to other persons who can obtain value from their disclosure or use.

187.   Monster undertakes reasonable efforts—such as the use of employee confidentiality agreements and the implementation of security technology—to maintain the secrecy of its trade secrets.

188.   Monster permits use of these trade secrets only for authorized business purposes by authorized employees. Any other use is not permitted.

189.   Defendants willfully and intentionally misappropriated Monster's trade secrets by requiring former Monster employees to bring these trade secrets to VPX as a precondition of employment.  Moreover, Defendants misled these former Monster employees by falsely assuring them that it was permissible to steal Monster's trade secrets

190.   Upon information and belief, Defendants have used Monster's trade secrets to, among other things, improve their pricing analytics and supply-chain strategies, thus causing Monster a competitive harm.

191.   Defendants have acted with oppression, fraud, or malice, entitling Monster to an award of punitive damages.

### ELEVENTH CAUSE OF ACTION
**(Violation of the Defend Trade Secrets Act ("DTSA")**
**under 18 U.S.C. § 1836 *et seq.*)**

192.   Monster incorporates all other allegations in this complaint.

193.   Monster has developed numerous valuable and protectable trade secrets, including its confidential and proprietary pricing information and data.

194.   These trade secrets, including but not limited to Monster's confidential and proprietary pricing information and data, derive independent economic value from not being generally known to the public or to other persons who can obtain value from their disclosure or use.

195.   Monster undertakes reasonable efforts—such as the use of employee confidentiality agreements and the implementation of security technology—to maintain the secrecy of its trade secrets.

196.   Monster permits use of these trade secrets only for authorized business purposes by authorized employees. Any other use is not permitted.

197.   Defendants willfully and intentionally misappropriated Monster's trade secrets by requiring former Monster employees to bring these trade secrets to VPX as a precondition of employment.  Moreover, Defendants misled these former Monster employees by falsely assuring them that it was permissible to steal Monster's trade secrets

198.   Upon information and belief, Defendants have used Monster's trade secrets to, among other things, improve their pricing analytics and supply-chain strategies, thus causing Monster a competitive harm.

199.   Defendants have acted with oppression, fraud, or malice, entitling Monster to an award of punitive damages.

5521379

**TWELFTH CAUSE OF ACTION**
**(Violation of the Computer Fraud and Abuse Act ("CFAA")**
**18 U.S.C. § 1030 *et seq.*)**

200.   Monster incorporates all other allegations in this complaint.

201.   Defendants, by and through their current employees, have intentionally accessed and/or attempted to access Monster's computers, which were used in or affected interstate and/or foreign commerce or communication.  Defendants did so without Monster's authorization and/or by exceeding any authorization as was granted.

202.   As a result of Defendants' unauthorized access, they have furthered a scheme to obtain Monster's trade secrets and have in fact gained access to Monster's valuable trade secrets.

203.   Defendants have gained—and Monster has lost—more than $5,000 in value since the time of Defendants' unauthorized access, which occurred within a year of the filing of this complaint.

204.   Defendants have acted with oppression, fraud, or malice, entitling Monster to an award of punitive damages.

**PRAYER FOR RELIEF**

Monster requests the following relief:

1.  A preliminary and permanent injunction barring Defendants from engaging in the unlawful conduct described above;

2.  Judgment in favor of Monster and against Defendants on all claims;

3.  Compensatory and punitive damages to be proven at trial;

4.  A declaration that this is an "exceptional case" due to the willful nature of Defendants' unlawful conduct, and awarding damages and attorneys' fees and costs to Monster pursuant to 15 U.S.C. § 1117, and any other damages including treble damages and attorneys' fees to the full extent allowable under the law;

5.  Treble damages, costs of suit, and attorneys' fees pursuant to California

5521379

1    Penal Code section 496(c);

2    6. An injunction of both actual and threatened misappropriation of Monster's

3    trade secrets pursuant to California Civil Code § 3426.2(a).

4    7. Reasonable costs and expenses incurred in this action, including attorneys'

5    fees and costs of the suit, to the full extent permitted by law;

6    8. Pre-judgment interest on all such damages, monetary, or otherwise; and

7    9. All other relief, legal or injunctive, as this Court finds appropriate.

8    <u>**JURY DEMAND**</u>

9    Monster demands a trial by jury on all claims for which trial by jury is proper.

10

11   Dated:  April 3, 2019                    Respectfully submitted,

12                                            **HUESTON HENNIGAN LLP**

13

14                                            By:  */s/ John C. Hueston*

15                                               John C. Hueston
16                                               Moez M. Kaba
                                                 Steven N. Feldman
17                                               Attorneys for Plaintiff
                                                 MONSTER ENERGY COMPANY,
18                                               a Delaware Corporation

19

20

21

22

23

24

25

26

27

28