UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 18-1882 JGB (SHKx)** | Date | June 17, 2019 |
| Title | *Monster Energy Company v. Vital Pharmaceuticals, Inc. et al.* | | |

Present: The Honorable     JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**   Order (1) DENYING Plaintiff's Motion for Preliminary Injunction (Dkt. No. 67) and (2) GRANTING Plaintiff's Motion for Leave to File Documents Under Seal (Dkt. No. 70) (IN CHAMBERS)

Before the Court is Plaintiff Monster Energy Company's ("Monster") motion for preliminary injunction, ("Motion," Dkt. No. 67), and motion for leave to file documents under seal, (Dkt. No. 70). The Court heard oral argument on Plaintiff's motions on June 17, 2019. After considering the parties arguments and written submissions, the Court DENIES Plaintiff's motion for preliminary injunction and GRANTS Plaintiff's motion for leave to file documents under seal.

## I.   BACKGROUND

Plaintiff filed a complaint on September 4, 2018, (Dkt. No. 1), and a First Amended Complaint on April 3, 2019, ("FAC," Dkt. No. 61.) The FAC alleges causes of action for (1) violation of the Lanham Act; (2) unfair competition; (3) false advertising; (4) trade libel; (5) intentional interference with contractual relations; (6) intentional interference with prospective economic advantage; (7) conversion; (8) larceny; (9) false patent marking; (10) violation of the California Uniform Trade Secrets Act; (11) violation of the Defend Trade Secrets Act; and (12) violation of the Computer Fraud and Abuse Act.

On April 17, 2019, Defendant John H. Owoc filed a motion to dismiss all claims against him for lack of personal jurisdiction, (Dkt. No. 79), and Defendants Vita Pharmaceuticals, Inc. ("VPX") and Owoc jointly moved to dismiss the FAC for failure to state claim, (Dkt. No. 81), and to strike portions of the FAC, (Dkt. No. 80). On May 20, 2019, the Court ruled on these

motions, denying Owoc's motion to dismiss for lack of personal jurisdiction, denying Defendants' motion to strike portions of the FAC, and granting in part and denying in part Defendants' motion to dismiss for failure to state claim. ("MTD Order," Dkt. No. 95.)  The Court dismissed Plaintiff's cause of action for trade libel with leave to amend and dismissed Plaintiff's causes of action for conversion, larceny, and false patent marketing without leave to amend.  (Id.)

Plaintiff filed this Motion on April 10, 2019.  (Dkt. No. 67.)  Defendants filed their opposition to the Motion on May 24, 2019.  ("Opposition," Dkt. No. 97.)  Plaintiff submitted its reply on June 3, 2019.

## II.  LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  "A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right."  Munaf v. Geren, 553 U.S. 674, 690 (2008) (citations omitted).  Where the balance of hardships tips sharply in the plaintiff's favor and the plaintiff has demonstrated a likelihood of irreparable harm, however, the plaintiff need only show that "serious questions" exist as to success on the merits.  See Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).

Under the Ninth Circuit's "sliding scale" approach to preliminary injunctions, the four "elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another."  Alliance For The Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).  Thus, "a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'"  Id. at 1131–32 (internal quotation omitted).  Put differently, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements [likelihood of irreparable injury and public interest] of the *Winter* test are also met."  Id. at 1132.

## III.  DISCUSSION

### A. Evidentiary Issues

#### 1. Plaintiff's Motion to Seal

On April 11, 2019, Plaintiff filed a motion for leave to file portions of its exhibits in support of its motion for a preliminary injunction under seal and for those portions to be maintained for outside attorneys' eyes only.  (Dkt. No. 70.)  Defendants opposed this motion on April 15, 2019.  (Dkt. No. 74.)  On April 18, 2019, the Court granted Plaintiff's ex parte

application for a temporary protective order prohibiting the disclosure to VPX's in-house counsel of documents subject to its sealing motion pending a ruling on its sealing motion. (Dkt. No. 84.)

