1  John C. Hueston, State Bar No. 164921
   jhueston@hueston.com
2  Moez M. Kaba, State Bar No. 257456
   mkaba@hueston.com
3  Allison L. Libeu, State Bar No. 244487
   alibeu@hueston.com
4  HUESTON HENNIGAN LLP
   523 West 6th Street, Suite 400
5  Los Angeles, CA 90014
   Telephone:  (213) 788-4340
6  Facsimile:   (888) 775-0898

7  Attorneys for Plaintiff
   Monster Energy Company
8

9           UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11

12 | MONSTER ENERGY COMPANY, a Delaware corporation, | Case No. 5:18-cv-1882-JGB-SHK
13 |  | **PLAINTIFF MONSTER ENERGY COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY OF DEFENDANTS' EXPERT WITNESS PETER KENT**
   | Plaintiff, |
14 | vs. |
15 | VITAL PHARMACEUTICALS, INC., d/b/a VPX Sports, a Florida corporation; and JOHN H. OWOC a.k.a. JACK OWOC, an individual, |
16 |  |
17 |  | Hon. Jesus G. Bernal
   | Defendant. | Hearing Date:  February 7, 2022
18 |  | Hearing Time:  9:00 a.m. PT
   |  | Courtroom: 1

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................1

II. BACKGROUND ................................................................................................3

    A. Professor Carpenter Opined That Consumers Are More Likely to Buy BANG Due to Defendants' "Super Creatine" Claims .........................3

    B. Mr. Kent Only Rebutted Professor Carpenter's Tabulation of Defendants' Instagram Posts ...................................................................5

III. LEGAL STANDARD ........................................................................................6

IV. ARGUMENT .....................................................................................................7

    A. Mr. Kent Is Not an Expert on Instagram .............................................8

    B. Mr. Kent's Proffered Testimony Is Unreliable ..................................10

        1. Mr. Kent Provides No Basis for His Claim that Professor Carpenter Fails To Provide A Nexus Between Social Media Posts and BANG Sales ..............................................................10

        2. Mr. Kent Provides No Basis for His Claims About the Ways Instagram Users Interact with Instagram Posts .......................11

        3. Mr. Kent Provides No Basis for His Claims About Hashtags ...................................................................................13

V. CONCLUSION ................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown v. China Integrated Energy Inc.*,
 2014 WL 12576643 (C.D. Cal. Aug. 4, 2014) ....................................................... 7, 9

*Burrows v. BMW of N. Am.*,
 2018 WL 6314187 (C.D. Cal. Sept. 24, 2018) ........................................................... 9

*Cabrera v. Cordis Corp.*,
 134 F.3d 1418 (9th Cir. 1998) ................................................................................... 7

*Claar v. Burlington N.R.R. Co.*,
 29 F.3d 499 (9th Cir. 1994) ................................................................................ 7, 11

*Daubert v. Merrell Dow Pharm., Inc.*,
 43 F.3d 1311 (9th Cir. 1995) ............................................................................. 7, 10

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993) ..................................................................................... 12, 13, 15

*Dep't of Toxic Substances Control v. Tenichem, Inc.*,
 2016 WL 1029463 (N.D. Cal., Mar. 15, 2016) ................................................. 12, 13

*G v. Hawaii, Dep't of Hum. Services*,
 703 F. Supp. 2d 1112 (D. Haw. 2010) ............................................................... 11, 13

*Garcia v. City of Everett*,
 728 F. App'x 624 (9th Cir. 2018) ....................................................................... 7, 10

*Gen. Elec. Co. v. Joiner*,
 522 U.S. 136 (1997) .................................................................................................. 7

*Greenawalt v. Sun City W. Fire Dist.*,
 23 F. App'x 650 (9th Cir. 2001) ............................................................................... 6

*In-N-Out Burgers v. Smashburger IP Holder LLC*,
 2019 WL 1431904 (C.D. Cal. Feb. 6, 2019) ............................................................. 3

