John C. Hueston, State Bar No. 164921
*jhueston@hueston.com*
Moez M. Kaba, State Bar No. 257456
*mkaba@hueston.com*
Allison L. Libeu, State Bar No. 244487
*alibeu@hueston.com*
HUESTON HENNIGAN LLP
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone:   (213) 788-4340
Facsimile:    (888) 775-0898

Attorneys for Plaintiff
Monster Energy Company

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>VITAL PHARMACEUTICALS, INC., d/b/a VPX Sports, a Florida corporation; and JOHN H. OWOC a.k.a. JACK OWOC, an individual,<br><br>        Defendant. | Case No. 5:18-cv-1882-JGB-SHK<br><br>**PLAINTIFF MONSTER ENERGY COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN TESTIMONY OF DEFENDANTS' EXPERT WITNESS DREW VOTH**<br><br>Date: February 7, 2022<br>Time: 9:00 a.m.<br>Courtroom: 1<br>Judge: Hon. Jesus G. Bernal |

## REDACTED VERSION OF DOCUMENT
## PROPOSED TO BE FILED UNDER SEAL

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................1

II.   BACKGROUND ...................................................................................3

      A.    Monster's Expert Calculates Damages for Defendants' False Advertising .......................................................................3

      B.    Mr. Voth's Cost Methodology Relies on the Erroneous Assumption that Virtually All of VPX's Sales Are Attributable to BANG ....................................................................4

            1.    Mr. Voth's Variable Contribution Margin Analysis Wrongly Assumes that BANG Represents Virtually All of VPX's Sales.............................................................4

            2.    Mr. Voth's Incremental Cost Analysis Wrongly Assumes that BANG Represents Virtually All of VPX's Sales Since 2015 .............................................................5

            3.    BANG Does Not Make Up Virtually All of VPX's Sales .................................................................................6

      C.    Mr. Voth Failed to Conduct an Apportionment Analysis...................7

III.  LEGAL STANDARD ...........................................................................8

IV.   ARGUMENT .........................................................................................9

      A.    Mr. Voth's Cost Analyses Must Be Excluded Because They Depend on an Erroneous Assumption ..........................................9

      B.    Mr. Voth's Apportionment Opinion Must Be Excluded Because He Failed to Conduct an Independent Apportionment Analysis ....................................................................12

            1.    Mr. Voth Improperly Assumes Lack of Materiality................12

            2.    Mr. Voth Relies on Defendants' Survey Expert Without Conducting Any Independent Analysis.....................14

            3.    Mr. Voth's Apportionment Opinion Is Unsound ...................15

V.    CONCLUSION ...................................................................................17

MONSTER'S MEMO ISO MOTION TO EXCLUDE CERTAIN TESTIMONY OF DREW VOTH

6099074

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Alloys Int'l, Inc. v. Aeronca, Inc.*,
2012 WL 13018597 (S.D. Ohio Oct. 23, 2012)....................................................2, 12

*Black Card LLC v. Visa USA Inc.*,
2020 WL 8513302 (D. Wyo. Sept. 9, 2020)............................................................15

*Cholakyan v. Mercedes-Benz, USA, LLC*,
281 F.R.D. 534 (C.D. Cal. 2012)................................................................3, 14, 15

*City of Pomona v. SQM N. Am. Corp.*,
866 F.3d 1060 (9th Cir. 2017) ..................................................................................9

*Colby v. Newman*,
2012 WL 12885118 (C.D. Cal. Nov. 20, 2012) ....................................................10

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)..............................................................................................9, 15

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ....................................................................................9

*Dorman Prod., Inc. v. Paccar, Inc.*,
201 F. Supp. 3d 663 (E.D. Pa. 2016) .....................................................................14

*Edwards Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*,
2021 WL 5407316 (N.D. Cal. Nov. 18, 2021) ......................................................13

*Est. of Barabin v. AstenJohnson, Inc.*,
740 F.3d 457 (9th Cir. 2014) ....................................................................................9

*Fifty-Six Hope Road v. Jammin Java Corp.*,
2017 WL 2992743 (C.D. Cal. May 30, 2017)..................................................10, 12

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
772 F.2d 505 (9th Cir. 1985) ..................................................................................10

*In re Imp. Credit Indus., Inc. Secs. Litig.,*
    252 F. Supp. 2d 1005 (C.D. Cal. 2003) .................................................. 14

*In re Toyota Motor Corp. Unintended Acceleration Mkt'g, Sales Pracs. & Prods. Liab. Litig.,*
    978 F. Supp. 2d 1053 (C.D. Cal. 2013) .................................................... 9

*In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prods. Liab. Litig.,*
    424 F. Supp. 3d 781 (N.D. Cal. 2020) .................................................... 16

*Indect USA Corp. v. Park Assist, LLC,*
    2021 WL 4311002 (S.D. Cal. Sept. 22, 2021) ........................................ 13

*In-N-Out Burgers v. Smashburger IP Holder LLC,*
    2019 WL 1431904 (C.D. Cal. Feb. 6, 2019) .......................................... 12

*Power Integrations, Inc. v. Fairchild Semi. Int'l, Inc.,*
    711 F.3d 1348 (Fed. Cir. 2013) ............................................................ 10

*Lust v. Merrell Dow Pharm., Inc.,*
    89 F.3d 594 (9th Cir. 1996) .................................................................... 9

*Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC,*
    2019 WL 13045054 (C.D. Cal. Feb. 28, 2019) ................................. 10, 12