There is a strong presumption of public access to judicial records and documents. Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 n. 7 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."); Pintos v. Pac. Creditors Ass'n, 605 F.3d 665, 677 (9th Cir. 2010). The presumption applies to pleadings filed with the court and extends to discovery material attached to those pleadings. Foltz v. State Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1134 (9th Cir. 2003). Although a request to seal judicial records offends the presumption in favor of public access, the right of access "is not absolute." Id. at 1135. A party seeking to file documents under seal must articulate compelling reasons supported by specific factual findings that "outweigh the general history of access and the public policies favoring disclosure . . . ." Kamakana v. City and Cty. of Honolulu, 447 F.3d 1172, 1178-79 (9th Cir. 2006).

Plaintiff seeks to seal information falling into two categories: (1) non-public financial information of Monster and third-parties and (2) non-public strategic and business-making information of Monster and third-parties. Courts routinely grant motions to seal information in cases where a court record might be used for "improper purposes such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." Kamakana, 447 F.3d at 1179 (internal quotations omitted). Even where records do not include trade secrets, they may still be sealed where they could be a "source[] of business information that might harm a litigant's competitive standing." Ctr. for Auto Safety v. Chrysler Grp., LLC, 809 F.3d 1092, 1096 (9th Cir. 2016). Courts also routinely find that non-public financial, pricing, and strategy information could harm litigants' competitive standing and grant motions to seal such information. See Rodman v. Safeway Inc., 2015 WL 13673842, at *2 (N.D. Cal. Aug. 4, 2015) (granting "narrowly tailored" request to seal nonpublic information discussing pricing strategy, business decision-making, customer research, and financial records); SteppeChange LLC v. VEON Ltd., 354 F. Supp. 3d 1033, 1045 (N.D. Cal. 2018) (granting motion to seal documents containing nonpublic pricing terms). In such circumstances, district courts have "broad latitude to grant protective orders to prevent disclosure of materials for many types of information, including, but not limited to, trade secrets or other confidential research, development, or commercial information." Phillips ex rel. Estates of Byrd v. Gen. Motors Corp., 307 F.3d 1206, 1211 (9th Cir. 2002). The Court finds that Plaintiff has presented compelling reasons to seal the redacted portions of these documents.

Plaintiff also seeks an order prohibiting the disclosure of the sealed information to anyone other than Defendants' outside counsel. The Court previously granted Plaintiff's ex parte application for a temporary restraining order seeking the same relief pending a ruling on this motion to seal. (Dkt. No. 84.) In that order, the Court found that such protection was warranted given allegations that Defendants have previously attempted to steal Monster's proprietary information, including confidential pricing data. (Id. at 1.) Defendants have not brought to the Court's attention any changed circumstances which would warrant lifting this protective order. In light of the fact that Plaintiff and VPX are direct competitors and that Plaintiff has made plausible allegations that Defendants attempted to steal its confidential pricing data, sharing

these documents with in-house counsel would pose an unnecessarily high risk of inappropriate disclosure of these documents. See Intel Corp. v. VIA Techs., Inc., 198 F.R.D. 525, 529 (N.D. Cal. 2000); U.S. Steel Corp. v. United States, 730 F.2d 1465, 1468 (Fed. Cir. 1984).  Further, while Defendants previously took the position that without disclosure they would be unable to effectively oppose Plaintiff's motion for a preliminary injunction, upon review of Defendants' briefing and evidence in opposition to Plaintiff's Motion the Court sees no evidence that Defendants' ability to defend themselves in this case has been impeded.  The therefore Court finds that maintaining this protective order in place is warranted.

Plaintiff's motion for leave to file portions of its exhibits in support of its motion for a preliminary injunction under seal and for those portions to be maintained for outside attorneys' eyes only is GRANTED.

### 2. Evidentiary Objections

Both parties have raised numerous evidentiary objections to documents and declarations submitted in support of, and in opposition to, Plaintiff's Motion.  Defendants submitted objections to evidence submitted by Monster in support of its motion on May 24, 2019.  ("Defendants' Objection," Dkt. No. 102.)  Plaintiff responded to these objections on June 3, 2019.  (Dkt. No. 107.)  Plaintiff then filed its own objections to evidence submitted in support of Defendants' opposition on June 3, 2019.  (Dkt. No. 108.)