- ii -
MONSTER'S MEMO ISO MOTION TO EXCLUDE DEFENDANTS' EXPERT WITNESS PETER KENT

*Lust v. Merrell Dow Pharm., Inc.*,
  89 F.3d 594 (9th Cir. 1996) .................................................................................... 7

*Mitchell v. Gencorp, Inc.*,
  165 F.3d 778 (10th Cir. 1999) ............................................................................... 12

*Novoa v. GEO Grp., Inc.*,
  2020 WL 8514832 (C.D. Cal. Dec. 18, 2020) ................................................ 1, 6, 7, 9

*Ollier v. Sweetwater Union High Sch. Dist.*,
  768 F.3d 843 (9th Cir. 2014) ................................................................. 2, 10, 11, 13

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ................................................................................ 3

*U.S. v. Tin Yat Chin*,
  371 F.3d 31 (2d Cir. 2004) ...................................................................................... 6

**Rules**

Fed. R. Evid. 702 ........................................................................................................ 7, 13

## I. INTRODUCTION

Defendants Vital Pharmaceuticals, Inc. ("VPX") and John H. Owoc falsely claim that their BANG energy drink contains "Super Creatine." They advertise this claim on the BANG can, on online retailers' BANG product pages, on their website, and on social media accounts including Instagram.

Plaintiff Monster Energy Company's ("Monster") expert witness Dr. Gregory S. Carpenter—Professor at Northwestern University's Kellogg Graduate School of Management—analyzed Defendants' advertising and the consumer response to it. He concluded that Defendants' advertising has persuaded consumers to believe that Super Creatine offers the benefits of creatine and, as a result, consumers are more likely to purchase BANG than other energy drinks.

Defendants served a rebuttal expert report from purported Instagram expert Peter Kent. But Mr. Kent ignored most of Professor Carpenter's analysis. He focused only on Professor Carpenter's tabulation of Defendants' Super Creatine posts on Instagram and user engagement with those posts. Mr. Carpenter concluded that about 13 million users were exposed to these posts. Mr. Kent contends, based on his understanding of how users behave on Instagram, that the number is closer to 7 million.

For two independent reasons, Defendants cannot carry their burden to prove that Mr. Kent's testimony is admissible.

*First*, Mr. Kent is not qualified. *Novoa v. GEO Grp., Inc.*, 2020 WL 8514832, at *2-3 (C.D. Cal. Dec. 18, 2020) (Bernal, J.) (excluding expert who lacked "the required expertise" under Rule 702). Mr. Kent considers himself an expert witness in "how people use Instagram," and his expert report only concerns Dr. Carpenter's conclusions about Defendants' Instagram posts. But Mr. Kent lacks the requisite specialized knowledge to be held out as an Instagram expert. His experience with Instagram stems from his *personal use* of Instagram—he could not identify any professional work that he has ever done specific to Instagram. This personal use is too limited to render him an expert in the field. Mr. Kent is not a regular user of Instagram,

could not identify whether certain behaviors were normal on Instagram, and failed repeatedly to answer basic questions about the platform.

*Second*, expert testimony that lacks a reliable foundation must be excluded. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) (upholding exclusion of expert testimony because testimony was based on "personal opinions and speculation"). Mr. Kent's deposition revealed that several of his opinions lack the necessary foundation:

- Mr. Kent claims that Professor Carpenter failed to establish a nexus between social media posts and BANG sales, but Mr. Kent admitted that he had "not conducted any analysis to determine what would have needed to be done to establish a nexus in this case";

- Mr. Kent claims that users "often" do not read captions and that captions are "often" just "rambling nonsense," but he admitted that he did not try to quantify how often users read captions and could not quantify how often captions are rambling nonsense; and

- Mr. Kent's report claimed that Defendants do not intend for Instagram users to read the text in the "hashtag blocks" of Instagram posts, but he admitted at his deposition that this opinion was not based on scientific studies or academic journals and he "had no idea" if Defendants intended for Instagram users to read their hashtag blocks.

The Court should exclude Peter Kent from testifying at trial because he is unqualified to offer opinions about Instagram, the sole topic on which he offers opinions. Should the Court allow him to testify, it should exclude his three baseless opinions.