*Montgomery Cnty. v. Microvote Corp.,*
    320 F.3d 440 (3d Cir. 2003) ................................................................. 10

*O'Conner v. Commonwealth Edison Co.,*
    13 F.3d 1090 (7th Cir. 1994) ................................................................ 13

*Out of the Box Enters., LLC v. El Paseo Jewelry Exch., Inc.,*
    2012 WL 12893524 (C.D. Cal. June 27, 2012) ................................. 16, 17

*Philips N. Am. LLC v. Summit Imaging Inc.,*
    2021 WL 2118400 (W.D. Wash. May 25, 2011) ...................................... 2

*Primiano v. Cook,*
    598 F.3d 558 (9th Cir. 2010) .................................................................. 9

*Soldo v. Sandoz Pharm. Corp.*,
    244 F. Supp. 2d 434 (W.D. Pa. 2003)........................................................13

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997) ...............................................................12

*United States v. Young*,
    571 F. App'x 558 (9th Cir. 2014) ..............................................................9

**<u>Statutes</u>**

15 U.S.C. § 1117(a) ..........................................................................1, 3, 10

15 U.S.C. § 1125(a)(1)(B) ...........................................................................3

**<u>Rules</u>**

Fed. R. Evid. 702 ...........................................................................*passim*

## I.     INTRODUCTION

Plaintiff Monster Energy Company ("Monster") moves to exclude cost and apportionment opinions offered by Drew Voth, a damages expert retained by Defendants Vital Pharmaceuticals, Inc. ("VPX") and John H. Owoc, relating to Monster's Lanham Act claim for VPX's false advertising of "Super Creatine" on its BANG energy drinks.

Plaintiffs in Lanham Act cases can recover "defendant's profits." 15 U.S.C. § 1117(a). The plaintiff need only prove "defendant's sales," while the "defendant must prove all elements of cost or deduction claimed" and apportionment. *Id*. Monster here seeks recovery of VPX's ill-gotten profits from Defendants' false advertising of certain BANG-branded products advertised as containing "Super Creatine," or creatyl-L-leucine ("CLL"). Monster's expert Christian Tregillis submitted an opening expert report that calculated BANG sales since 2015 relating to its false advertising.

In response, Defendants offer a rebuttal report from Mr. Voth that purports to satisfy Defendants' burdens by offering cost deduction and apportionment calculations for Defendants' sales of BANG. But both calculations suffer from fatal deficiencies that require exclusion.

*First*, Mr. Voth calculates deductible costs for the accused BANG sales in two ways: (1) based on a variable contribution margin analysis that assumes *VPX's* profit margin for all products is the same as the specific profit margin for BANG sales; and (2) based on a secondary incremental cost approach that assumes that *every* variable cost incurred by VPX since it began selling BANG with CLL in 2015 is attributable to BANG. *Both approaches* rely on the same premise: because BANG represented 99.8% of VPX's total revenue in 2020, all costs since 2015 (when BANG was less than ███ of VPX's total revenues) must have been attributable to BANG, not any other products.

But VPX's 30(b)(6) witness testified that BANG has never accounted for 99.8% of VPX's total revenue. To the contrary, BANG sales have represented less than ███

1   of VPX's sales in every year except 2020, when they were ▮▮▮ of total revenue.  As

2   for VPX's sales of *non-BANG* products, VPX admits that those sales have *increased*

3   ▮▮▮ between 2015 and 2019.  In fact, BANG as a percentage of VPX's total sales

4   *decreased* between 2020 and 2021 (through June).

5        VPX's own 30(b)(6) testimony shows that all variable VPX costs after 2015

6   cannot be solely attributable to BANG because revenue for non-BANG products also

7   increased and at least *some* of those costs must be attributable to non-BANG products.

8   Since VPX's own testimony contradicts Mr. Voth's key assumption underlying his

9   cost analyses, his cost opinions must be excluded.  *See Alloys Int'l, Inc. v. Aeronca,*

10  *Inc.*, 2012 WL 13018597, at *2 (S.D. Ohio Oct. 23, 2012) (rejecting cost analysis

11  where it rested on "an unfounded assumption" that was "not supported by the record").

12       *Second*, Mr. Voth offers an apportionment analysis for the accused BANG sales

13  that concludes that none of VPX's profits should be disgorged because Defendants'

14  prominent and widespread advertising of "Super Creatine" in BANG is immaterial.

15  As an initial matter, Mr. Voth's opinion is contrary to law: since materiality is an

16  element of liability under the Lanham Act, Mr. Voth's assumption that "Super

17  Creatine" can be immaterial even if the jury finds liability is wrong.

18       Moreover, Mr. Voth's apportionment opinion is unreliable.  His opinion is based

19  solely on the findings of Defendants' survey expert, Dr. Larry Chiagouris, who claims

20  that the words "Super Creatine" on the BANG label are immaterial to consumers'

21  purchasing decisions.  But Mr. Voth admits that he conducted no independent analysis

22  or separate apportionment analysis as required by law—he simply parrots Dr.

23  Chiagouris's opinion and concludes that the proper unjust enrichment is $0.[1]  *See*

24  *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 544 (C.D. Cal. 2012) ("An

---

[1] Indeed, Mr. Voth was recently excluded in another case for this very same error.  *See Philips N. Am. LLC v. Summit Imaging Inc.*, 2021 WL 2118400, at *10 (W.D. Wash. May 25, 2011) (finding Mr. Voth's analysis "unreliable" when "[h]e relied completely on" information received from another individual and "did not independently verify" that information).

expert's sole or primary reliance on the opinions of other experts raises serious reliability questions."). And since Dr. Chiagouris's survey purports to test only the advertising on the BANG can and not Defendants' *entire* advertising campaign, Mr. Voth's damages opinion based on that survey is irrelevant and prejudicial.