Preliminary injunctions are customarily decided "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." QBAS Co. v. C Walters Intercoastal Corp., 2010 WL 7785955, at *4 (C.D. Cal. Dec. 16, 2010) (internal quotations and citations omitted).  In deciding whether to grant a preliminary injunction, the Court "may give even inadmissible evidence some weight," Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984), and, in its discretion, accord the appropriate weight to that evidence, Signeo USA, LLC v. SOL Republic, Inc., 2012 WL 2050412, at *3 (N.D. Cal. June 6, 2012).  The Court has considered the likely admissibility of challenged evidence in determining whether Plaintiff demonstrated a likelihood of success on the merits but need not rule individually on each of the parties' objections.  Where the Court has expressly relied on evidence subject to an objection, the Court has OVERRULED that objection.  See Disney Enterprises, Inc. v. VidAngel, Inc., 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), aff'd, 869 F.3d 848 (9th Cir. 2017)

## B. Motion for Preliminary Injunction

Monster seeks a preliminary injunction enjoining (1) VPX's use of the terms "creatine" and "Super Creatine" to sell BANG energy drinks and (2) VPX's intentional interference with Monster's shelving-space contracts with its retail partners.  Because the Court is not satisfied the evidence presented establishes that Plaintiff is likely to succeed on the merits of either of these claims, Plaintiff's Motion will be denied.

### 1. Likelihood of Success on the Merits

Monster argues that it is likely to succeed on the merits of its claims for false advertising, under Section 43(a) of the Lanham Act, and intentional interference with contractual relations. The Court will consider these claims in turn. Likelihood of success on the merits is "the most important" factor in determining whether to issue a preliminary injunction. Disney Enterprises, Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017) (citing Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015)).

#### a. False Advertising

The elements of a Lanham Act 43(a) false advertising claim are: (1) a false statement of fact about a product in a commercial advertisement; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material; (4) the defendant caused the statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement. See Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997); Newcal Indus., Inc. v. Ikon Office Sol., 513 F.3d 1038, 1052 (9th Cir. 2008). Because Plaintiff has failed to demonstrate a likelihood of success on the merits of the first element of this claim, the Court addresses only that factor.

To demonstrate that a statement was false within the meaning of the Lanham Act, a plaintiff must show either that the statement was literally false or that the statement was literally true but likely to mislead or confuse consumers. Southland Sod Farms, 108 F.3d at 1139. Monster claims that Defendants' use of the term "creatine" on the labels of its energy drink products is literally false, because BANG does not contain creatine, and that its use of the term "Super Creatine" is impliedly false because it suggests that BANG contains creatine when it actually contains an entirely different molecule, creatyl-L-leucine.

Plaintiff first argues that BANG's labels contains claims which are literally false because, while the label claims that BANG contains a "potent body-rocking fuel" consisting of "Creatine, Caffeine, CoQ10, & BCAAs," (manually filed cans of BANG energy drink ("BANG Cans"), Dkt. No. 72), BANG does not contain actual creatine. In support of this argument, Plaintiff has submitted the declaration of Dr. Neil Spingarn, an analytical chemist and the president of S & N Labs. (Declaration of Dr. Neil Spingarn, Dkt. No. 67-3.) S & N Labs was retained by Plaintiff to test BANG energy drink for the presence of the chemicals creatine, creatinine, creatyl-L-leucine, branched-chain amino acids ("BCAAs"), and CoQ10. (Id. ¶ 5.) Spingarn tested four cans of "Root Beer Blaze" flavored BANG, one can of "Blue Razz" BANG, and one can of "Lemon Drop" BANG. Creatine was not detected, or detected in only trace amounts, in any of the tested products. (Spingarn Decl. Exh. 2.) Additionally, Plaintiff points to Owoc's public statements admitting that his product does not contain "regular creatine." ("Declaration of Steven N. Feldman," Exhibit 1, Dkt. No. 69-1.)