## II. BACKGROUND

### A. Professor Carpenter Opined That Consumers Are More Likely to Buy BANG Due to Defendants' "Super Creatine" Claims

Defendants advertise that their BANG energy drinks contain "Super Creatine." Dkt. 437-1 at 6-7, 19-21. At trial, Monster will prove that this advertising is false because BANG does not contain creatine (much less a "super" form of creatine) and does not deliver creatine's effects in the body. *Id.* at 15-22. Monster will also prove that Defendants' claims are likely to both deceive consumers and influence their purchasing decisions. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).[1]

To analyze the effect of Defendants' advertising on consumers, Monster retained Professor Gregory S. Carpenter, who has served as a Professor of Marketing at Northwestern University's Kellogg Graduate School of Management since 1990. Ex.[2] 9 ¶¶ 1-2. Professor Carpenter specializes in understanding how organizations develop marketing strategies and how consumers respond to those strategies. *Id.* His experience includes analyzing the marketing strategies of food and beverage companies including Coca Cola and PepsiCo. *Id.*

Professor Carpenter analyzed Defendants' advertising for BANG, including on the BANG can, on online retailers' BANG product pages, on Defendants' website, in retail locations, and on social media accounts including Instagram. *Id.* ¶¶ 43-130. He also analyzed consumer reactions to and interactions with Defendants' advertising, which were collected through consumer surveys, consumer comments on social media and BANG product pages, and emails to VPX's customer service department. *Id.*

---

[1] Monster need not prove Defendants' claims are likely to deceive consumers if the Court finds Defendants' claims literally false. *In-N-Out Burgers v. Smashburger IP Holder LLC*, 2019 WL 1431904, at *7 (C.D. Cal. Feb. 6, 2019).

[2] All "Ex." citations refer to the exhibits attached to the Declaration of Jennifer Popp, filed herewith.

Professor Carpenter concluded, based on his analysis, that Defendants' advertising has persuaded consumers to believe that:

- Super Creatine is not only creatine but also a superior form of creatine;
- Super Creatine offers health benefits, including as a muscle growth and exercise performance aid; and
- The benefits of Super Creatine are supported by scientific research. *Id.* ¶ 16(g).

These beliefs make consumers "more likely to purchase an energy drink that contains Super Creatine compared to one that does not" and give Defendants an unearned "competitive advantage over [their] rivals." *Id* ¶ 16(h).

Just one bit—three out of 219 paragraphs—of Dr. Carpenter's analysis concerned Defendants' Instagram posts about Super Creatine and the consumer reaction to those posts. *Id.* ¶¶ 36-37, 138. Professor Carpenter determined that, between January 2017 and July 2020, Defendants "promot[ed] Super Creatine or creatine in connection with Bang Energy or the overall Bang Energy brand" in over 1,000 Instagram posts. *Id.* ¶¶ 36-37. Those posts received over 2 million likes and almost 13 million video views. *Id.*

Based on his analysis of, among other things, Defendants' emphasis on Super Creatine in social media posts, Professor Carpenter concluded that "Super Creatine is an important source of differentiation for the [BANG] brand." *Id.* This conclusion aligns with Defendants' admissions, including: (1) VPX's 30(b)(6) witness's admission that Super Creatine has been the key differentiating factor for selling BANG against competing products, and (2) Mr. Owoc's public statement that Super Creatine is the "primary ingredient found in BANG which drives the BANG formula." Dkt. 437-74 at 48:14-18, 63:3-14.

Professor Carpenter's analysis also showed that Defendants' Super Creatine posts received more likes, on average, than Defendants' other posts. Ex. 9 ¶ 138. Professor Carpenter concluded that this evidenced "consumers interest in creatine and

Super Creatine." *Id.* This conclusion is bolstered by legions of consumer comments and inquiries about creatine and Super Creatine on social media and in customer service emails. *Id.* ¶¶ 139-40, 142-43, 150-54, 159, 208-213.