For these reasons and those further explained below, Monster respectfully requests that the Court exclude Mr. Voth's cost deduction and apportionment opinions.

## II. BACKGROUND

### A. Monster's Expert Calculates Damages for Defendants' False Advertising

The Lanham Act permits a plaintiff "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a) (applying to "a violation under section 1125(a)"); 15 U.S.C. § 1125(a)(1)(B) (false advertising prong of the Lanham Act). When the plaintiff seeks to disgorge defendant's profits, the plaintiff need only "prove defendant's sales"—"defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a).

In this case, Monster alleges that Defendants violated the Lanham Act by, among other things, falsely advertising the alleged "Super Creatine" in BANG as providing various health benefits. (ECF 61 ¶¶ 121-28.) Monster served an expert report on damages from Christian Tregillis, an experienced economist and accountant. (Ex.[2] 27.) As part of his analysis, Mr. Tregillis calculated damages for Defendants' false advertising based on an unjust enrichment/disgorgement theory.

As required by the Lanham Act, Mr. Tregillis identified VPX's sales of BANG products that bear the false advertising at issue. (*Id.* ¶ 223.) But Mr. Tregillis went beyond Monster's burden to calculate sales and calculated VPX's profits attributable to the false advertising. (*Id.* ¶¶ 223-25.) To do so, Mr. Tregillis calculated BANG's cost of goods sold and then deducted those costs from VPX's total sales. (*Id.* ¶ 225.)

---

[2] All "Ex." citations refer to the exhibits attached to the Declaration of Jennifer Popp, filed herewith.

1  Ultimately, Mr. Tregillis calculated that VPX earned approximately ███████ in

2  profits due to Defendants' false "Super Creatine" advertising.  (*Id.*)

3      **B.  Mr. Voth's Cost Methodology Relies on the Erroneous Assumption that Virtually All of VPX's Sales Are Attributable to BANG**

4

5  Defendants served an expert report from Mr. Voth as rebuttal to Mr. Tregillis.

6  (Ex. 26.)   In his report, Mr. Voth claims that Mr. Tregillis underestimated costs

7  associated with the sale of BANG.  (*Id.* ¶ 44.)  Mr. Voth proffers two alternative cost

8  calculations, which he then uses to reduce the total profits purportedly attributable to

9  sales of BANG.  (*Id.* ¶ 45.)  In neither cost methodology, however, does Mr. Voth

10  actually calculate costs associated with sales of BANG.  Instead, Mr. Voth calculates

11  costs incurred by VPX as an entire enterprise, including costs associated with the sale

12  of products not at issue in this case.  (*See id.* ¶¶ 46-48 (relying on company-wide cost

13  data).)  To be clear, BANG is only one of VPX's products.  VPX has dozens of other

14  products, including Redline, Noo Fuzion, and Meltdown.  (*Id.* ¶ 19.)  Despite this, Mr.

15  Voth simply assumes that all of VPX's costs relate to BANG.  (*Id.* ¶¶ 46-48.)

16      1.  Mr. Voth's Variable Contribution Margin Analysis Wrongly Assumes that BANG Represents Virtually All of VPX's Sales

17

18  Mr. Voth first calculates costs using a variable contribution margin analysis.

19  (*Id.* ¶ 45.)  A proper variable contribution margin analysis identifies the specific costs

20  a party incurs as a result of selling the product at issue (the "variable" costs) and

21  separates those from costs the party incurs even if it did not sell the product at issue

22  (the "fixed" costs).  Only the variable costs are then deducted from the party's total

23  revenue to arrive at a calculation of profits.  (*See* Ex. 31 at 48-50.)

24  To calculate VPX's total variable contribution margin here, Mr. Voth

25  considered costs for VPX's entire company.  (Ex. 26 ¶¶ 46-48, Sch. 1.10.)  Mr. Voth

26  then identified which of those costs were fixed and which costs were variable.  (*Id.*,

27  Sch. 1.10.)  For each year between 2015 and 2020, he summed the total variable costs

28  and then divided each year's sum by that year's net sales to arrive at the percentage of

- 4 -
MONSTER'S MEMO ISO MOTION TO EXCLUDE CERTAIN TESTIMONY OF DREW VOTH

6099074

1  variable costs of net sales. (*Id.*) And, finally, he subtracted that percentage from each
2  year's gross margin[3] for sales of BANG to arrive at his estimates of annual
3  contribution margins for BANG. (*Id.*) Mr. Voth ultimately concludes that "█████
4  ████████████████████████████████████████████████████████
5  ████████████." (*Id.* ¶ 45; *see also id.* ¶ 3(c).)