Plaintiff next argues that VPX's use of the term "Super Creatine" is impliedly false because it suggests that BANG contains creatine, when in fact it contains only creatyl-L-leucine, a different molecule. Dr. Spingarn's declaration states that creatyl-L-leucine – what Defendants

market as "Super Creatine" – is a "chemically synthesized compound" which is created from the linking of two distinct amino acids, creatine and leucine. (Spingarn Decl. ¶ 13.) Spingarn states that the properties of combined drugs such as creatyl-L-leucine are "distinct from [those of] the constituent amino acids." (Id.)

It appears, however, that Monster's claims rely on an overly narrow understanding of the word "creatine," since, as discussed in their own evidentiary submissions, "[m]any forms of creatine exist in the marketplace," including formulations combining creatine with other amino acids. Thomas W. Buford, et al., <u>International Society of Sports Nutrition position stand: creatine supplementation and exercise</u>, J. Int. Soc. Sports. Nutr., Aug. 2007; <u>see also</u> Robert Cooper, et al., <u>Creatine supplementation with specific view to exercise/sports performance: an update</u>, J. Int. Soc. Sports. Nutr., July 2012. The parties agree that "Super Creatine" is a dipeptide – a chemical composed of two amino acids – which consists of the amino acids creatine and L-leucine. ("Declaration of Dr. Liangxi Li," Dkt. No. 100 ¶ 24; Spingarn Decl. ¶ 13.) Defendants have submitted the declaration of Dr. Liangxi Li, Research & Development Manager at VPX, which details the many forms of creatine compound which are available on the market, many of which consist of creatine bonded with other molecules, and describes the process of developing Super Creatine by joining creatine to other amino acids. ("Declaration of Dr. Liangxi Li," Dkt. No. 100 ¶¶ 13-16, 21.) Li states that the purpose of joining the creatine and L-leucine amino acids was to create a form of creatine which is "more stable and more bioavailable than other forms of creatine." (Li Decl. ¶ 35.)

While Monster argues that creatyl-L-leucine does not provide any of the benefits of creatine, the evidence they have submitted in support of this claim supports only the more general conclusion that the chemical and physical properties of a new substance formed from the combination of two amino acids differs from their constituent parts. Scientific journal articles submitted by Monster agree that many forms of creatine exist and are available for consumer purchase as nutritional supplements. Neither the Buford nor the Cooper articles discuss creatyl-L-leucine, but both state that at least some of common creatine compounds provide similar or superior effects to those provided by creatine alone. Other than this, Plaintiff's briefing points to no evidence demonstrating that creatyl-L-leucine does not provide the benefits of creatine. Monster's argument that the combination of creatine and L-leucine "does not prove that someone who ingests creatyl-L-leucine receives creatine or the benefits of creatine," (Reply at 4), simply flips the burden of proof: in order to prevail, Monster must demonstrate that Super Creatine does not provide the benefits of creatine. They have not yet done this to the Court's satisfaction.

Monster also argues that even if Super Creatine and creatine are substantially the same molecule, BANG does not contain enough Super Creatine to provide the benefits that VPX promises consumers. But Plaintiff's conclusion as to the amount of Super Creatine in BANG products is based on tests conducted in a single lab of only four cans of a single flavor of BANG purchased from the same retail store in Southern California. (Spingarn Decl. Exh. 2.) Plaintiff has pointed to no evidence that such an obviously limited sampling is sufficient for the Court to conclude that the quantities of Super Creatine detected in these tests – approximately 34

milligrams per can – are representative of BANG products generally. Without more conclusive evidence that BANG cans generally lack sufficient quantities of Super Creatine to have any health or performance benefits, Monster cannot demonstrate that it is likely to succeed on the merits of its implied falsity claim. Nor has Monster submitted evidence that that other ingredients touted by BANG – including caffeine, CoQ10, and BCAAs – are not present in sufficient quantities to have some performance benefits. The Court will not order a nationwide recall on the basis of such a limited sample size.