### B. Mr. Kent Only Rebutted Professor Carpenter's Tabulation of Defendants' Instagram Posts

Defendants submitted an expert report from Peter Kent, a self-described "e-commerce and SEO ('Search Engine Optimization') consultant, trainer, and author." Ex. 10 ¶ 3. Mr. Kent claims that he has "work[ed] with computer technology since early 1979" and has "used social media since 1984." *Id.* ¶¶ 4-5; Ex. 11 at 18:6-11.

Mr. Kent's expert report did not address Professor Carpenter's primary opinions and instead focused on a narrow issue: Professor Carpenter's tabulation of Defendants' Super Creatine posts and user engagement with those posts. Ex. 10 at ii (table of contents showing only substantive section titled "Professor Carpenter's Analysis of Defendants' Instagram Posts"). Mr. Kent's report does not address the other evidence Professor Carpenter considered in offering his opinions. Ex. 11 at 12:1-13:4 (Mr. Kent admitting his opinions relate only to Instagram posts); *see also id.* at 14:7-15:14 (same).

Mr. Kent's opinions on this topic are similarly narrow. He claimed that Professor Carpenter overstated the effect of Defendants' Instagram posts because (1) Professor Carpenter assumed that a like or video view shows engagement with an Instagram post, but users do not always read captions and often like posts without reading (Ex. 10 at 10-22); and (2) Professor Carpenter counted Instagram posts that include #SuperCreatine and #creatine in hashtag blocks because hashtag blocks are not designed to be read and users do not read them (*id.* at 22-39).

Mr. Kent offered an alternative tabulation of Defendants' posts by removing those that only mention Super Creatine or creatine in the hashtag block:

| Account | No. of Super Creatine and/or Creatine Posts | Total Likes | Total Video Views |
|---|---|---|---|
| @bangenergy.ceo | ~~533~~ 416 | ~~568,192~~ 419,480 | ~~6,709,471~~ 5,472,342 |
| @bangenergy | ~~417~~ 128 | ~~1,576,221~~ 444,106 | ~~6,245,036~~ 1,521,076 |
| @bang.fuelteam | ~~58~~ 1 | ~~8,229~~ 182 | ~~5,929~~ 0 |
| @megliz.owoc | ~~3~~ 1 | ~~1,336~~ 243 | ~~5,929~~ 0 |
| @bangrevolution.apparel | ~~2~~ 0 | ~~873~~ 0 | ~~N/A~~ 0 |
| @bangenergy.evp | ~~1~~ 0 | ~~185~~ 0 | ~~N/A~~ 0 |
| @bangenergy.careers | ~~1~~ 0 | ~~33~~ 0 | ~~300~~ 0 |
| Total | ~~1,015~~ 546 | ~~2,155,069~~ 864,011 | ~~12,972,552~~ 6,993,418 |

*Id.* ¶ 84.

Under Mr. Kent's analysis, Defendants' posts falsely advertising the Super Creatine in BANG still attracted nearly 1 million likes and 7 million video views. *Id.*

### III. LEGAL STANDARD

Under Rule 702, the "trial court is accorded wide discretion when acting as gatekeepers for the admissibility of expert testimony." *Novoa*, 2020 WL 8514832, at *2 (Bernal, J.). "A trial court's 'gatekeeping' obligation to admit only expert testimony that is both reliable and relevant is especially important 'considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony.'" *Id.* at *1. This gatekeeping function is described as a two-step process.

*First*, "the court must determine if a witness has the required expertise, whether it be 'knowledge, skill, experience, training, or education' under Rule 702(a)." *Id.* at *2. To determine whether a potential expert witness is qualified, "courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *U.S. v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004); *see also Greenawalt v. Sun City W. Fire Dist.*, 23 F. App'x 650, 652

(9th Cir. 2001) (expert testimony "must relate to some form of specialized knowledge").