6        Mr. Voth readily admits that in calculating VPX's variable contribution margin,
7  he did not limit his analysis to only those costs associated with sales of BANG. (Ex.
8  28 at 180:9-18 (conceding costs related to VPX's Stoked product may be included in
9  costs Mr. Voth identified as variable).) Instead, Mr. Voth lumped together all of
10  VPX's costs, without analyzing whether such costs were incurred to sell BANG or to
11  sell one of the scores of other VPX products. (*See* Ex. 26, Sch. 1.10 (relying solely on
12  VPX's company-wide annual financial statements).)To try to defend his failure to
13  perform this critical analysis, Mr. Voth argued that he did not need to do so because
14  the BANG products at issue "██████████████████████████████████
15  ██████████." (*Id.* ¶ 44; *see also* Ex. 28 at 182:22-184:12 (arguing that any costs
16  related to VPX's other products that Mr. Voth included as variable are "immaterial"
17  because VPX's sales of other products "have fallen significantly since [2015]").) Mr.
18  Voth concluded that it is appropriate to use *VPX's* variable contribution margin as
19  *BANG's* variable contribution margin. (Ex. 26 ¶ 44.)

20        The reliability of Mr. Voth's methodology thus depends on his bedrock
21  assumption that BANG makes up virtually all of VPX's sales.

22        2.    Mr. Voth's Incremental Cost Analysis Wrongly Assumes that
23              BANG Represents Virtually All of VPX's Sales Since 2015

24        Mr. Voth calculates costs in a second way, which he calls the incremental cost
25  approach. (*Id.* ¶ 48.) Once again, Mr. Voth assumes that "██████████████████

26

27  ---
28  [3] Mr. Voth calculated gross margin for each year by dividing his estimate of total cost of goods sold for the BANG sales identified by Mr. Tregillis by the total revenues for those BANG sales. (Ex. 26 at Sch. 1.)

████████████████████████████████████████████████████████

██████ . . . ." (*Id.* ¶ 44.)  Based on the assumption that BANG represents almost all of VPX's total revenue, Mr. Voth claims that "████████████████████

████████████████████████████████████████████████████████

██████████████." (*Id.* ¶ 48.)

Mr. Voth explained his methodology as follows:

> The issue here revolves around which products are at issue in terms of the claim, and the claimed products are the Bang products which represent—I'm looking at the schedule now—99.8 percent of the sales of the company as of 2020.  And so virtually all of the expenses that the company incurs are really going to be variable in terms of sales of the Bang product that are being claimed here.

(Ex. 28 at 186:10-19.)  Thus, like his variable contribution margin analysis, the reliability of Mr. Voth's incremental cost methodology depends on the veracity of his assumption that BANG makes up 99.8% of VPX's sales.

After assuming that "████████████████████████████

████████████████," Mr. Voth calculates a total variable operating cost percentage of sales of ██████.  (Ex. 26 ¶ 48.)

3.    <u>BANG Does Not Make Up Virtually All of VPX's Sales</u>

During discovery, Monster served a 30(b)(6) notice on VPX that included the following Topic No. 36: "The percentage of YOUR total annual revenue for each year between 2015 and 2020 that is attributable to: (1) BANG; and (2) BANG MASTER BLASTER." (Ex. 30 at 7.)  VPX designated Robbie Durand, VPX's Vice President of Media, as its 30(b)(6) witness on this topic.

At deposition, Mr. Durand testified that sales of BANG have been a different percentage of VPX's total revenues depending on the year.  (Ex. 29 at 87:9-91:1.)  In 2015, for example, sales of BANG were only ██████ of VPX's total revenue.  (Ex. 29 at 88:17-21; Ex. 32.)  This is a far cry from Mr. Voth's assumption that BANG has made up virtually all of VPX's sales.  Since 2015, the percentage of VPX's revenue

1   attributable to BANG has trended upward: in 2016, it was ████; in 2017, it was

2   ████; in 2018, it was ████; and in 2019, it was ████. (Ex. 29 at 89:2-90:7;

3   *see also* Ex. 32.) Yet none of these numbers comes close to Mr. Voth's 99.8%. Indeed,

4   in 2020, the only year to cross the ████ threshold, sales of BANG were ████ of

5   VPX's revenues, meaning ████ of VPX's sales were attributable to other products.

6   (Ex. 29 at 90:12-15; Ex. 32.) Mr. Voth assumes that other products account for only

7   0.2% of VPX's sales, a figure 35 times less than the actual number. Mr. Voth's

8   assumption is even more off base in every other year since 2015.

9          **C.    Mr. Voth Failed to Conduct an Apportionment Analysis**

10         Mr. Voth acknowledges that, in addition to bearing the burden to prove costs,

11  Defendants bear the burden to apportion sales for unjust enrichment. (Ex. 28 at 45:3-

12  51:19 (admitting that he authored a practice aid stating that plaintiff only needs to

13  identify the "quantum of sales" while defendant has the burden to apportion and

14  identify relevant costs); Ex. 31 at 87 (Mr. Voth-authored practice aid).) Yet Mr. Voth's

15  only affirmative apportionment opinion is that there should be no apportionment in

16  this case. (Ex. 26 ¶¶ 72-77, Sch. 1.) Mr. Voth purports to apply an apportionment

17  percentage of *zero* to VPX's sales since 2015, concluding that Monster is entitled to

18  recover nothing on its false advertising claims. (*Id.* at Sch. 1.)

19         Mr. Voth explains his failure to do an apportionment analysis by pointing to a

20  survey conducted by another of Defendants' experts, Dr. Larry Chiagouris. (*Id.* ¶¶ 72-

21  77.) In the survey, Dr. Chiagouris separated respondents into two groups—a test group

22  and a control group. (Ex. 37 ¶ 33.) He showed the respondents two images of the

23  BANG label, but he removed the words "Super Creatine" from the images shown to

24  the control group. (*Id.*; *see also id.* at VPX-LC-00080-85.) Respondents were then

25  asked (1) how they would "describe" BANG to someone else and (2) whether they

26  were interested in purchasing BANG. (Ex. 37 at VPX-LC-00081-82.) Based on the

27  results to those questions, Dr. Chiagouris opined that the Super Creatine advertising

28  on cans of BANG is immaterial to consumers. (Ex. 37 ¶ 16; Ex. 26 ¶ 72.)