Because Plaintiff has not demonstrated that it is likely to succeed on its claim that BANG either does not contain creatine or does not contain enough creatine to have any performance benefit, the Court need not address the other elements of their false advertising claim. A theory of recovery based on a claim of implied falsehood requires plaintiff to "demonstrate, by extrinsic evidence, that the challenged [advertisements] tend to mislead or confuse consumers." Mut. Pharm. Co. v. Ivax Pharm., Inc., 459 F. Supp. 2d 925, 933 (C.D. Cal. 2006). Absent more adequate evidence that BANG does not, in fact, contain sufficient Super Creatine to have the effects which Defendants claims, Plaintiff cannot demonstrate that their claims are misleading. The Court therefore finds that Plaintiff has failed to establish a likelihood of success on the merits of its Lanham Act false advertising claim.

Likelihood of success on the merits is "the most important" factor in determining whether to issue a preliminary injunction. Disney Enterprises, Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017) (citing Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015)). If the moving party fails to meet this showing, then "the court need not consider the other factors … in the absence of serious questions going to the merits." (Id.) (internal citations omitted.) The Court therefore need proceed no further and DENIES Monster's motion for a preliminary injunction enjoining Defendants from using the term "creatine" or "Super Creatine" to market, sell, advertise, or promote BANG.

### b. Intentional Interference with Contractual Relations

The elements of the tort of intentional interference with contract are: "(1) a valid contract between plaintiff and another party, (2) defendant's knowledge of the contract, (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship, (4) actual breach or disruption of the contractual relationship, and (5) resulting damage." Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 505 (1994).

Monster has demonstrated that it has valid contracts for specific amounts of in-store shelf and/or cooler space with retailers across the country, including: AM PM (agreement to provide Monster with at least six shelves of cooler space in Southern California and at least four shelves of cooler space in Northern California) (Feldman Decl. Exh. 36); American Gas & Oil (agreement to merchandize Monster energy products on, at minimum, four shelves and that Monster would have "45% of predominant energy section") (Feldman Decl. Exh. 35); Circle K (agreement to allocate shelf space to Monster based on combination of "customer internal scan data" and "fair market share" calculation, as well as to place Monster in "first position on top shelves above closest market share competitor" in markets where Monster is market share

leader) (Feldman Decl. Exh. 47; Walmart (agreement that Monster products be placed on one side of "Tobacco Checklane Coolers" that it shares with Red Bull) (Feldman Decl. Exh. 49); Dunne Manning (agreement to merchandise all Monster energy products on four shelves of "predominant energy section") (Feldman Decl. Exh. 50); Duchess (agreement to merchandise Monster energy products on four shelves of "predominant energy section") (Feldman Decl. Exh. 51); Big Red (agreement to merchandise Monster energy products at no less than "50% of the total energy space") (Feldman Decl. Exh. 53); and Pit Stop (agreement to merchandise Monster energy products on three shelves of "predominant energy section in cold vault") (Feldman Decl. Exh. 55).

Monster has also submitted direct and circumstantial evidence that VPX engaged in conduct which disrupted these agreements. In numerous declarations, Monster employees describe repeated instances in which they have found BANG products in Monster's contracted-for retail shelving space in retail locations across the country governed by each of the above retail shelving agreements. (Declaration of Steve Landry, Dkt. No. 67-31; Declaration of Gerardo Rico, Dkt. No. 67-18; Declaration of Meghan Higbie, Dkt. No. 67-26; Declaration of William Charles Hamby III, Dkt. No. 67-15; Declaration of Charley Boyum, Dkt. No. 67-14; Declaration of Lauren Milliano, Dkt. No. 67-23; Declaration of Matthew Boccia, Dkt. No. 67-25; Declaration of Bob Samela, Dkt. No. 67-12; Declaration of James O'Brien, Dkt. No. 67-20; Declaration of Aaron Cheney, Dkt. No. 67-9; Declaration of Nathan Nielsen, Dkt. No. 67-28.) Defendants' attempt to minimize this allegation as a "quibble[]" over "wayward cans on the wrong shelf in this-or-that store" is belied by the scope and duration of this phenomenon which, as discussed below, hardly appears accidental in light of the documented statements of VPX's management and executive leadership. (Opp. at 7.)