*Second*, "courts must ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Novoa*, 2020 WL 8514832, at *2 (Bernal, J.). This same standard applies "to all expert testimony, not just scientific testimony." *Brown v. China Integrated Energy Inc.*, 2014 WL 12576643, at *3 (C.D. Cal. Aug. 4, 2014). "The court's task "is to analyze not what the experts *say*, but what *basis* they have for saying it." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995). Opinions based on "mere subjective beliefs or unsupported speculation," or "unsubstantiated and undocumented information," are not reliable. *Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994); *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"It is the proponent of the expert who has the burden of proving admissibility." *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

## IV.   ARGUMENT

Mr. Kent's testimony is inadmissible for two reasons. First, his opinions relate only to user behavior on Instagram, Ex. 11 at 17:14-19; Ex. 10 ¶¶ 26, 56, 100, but Mr. Kent lacks the requisite "knowledge, skill, experience, training, or education" to testify as an Instagram expert. Fed. R. Evid. 702; *Novoa*, 2020 WL 8514832, at *3 (excluding expert who lacked "the required expertise"). Second, even if Mr. Kent were qualified to testify, his conclusions are inadmissible because they were made without basis. *Garcia v. City of Everett*, 728 F. App'x 624, 628 (9th Cir. 2018) (upholding exclusion of expert testimony when the expert's "opinions were unreliable and unhelpful because [expert] failed to explain the basis for his opinions").

### A. Mr. Kent Is Not an Expert on Instagram

Mr. Kent expert report concerns "VPX's marketing on Instagram." Ex. 11 at 12:1-22. He described his role as "an expert witness in how people use Instagram." *Id.* at 17:14-19. But Mr. Kent's credentials turn up no experience with Instagram: his eight-page curriculum vitae does not list a single entry relating to Instagram (*id.* at 51:8-52:14), he could not identify any consulting services that he has provided concerning Instagram (*id.* 18:12-20:3), and he could not identify any publications he authored that concern Instagram (*id.* at 20:4-12). When asked what, precisely, qualified him to testify as an Instagram expert, Mr. Kent pointed only to the fact that he "ha[s] used Instagram" and other social media platforms. *Id.* at 18:6-11.

Mr. Kent's personal use of Instagram cannot justify his admission as an Instagram expert. His engagement is very low. He is not a daily Instagram user and could not estimate how often he uses the platform. Ex. 11 at 23:14-19. A review of his account reveals he has only 39 followers and follows just six other users. Ex. 10 at 23:10-25:17, *id.* at 26:12-15 (admitting "clickmensch" is his username on social media); Ex. 13 (showing 39 followers and 6 follows for his @clickmensch account). His lack of knowledge about the platform was on full display at his deposition, where he repeatedly failed to answer questions about the user experience on Instagram:

- Mr. Kent did not know if a user sees the full caption on an Instagram post before they can comment on the mobile application (Ex. 11 at 123:5-124:6);
- Mr. Kent did not know the number of people a user can tag in an Instagram post (*id.* at 53:2-4);
- Mr. Kent did not know the maximum number of accounts an Instagram user can follow (*id.* at 53:8-10);
- Mr. Kent did not know the maximum number of posts an Instagram user can like per hour (*id.* at 53:15-17);
- Mr. Kent did not know the maximum number of characters an Instagram user can include in a caption (*id.* at 53:18-20);

- Mr. Kent did not know the maximum size or length for images and videos on Instagram (*id.* at 56:8-16);
- Mr. Kent could not identify how the introduction of the reel or story feature on Instagram changed user behavior on Instagram (*id.* at 53:24-55:23);
- Mr. Kent incorrectly claimed that InstaMeet refers to a "meeting function you can use through Instagram" and testified that he has never used Instagram Live or InstaMeet before (*id.* at 54:24-55:17);
- Mr. Kent incorrectly claimed a "latergram" is a "scheduled post that will automatically submit later" and testified that he does not "know for sure" (*id.* at 55:22-56:2).