Unlike Dr. Chiagouris's survey, Monster's false advertising claims are not limited to statements on the BANG can.  (*E.g.*, ECF 437-1 at 22-25.)  VPX has made legions of false claims about "Super Creatine" that have nothing to do with the can, including in advertising on its website, in social media, and in presentations to retailers.  (*Id.*)  Even with respect to the can, Dr. Chiagouris's survey did not test all of Defendants' false statements, such as Defendants' erroneous claim that drinks like Monster cause a "sugar crash."  (Ex. 40 at 340:6-18 (Dr. Chiagouris conceding he is "not offering anything about" whether the "sugar crash [statement] impacts consumers' purchasing decisions").)

Mr. Voth also admits that Dr. Chiagouris's survey is the sole basis for his apportionment opinions.   (Ex. 28 at 212:10-22 (Mr. Voth has no "alternative calculation of apportionment" if Dr. Chiagouris's survey is excluded); *see also id.* at 196:21-198:4 (same).)  Yet, at deposition, Mr. Voth conceded that, except for certain statements on the can, Dr. Chiagouris's survey does not test the materiality of Defendants' claims about Super Creatine or of Defendants' "sugar crash" statement—in other words, the vast majority of the statements at issue in this case. (*Id.* at 162:6-11, 215:17-217:5.)

When confronted with the limited scope of Dr. Chiagouris's survey at deposition, Mr. Voth admitted that his opinion that there should be no apportionment is limited to sales resulting solely from the "Super Creatine" references on the BANG label.  (*Id.* at 212:10-217:5.)  Mr. Voth further admitted that he did not perform an analysis and does not have an opinion on the proper apportionment of sales attributable to Defendants' *entire* marketing campaign about Super Creatine or sugar crashes.  (*Id.*; *see also id.* at 195:24-196:14 (conceding he has not "performed an independent survey . . . to come up with" an apportionment percentage).)

## III.   LEGAL STANDARD

Federal Rule of Evidence 702 requires the Court to act as a gatekeeper to ensure that expert opinions are relevant, reliable, and helpful to the jury.  *See* Fed. R. Evid.

- 8 -

6099074

702(a); *Primiano v. Cook*, 598 F.3d 558, 563-64 (9th Cir. 2010) (expert testimony must assist the trier of fact in understanding evidence or determining a fact in issue); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) (holding that expert testimony must be both relevant and reliable to be admissible). "A trial court's 'gatekeeping' obligation to admit only expert testimony that is both reliable and relevant is especially important 'considering the aura of authority experts often exude, which can lead juries to give more weight to their testimony.'" *In re Toyota Motor Corp. Unintended Acceleration Mkt'g, Sales Pracs. & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1064 (C.D. Cal. 2013). As the testimony's proponent, Defendants bear the burden of showing that the testimony is admissible. *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

*Daubert* motions serve an important function in assessing the admissibility of expert opinions. *See Est. of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464 (9th Cir. 2014) (reversing district court denial of *Daubert* motion where the district court based its decision on the existence of "a strong divide among both scientists and courts on whether such expert testimony is relevant" and did not make its own determination that the testimony was relevant and reliable); *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1069 (9th Cir. 2017) (same); *United States v. Young*, 571 F. App'x 558, 559 (9th Cir. 2014) (same). The Court retains "discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations and quotation marks omitted). "[T]he test under *Daubert* is not the correctness of [experts'] conclusions but the soundness of [their] methodology." *Daubert*, 43 F.3d 1311, 1318 (9th Cir. 1995).

## IV.    ARGUMENT

### A.    Mr. Voth's Cost Analyses Must Be Excluded Because They Depend on an Erroneous Assumption

Federal Rule of Evidence 702 requires that expert opinions rest on "sufficient

- 9 -

1  facts or data" and that the expert "reliably appl[y] the principles and methods [they]

2  use] to the facts of the case."  An expert thus must conduct an independent analysis

3  that is "connected to existing data" by more than just "the *ipse dixit* of the expert."

4  *Colby v. Newman*, 2012 WL 12885118, at *6 (C.D. Cal. Nov. 20, 2012).  For that

5  reason, courts routinely exclude expert witnesses who offer opinions that rest on

6  incorrect facts, data, or assumptions.  *See, e.g.*, *Montgomery Cnty. v. Microvote Corp.*,

7  320 F.3d 440, 448 (3d Cir. 2003) (finding expert's data source unreliable where "some

8  of the things that were shown to [the expert] he didn't seem to know where they were

9  from or what the source of them were"); *Power Integrations, Inc. v. Fairchild Semi.*

10 *Int'l, Inc.*, 711 F.3d 1348, 1373-74 (Fed. Cir. 2013) ("[W]hile an expert's data need

11 not be admissible, the data cannot be derived from a manifestly unreliable source.").