Monster also submitted the declaration of Richard Laitinen, who worked as an account manager for VPX in California from November 2016 to September 2017 and again from April 2018 to November 2018. (Declaration of Richard Laitinen, Dkt. No. 67-7 ¶ 1.) Laitinen states that VPX district and regional managers directed him to use "guerilla tactics" and "be aggressive" in order to obtain shelf and cooler space for BANG at retail stores. (Id.) They made specific demands about the location in which BANG should be placed – at eye level in the energy drink doors – and instructed Laitinen to document the space he acquired with photographs. (Id. ¶¶ 4-6.) Laitinen understood their instructions to mean that he should take premier shelf and cooler space from competitors, including Monster, and that at the time he received these instructions he was aware that retailers had contracts and arrangements with competitor companies governing the allocation of space in shelves and coolers. (Id. ¶ 7.) In exchange for his role in placing BANG in retail stores, Laitinen received a "large commission". (Id. ¶ 8.)

In addition to the Laitinen declaration, Monster introduced additional evidence showing that it is likely to prevail on its claim that Defendants knew of and intended to interfere with its shelving-space contracts: first, declarations from Emelie Tirre, President of the Americas for Monster, and other Monster management which state, in part, that it is industry custom that product placement is the subject of contract between retailers and beverage companies and that these contracted-for shelving arrangements are recorded in "planograms" which are circulated to beverage manufacturers and, in some cases, placed inside beverage coolers themselves. ("Declaration of Emelie Tirre," Dkt. No. 67-6 ¶¶ 7, 9; Nielsen Decl. ¶ 2.) Second, Instagram

posts made by Owoc, including one which shows an image of a VPX products placed in front of Monster products accompanied by the text "When in doubt block them out. In life when they tell you there's no shelf space – make your own shelf space! When multibillion-dollar competitors pay for space retaliate with a vengeance," and another which states that VPX will "not placate to [a retailer's] tomfoolery and rigged system of paying for shelf space." (Feldman Decl. Exhs. 6, 37.)

Defendants argue that Monster has failed to show that VPX or its agents had knowledge of the existence of the specific shelving-space contracts between Monster and its retailers with which they interfered. Their argument, however, ignores both the numerous declarations submitted by Plaintiff stating that distributors and representatives of beverage companies are aware of the existence of contracted for shelving space and that such space is highly sought after, (Dkt. Nos. 67-7 – 67-34), as well as the public statements made by Owoc which object to the industry practice of paying for shelf space and state his intention to "make [his] own shelf space" and "retaliate" against competitors who pay for space. (Feldman Decl. Exhs. 6, 37.)

Defendants offer some authority for the proposition that the knowledge element of the tort of intentional interference with contract requires that defendant have knowledge of the specific contract with which it is interfering. See Davis v. Nadrich, 174 Cal. App. 4th 1, 10–11, (2009), as modified (May 21, 2009) (affirming grant of summary judgment to defendant where plaintiff had failed to show that defendant was sufficiently aware of the details of the employment contract to form an intent to interfere with it); Swipe & Bite, Inc. v. Chow, 147 F. Supp. 3d 924, 934–35 (N.D. Cal. 2015) (dismissing complaint for failure to allege facts showing that defendant had knowledge of agreements with specific customers); GSI Tech. v. United Memories, Inc., 2014 WL 1572358, at *7 (N.D. Cal. Apr. 18, 2014) (allegations that non-compete clause was common industry practice, without more, was insufficient to plausibly plead knowledge of contractual relations). But they interpret the knowledge requirement too narrowly. As Owoc's public statements and the Laitinen declaration make clear, VPX's management was fully aware that Monster and other energy drink manufacturers contracted for specific shelving space in retail stores across the country. In many of these stores, planograms were available which specifically describe the locations of this contracted for space, which would have placed their distributers on notice as to the terms of these shelving agreements. (Tirre Decl ¶¶ 7,9; Nielsen Decl. ¶ 2.) While some questions remain as to the specificity of Defendants' knowledge of each specific agreement in question, some evidence suggests that Defendants engaged in an ongoing, nationwide practice of placing their products on contracted-for shelving space while knowing that such agreements existed. In light of the extent of this practice, Plaintiff need not demonstrate specific knowledge of each contract in question in order to demonstrate a likelihood of success on the merits.