Mr. Kent's testimony illustrated why his personal use does not qualify him to identify if certain user behavior on Instagram is common: he admitted that he has "never looked to see" whether certain behaviors are "normal" on Instagram because he "typically look[s] at landscape photographers," not advertising of the type at issue in this case. Ex. 11 at 140:4-17. Occasionally browsing Instagram for landscape photographs does not make someone an Instagram expert. *Brown v. China Integrated Energy Inc.*, 2014 WL 12576643, at *6 (C.D. Cal. Aug. 4, 2014) ("[M]ere 'familiarity' is not the expertise required in an expert witness."). If Mr. Kent's limited use of Instagram qualifies him to be an Instagram expert, a billion people around the world similarly qualify. Ex. 14 (Instagram monthly average users is over 1 billion). Admitting Mr. Kent as an Instagram expert is incompatible with the requirement that an expert have specialized knowledge that would assist the trier of fact.[3] Here, many, if not most, members of the jury will have more experience with Instagram than Mr. Kent.[4]

---

[3] This is true not just of Mr. Kent, but of nearly all Defendants' experts, reflecting Defendants' perpetual attempts to bend the truth to suit their needs.

[4] Mr. Kent's alleged experience with other social media sites, e-commerce, or SEO does not change this conclusion. Expertise in one general area does not qualify a
(Continued...)

### B. Mr. Kent's Proffered Testimony Is Unreliable

Mr. Kent's testimony is independently inadmissible because he provided no basis for the conclusions in his report. *Daubert* 43 F.3d at 1316 (The court's task "is to analyze not what the experts *say*, but what *basis* they have for saying it."); *Garcia*, 728 F. App'x at 628 (upholding exclusion of expert testimony when the expert's "opinions were unreliable and unhelpful because [expert] failed to explain the basis for his opinions"); *Ollier*, 768 F.3d at 861 (same when testimony was based on "personal opinions and speculation").

#### 1. Mr. Kent Provides No Basis for His Claim that Professor Carpenter Fails To Provide A Nexus Between Social Media Posts and BANG Sales (¶ 100)

With no analysis or explanation, in the last paragraph of his expert report, Mr. Kent concluded that Professor Carpenter failed to provide a "nexus between Defendants' social-media posts and sales of their products, or any evidence that consumers purchased Defendants' products instead of Monster's products specifically due to Defendants' social media posts." Ex. 10 ¶ 100. This conclusion is unreliable because Mr. Kent has "failed to explain the basis for his opinion[]." *Garcia*, 728 Fed. App'x at 628.

Not only did Mr. Kent fail to provide a basis for this opinion in his expert report, but he also could not provide one during his deposition. When questioned about this conclusion, Mr. Kent could only say that it was his "understanding" that Professor Carpenter did not "draw a line between these ads and somebody making a purchase." Ex. 11 at 47:14-50:9. He then admitted that he did not review the documents Professor

---

person to serve as an expert in a subfield. *Novoa*, 2020 WL 8514832, at *3 ("[Expert]'s general psychology background … do not qualify him to testify as an expert on the effects of segregation in civil immigration detention"); *Burrows v. BMW of N. Am.*, 2018 WL 6314187, at *2 (C.D. Cal. Sept. 24, 2018) ("[Expert] lacks the specialized training and experience specific to the subject vehicle … that would be helpful to the trier of fact … [Expert's] broad automotive background and firsthand experience, although impressive, does not qualify him to testify as an expert on all matters related to the design and function of vehicles with which he is not personally familiar.").

Carpenter relied on in reaching his conclusions (*id.* at 49:13-17), did not know what Professor Carpenter should have done to establish a nexus (*id.* at 49:18-50:3), and had "not conducted any analysis to determine what would have needed to be done to establish a nexus in this case" (*id.* at 50:5-9).

Because Mr. Kent did not provide any basis for concluding that Professor Carpenter's report failed to show a nexus, this conclusion is inadmissible. *Ollier*, 768 F.3d at 860 (upholding decision that expert testimony was unreliable because the Court "could not 'discern what, if any, method [the expert] employed in arriving at his opinions'"); *Claar*, 29 F.3d at 502 (same when expert's conclusions supported only by "mere subjective beliefs [and] unsupported speculation").