12 Indeed, an expert must "independently verify" that the data underlying the expert's

13 opinion is accurate.  *See Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC*, 2019

14 WL 13045054, at *4 (C.D. Cal. Feb. 28, 2019).

15     In a Lanham Act case, the defendant bears the burden of proving the amount of

16 any costs to deduct from total sales.  15 U.S.C. § 1117(a).  A defendant's costs cannot

17 be deducted unless the defendant proves that those costs were of "actual assistance in

18 the production, distribution or sale" of the products at issue.  *Fifty-Six Hope Road v.*

19 *Jammin Java Corp.*, 2017 WL 2992743, at *4 (C.D. Cal. May 30, 2017) (citing *Frank*

20 *Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 516 (9th Cir. 1985)).

21     Here, Mr. Voth's cost opinions are unreliable because he failed to conduct the

22 required analysis to determine whether any of VPX's costs were of "actual assistance"

23 in the production, distribution, or sale of the BANG products at issue.  In lieu of that

24 analysis, Mr. Voth simply assumes that *every cost incurred by VPX since 2015* is a

25 cost that can be fairly attributed to BANG.  (Ex. 26 ¶ 48 ████████████████████

26 ████████████████████████████████████████████████████████████

27 ███████████████████.".)  Mr. Voth claims that it is reasonable to make this

28 assumption because "███████████████████████████████████████

- 10 -

1 █████████████████████████████████████████████████████████████." (*Id.*

2 ¶ 44.; *see also* Ex. 28 at 167:21-25 ("[T]he claimed products and sales account for

3 almost 100 percent of the sales of the company, in which case virtually almost 100

4 percent of the costs would be relevant.").)

5      Based on his assumption that all of VPX's revenue growth since 2015 is

6 attributable to sales of BANG, Mr. Voth concludes: (1) as part of his variable

7 contribution margin analysis, VPX's profit margin can be assumed to be the same as

8 BANG's profit margin; and (2) as part of his incremental cost analysis, all of VPX's

9 operating costs may be deducted from sales of BANG.

10      For Mr. Voth's cost analysis to be reliable, he admits that BANG must account

11 for *all* of VPX's revenue growth since 2015—that way, it is proper to assume that any

12 costs VPX incurred since 2015 were attributable to the BANG products at issue. (*See,*

13 *e.g.*, Ex. 26 ¶ 48.) Yet, VPX's 30(b)(6) witness testified that BANG never made up

14 99.8% of VPX's total revenue, as Mr. Voth assumed. (Ex. 29 at 88:8-91:1.) Indeed,

15 during the relevant time period, BANG's annual percent of VPX's sales was as low as

16 ████. (*Id.* at 88:17-21; Ex. 32.) At most, in 2020, BANG was ████ of total VPX

17 revenues. (Ex. 29 at 90:12-15; Ex. 32.) As set forth in the table below, a material

18 portion of VPX's revenues has been attributable to *other* products, contrary to Mr.

19 Voth's assumption:

20
| Year | Non-BANG Revenue |
|------|------------------|
| 2015 | ████████ |
| 2016 | ████████ |
| 2017 | ████████ |
| 2018 | ████████ |
| 2019 | ████████ |
| 2020 | ████████ |

28 (*See* Ex. 32.)

MONSTER'S MEMO ISO MOTION TO EXCLUDE CERTAIN TESTIMONY OF DREW VOTH

6099074

Mr. Voth's opinion that all incremental costs since 2015 are attributable to BANG depends on the faulty assumption that BANG constitutes virtually all of VPX's sales since 2015. This assumption conflicts with undisputed fact, rendering Mr. Voth's opinions unreliable under *Daubert*. *See Alloys*, 2012 WL 13018597, at *2 (rejecting incremental cost analysis where it rested on "an unfounded assumption" that was "not supported by the record"); *see also Mission Viejo Florist*, 2019 WL 13045054, at *4 (excluding damages opinion depending on an "unverified estimate" of "in-store sales" when expert "engaged in no independent analysis to determine whether this [estimate] was accurate").

Mr. Voth's cost opinions also conflict with the Ninth Circuit's requirement limiting defendants' deductions to costs that are of actual assistance in the production, distribution, and sale of the products at issue. *Fifty-Six Hope Road*, 2017 WL 2992743, at *4. Because Mr. Voth performed no such analysis, his cost opinions are irrelevant.

### B.   Mr. Voth's Apportionment Opinion Must Be Excluded Because He Failed to Conduct an Independent Apportionment Analysis

Mr. Voth's 0% apportionment analysis must be excluded for three independent reasons: (1) it is contrary to law; (2) Mr. Voth performs no independent analysis and instead relies entirely on an opinion of Defendants' survey expert, Dr. Larry Chiagouris; and (3) Mr. Voth's methodology is unsound.

#### 1.   Mr. Voth Improperly Assumes Lack of Materiality

Under the Lanham Act, liability for false advertising requires a finding that the alleged false statements (here, about "Super Creatine") are material to consumers' purchasing decisions. *See, e.g.*, *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) ("the deception is material, in that it is likely to influence the purchasing decision"). To reach the damages question under the Lanham Act, a factfinder must first find that the alleged false statement is "likely to influence the purchasing decision." *In-N-Out Burgers v. Smashburger IP Holder LLC*, 2019 WL 1431904, at *7-8 (C.D. Cal. Feb. 6, 2019).