For the same reasons, the Court finds that Plaintiff has demonstrated a high likelihood of showing that Defendants' interference was intentional. Plaintiff need not show specific intent to interfere with its contract, only that Defendants knew that interference was "certain or substantially certain to occur as a result of its action." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 63 P.3d 937 (2003); Winchester Mystery House, LLC v. Glob. Asylum, Inc., 210 Cal. App. 4th 579, 596 (2012). Owoc's public statements and Laitinen's declaration regarding VPX's internal practice of directing distributors to place BANG products in competitors' contracted-for shelving space both show that the numerous documented instances

of "wayward" BANG cans in Monster's shelving space were likely the result of Defendants' intentional conduct.

Plaintiff has, however, submitted very little evidence that the above conduct resulted in damages. Indeed, the only evidence connecting Defendants' interference with shelving-space contracts are two conclusory statements by the President of the Americas for Monster. While it may be the case that BANG's sales growth has been "fueled by VPX's theft of Monster's shelf and cooler space," (Tirre Decl. ¶ 24), it is unclear how Tirre is qualified to make this assessment or what information this conclusion is based on, and Plaintiff has submitted no empirical evidence in support of this claim. In particular, the Court can find no evidence connecting the interference with Monster's shelving-space contracts to the loss of customer goodwill, the loss of market share, or the loss of profits. Without such evidence, or a basis for his conclusion, Tirre's statements that a customer entering a retail store would be "more likely to find BANG and less likely to believe that Monster is proven and popular" are purely speculative. (Tirre Decl. ¶ 24.) At this preliminary stage, the Court cannot determine whether it is likely that Plaintiff is likely to successfully demonstrate this element of its intentional interference with contractual relations claim.

### 2. Irreparable Harm

Even if Plaintiff had demonstrated a likelihood of successfully demonstrating damages resulting from Defendants' interference in its shelving-space contracts, the Court is not convinced that it has adequately shown a likelihood of irreparable harm. A party seeking injunctive relief must show "evidence of likely irreparable harm," not merely "unsupported and conclusory statements regarding the harm [the plaintiff] might suffer." Pom Wonderful LLC v. Pur Beverages LLC, 2015 WL 10433693, at *5 (C.D. Cal. Aug. 6, 2015) (internal quotations and emphasis omitted); see also Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (plaintiffs seeking preliminary relief must "demonstrate that irreparable injury is likely in the absence of an injunction); Perfect 10, Inc. v. Google, Inc., 653 F.3d 976, 982 (9th Cir. 2011) (affirming denial of motion for preliminary injunction where plaintiff had failed to submit statements showing customers had abandoned their company because of the challenged conduct). But the Court can locate no evidence in showing that Monster has lost or will lose any business, market share, or customer goodwill to VPX due to interference with its shelving space contracts. Even assuming that Monster has demonstrated a loss in market share or customer goodwill, the Court does not have any evidence before it connecting these downturns to Defendants' conduct. The Court therefore concludes that Plaintiff has failed to demonstrate that it is likely to suffer irreparable harm absent a permanent injunction.

### 3. Balance of Equities and the Public Interest

If the moving party fails to show a likelihood of success on the merits, then "the court need not consider the other factors … in the absence of serious questions going to the merits." Disney Enterprises, Inc., 869 F.3d at 856 (internal citations omitted.) Because Plaintiff has not shown either a likelihood of success on the merits or that it is likely to suffer irreparable harm absent an injunction, the Court need not weigh either the potential harms caused by a preliminary

injunction or whether a preliminary injunction would be in the public interest.  See <u>Disney Enterprises, Inc.</u>, 869 F.3d at 856.

### IV.   CONCLUSION

Based on the foregoing, the Court DENIES Plaintiff's Motion for Preliminary Injunction. Plaintiff's motion to file document in support of this Motion under seal is  GRANTED.

**IT IS SO ORDERED.**