### 2. Mr. Kent Provides No Basis for His Claims About the Ways Instagram Users Interact with Instagram Posts (¶¶ 24-48)

In his expert report, Mr. Kent makes certain quantitative conclusions about the ways in which Instagram users interact with Instagram posts. These conclusions are unreliable and inadmissible because Mr. Kent provided no "facts or data" to support them. *G v. Hawaii, Dep't of Hum. Services*, 703 F. Supp. 2d 1112, 1127 (D. Haw. 2010) (holding testimony inadmissible because "there are no facts or data to support Dr. Meyers' statement that a large number of QExA members require new physicians").

*First*, Mr. Kent claimed that "captions are *often* not read, or perhaps only briefly skimmed" and that users "are *more likely* to view a video before they read the caption." Ex. 10 ¶¶ 29, 99 (emphasis added); *see also* ¶ 46 (same). But Mr. Kent conceded he has no facts or data to support this conclusion. Mr. Kent admitted that (1) he did not "quantif[y] how often people read captions" (Ex. 11 at 95:20-22); (2) he has "no way to know" how often people who "watch a video or like a post" have "actually read the post" (*id.* at 97:3-7); and (3) he did not analyze how often "consumers who comment

on Bang Energy's Instagram posts actually read the posts" (*id.* at 99:19-100:5).[5] In fact, the only data in Mr. Kent's report—"a survey of Instagram users" by Preview App, Pty Ltd. ("Preview Survey")—demonstrates that Mr. Kent is wrong. *Id.* at 89:14-90:16, 95:23-96:1 (admitting the Preview Survey is his only basis for these conclusions and that he reviewed no academic articles on the topic). As Mr. Kent conceded, the Preview Survey found that the "majority" of people read Instagram captions when, among other things, the post's photo captures their attention. *Id.* at 95:1-10.[6]

Furthermore, even if the Preview Survey supported Mr. Kent's conclusions, this survey does not constitute a "reliable foundation" upon which Mr. Kent could build his conclusions. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Mr. Kent admitted that Preview Survey was not "scientific," that he does not know the survey's demographics, and that he does not know if its results "were representative of all Instagram users." *Id.* at 90:17-91:21. He further admitted that the "survey" was simply a post by a third-party "asking that question in their Instagram account." *Id.* This source is unreliable. *Dep't. of Toxic Substances Control v. Tenichem, Inc.*, 2016 WL 1029463, at *1 (N.D. Cal., Mar. 15, 2016) (no reliable foundation for "cursory and unscientific" opinion premised on information turned up in a Google search); *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 782 (10th Cir. 1999) ("[U]nder *Daubert*, 'any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.'").

Mr. Kent's concession that there are no facts or data underlying his conclusions that "captions are *often* not read, or perhaps only briefly skimmed" and that users "are *more likely* to view a video before they read the caption" render these conclusions

---

[5] Faced with the dearth of data supporting his conclusions, Mr. Kent tried to walk them back during his deposition: "I wasn't saying nobody reads captions . . . The point is people don't always read captions." Ex. 11 at 96:18-21; *see also id.* at 95:17-19.

[6] Academic sources find that *both* "text and image are known to increase performance on tasks such as predicting post popularity or user popularity." Ex. 12 § 6.3.

inadmissible. *G*, 703 F. Supp. 2d at 1126 (quantitative conclusion inadmissible when expert conceded she "d[id] not have data" to support the conclusion).

*Second*, Mr. Kent proclaimed that Instagram captions are "*often* just rambling nonsense." Ex. 10 ¶ 28 (emphasis added). Once again, Mr. Kent provided no facts or data to support this conclusion. At his deposition, the only supporting "evidence" he identified was the fact that "if you read many posts online – on Instagram, they appear to be rambling nonsense." Ex. 11 at 77:11-16; *see also* 78:5-13 ("Q: Your conclusions that [captions are] often just rambling nonsense is based on your experience reading posts in Instagram, is that correct? A: Yes."). Mr. Kent conceded that he is "not sure how to measure rambling nonsense scientifically." *Id.* at 77:13-14. Because there is no reliable foundation underlying Mr. Kent's conclusion that captions are "often just rambling nonsense," this conclusion is inadmissible. *G*, 703 F. Supp. 2d at 1126; *see also Ollier*, 768 F.3d at 861 ("[P]ersonal opinion testimony is inadmissible as a matter of law under Rule 702, [] and speculative testimony is inherently unreliable.").