1  Though Mr. Voth claims that he is assuming liability in arriving at his damages

2  opinions (Ex. 26 ¶¶ 2, 103), his apportionment opinion relies on the assumption that

3  Defendants' false advertising of "Super Creatine" is not material and has no impact on

4  consumers' purchasing decisions.  (*Id.* ¶¶ 72-77.)  As discussed above, Mr. Voth's

5  assumption is based solely on Dr. Chiagouris's survey:

6

7

8

9

10

11  (*Id.* ¶ 3(d) (emphases added).)  Mr. Voth's assumption regarding the immateriality of

12  the "Super Creatine" advertising thus directly contradicts a finding of liability, which

13  Mr. Voth purportedly assumed as well.  Indeed, Mr. Voth could not explain at

14  deposition how his apportionment opinion could be consistent with a finding that

15  Defendants' false advertising is material.  (Ex. 28 at 213:2-214:23.)  This renders

16  Mr. Voth's analysis unreliable under his own methodology.  *Soldo v. Sandoz Pharm.*

17  *Corp.*, 244 F. Supp. 2d 434, 561 (W.D. Pa. 2003) (*Daubert* requires exclusion "where

18  [the] expert did not follow his own expressed methodology" (quoting *O'Conner v.*

19  *Commonwealth Edison Co.*, 13 F.3d 1090, 1106-07 (7th Cir. 1994)).

20  For this reason, courts routinely exclude opinions of damages experts, like

21  Mr. Voth here, who claim they are assuming liability but then make assumptions or

22  offer opinions contradicting a necessary element of liability.  *See, e.g.*, *Edwards*

23  *Lifesciences Corp. v. Meril Life Scis. Pvt. Ltd.*, 2021 WL 5407316, at *3 (N.D. Cal.

24  Nov. 18, 2021) ("[T]he Court does not understand how Dr. Vigil can at the same time

25  assume that Plaintiffs have met their burden of proving that Defendants' statements

26  were 'literally false' or 'literally true but likely to mislead consumers' and testify, on

27  the other hand, that Defendants' statements were unlikely to confuse consumers

28  because they were correct when made."); *Indect USA Corp. v. Park Assist, LLC,* 2021

- 13 -

WL 4311002, at \*3–4 (S.D. Cal. Sept. 22, 2021) ("Park Assist is free to solicit testimony from Mr. Wacek that challenges Indect's calculation of damages. Park Assist cannot, however, use Mr. Wacek as a vehicle to challenge causation."); *c.f. Dorman Prod., Inc. v. Paccar, Inc.,* 201 F. Supp. 3d 663, 690 (E.D. Pa. 2016), *as amended* (Oct. 17, 2016) ("All damages expert opinions are dependent, for example, on the assumption that liability has been proven.").

Under these principles, the Court should exclude Mr. Voth's legally unreliable and internally inconsistent 0% apportionment opinion.

2. <u>Mr. Voth Relies on Defendants' Survey Expert Without Conducting Any Independent Analysis</u>

Federal Rule of Evidence 702 requires expert testimony to be "based on sufficient facts or data" and "the product of reliable principles and methods." Fed. R. Evid. 702(b)-(c). This rule "do[es] not permit an expert to rely upon excerpts from opinions developed by another expert for the purposes of litigation" as the sole basis for the expert's own opinions. *In re Imp. Credit Indus., Inc. Secs. Litig.*, 252 F. Supp. 2d 1005, 1012 (C.D. Cal. 2003); *Cholakyan*, 281 F.R.D. at 544 ("An expert's sole or primary reliance on the opinions of other experts raises serious reliability questions.").

Mr. Voth opines that none of VPX's profits are attributable to Defendants' false advertising of "Super Creatine," (Ex. 26 ¶ 77), and thus applies an apportionment percentage of zero to all VPX's sales between 2015 and 2020. (*Id.* at Sch. 1.)

But the only basis for Mr. Voth's zero apportionment opinion is Dr. Chiagouris's opinion that the words "Super Creatine" appearing on cans of BANG are not material to consumers' purchasing decisions. (*See id.* ¶¶ 72-77; *id.* at Sch. 1 n. 10 (citing only "the Chiagouris Surveys" to support apportionment percentage).) At deposition, Mr. Voth conceded that his conclusion of "no apportionment" is based on Dr. Chiagouris's survey, and that he "do[es not] have [] an alternative calculation of apportionment" absent Dr. Chiagouris's findings. (Ex. 28 at 212:6-22.)

Mr. Voth also admits that he did not conduct an independent analysis to verify the reliability or veracity of Dr. Chiagouris's findings.  Mr. Voth testified at deposition that he did "not separately analyze[] [Dr. Chiagouris's] survey design or his 12 qualifying questions or anything of that nature."  (*Id.* at 218:2-9.)  Nor did Mr. Voth "do an analysis" to "determine if there were any inconsistencies in" Dr. Chiagouris's survey data, despite performing such an analysis of the survey administered by Dr. Cowan, Monster's survey expert.  (*Id.* at 219:8-14.)  In fact, Mr. Voth repeated that he must "defer" to Dr. Chiagouris for any questions relating to the meaning or scope of Dr. Chiagouris's surveys, and by extension, the scope of Mr. Voth's apportionment opinion.  (*See, e.g.*, *id.* at 215:7-23; 217:8-218:1.)

Mr. Voth's blind reliance on Dr. Chiagouris's survey as the sole basis for his apportionment opinion requires exclusion of that opinion.  *See Cholakyan*, 281 F.R.D at 546 (excluding expert testimony as unreliable when the expert merely "took [another expert's] conclusions, engaged in little, if any, evaluation of their merits, and reproduced" the other expert's findings).[4]

### 3.    Mr. Voth's Apportionment Opinion Is Unsound

Mr. Voth's apportionment opinion suffers from a final, fatal flaw: his methodology is without basis.  Thus, Mr. Voth's opinion will not "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).