### 3. Mr. Kent Provides No Basis for His Claims About Hashtags (¶¶ 49-88).

"If [an] expert purports to apply principles and methods to the facts of [a] case, it is important that this application be conducted reliably." Fed. R. Evid. 702 Advisory Committee Notes (2000); *see also Daubert*, 509 U.S. at 593 (expert admissibility requires valid "reasoning or methodology [that] properly can be applied to the facts in issue"). Here, Mr. Kent unreliably applied a principle to the facts of this case, so the resulting conclusion is inadmissible.

In his expert report, Mr. Kent opined that hashtag blocks are not intended to be read by Instagram users. Ex. 10 ¶¶ 57, 82. This principle is faulty. Mr. Kent admitted that he did not draw this information from scientific studies or academic articles. Ex. 11 at 135:18-22, 90:5-16. Mr. Kent sourced it solely from online articles about unidentified "Instagram experts." Ex. 10 ¶ 67. Opinions sourced by Google search are not reliable. *Tenichem*, 2016 WL 1029463, at *1 (excluding expert because "when he

is not simply speculating, [he] often does no more than regurgitate information given to him by other sources … He [does] not analyze his source materials so much as repeat their contents").

Mr. Kent then applied this faulty principle to the facts, explaining that when Defendants include #creatine and #SuperCreatine only "in the hashtag block" of Instagram posts, those hashtags are "not designed to be read by users but by the social network itself." Ex. 10 ¶ 82. Therefore, according to Mr. Kent, Professor Carpenter's tabulation of Super Creatine posts wrongly included posts that only mention creatine or Super Creatine in hashtag blocks. *Id.* ¶¶ 82-84.

But Mr. Kent admitted during his deposition that he had no basis to know whether Defendants intend for Instagram users to read their hashtag blocks. He testified that while "a lot of people push [hashtag blocks] down because they don't even really want people to see them," Defendants do not follow this strategy. Ex. 11 at 137:1-17. His expert report shows the same: Mr. Kent identified strategies some Instagram users employ to hide hashtag blocks, yet Defendants do not employ these strategies in the three sample Instagram posts included in Mr. Kent's report. *Compare* Ex. 10 ¶¶ 66-67, *with* ¶¶ 32, 53, 55, 66. Mr. Kent's opinion is thus inapplicable to Defendants' social media posts.

When asked directly whether it was possible that Defendants do not follow these strategies "because they want users to see the hashtags," Mr. Kent admitted that he had no basis for knowing whether Defendants wanted users to read their hashtags: "I don't know. I have no idea why they do it." Ex. 11 at 137:8-17.[7]

In sum, Mr. Kent's principle that users do not read hashtag blocks is faulty, and he admitted he has no basis for knowing whether Defendants want users to read their

---

[7] That Mr. Kent lacked insight into Defendants' Instagram intentions is no surprise, considering Mr. Kent never spoke with Defendants about their Instagram strategy. Ex. 11 at 36:11-18 ("Q: Why not speak with VPX employees to understand what their approach on Instagram is? A: I didn't need to. I was rebutting Professor Carpenter's report.").

hashtag blocks. There is thus no reliable foundation for his conclusion that Professor Carpenter wrongly included hashtag blocks when tabulating Defendants' Super Creatine posts. *Daubert*, 509 U.S. at 590 (Expert testimony "must be supported by appropriate validation—i.e., 'good grounds,' based on what is known.").

## V.  CONCLUSION

Peter Kent's experience with Instagram is limited to his occasional personal use of the platform. This experience does not make him an Instagram expert. Mr. Kent's conclusions further illustrate his lack of specialized knowledge with the platform: they are baseless and unreliable. For these reasons, Monster respectfully requests that the Court exclude Peter Kent from offering these opinions at trial.

Dated:  December 20, 2021

Respectfully submitted,

HUESTON HENNIGAN LLP

By: *Sourabh Mishra*
Sourabh Mishra

Attorneys for Plaintiff
Monster Energy Company