An expert's opinion must "fit" the facts of the case to be admissible.  *Daubert*, 509 U.S. at 591; *see Black Card LLC v. Visa USA Inc.*, 2020 WL 8513302, at *3 (D. Wyo. Sept. 9, 2020) (excluding damages experts' opinions that were "not relevant to, or do not 'fit,' the issues" in the case).  Put differently, "[e]xpert testimony should clarify the evidence, not confuse it."  *Out of the Box Enters., LLC v. El Paseo Jewelry*

---

[4] For the reasons set forth in a separate motion filed concurrently with this motion, Dr. Chiagouris's opinion suffers from several significant flaws that merit exclusion.  If the Court grants that motion and excludes Dr. Chiagouris's opinion, Mr. Voth's apportionment opinion must also be excluded, given Mr. Voth's admission that he "do[es] not] have [] an alternative calculation of apportionment" absent Dr. Chiagouris's survey.  (Ex. 28 at 212:6-22.)

MONSTER'S MEMO ISO MOTION TO EXCLUDE CERTAIN TESTIMONY OF DREW VOTH

6099074

1    *Exch., Inc.*, 2012 WL 12893524, at *8 (C.D. Cal. June 27, 2012).  The law thus

2    "require[s] exclusion of an expert's testimony" that depends on "unjustified

3    extrapolations from existing data."  *E.g.*, *In re Viagra (Sildenafil Citrate) & Cialis*

4    *(Tadalafil) Prods. Liab. Litig.*, 424 F. Supp. 3d 781, 790 (N.D. Cal. 2020).  Yet, this

5    is precisely what Mr. Voth attempts to do in this case.

6         Monster has alleged that Defendants engaged in a widespread false advertising

7    campaign about the "Super Creatine" in BANG and purported "sugar crashes" caused

8    by consuming Monster's beverages.  (ECF 61 ¶¶ 42-59, 85-98.)  As noted above,

9    Monster's allegations are not limited to the statements appearing on the BANG can,

10   but encompass Defendants' extensive advertising about Super Creatine on social

11   media, on their website, and in other contexts.  *See supra* § II.C.

12        Mr. Voth contends that apportionment of zero percent applies to all of VPX's

13   sales based on Dr. Chiagouris's survey.  (*See* Ex. 26 at Sch. 1.)  But as Mr. Voth and

14   Dr. Chiagouris admit, Dr. Chiagouris's survey is limited to the materiality of the words

15   "Super Creatine" on the BANG can; Dr. Chiagouris did not test the materiality of any

16   of Defendants' other advertising of Super Creatine.  (Ex. 28 at 162:6-11, 215:17-

17   217:5.)  For that reason, even if Mr. Voth could rely on Dr. Chiagouris's survey to

18   proffer an apportionment opinion related to statements on the BANG can, Mr. Voth

19   cites nothing in support of his opinion that he can extrapolate that analysis to all of

20   Defendants' sales.  *See In re Viagra*, 424 F. Supp. 3d at 790, 797 (excluding expert

21   because his "unjustified extrapolation[]" was "untethered to the evidence"); Fed. R.

22   Evid. 702(b) (expert's opinion must be "based on sufficient facts or data").

23        In other words, Mr. Voth applies zero percent apportionment across the board,

24   essentially presuming that all of Defendants' false statements were immaterial.  (*See*

25   Ex. 26 at Sch. 1.)  Yet Mr. Voth readily admits that, except for statements on the

26   BANG can, neither he nor Dr. Chiagouris analyzed whether Defendants' false

27   statements were material.  (Ex. 28 at 162:6-11, 215:17-217:5.)  There is thus no basis

28   for Mr. Voth's opinion that a zero percent apportionment applies to all of Defendants'

- 16 -

1  sales.  Accordingly, Mr. Voth should be precluded from offering an apportionment

2  opinion at trial.

3      Mr. Voth's opinion is also of no use to the jury, and so must be excluded for

4  that additional reason.  As discussed above, Mr. Voth says that he assumes liability.

5  (Ex. 26 ¶¶ 2, 103.)   In reality, Mr. Voth assumes the opposite.  Specifically, by

6  applying zero percent apportionment, Mr. Voth assumes that the false statements at

7  issue were not material.  However, Mr. Voth has not done the analysis to determine

8  whether the statements were material.  Thus, his opinion is both irrelevant and

9  confusing to the jury. *See Out of the Box Enters.*, 2012 WL 12893524, at *8 (holding

10 that an expert's testimony must "clarify the evidence, not confuse it").

## V.    CONCLUSION

12     Neither Mr. Voth's cost analyses nor his apportionment opinion is reliable.  The

13 former depends on an incorrect assumption about the percentage of BANG sales that

14 is directly contradictory to binding testimony by VPX's own 30(b)(6) witness.  The

15 latter is unsupported by any independent analysis by Mr. Voth and will only confuse

16 the jury.  As a result, Mr. Voth's opinions fail to satisfy the requirements of Rule 702

17 and *Daubert*.  The Court should thus exclude Mr. Voth from offering these opinions

18 at trial.

20 Dated:  December 20, 2021         Respectfully submitted,

21                                   HUESTON HENNIGAN LLP

23                           By: _____

24                                   Allison L. Libeu
                                     Attorneys for Plaintiff
25                                   Monster Energy Company