UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 18-1882 JGB (SHKx)** | Date | August 2, 2022 |
|---|---|---|---|

| Title | ***Monster Energy Company v. Vital Pharmaceuticals, Inc., et al.*** |
|---|---|

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):          Attorney(s) Present for Defendant(s):

None Present                    None Present

Proceedings:      **Order (1) GRANTING IN PART AND DENYING IN PART Plaintiff's Motions to Exclude Dr. Keykavous Parang (Dkt. No. 580); (2) DENYING Plaintiff's Motion to Exclude Drew Voth (Dkt. No. 578); (3) DENYING Plaintiff's Motion to Exclude Dr. Larry Chiagouris (Dkt. No. 579); (4) GRANTING IN PART AND DENYING IN PART Plaintiff's Motion in Limine No. 1 (Dkt. No. 622); (5) DENYING Plaintiff's Motion in Limine No. 2 (Dkt. No. 623); (6) GRANTING IN PART AND DENYING IN PART Plaintiff's Motion in Limine No. 3 (Dkt. No. 625); (7) GRANTING Plaintiff's Motion in Limine No. 4 (Dkt. No. 626); (8) DENYING Defendants' Motion to Exclude Christian Tregillis (Dkt. No. 567); (9) GRANTING IN PART AND DENYING IN PART Defendants' Motion to Exclude Dr. Gregory Carpenter (No. 568); (10) DENYING Defendants' Motion to Exclude Dr. Charles Cowan (Dkt. No. 569); (11) DENYING Defendants' Motion to Exclude Dr. Darren Candow (Dkt. No. 571); (12) DENYING Defendants' Motion to Exclude Dr. Richard Kreider (Dkt. No. 572); (13) GRANTING Defendants' Motion in Limine No. 1 (Dkt. No. 617); and (14) GRANTING Defendants' Motion in Limine No. 2 (Dkt. No. 618).**

Before the Court are Plaintiff Monster Energy Company's ("Monster" or "Plaintiff") motions to exclude (Dkt. Nos. 578, 579, 580) and motions in limine (Dkt. Nos. 622, 623, 625, 626), and Defendant Vital Pharmaceuticals, Inc. and John H. Owoc's (collectively, "Defendants") motions to exclude (Dkt. Nos. 567, 568, 569, 571, 572) and motions in limine (Dkt. Nos. 617, 618) (collectively, "Motions"). The Court held a hearing on the Motions on July

25, 2022.  Upon consideration of the papers filed in support of and in opposition to the Motions, as well as oral argument, the Court rules as follows:

1.  GRANTS IN PART AND DENIES IN PART Plaintiff's Motions to Exclude Dr. Keykavous Parang (Dkt. No. 580);

2.  DENIES Plaintiff's Motion to Exclude Drew Voth (Dkt. No. 578);

3.  DENIES Plaintiff's Motion to Exclude Dr. Larry Chiagouris (Dkt. No. 579);

4.  GRANTS IN PART AND DENIES IN PART Plaintiff's Motion in Limine No. 1 (Dkt. No. 622);

5.  DENIES Plaintiff's Motion in Limine No. 2 (Dkt. No. 623);

6.  GRANTS IN PART AND DENIES IN PART Plaintiff's Motion in Limine No. 3 (Dkt. No. 625);

7.  GRANTS Plaintiff's Motion in Limine No. 4 (Dkt. No. 626);

8.  DENIES Defendants' Motion to Exclude Christian Tregillis (Dkt. No. 567);

9.  GRANTS IN PART AND DENIES IN PART Defendants' Motion to Exclude Dr. Gregory Carpenter (No. 568);

10.  DENIES Defendants' Motion to Exclude Dr. Charles Cowan (Dkt. No. 569)

11.  DENIES Defendants' Motion to Exclude Dr. Darren Candow (Dkt. No. 571);

12.  DENIES Defendants' Motion to Exclude Dr. Richard Kreider (Dkt. No. 572);

13.  GRANTS Defendants' Motion in Limine No. 1 (Dkt. No. 617); and

14.  GRANTS Defendants' Motion in Limine No. 2 (Dkt. No. 618).

## I.  BACKGROUND

The parties are familiar with the extensive procedural and factual history of this case; the Court relates only the background necessary to understand the Motions.

On September 4, 2018, Monster initiated this action against VPX and Mr. Owoc. ("Complaint," Dkt. No. 1.)  On April 3, 2019, Monster filed a first amended complaint. ("FAC," Dkt. No. 61.)  On May 20, 2019, the Court granted in part Defendants' motion to dismiss the FAC and dismissed Count 4 and Counts 7 through 9.  ("MTD Order," Dkt. No. 95.)

On April 4, 2022, the Court held a hearing on the parties' cross motions for summary judgment.  (Dkt. No. 730.)  On April 19, 2022, the Court (1) denied Monster's partial motion for summary judgment on its Lanham Act claim; (2) granted in part VPX's motion for summary judgment on the Lanham Act claim but only with respect to false statements about the '466 Patent, granted the VPX motion on Monster's intentional interference of prospective economic advantage claim, and denied VPX's motion on all other claims; and (3) granted Mr. Owoc's motion for summary judgment on Monster's claims for intentional interference of prospective economic advantage, and claims under the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, et seq., Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., and Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et seq., against Mr. Owoc, and denied Mr. Owoc's MSJ as to the other claims.  ("MSJ Order," Dkt. No. 740.)

Monster's remaining causes of action are as follows:

(1)  Violation of the Lanham Act, 15 U.S.C. § 1125(a), against VPX and Mr. Owoc, except with regard to statements about the '466 Patent  (Count One);
(2)  Violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., against VPX and Mr. Owoc (Count Two);
(3)  Violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, et seq., against VPX and Mr. Owoc (Count Three);
(4)  Intentional interference with contractual relations against VPX and Mr. Owoc (Count Five);
(5)  Violation of the CUTSA against VPX (Count Ten);
(6)  Violation of the DTSA against VPX (Count Eleven); and
(7)  Violation of the CFAA against VPX (Count Twelve).  (See FAC; MTD Order; MSJ Order.)

At the April 4, 2022 hearing, the Court also ordered the parties to select seven of their respective pending motions to exclude and motions in limine for the Court's consideration.  (Dkt. No. 730.)  Pursuant to this order, on April 11, 2022, Monster and Defendants filed their respective notices of election of pending motions to exclude and motions in limine.  (Dkt. Nos. 735, 736.)

Monster's seven motions are as follows:

1.  Plaintiff's Motion to Exclude Defendants' Expert Dr. Keykavous Parang: On December 20, 2021, Monster filed a motion to exclude Defendants' expert Dr. Keykavous Parang.  ("Pl.'s MTE 1," Dkt. No. 580.)  On January 13, 2022, Defendants opposed.  ("Pl.'s MTE 1 Opp'n," Dkt. No. 595.)  On January 24, 2022, Monster replied.  ("Pl.'s MTE 1 Reply," Dkt. No. 654.)

2.  Plaintiff's Motion to Exclude Defendants' Expert Drew Voth: On December 20, 2021, Monster filed a motion to exclude Defendants' expert Drew Voth.  ("Pl.'s MTE 2," Dkt.

No. 578.) On January 13, 2022, Defendants opposed. ("Pl.'s MTE 2 Opp'n," Dkt. No. 597.) On January 24, 2022, Monster replied. ("Pl.'s MTE 2 Reply," Dkt. No. 655.)

3. <u>Plaintiff's Motion to Exclude Defendants' Expert Dr. Larry Chiagouris</u>: On December 20, 2021, Monster filed a motion to exclude Defendants' expert Dr. Larry Chiagouris. ("Pl.'s MTE 3," Dkt. No. 579.) On January 13, 2022, Defendants opposed. ("Pl.'s MTE 3 Opp'n," Dkt. No. 594.) On January 24, 2022, Monster replied. ("Pl.'s MTE 3 Reply," Dkt. No. 652.)

4. <u>Plaintiff's Motion in Limine No. 1</u>: On January 14, 2022, Monster filed a motion in limine to exclude evidence of third-party market research conducted by InfoScout. ("Pl.'s MIL 1," Dkt. No. 622.) On January 24, 2022, Defendants opposed. ("Pl.'s MIL 1 Opp'n," Dkt. No. 659.)

5. <u>Plaintiff's Motion in Limine No. 2</u>: On January 14, 2022, Monster filed a motion in limine to exclude evidence related to Defendants' high-dose cell study. ("Pl.'s MIL 2," Dkt. No. 623.) On January 24, 2022, Defendants opposed. ("Pl.'s MIL 2 Opp'n," Dkt. No. 660.)

6. <u>Plaintiff's Motion in Limine No. 3</u>: On January 14, 2022, Monster filed a motion in limine to exclude evidence of and references to Monster's alleged conduct. ("Pl.'s MIL 3," Dkt. No. 625.) On January 24, 2022, Defendants opposed. ("Pl.'s MIL 3 Opp'n," Dkt. No. 662.)

7. <u>Plaintiff's Motion in Limine No. 4</u>: On January 14, 2022, Monster filed a motion in limine to exclude evidence of allegations against Monster in related lawsuits between the parties in Florida. ("Pl.'s MIL 4," Dkt. No. 626.) On January 24, 2022, Defendants opposed. ("Pl.'s MIL 4 Opp'n," Dkt. No. 663.)

Defendants' seven motions are as follows:

1. <u>Defendants' Motion to Exclude Plaintiff's Expert Christian Tregillis</u>: On December 20, 2021, Defendants filed a motion to exclude the testimony of Monster's expert Christian Tregillis. ("Defs.' MTE 1," Dkt. No. 567.) On January 13, 2022, Monster opposed. ("Defs.' MTE 1 Opp'n," Dkt. No. 604.) On January 24, 2022, Defendants replied. ("Defs.' MTE 1 Reply," Dkt. No. 637.)

2. <u>Defendants' Motion to Exclude Plaintiff's Expert Dr. Gregory Carpenter</u>: On December 20, 2021, Defendants filed a motion to exclude the testimony of Monster's expert Dr. Gregory Carpenter. ("Defs.' MTE 2," Dkt. No. 568.) On January 13, 2022, Monster opposed. ("Defs.' MTE 2 Opp'n," Dkt. No. 602.) On January 24, 2022, Defendants replied. ("Defs.' MTE 2 Reply," Dkt. No. 636.)

//

**CIVIL MINUTES—GENERAL**     Initials of Deputy Clerk <u>MG</u>

3. **Defendants' Motion to Exclude Plaintiff's Expert Dr. Charles Cowan**: On December 20, 2021, Defendants filed a motion to exclude the testimony of Monster's expert Charles Cowan.  ("Defs.' MTE 3," Dkt. No. 569.)  On January 13, 2022, Monster opposed.  ("Defs.' MTE 3 Opp'n," Dkt. No. 606.)  On January 24, 2022, Defendants replied.  ("Defs.' MTE 3 Reply," Dkt. No. 640.)

4. **Defendants' Motion to Exclude Plaintiff's Expert Dr. Darren Candow**: On December 20, 2021, Defendants filed a motion to exclude the testimony of Monster's expert Dr. Darren Candow.  ("Defs.' MTE 4," Dkt. No. 571.)  On January 13, 2022, Monster filed a joint opposition to Defendants' MTE No. 4 and motion to exclude Dr. Richard Kreider ("Defs.' MTE 5, Dkt. No. 572).  ("Defs.' MTE 4 Opp'n," Dkt. No. 605.)  On January 24, 2022, Defendants filed a joint reply to Monster's joint opposition.  ("Defs.' MTE 4 Reply," Dkt. No. 641.)

5. **Defendants' Motion to Exclude Plaintiff's Expert Dr. Richard Kreider**: On December 20, 2021, Defendants filed a motion to exclude the testimony of Monster's expert Dr. Richard Kreider.  (See Defs.' MTE 5.)  On January 13, 2022, Monster opposed.  (See Defs. MTE 4 Opp'n.)  On January 24, 2022, Defendants replied.  (See Defs. MTE 4 Reply.)

6. **Defendants' Motion in Limine No. 1**: On January 14, 2022, Defendants filed a motion in limine to exclude evidence regarding Mr. Owoc's unpublished draft book.  ("Defs.' MIL 1," Dkt. No. 617.)  On January 24, 2022, Monster opposed.  ("Defs.' MIL 1 Opp'n," Dkt. No. 668.)

7. **Defendants' Motion in Limine No. 2**: On January 14, 2022, Defendants filed a motion in limine to exclude evidence of VPX's workplace environment.  ("Defs.' MIL 2," Dkt. No. 618.)  On January 24, 2022, Monster opposed.  ("Defs.' MIL 2 Opp'n," Dkt. No. 670.)

Both parties filed multiple applications to provisionally file documents related to the Motions under seal.  (Dkt. Nos. 574, 583, 598, 609, 619, 627, 642, 665, 673, 789, 793 (collectively, "Applications").)

On July 25, 2022, the Court heard arguments on the Motions and ordered the parties to submit supplemental briefing regarding Plaintiff's Motion in Limine No. 2.  (Dkt. No. 787.)  On August 1, 2022, Monster and Defendants filed their supplemental briefs.  (Dkt. Nos. 789-2, 792.)

//
//
//
//
//
//
//

**CIVIL MINUTES—GENERAL**                       Initials of Deputy Clerk MG

## II.   LEGAL STANDARDS

### A.  Application to Seal

There is a strong presumption against filing documents under seal.  See Kamakana v. City & Cnty. of Honolulu, 447 F.3d 1172, 1178 (9th Cir. 2006).  Generally, two standards govern requests to seal documents: the "compelling reasons" standard and the "good cause" standard. Pintos v. Pac. Creditors Ass'n, 605 F.3d 665, 667 (9th Cir. 2010).  The "good cause" standard is an "exception" to the "presumptive 'compelling reasons' standard" and only applies to "sealed materials attached to a discovery motion unrelated to the merits of a case."  Ctr. for Auto Safety v. Chrysler Grp., LLC, 809 F.3d 1092, 1097 (9th Cir. 2016).  For all other cases, a party seeking to seal a judicial record bears the burden of presenting "compelling reasons."  Kamakana, 447 F.3d at 1178-79.  "[T]he party must 'articulate[] compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the 'public interest in understanding the judicial process.'"  Id.  Compelling reasons exist when "court files might have become a vehicle for improper purposes, such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets."  In re Midland Nat. Life Ins. Co. Annuity Sales Practices Litig., 686 F.3d 1115, 1120 (9th Cir. 2012) (citation and quotation omitted).

### B.  Motion to Exclude

Federal Rule of Evidence 702 ("FRE 702") allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if four conditions are met: (a) the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) "the expert has reliably applied the principles and methods to the facts of the case."  FRE 702(a)-(d).

The trial court is accorded wide discretion to act as gatekeepers for the admissibility of expert testimony.  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 151–52 (1999).  A court may consider several factors to determine the reliability of an expert's opinion, including whether a theory or technique has been tested, has been subjected to peer review and publication, has a high known or potential rate of error, and "enjoys 'general acceptance' within a 'relevant scientific community.'"  Id. at 149–50 (quoting Daubert v. Merrell Dow Pharm., 509 U.S. 579, 592–94 (1993)).  "The party offering the expert bears the burden of establishing that Rule 702 is satisfied."  Sundance Image Tech., Inc. v. Cone Editions Press, Ltd., 2007 WL 935703, *4 (S.D. Cal. Mar. 7, 2007).  FRE 702 should be applied consistent with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion testimony.'"  Daubert, 509 U.S. at 588.

//
//
//

---

## C.  Motion in Limine

Motions in limine are a well-recognized judicial practice based in "the court's inherent power to manage the course of trials."  Luce v. United States, 469 U.S. 38, 41 n.4 (1984).  Regardless of its initial decision on a motion in limine, a court may revisit the issue at trial.  See Fed. R. Evid. 103, advisory committee's note to 2000 Amendment ("Even where the court's ruling is definitive, nothing in the amendment prohibits the court from revisiting its decision when the evidence is to be offered.");  Luce, 469 U.S. at 41–42 ("[E]ven if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling.").  "[A] ruling on a motion in limine is essentially a preliminary opinion that falls entirely within the discretion of the district court."  United States v. Bensimon, 172 F.3d 1121, 1127 (9th Cir. 1999) (citing Luce, 469 U.S. at 41–42).

## III.    APPLICATIONS TO SEAL

The parties apply to provisionally seal various documents relating to their motions to exclude and motions in limine.  They argue that the documents include (1) proprietary business information and product formula information, (2) company financial information, the disclosure of which creates a risk of competitive harm, (3) sensitive personal information of a non-party, and (4) documents designated as "confidential" or "highly confidential" under the parties' protective order.  (See Applications.)

As the Court discussed in the MSJ Order, "the presumption of access is not rebutted where ... documents subject to a protective order are filed under seal as attachments to a dispositive motion."  Foltz, 331 F.3d at 1136 (internal citations omitted); see also L.R. 79-5.2.2(a)(i) ("That the information may have been designated confidential pursuant to a protective order is not sufficient justification for filing under seal; a person seeking to file such documents under seal must comply with [the Local Rules].").  However, the Court finds that the combined reasons the parties provide support sealing the documents at issue.  Accordingly, the Court GRANTS the Applications.

## IV.    PLAINTIFF'S MOTIONS

Monster moves to exclude Defendants' experts Dr. Keykavous Parang, Drew Voth, and Dr. Larry Chiagouris.  (See Pl.'s MTE 1; Pl.'s MTE 2; Pl.'s MTE 3.)  Monster also moves in limine to exclude evidence of third-party market research, evidence of a cell study Defendants conducted with the University of West Florida, references to Monster's alleged conduct, and allegations against Monster in related lawsuits in Florida.  (See Pl.'s MIL 1; Pl.'s MIL 2; Pl.'s MIL 3; Pl.'s MIL 4.)

//
//
//
//

**A.  Plaintiff's MTE No. 1: Dr. Keykakous Parang**

Monster first moves to exclude the opinions of Defendants' expert Dr. Keykakous
Parang, a medicinal chemist whom Defendants retained to rebut Monster's creatine experts and
evidence.  (See Pl.'s MTE 1.)  Monster argues that: (1) Dr. Parang is unqualified to rebut
Monster's creatine experts Dr. Richard Kreider and Dr. Darren Candow;[1] (2) his opinions about
creatyl-L-leucine ("CLL") are too speculative to assist the jury; (3) he offers unreliable rebuttal
opinions about an analysis of Bang conducted by Monster's expert Dr. Derek Beauchamp,
Monster's CLL studies, and "micro-dosing"; and (4) any testimony he gives at trial would hold
little relevance and would confuse the jury.  (Id. at 1–3, 8–15.)  Monster also contends that Dr.
Parang opines on advertising matters when he is unqualified to do so.  (Id. at 10–11.)

**1.  Rebuttal Expert to Dr. Kreider and Dr. Candow**

Monster challenges Dr. Parang's qualifications as a rebuttal expert to Dr. Kreider and Dr.
Candow, its experts in creatine, kinesiology, and sports nutrition.  (Pl.'s MTE 1 at 4–5, 8.)
Monster argues that Dr. Parang is unqualified to rebut their opinions because he lacks any
experience in creatine research or literature or expertise in kinesiology or sports nutrition.  (Pl.'s
MTE 1 at 8–10.)

The Court agrees in part.  In their respective expert reports, Dr. Kreider and Dr. Candow
analyze various studies and opine on whether CLL is creatine, whether CLL is bioavailable and a
physiologically effective source of creatine, and whether CLL is a creatine supplement.  (See
Kreider Report; Candow Report.)  Nothing in Dr. Parang's background suggests that he is
qualified to offer opinions about CLL's physiological effects or about creatine supplementation.
If he had attempted to do so, such opinions would be excluded.

However, that is not the case here.  Dr. Kreider's and Dr. Candow's reports opine about
CLL's chemical structure, including whether CLL is a dipeptide of creatine.  Dr. Parang, an
expert in medicinal chemistry and peptide research, is well-qualified to critique these opinions.
As noted in his report, Dr. Parang is currently the Associate Dean of Research, Innovation, and
Global Affairs and a Full Professor of Medicinal and Pharmacology at Chapman University
School of Pharmacy.  (Parang Report ¶ 4.)  His research focuses on the fields of medicinal
chemistry, organic chemistry, nanomedicine, and drug delivery.  (Id. ¶ 5.)  For the last twenty-
one years, Dr. Parang has worked in the areas of peptide chemistry and peptide-based drug
delivery, and authored hundreds of publications in organic/medicinal and peptide chemistry.  (Id.
¶¶ 6, 8.)  This experience qualifies Dr. Parang to rebut Dr. Kreider's and Dr. Candow's
assumptions about CLL's properties.  The Court also agrees with Defendants that Dr. Parang
appropriately limits the opinions in his report to his field of expertise in chemistry and
pharmacology.  (Pl.'s MTE 1 Opp'n at 8; see Parang Report.)

---

[1] Monster does not challenge Dr. Parang's qualifications to rebut Monster's expert Dr.
Adam Renslo.  (Pl.'s MTE 1 at 16–17; Pl.'s MTE 1 Reply at 2.)

Monster argues that expertise in sports nutrition and kinesiology is still necessary because these disciplines underly the research of CLL. (Pl.'s MTE 1 Reply at 2–3.) The Court is unpersuaded. That existing CLL research is based in sports nutrition and kinesiology does not immunize such studies from chemistry-based criticisms. Even if expertise in sports nutrition or kinesiology could be helpful, it is not necessary. "Daubert does not require that the expert with the best possible qualifications testify." Zeiger v. WellPet LLC, 526 F Supp. 3d 652, 669 (N.D. Cal. 2021) (rejecting argument that "a toxicologist, not a nutritionist, [should] opine on what levels of certain chemicals are safe in pet food"); Lewert v. Boiron, Inc., 212 F. Supp. 3d 917, 925–28 (C.D. Cal. 2016) (finding that biochemist was qualified to opine on drug's dilution based on his chemical evaluation and "to opine on the credibility of clinical studies" on which adverse experts relied, even those his "experience differ[ed] in kind"). Further, "[a] lack of specialization affects the weight of the expert's testimony, not its admissibility." In re Silicone Gel Breast Implants Prods. Liability Litig., 318 F. Supp. 2d 879, 889 (C.D. Cal. 2004).

Accordingly, the Court finds that Dr. Parang is qualified to rebut the opinions of Dr. Kreider and Dr. Candow. Moreover, the Court finds that his opinions are relevant because they are probative of whether CLL is creatine. Therefore, the Court DENIES Plaintiff's MTE No. 1 with respect to Dr. Parang's qualifications as a rebuttal expert to Dr. Kreider and Dr. Candow.

### 2. Opinions about CLL

Monster next argues that Dr. Parang's opinions about CLL are too speculative. (Pl.'s MTE 1 at 11–13.) It cites Dr. Parang's deposition testimony and contends that his inability to definitively answer questions about CLL, including whether CLL is creatine, shows that his opinions are not based on sufficient facts or data. (Id.) The Court disagrees. During Dr. Parang's deposition, Monster's counsel repeatedly asked Dr. Parang whether it was his opinion that CLL is creatine or a source of creatine, and Dr. Parang responded that is was his opinion that CLL is a creatine derivative. (See Parang Depo.) Therefore, Dr. Parang drew a firm conclusion about CLL, albeit a different one from Monster. His report and deposition testimony sufficiently show that this conclusion is grounded in Dr. Parang's understanding of peptides and chemistry. That Dr. Parang did not confirm that CLL is a "source" of creatine—a key disputed issue in this case—is irrelevant to the reliability or admissibility of his opinions. Both parties also recognize that Dr. Parang is not a creatine or CLL expert. As such, it was proper that he refused to offer opinions about CLL when he did not know the answer. Further, as Dr. Parang plans to testify that there is insufficient data on CLL's potential for physiological benefits, his responses are consistent with this opinion and relevant to the questions at issue. (Id. 79:21-80:1.) Accordingly, the Court DENIES Plaintiff's MTE No. 1 with respect to Dr. Parang's opinions about CLL.

### 3. Opinions about Dr. Derek Beauchamp's HPLC Testing, CLL Studies, and "Micro-dosing"

Monster contends that Dr. Parang provides unreliable opinions about a test conducted by Monster's expert Dr. Derek Beauchamp, the dosage of CLL used in Monster's studies, and "micro-dosing." (Pl.'s MTE 1 at 14–15.) All but the last argument lack merit.

In its first argument, Monster contends that Dr. Parang critiques Dr. Beauchamp's report without providing citations.  In 2021, Monster had hired Dr. Beauchamp to evaluate 53 cans of Bang to determine if they contain creatine and/or creatinine.  (Id. at 14; Beauchamp Report ¶ 7.) Dr. Beauchamp used a technique called High Performance Liquid Chromatography ("HPLC") and could not detect creatine or creatinine in any of the tested cans.  (Pl.'s MTE 1 at 14; Beauchamp Report ¶¶ 11, 26.)  Dr. Parang opines that Dr. Beauchamp's methodology was flawed and that liquid chromatography-mass spectrometry ("LC-MS") would have been a better technique to apply than HPLC.  (Pl.'s MTE 1 Opp'n at 10; Parang Report ¶¶ 15–35.)  While Dr. Parang did not cite sources about HPLC or LC-MS in his report, he testified in his deposition that his lab "commonly" uses HPLC, that HPLC is "one of the highlights of [his] expertise," and that it is "bread and butter for us."  (Parang Depo. 259:22-260:9.)  He further testified that his lab uses mass spectrometry "every day" and that his lab has three mass spectrometry units.  (Id. 260:1-5.)  Accordingly, the Court finds that Dr. Parang's opinions about Dr. Beauchamp's study are the product of reliable principles and methods.[2]  See In re Silicone Gel Breast Implants Prods. Liability Litig., 318 F. Supp. 2d at 901 (noting that "mass spectrometry" is a "classic tool[] of the analytical chemistry trade").  Moreover, they are relevant to understand the reliability of Dr. Beauchamp's study.

Monster's second argument is that Dr. Parang offers unsupported criticisms of Monster's CLL studies, upon which Dr. Kreider and Dr. Candow had relied.  Monster had conducted in vivo studies that compared how people and mice reacted to equivalent gram doses of creatine and CLL.  (Pl.'s MTE 1 at 14; Parang Report ¶¶ 69, 72.)  According to Dr. Parang, using equivalent gram doses was "not scientifically correct" because creatine has a greater molar mass than CLL and a study using equivalent gram quantities will bias the results toward the higher performance of creatine over CLL.  (Id. ¶¶ 71–73.)  He opines that the studies should have used equimolar quantities instead.  (Parang Report ¶¶ 69–92.)  Monster argues that Dr. Parang's opinions are unreliable because he fails to cite sources or explain why using equimolar quantities is the correct method.  (Pl.'s MTE 1 at 14.)  The Court agrees that citations to facts and sources would strengthen the validity of Dr. Parang's opinions.  However, Dr. Parang can rely on his expertise as a chemist to opine about the importance of equimolar quantities.  Monster can cross-examine Dr. Parang to test deficiencies in his opinions.  Lewert, 212 F. Supp. 3d at 928.  Because the Court finds that Dr. Parang's opinions go to the credibility of Monster's experts' conclusions about CLL, they are relevant and admissible.

//
//

––––––––––––––––––

[2] Monster asserts in its reply that it never "argued[t] that Dr. Parang was not 'qualified to testify regarding HPLC and LCMS,'" and instead had argued that "Dr. Parang's opinions on those topics fail for separate, independent reasons."  (Pl.'s MTE 1 Reply at 5.)  But the motion only includes a short paragraph that states, "Dr. Parang does not cite a single source—let alone a source explaining which method is appropriate to measure creatine."  (Pl.'s MTE 1 at 14.) Monster's re-characterization of its argument in the reply is, therefore, unavailing.

Monster's third argument challenges Dr. Parang's opinions that CLL may have a "micro-dosing effect." (Pl.'s MTE 1 at 14–15.) In his deposition, Dr. Parang testified that CLL requires further study, in part, because some compounds may not generate biological activity in the short-term but could provide benefits in the long-term. (Parang Depo. 79:21-81:16.) He testified that a study could test whether CLL had micro-dosing effects. (Id. 80:18-24.) Monster argues that these opinions are unreliable because Dr. Parang fails to cite studies or literature for this theory. (Pl.'s MTE 1 at 15; Pl.'s MTE 1 Reply at 9.) The Court agrees.

While Dr. Parang may opine on what further studies on CLL should be conducted, he must demonstrate that his theory has been tested, has been subjected to peer review and publication, does not have a high known or potential rate of error, or enjoys general acceptance within a relevant scientific community. Kumho Tire Co., Ltd., 526 U.S. at 149–50 (quoting Daubert v. Merrell Dow Pharm., 509 U.S. 579, 592–94 (1993)).

Here, Dr. Parang describes micro-dosing as a "very small quantity of pharmacological compound used in the long term and it can provide benefit." (Parang Depo. 80:8-11.) However, he fails to show that this definition is consistent with the relevant scientific community or that micro-dosing is generally accepted within those communities. He only states that "[a] lot of people right now are doing microdosing" and that "[a] lot of pharmaceutical industry are working on microdosing." (Id. 80:7-13.) Dr. Parang never opines that CLL is a pharmacological compound. Nor does he explain how a technique principally used for pharmacological compounds, "especially psychedelic drugs," applies to a potential nutritional supplement. See United States v. 45/194 Kg. Drums of Pure Vegetable Oil, 961 F.2d 808, 812–13 (distinguishing data about evening primrose oil's "use as a drug and not as a dietary supplement"). Absent this information, the Court cannot find that Dr. Parang's opinions about "micro-dosing" are scientifically valid or relevant. See In re Incretin-Based Therapies Prods. Liability Litig., 524 F. Supp. 3d 1007, 1041–42 (S.D. Cal. 2021) (finding expert's hypothesis "more speculative than helpful to a jury" when "there [was] insufficient evidence to support the last link of his theory").

Accordingly, the Court GRANTS IN PART Plaintiff's MTE No. 1 and EXCLUDES Dr. Parang's opinions about "micro-dosing." The Court DENIES Plaintiff's MTE No. 1 with respect to Dr. Parang's opinions about Dr. Beauchamp's report and Monster's CLL studies.

### 4. "Marketing" Opinions

Monster finally argues that Dr. Parang improperly opines about the marketing of creatine and creatine supplements when he is unqualified to do so. (Pl.'s MTE 1 at 10–11.) But Dr. Parang does not offer such opinions in the deposition testimony Monster cites. Monster fails to identify a specific opinion in Dr. Parang's report. The only possible "marketing"-type opinion in the Parang Report is the statement that "[c]reatine supplements are marketed in ethyl ester, gluconate, monohydrate, citrate, monohydrate, and nitrate forms." (Parang Report ¶ 44.) However, this opinion describes creatine supplements, not marketing or advertising. Because Dr. Parang cites to an article about creatine supplementation in a sports nutrition journal, the opinion is also based on sufficient data. The Court DENIES Plaintiff's MTE No. 1 on this basis.

In sum, the Court GRANTS IN PART Plaintiff's MTE No. 1 and EXCLUDES Dr. Parang's opinions about "micro-dosing."  The Court DENIES Plaintiff's MTE No. 1 with respect to the remaining opinions.

## B.  Plaintiff's MTE No. 2: Drew Voth

Monster next moves to exclude cost and apportionment opinions offered in the rebuttal report of Defendants' damages expert Drew Voth.  (See Pl.'s MTE 2.)  Defendants retained Mr. Voth to rebut the opinions of Monster's damages expert Christian Tregillis about Bang sales relating to Monster's Lanham Act claim.  (Id. at 1; "Voth Report," Popp Decl., Ex. 26.)  Monster argues that Mr. Voth's opinions are based on faulty assumptions and thus unreliable.

Under the Lanham Act, prevailing plaintiffs may recover "defendant's profits."  15 U.S.C. § 1117(a).  To support its claim for such profits, Monster hired Mr. Tregillis, who calculated VPX's purported profits attributable to Defendants' alleged false advertising.  (Pl.'s MTE 2 at 3.)  Mr. Tregillis calculated Bang's cost of goods sold and then deducted those costs from VPX's total sales.  (Id.)  In response, Mr. Voth offered the following opinions at issue here:

- Mr. Tregillis overstated Defendants' variable profit margins because he underestimated costs associated with the sale of Bang (Id. at 4; Voth Report ¶ 2c); and

- There is no apportionment of Defendants' profits attributable to the alleged false advertising of Super Creatine on Bang cans because Defendants' consumer survey expert, Dr. Larry Chiagouris, had opined that such claims were immaterial to consumers' purchasing decisions.  (Pl.'s MTE 2 at 7–8; Voth Report ¶ 2d.)

### 1.  Cost Deduction Calculations

Mr. Voth first opines that Mr. Tregillis overstated Defendants' variable profit margins because Mr. Tregillis underestimated costs associated with the sale of Bang.  (Voth Report ¶ 2c.)  Mr. Voth offers two alternative cost calculations: (1) a variable contribution margin analysis, and (2) a secondary incremental cost approach.  (Pl.'s MTE 2 at 4–7.)  Monster argues that both calculations rely on an erroneous assumption that Bang products represented 99.8% of VPX's total revenue in any given year.  (Id. at 1, 4–7; Voth Report ¶ 44.)  It asserts that this percentage is an extrapolation of revenue data from 2020 and unsupported by any evidence.  (Id. at 9–11.)

As an initial matter, Mr. Voth's reliance on an assumption in and of itself is not fatal to the admissibility of his calculations.  The Ninth Circuit has "recognized that lost profits are 'necessarily an estimate.'"  Humetrix, Inc. v. Gemplus S.C.A., 268 F.3d 910, 919 (9th Cir. 2001) (internal citations omitted).  Therefore, "[a]s to the reasonableness of the assumptions underlying the experts' lost profit analysis, criticisms of an expert's method of calculation [are] a matter for the jury's consideration in weighing that evidence."  Id. (quoting Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co., 47 Cal. App. 4th 464, 489 (1996)); see also Liss v. Exel

Transp. Servs., Inc., 2008 WL 607151, at *2 (D. Ariz. Feb. 29, 2008) (noting that assumptions in expert report about profits for a particular year "affect the weight of the testimony, not the admissibility, unless the assumptions include facts not in evidence").

Mr. Voth's report attaches the schedules on which he relied to reach the 99.8% figure. (See Voth Report.) Defendants assert that these schedules are based on Mr. Voth's analysis of VPX expense accounts and conversations with key VPX personnel. (Pl.'s MTE 2 Opp'n at 7.) At the July 25, 2022 hearing, Defendants confirmed that Mr. Voth had reviewed specific, financial documents. Mr. Voth states that he had discussions with Meg Liz Owoc, VPX Director of Marketing, Brent Boucaud, VPX Financial Controller of Supply Chain Operations, and Fritz Tilus, VPX Financial Controller of General Ledger Accounting and Financial Reporting. (Voth Report ¶ 7.) Though Monster submits evidence of different Bang revenue figures, "[t]he test under Daubert is not the correctness of the expert's conclusions but the soundness of his methodology." Primiano v. Cook, 598 F.3d 558, 564 (9th Cir. 2010). On this evidence, Defendants have shown that sufficient facts support Mr. Voth's assumption. Since "[a]uthority to determine the victor in such a 'battle of expert witnesses' is properly reposed in the jury," the Court will not exclude Mr. Voth's opinions on cost calculations. See, e.g. Brighton Collectibles, Inc. v. Coldwater Creek, Inc., 2010 WL 3718859, at *10–11 (S.D. Cal. Sept. 20, 2010).

### 2. Apportionment Calculation

Mr. Voth also opines that "no apportionment of Defendant's profits to the alleged false Super Creatine can advertising is indicated." (Voth Report ¶ 2d.) Monster argues that this opinion is unreliable because it incorrectly assumes that the phrase "Super Creatine" is immaterial to Bang consumers and rests solely on the opinions of Dr. Chiagouris.

The Court disagrees. Dr. Voth may reasonably rely on the opinions and conclusions of Dr. Chiagouris for his apportionment opinion. Fed. R. Evid. 703. As the Court discusses below, Dr. Chiagouris's opinions and consumer surveys are admissible. The degree to which Mr. Voth relied on Dr. Chiagouris's conclusions to form his opinion about the materiality of the phrase "Super Creatine" goes to Mr. Voth's credibility, rather than the admissibility of his testimony. Accordingly, because the Court concludes that Mr. Voth's cost and apportionment opinions are admissible, the Court DENIES Plaintiff's MTE No. 2.

## C. Plaintiff's MTE No. 3: Dr. Larry Chiagouris

Monster's last Daubert motion seeks to exclude the opinions of Defendants' consumer expert Dr. Larry Chiagouris, who conducted two surveys to assess the materiality of Super Creatine to Bang consumers ("Chiagouris Surveys").[3] (See Pl.'s MTE 3.) Dr. Chiagouris

---

[3] The two surveys were generally the same except that one survey showed Bang cans and labels from 2017 and the second survey showed Bang cans and labels from 2019. The parties address the two surveys simultaneously in their arguments without significant distinction. The Court does the same.

opines that based on his survey results, "[t]he presence of the words 'Super Creatine' included on the Defendants' cans has no impact on the purchasing decisions by consumers." (Pl.'s MTE 3 Opp'n at 1 (citing "Chiagouris Report," Popp Decl., Ex. 37).) Monster does not dispute Dr. Chiagouris's qualifications,[4] but argues that his opinion is unsupported because the Chiagouris Surveys suffer from flaws that render them inadmissible. (Pl.'s MTE 3 at 1–5.) It claims that the Chiagouris Surveys fail to test materiality, used misleading pictures, surveyed an overbroad audience, and failed to exclude nonresponsive answers. (Id. at 6–17.) Monster also argue that Dr. Chiagouris's opinions that rely on surveys conducted by InfoScout ("InfoScout Surveys") are unreliable and must be excluded. (Id. at 17–21.)

### 1. Chiagouris Surveys

"The Ninth Circuit has stated that surveys in trademark cases are to be admitted as long as they are conducted according to accepted principles." E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1292 (9th Cir. 1992). Surveys must also be "relevant." Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc., 618 F.3d 1025, 1036 (9th Cir. 2010). Critiques about "issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility." Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1263 (9th Cir. 2001); see also Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F. Supp. 2d 1023, 1038 (C.D. Cal. 2013) ("[T]he basis of the test protocol used, the universe defined and tested, and the questions asked go to the weight, not the admissibility of the survey."). Here, the Court agrees with Defendants that the Chiagouris Surveys are relevant to whether the advertising of "Super Creatine" on Bang cans is material to Bang purchasers. The Court considers whether Monster's criticisms of the surveys show a failure to apply accepted survey principles or raise issues that go to its weight.

Monster first critiques the two questions asked in the Chiagouris Surveys. Participants were first shown Bang cans and labels—one group with actual Bang cans and labels that had the phrase "Super Creatine," and a second group with altered Bang cans and labels without the phrase "Super Creatine." (Pl.'s MTE 3 at 7; Pl.'s MTE 3 Opp'n at 1; see Chiagouris Report.) They were asked to describe what they saw. (Pl.'s MTE 3 at 7.) Participants were next asked how likely they were to purchase Bang generally. (Id. at 8.) Monster notes that neither question directly asked about the phrase "Super Creatine," whether participants had prior experiences with or opinions of Bang, or whether they had seen Defendants' advertising in the market. (Pl.'s MTE 3 at 6–8.) As a result, it argues that the participants' responses are not probative of whether the phrase "Super Creatine" is material to consumers' purchasing decisions. (Id. at 7.) Monster asserts that the Chiagouris Surveys further fail to measure materiality because they only test responses to Bang cans and labels, rather than the entirety of Defendants' advertisements. (Id. at 8–9.)

---

[4] The Court notes that Monster also does not challenge Dr. Chiagouris's separate report that reviewed and opined on a survey conducted by Monster's survey expert Dr. Charles Cowan. Accordingly, the Court assumes that Monster does not seek to exclude Dr. Chiagouris's opinions and testimony on this subject.

**CIVIL MINUTES—GENERAL**

The Court agrees with Monster "that the sloppy questions are problematic and the sweeping conclusions are careless." Brighton Collectibles, Inc., 923 F. Supp. 2d 1245, 1258 (S.D. Cal. 2013). Nevertheless, the questions are not so broad that they "lack [] relevance to the pertinent issues" in this case. Ngethpharat v. State Farm Fire & Cas. Co., 2021 WL 2823245, at *3 (W.D. Wash. July 7, 2021). As even Monster concedes, the surveys provide information on how "the manner in which the cans are labeled … and presented to consumers at the point of sale" affected consumers. (Pl.'s MTE 3 at 5; Chiagouris Depo. 202:12-203:4.) That the Chiagouris Surveys lacked questions about Defendants' other advertisements does not make the surveys less material as the labels themselves constitute commercial advertising or promotion.[5] Moreover, whether Dr. Chiagouris should have surveyed participants about all of Defendants' advertisements concerns the universe defined and tested, which does not affect admissibility. The remaining challenges to the questions also go to the Chiagouris Surveys' weight.

Monster next argues that the images used in the Chiagouris Surveys misrepresent Bang cans. It asserts that the picture of the Bang can is taken at an angle that obscures the words "Super Creatine," when Dr. Chiagouris should have used a picture that clearly shows the top half of the can and the phrase "Super Creatine." (Pl.'s MTE 3 at 9–12.) Similarly, Monster claims that the use of an image of a flattened Bang label "burie[s]" the phrase "Super Creatine" "in a sea of text." (Id. at 11.)

Leading images in surveys have the potential to "infect[] the entire study with an unacceptable degree of bias." Vital Pharms., Inc. v. Monster Energy Co., 553 F. Supp. 3d 1180, 1230 (S.D. Fla. 2021). Courts have excluded surveys in such cases. Id. (rejecting survey that used certain line-up of products, even though "[n]one of the trial evidence suggested that these energy drinks are ever sold together as they appeared in [the] survey"); Brighton Collectibles, Inc., 923 F. Supp. 2d at 1257–58 (excluding survey that used pictures "in which only one bag shares the most prominent and eye-catching features" when color was not an element of the claimed trade dress).

Here, however, the Court finds that the pictures in the Chiagouris Surveys do not rise to this level. While the picture of the Bang can does partially obscure the words "Super Creatine," the image of the flattened Bang label clearly shows the phrase. Moreover, the surveys allowed respondents to view the image for as long as they needed and told respondents that they could click on the image and zoom in. (Pl.'s MTE 3 Opp'n at 3.) These measures help mitigate the concern that the Chiagouris Surveys failed to accurately represent the challenged statements. C.f. Townsend v. Monster Beverage Corp., 303 F. Supp. 3d 1010, 1030 (C.D. Cal. 2018) (excluding survey that "omitted the word 'bad' from the 'big bad buzz' portion of the … statement" and "asked respondents what this shortened statement meant to them"). The use of an image of a flattened Bang label affects the surveys' reliability, but it is not a basis for exclusion.

---

[5] Monster argued at summary judgment, and the Court agreed, that Defendants' statements on Bang labels are commercial advertising or promotion. (MSJ Order at 14 n.8.)

Monster raises additional issues with the Chiagouris Surveys' design and methodology. It argues that the surveys captured all energy drink consumers, as opposed to only Bang consumers, and underweighted young men between 18 and 29 years old who are the relevant demographic. (Pl.'s MTE 3 at 13–15.) Monster also notes that Dr. Chiagouris failed to exclude all nonresponsive answers. (Id. at 15–17.) Based on the Court's review of the Chiagouris Surveys and accompanying record, the Court finds that none of these issues constitute "fatal flaw[s]" contrary to accepted survey principles. Clicks Billiards, Inc., 251 F.3d at 1263. Because these criticisms affect the weight a jury may accord to the Chiagouris Surveys, the Court need not exclude the surveys or Dr. Chiagouris's opinions and testimony for these reasons. Monster "can explore the weaknesses in [the Chiagouris Surveys] through the traditional methods such as vigorous cross examination and by presenting their own expert testimony." Brighton Collectibles, Inc., 923 F. Supp. 2d at 1258.

### 2. InfoScout Surveys

In his expert report, Dr. Chiagouris also opines on two Monster-commissioned surveys conducted by InfoScout, a market research firm ("InfoScout Surveys"). (Chiagouris Report ¶¶ 65–71.) Monster asserts that these opinions are unreliable because Dr. Chiagouris lacks foundational information about the surveys, only looks at one of the surveys and not the second, and the InfoScout Surveys are methodologically flawed. (Pl.'s MTE 3 at 17–21.) For reasons discussed below regarding Plaintiff's MIL No. 1, the Court agrees that the InfoScout Surveys are inadmissible. However, the record fails to show that the surveys are atypical of the kind of evidence that consumer experts rely on. Accordingly, they are admissible to examine Dr. Chiagouris on the basis of his opinions. See, e.g., In re Crash of Aircraft N93PC on July 7, 2013, at Soldana, Alaska, 2021 WL 3418392, at *2 (D. Alaska Aug. 4, 2021) (finding that "[e]ven though the NTSB studies are inadmissible, the experts could reasonably rely on them because they are the type of evidence that experts in the field typically rely on").

The Court DENIES Plaintiff's MTE No. 3.

### D. Plaintiff's MIL No. 1: Third-Party Market Research

Monster's first motion in limine seeks to exclude argument or evidence of third-party market research conducted by InfoScout. (See Pl.'s MIL No. 1.) InfoScout is a market research firm that collects information about shoppers through their receipts. (Id. at 3.) In 2018, Monster hired InfoScout to learn about Bang consumers' preferences when buying performance energy products. (Id. at 3.) InfoScout conducted two consumer surveys ("InfoScout Surveys") and produced reports for each ("InfoScout Reports"). (Id. at 3–4.)

Monster argues that the surveys and reports must be excluded because they are (1) hearsay, (2) not based on reliable survey methods, (3) irrelevant to whether Super Creatine is material to Bang consumers, (4) likely to confuse the issues and waste time, and (5) needlessly cumulative. (Id. at 1–3, 4–10.) Defendants note that both parties' experts' reports rely on the InfoScout Surveys. (Pl.'s MIL No. 1 Opp'n at 2–3.) They argue that the InfoScout Surveys are

admissible because experts may rely on hearsay evidence like surveys to form their opinions, and the InfoScout Surveys are reliable and relevant.  (See id.)

The Court agrees with Monster that the InfoScout Surveys and InfoScout Reports contain hearsay.  Fed. R. Evid. 801.  However, Defendants correctly note that "survey responses are admissible under Federal Rule of Evidence 703 as the bases of the expert's opinions."  Stone Creek, Inc. v. Omnia Italian Design, Inc., 808 F. App'x 459, 461 (9th Cir. 2020).  To the extent that Defendants seek to introduce the InfoScout Surveys and InfoScout Reports to question the basis of an expert's opinion, they are generally admissible.

Surveys are also independently admissible, "if relevant, either as nonhearsay or through a hearsay exception."  Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp., 694 F.2d 1150, 1156 (9th Cir. 1982).  Courts routinely admit surveys under the residual hearsay exception "if there are circumstantial guarantees of trustworthiness."  G. v. Hawaii, 703 F. Supp. 2d 1112, 1124 (D. Haw. 2010) (quoting Pittsburgh Press Club v. United States, 579 F.2d 751, 757–58 (3d Cir. 1978)); Stonefire Grill, Inc., 987 F. Supp. 2d at 1038 (citing cases); Fed. R. Evid. 807 (admitting hearsay if "the statement is supported by sufficient guarantees of trustworthiness" and "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts").  Under this exception, and as noted above, "surveys in trademark cases are to be admitted as long as they are conducted according to accepted principles."  E. & J. Gallo Winery, 967 F.2d at 1292.

Here, the Court finds that the InfoScout Surveys are relevant because they tend to show what aspects of Bang are material to its purchasers.  Monster asserts that the survey results are irrelevant because they capture responses from non-consumers.  (Pl.'s MIL 1 at 7–8.)  However, most participants responded that they had purchased Bang for themselves.  (Greer Decl., Ex. 38, Dkt. No. 627-36; id., Ex. 40, Dkt. No. 627-38.)  Monster's criticisms that the survey respondents were disproportionately women and grocery-store shoppers raise concerns about the surveys' reliability, not their relevance.  Such issues "go to the weight of the survey" and "are issues for a jury."  Clicks Billiards, Inc., 251 F.3d at 1263.

Monster remains silent on whether the InfoScout Surveys were conducted according to accepted survey principles.  It only argues that Defendants do not know whether the InfoScout Surveys were conducted according to accepted principles because they failed to discover this information from Monster.  (Pl.'s MIL 1 at 6.)  This argument, while somewhat facetious, is persuasive.  As the proponent of the InfoScout Surveys, Defendants bear "the burden of establishing that the survey was conducted, in accordance with generally accepted survey principles."  G., 703 F. Supp. 2d at 1124.  Yet, they fail to address this point.  The parties submit not the surveys themselves, but slides summarizing the InfoScout Surveys, which offer little insight into the principles InfoScout applied.  Critically, as Monster notes, Defendants have not identified a witness who can testify about the InfoScout Surveys' design or methodology.  On this record, the Court cannot find that the surveys are supported by sufficient guarantees of trustworthiness.  C.f. Stonefire Grill, Inc., 987 F. Supp. 2d at 1038 (evaluating survey and finding that it was conducted according to accepted principles).

Accordingly, because Defendants have not carried their burden, the Court GRANTS IN PART Plaintiff's MIL No. 1 and EXCLUDES standalone evidence of the InfoScout Surveys and InfoScout Reports. The Court DENIES Plaintiff's MIL No. 1 to the extent that the parties seek to introduce the InfoScout Surveys and InfoScout Reports to examine the basis of an expert's opinion. In light of this conclusion, the Court need not address Monster's arguments that the InfoScout Surveys and InfoScout Reports will cause confusion of issues, waste time, and are needlessly cumulative.

### E. Plaintiff's MIL No. 2: University of West Florida High-Dose Cell Study

Monster moves in limine to exclude a University of West Florida ("UWF") study that Defendants commissioned to test how cells respond to CLL.[6] (See Pl.'s MIL 2.) The UWF study consisted of three experiments: (1) an initial cell culture study, (2) a follow-up cell culture study ("High-Dose Cell Study"), and (3) a mice study. (Id. at 1–2; Pl.'s MIL 2 Opp'n at 3; "UWF Study," Greer Declaration, Ex. 4, Dkt. No. 627-6.) Monster only seeks to exclude the High-Dose Cell Study.

Monster argues that the High-Dose Cell Study is scientifically unreliable because UWF could not explain some of the results, Defendants never disclosed the study's underlying data to Monster, and Defendants conducted parts of the study. (Id. at 3–5.) It asserts that the High-Dose Cell Study is also irrelevant because no person could consume enough Bang to ingest the CLL dosages that had been used in the study. (Id. at 5–6.) As such, Monster argues that any probative value of the High-Dose Cell Study is outweighed by the risks of unfair prejudice and jury confusion. (Id. at 3, 6.)

Defendants respond that Monster cannot seek to exclude the High-Dose Cell Study but not the other two experiments from the UWF study. (Pl.'s MIL 2 Opp'n at 2–3.) They note that Monster's own experts rely on the High-Dose Cell Study to form their opinions, and argue that Defendants' experts should be able to use the study to rebut those opinions. (Id. at 3–5.) They argue that any purported flaws in the study go to its weight, not admissibility. (Id. at 5–6.)

The Court finds that the High-Dose Cell Study is admissible. First, the High-Dose Cell Study is directly relevant to whether CLL is creatine or provides the benefits of creatine. Moreover, since Monster's expert Dr. Kreider relies on the High-Dose Cell Study in his report

---

[6] Defendants argue that Monster should have brought a Daubert motion, not a motion in limine, to exclude the High-Dose Cell Study. (Pl.'s MIL 2 Opp'n at 2.) While the Court agrees that some of the arguments Monster raises are Daubert-like, the evidence at issue is not an expert's testimony or opinion. Accordingly, Monster properly seeks the study's exclusion through a motion in limine. See, e.g., United States v. Grace, 597 F. Supp. 2d 1143, 1149-50 (D. Mont. 2009) (discussing motion in limine to exclude evidence relating to a non-epidemiological study); In re Roundup Prods. Liability Litig., 2019 WL 1371806, at *2 (N.D. Cal. Feb. 18, 2019) (ruling on motions in limine to exclude studies).

**CIVIL MINUTES—GENERAL**            Initials of Deputy Clerk MG

to opine on whether CLL is bioavailable, Defendants may cite to the study in their experts' rebuttal reports.  In re Crash of Aircraft N93PC, 2021 WL 3418392, at *2 (experts may rely on purportedly "untrustworthy" studies if "they are the type of evidence that experts in the field typically rely on").

Second, the High-Dose Cell Study's alleged flaws go to the weight a jury may accord to the study, not its admissibility.  For example, whether the High-Dose Cell Study replicates real-life scenarios attacks its credibility but does not diminish what the study purports to be: an experiment that measures whether CLL is a form of creatine.  See, e.g., Nomo Agroindus. SA DE CV v. Enza Zaden N. Am., Inc., 2009 WL 211085, at *6 (D. Ariz. Jan. 29, 2009) (denying motion to exclude "unreliable" testing on frozen samples that had been stored above the recommended temperature); c.f. Sugar Assoc., Inc. v. McNeil-PPC, Inc., 2008 WL 11338092, at *5 (C.D. Cal. July 21, 2008) (excluding expert opinions about the health effects of Splenda when opinions extrapolated results from animal studies to apply to humans); Bourne ex rel. Bourne v. E.I. Dupont de Nemours & Co., 189 F. Supp. 2d 482, 496–97 (S.D.W. Va. 2002) (excluding opinion about whether substance causes birth defects when based on extrapolations "from high-dosage, single species in vivo testing and lengthy benomyl exposure in vitro testing").

Defendants' collaboration in the High-Dose Cell Study's design and analysis also does not render the study inadmissible.  See, e.g., Dunbar v. City of Riverside, 2017 WL 11636155, at *6 (C.D. Cal. June 6, 2017) (finding that involvement of party's counsel in preparation of expert materials impacted experts' weigh).  There is no evidence that their participation "infected the entire study with an unacceptable degree of bias" to make the study "unreliable."  Vital Pharms., Inc., 553 F. Supp. 3d at 1230–34.  The High-Dose Cell Study was one of two cell culture experiments that varied only in dosage.  As Defendants note, Monster does not contest the reliability of the first experiment, even though Defendants also analyzed the cells in that study and did not produce data from it.  C.f. In re Incretin-Based Therapies Prods. Liability Litig., 524 F. Supp. 3d at 1036, 1038–39 (excluding data analysis by experts who "cherry-picked selection of favorable data" and whose "unequal application of criteria among the two groups inevitably skew[ed] the data and critically undermine[d] the reliability of his analysis"); Vital Pharms., Inc., 553 F. Supp. 3d at 1230–34 (rejecting survey as "viable evidence of consumer confusion" about Bang and Reign drinks when survey was designed to lead participants to a specific conclusion).  Nor does Monster argue that the study's results are wholly unsupported.  C.f. United States v. Grace, 597 F. Supp. 2d 1143, 1149–50 (D. Mont. 2009) (noting that study was unreliable to show causation when that was not the study's goal).  Therefore, the Court finds that Monster's criticisms of the High-Dose Cell Study's methodology are not appropriate bases for exclusion.

The Court is, of course, conscious that "[a] false aura of scientific infallibility, coupled with low probative value, increases resistance to admitting evidence since it multiplies the hazards of misleading a jury."  In re Agent Orange Product Liability Litig., 611 F. Supp. 1223, 1256 (E.D.N.Y. 1985).  However, the Court concludes that the parties' ability to present their respective experts' testimony on the High-Dose Cell Study and cross-examine the experts reduces the risk of jury confusion and unfair prejudice.  Accordingly, the Court DENIES Plaintiff's MIL No. 2.

**F.  Plaintiff's MIL No. 3: Monster's Alleged Conduct**

Monster moves to exclude evidence that it allegedly (1) makes unsupported claims about
its own products, (2) has attempted to obtain shelf space from VPX and/or interfere with VPX's
retailer relationships, and (3) has acquired VPX's information from retailers.  (See Pl.'s MIL 3.)
Monster argues that this conduct is irrelevant to Defendants' actions at issue or to their
affirmative defenses, and consideration of this evidence will distract the jury and unfairly
prejudice Monster.  (Id. at 1–3.) Defendants assert that Monster's motion in limine is a proxy
motion for summary judgment on their unclean hands affirmative defense.  (Pl.'s MIL 3 Opp'n at
2–3.)  They further argue that Monster's alleged conduct is relevant to whether Defendants
made false or misleading statements, as well as to Defendants' affirmative defenses of unclean
hands, estoppel, laches, and waiver.  (Id. at 3–6.)

**1.  Monster's Claims about Its Products**

Defendants' evidence about Monster's products falls into two categories: (1) Monster's
existing line of energy drinks that allegedly claim unsupported health benefits without identifying
ingredient amounts, and (2) Monster's purported development of energy drinks that contained a
manufactured creatine supplement.  (Pl.'s MIL 3 at 6–7; Pl.'s MIL 3 Opp'n at 5.)

The Court finds that evidence regarding the first category of products is irrelevant to
Monster's claims or Defendants' affirmative defenses.  The Court previously ruled that the
material issues in this case are Defendants' "advertising of 'creatine' or 'Super Creatine'" and
"the presence of 'creatine' or 'Super Creatine' in BANG."  Monster Energy Co. v. Vital
Pharm., Inc., 2019 WL 8112506, at *8–9 (C.D. Cal. Oct. 16, 2019).[7]  According to the parties'
evidence, Monster's products in the first category do not contain creatine and allegedly make
claims about other ingredients.  As such, evidence about these products is not probative of
whether or not Defendants falsely advertised.

//
//
//
//



[7] Monster is correct that the Court's discovery ruling constitutes the law of the case.
However, the Court agrees with Defendants that Monster misconstrues this order.  The Court
had denied Defendants' request for production of the "formulation and ingredients" for
Monster's REIGN energy drinks because this information was not relevant to "the advertising of
'creatine' or 'Super Creatine.'"  Monster Energy Co., 2019 WL 8112506, at *8–9.  Contrary to
Monster's contention, the Court did not rule that "Defendants must show that Monster engaged
in advertising about 'creatine or Super Creatine'" in order to assert an unclean hands defense.
(Pl.'s MIL 4 at 7.)  The Court simply reiterated that any alleged misconduct by Monster must
"relate[] to the subject matter of its claims."  Vineyard House, LLC, 515 F. Supp. 3d at 1078.

Nor does it support an unclean hands defense.  The party asserting the defense "must demonstrate that the [opposing party's] conduct is inequitable and that the conduct relates to the subject matter of its claims."  <u>Vineyard House, LLC v. Constellation Brands U.S. Ops., Inc.</u>, 515 F. Supp. 3d 1061, 1078 (N.D. Cal. 2021) (quoting <u>Fuddruckers, Inc. v. Doc's B.R. Others, Inc.</u>, 826 F.2d 837, 847 (9th Cir. 1987)).  "[T]he relevant inquiry is 'not whether the plaintiff's hands are dirty, but whether he dirtied them in acquiring the right he now asserts, or whether the manner of dirtying renders inequitable the assertion of such rights against the defendants." <u>Pom Wonderful LLC v. Welch Foods, Inc.</u>, 737 F. Supp. 2d 1105, 1110 (C.D. Cal. 2010) (internal alterations and citations omitted).  "Factual similarity between the misconduct that forms the basis for an unclean hands defense and the plaintiff's allegations in the lawsuit is not sufficient." <u>Id.</u>  Here, Defendants allege that Monster's hands are dirty because it has engaged in the same kind of activity of which Defendants have been accused: the misrepresentation of certain benefits or ingredients in its drinks.  However, they fail to show that Monster dirtied its hands to make the false advertising claims now alleged against Defendants.  As the products at issue do not claim to contain creatine or to be a source of creatine, Defendants show only a factual similarity.  This is insufficient.  Accordingly, the Court GRANTS IN PART Plaintiff's MIL No. 3 and EXCLUDES evidence of Monster's products that do not contain creatine or make claims about creatine.

On the other hand, the Court finds that evidence regarding the second category of products is relevant to Monster's false advertising claims.  Defendants' submitted evidence purports to show that Monster considered adding a manufactured creatine supplement in its own drinks.  (Pl.'s MIL 3 Opp'n, Exs. A & B.)  This fact, if true, helps illuminate what constitutes "creatine" and is probative of a key element in this case: whether Defendants' claims about Super Creatine are literally false or misleading.  Monster fails to address how this specific evidence is unfairly prejudicial or would cause jury confusion.  Accordingly, the Court DENIES Plaintiff's MIL No. 3 with respect to evidence of Monster's development of an energy drink containing creatine for the limited purpose of defining creatine.

The second category of products, however, is not relevant to Defendants' affirmative defenses.  The unclean hands doctrine, laches, estoppel, and waiver require some element of prejudice to or reliance by the Defendants.  Here, Defendants' submitted evidence fails to demonstrate that it knew of or relied on Monster's developed its own creatine-inclusive product.  Accordingly, the Court GRANTS IN PART Plaintiff's MIL No. 4 and EXCLUDES evidence of Monster's development of a creatine-containing energy drink in relation to Defendants' affirmative defenses.

## 2. Monster's Alleged Shelf Space Interference

Monster argues that evidence that it allegedly interfered with VPX's shelf space must be excluded because Monster's conduct was legal and did not relate to the contracts at issue here. (Pl.'s MIL 3 at 7–9.)

//
//

The first argument fails.  As Defendants note, Monster's belief that its conduct was legal is irrelevant to the admissibility of the evidence and goes toward the weight of the evidence. (Pl.'s MIL 3 Opp'n at 2.)  The second argument, however, has merit.  Defendants do not contest that they seek to introduce this evidence for their unclean hands defense.  At least one court has found that an unclean hands defense against a tortious interference of contractual relations claim requires that the plaintiff's misconduct relate to "the contract [the plaintiff] seeks to enforce" or be "responsible" for the plaintiff's acquisition of the contractual rights at issue.  <u>Kaiser Trading Co. v. Assoc. Metals & Minerals Corp.</u>, 321 F. Supp. 923, 937 (N.D. Cal. 1970).  Here, Defendants seem to concede that Monster's alleged interference with their contracts is unrelated to the contracts Monster seeks to enforce.  They argue instead that this fact is inconsequential because Monster cannot show any contracts with which Defendants allegedly interfered.  (Pl.'s MIL 3 Opp'n at 6.)  The Court's MSJ Order defeats this assertion.  There, the Court found that a reasonable jury could find from disputed facts that Defendants interfered with Monster's contracted-for shelf space.  (MSJ Order at 30–31.)  Accordingly, "[b]ecause the activities of [Monster] … were independent of the contract [it] seeks to enforce," evidence of Monster's alleged interference with VPX's shelf space cannot support Defendants' unclean hands defense.  Because Defendants have not proffered any other arguments for this evidence's relevance, the Court GRANTS Plaintiff's MIL No. 3 and EXCLUDES evidence of Monster's alleged shelf space interference activities.

### 3. Monster's Alleged Trade Secret Misappropriation

Monster argues that evidence that it purportedly misappropriated VPX's trade secrets is irrelevant because it does not concern the trade secrets in this case.  (Pl.'s MIL 3 at 7–8.)  Defendants fail to address this argument and only assert that Monster offers insufficient evidence to support its trade misappropriation claim.  (Pl.'s MIL 3 Opp'n at 5–6.)

As with Monster's alleged shelf space interference activities, Monster's alleged misappropriation of VPX's trade secrets is potentially relevant, if at all, only to Defendants' unclean hands defense.  However, to assert this defense against a trade secret misappropriation claim, any trade secrets Monster purportedly misappropriated must "arise out of the claims raised in Plaintiff['s complaint]."  <u>Medimpact Healthcare Sys., Inc. v. IQVIA Inc.</u>, 2022 WL 126307, at *3–4 (S.D. Cal. Jan. 13, 2022) (finding that "Defendants' argument that Plaintiffs separately stole Defendants' trade secrets" regarding "drug-to-diagnosis indication and contraindication edits" did not relate to plaintiffs' claims that defendants misappropriated "Plaintiffs' trade secrets that could be sold to pharmaceutical companies" and were thus "new and distinct claims") (internal alterations omitted).  Defendants do not state that the trade secrets Monster allegedly misappropriated are the same or related to the trade secrets that Monster raises.  Accordingly, the Court finds that this evidence is not relevant to Defendants' unclean hands affirmative defense.  The Court GRANTS Plaintiff's MIL No. 3 and EXCLUDES evidence of Monster's alleged trade secret misappropriation.

//
//

In sum, the Court GRANTS IN PART Plaintiff's MIL No. 4 and EXCLUDES evidence of (1) Monster's products that do not contain creatine or make claims about creatine, (2) Monster's alleged shelf space interference activities, and (3) Monster's alleged trade secret misappropriation.  The Court DENIES Plaintiff's MIL No. 4 with respect to evidence of Monster's development of a creatine-containing energy drink for the purpose of defining creatine, but GRANTS Plaintiff's MIL No. 4 and EXCLUDES this evidence for Defendants' affirmative defenses.

## G. Plaintiff's MIL No. 4: Florida Lawsuits

Monster finally moves to exclude evidence of certain allegations Defendants have made against it in the parties' litigation in <u>Vital Pharms. Inc. v. Monster Energy Co.</u>, No. 19-cv-60809 (S.D. Fla.), and <u>Vital Pharms. Inc. v. Monster Energy Co.</u>, No. 19-cv-61974 (S.D. Fla.) ("Florida Lawsuits").  (<u>See</u> Pl.'s MIL 4.)  Specifically, Monster seeks to exclude allegations that (1) Monster's Reign energy drink is a "copy-cat"; (2) Monster's products cause adverse health effects; (3) Monster is litigious; and (4) Monster instigated "smear campaigns" against Defendants.  (<u>Id.</u> at 1.)  It argues that this evidence has no relevance to the claims or affirmative defenses at issue and require exclusion under Rule 403.  (<u>Id.</u> at 3–10.)  Defendants oppose and argue that these allegations are admissible.  (<u>See</u> Pl.'s MIL 4 Opp'n.)

### 1. Monster's Reign Product Allegations

According to Monster, Defendants intend to introduce allegations from the Florida Lawsuits that Monster's Reign energy drink is a "copy-cat" product to Bang.  (Pl.'s MIL 4 at 4.) Monster asserts that Defendants seek to relitigate an issue they had lost in the Florida Lawsuits and that whether Reign copied Bang has no bearing on the claims or defenses in this case.  (<u>Id.</u> at 5.)  Defendants respond that evidence of Monster's development of the Reign line of drinks is relevant to Monster's false advertising claims because Monster chose to develop a creatine-less product as Bang's competition.  (Pl.'s MIL 4 Opp'n at 2–3.)  This fact, they argue, shows that even Monster believed that caffeine, rather than Super Creatine or creatine, was material to Bang purchasers.  (<u>Id.</u> at 3.)  Defendants further contend that Reign's development supports their affirmative defenses of waiver, estoppel, and unclean hands.  (<u>Id.</u> at 5.)

Monster is incorrect that the Florida Lawsuits decided the issue raised here: whether Monster's formulation of Reign intended to copy Bang's formulation.  The Florida Lawsuits considered whether Monster's Reign had infringed on Bang's trade dress—or the outward appearance of Bang drinks—and found that it did not.  <u>Vital Pharms., Inc. v. Monster Energy Co.</u>, 553 F. Supp. 3d 1180 (S.D. Fla. 2021).  Whether the ingredients included in Reign copied that of Bang is distinct from whether the Reign can copied the overall visual impression of a Bang can.  To the extent that Defendants seek to introduce evidence about the ingredients included in Reign, the Florida Lawsuits have not foreclosed it.

//
//

---

**CIVIL MINUTES—GENERAL**

Nevertheless, the Court finds that the allegations about Reign's development from the Florida lawsuits must be excluded. This case is about the purported false advertisement of Bang, not Monster's products. What Monster believed set Bang apart from competitor energy drinks has little relevance to what consumers believed set Bang apart from other energy drinks. That Monster developed a product with the goal of matching Bang's caffeine content, as opposed to Bang's Super Creatine, does not tend to show that Super Creatine was not material to Bang purchasers. Defendants note that Monster conducted a survey of Bang consumers in connection with Reign's development. However, as discussed above, the Court has found that the survey is admissible. As such, the "copy-cat" allegations are neither necessary nor probative of Monster's false advertising claims.

Moreover, the allegations do not support Defendants' waiver, estoppel, or unclean hands defenses. There is no evidence that Monster knew about the alleged falsity or misleading nature of Defendants' claims about Super Creatine and Bang when it chose to prioritize caffeine content in Reign. Even if a link could be drawn from Reign's development to the claims Monster now asserts, the evidence would only confuse the jury and cause undue delay. Hill v. Novartis Pharm. Corp., 944 F. Supp. 2d 943, 952–53 (E.D. Cal. 2013) (excluding "argument or evidence about other litigation involving bisphosphonates" because it was "irrelevant" and "would be confusing"). Accordingly, the Court GRANTS Plaintiff's MIL No. 4 and EXCLUDES allegations from the Florida Lawsuits that Reign is a "copy-cat" product of Bang.

### 2. Adverse Health Allegations

Monster contends that Defendants seek to introduce allegations from the Florida Lawsuits that Monster's products cause adverse health events. (Pl.'s MIL 4 at 4.) Defendants argue that "evidence related to the history of adverse health events for Monster's products is highly probative into what Monster believed or knew to be true about the development of a successful energy drink product." (Pl.'s MIL 4 Opp'n at 3–4.)

Defendants' argument is unpersuasive. Overbroad allegations about adverse health events are irrelevant to any of Monster's claims or Defendants' affirmative defenses. True, Monster alleges that Defendants falsely claim that Bang does not cause a "sugar crash," unlike Monster's products or other competitor's energy drinks.[8] However, Defendants' planned evidence about the adverse health event allegations do not concern sugar crashes. (Pl.'s MIL 4 at 5–6 n.1.) Accordingly, because these allegations lack any probative value and are highly prejudicial, the Court GRANTS Plaintiff's MIL No. 4 and EXCLUDES allegations from the Florida Lawsuits about adverse health events from Monster's products.

//

---

[8] In the MSJ Order, the Court granted VPX's motion for summary judgment on Monster's false advertising claim, alleging that Defendants' sugar crash statements are literally false. (MSJ Order at 25.) However, the Court denied summary judgment on Monster's claim that the sugar crash statements are misleading. (Id.)

### 3. Allegations that Monster Is Litigious

Monster asserts that Defendants seek to introduce allegations from the Florida Lawsuits that Monster is litigious.  (Pl.'s MIL 4 at 4.)  Monster argues that this evidence is irrelevant to any element of its claims and is improper character evidence.  (Id. at 6.)  Defendants contend that evidence of Monster's prior lawsuits against competitors in similar matters bears on the credibility of its claims and alleged damages here.  (Pl.'s MIL 4 Opp'n at 4.)

The Court finds that Monster's motive for filing lawsuits has no bearing on whether Defendants falsely advertised about Super Creatine or Bang.  While Monster's motive may be relevant to Defendants' affirmative defenses if the litigation history showed that Monster knew of Defendants' alleged misconduct earlier or unreasonably delayed, this is not the case here.  Moreover, evidence about Monster's purported character of suing its competitors is unfairly prejudicial.  Accordingly, the Court GRANTS Plaintiff's MIL No. 4 and EXCLUDES allegations from the Florida Lawsuits that Monster is litigious.

### 4. "Smear Campaign" Allegations

Monster finally argues that Defendants seek to introduce allegations from the Florida Lawsuits that it engaged in a "smear campaign" against Defendants, including creating a website called The Truth About Bang ("TAB Campaign").  (Pl.'s MIL 4 at 4.)  Monster contends that Defendants have no evidence that it actually engaged in a smear campaign, and, regardless, these activities are irrelevant to Defendants' misconduct.  (Id. at 6–7.)  Defendants argue that evidence of the TAB Campaign is relevant to their affirmative defenses.[9]  (Pl.'s MIL 4 Opp'n at 5.)

The Court agrees with Monster.  According to evidence attached to Defendants' opposition, the TAB Campaign questions the veracity of Defendants' claims that Bang contains creatine and that Super Creatine is patented.  (Pl.'s MIL 4 Opp'n, Ex. E.)  These actions are irrelevant to Defendants' misconduct or their affirmative defenses.  Accordingly, the Court GRANTS Plaintiff's MIL No. 4 and EXCLUDES allegations from the Florida Lawsuits that Monster engaged in the TAB Campaign.

In sum, the Court GRANTS Plaintiff's MIL No. 4 and EXCLUDES allegations and evidence from the Florida Lawsuits of Monster's development of Reign, adverse health events from Monster products, Monster's litigation against competitors, and allegations and evidence of Monster's purported involvement in the TAB Campaign.

//

---

[9] Defendants briefly note that these allegations are also relevant to Monster's claimed damages.  However, Defendants fail to expand on this argument.  In addition, whether Monster's actions diverted sales of Bang was litigated in the Florida Lawsuits.  (Pl.'s MIL 5 Opp'n, Ex. F at 23:5-18.)  Without further evidence or argument, the Court finds that Defendants may not admit evidence of the TAB Campaign for the purpose of challenging Monster's damages.

---

# V.     DEFENDANTS' MOTIONS

Defendants move to exclude Monster's experts Christian Tregillis, Dr. Gregory Carpenter, Dr. Charles Cowan, Dr. Darren Candow, and Dr. Richard Kreider.  (See Defs. MTE 1; Defs. MTE 2; Defs. MTE 3; Defs.' MTE 4; Defs. MTE 5.)  They also move in limine to exclude evidence of Mr. Owoc's unpublished draft book and evidence about VPX's workplace environment.  (See Defs. MIL 1; Defs. MIL 2.)

## A.  Defendants' MTE No. 1: Christian Tregillis

Defendants first move to exclude all testimony and evidence from Monster's damages expert Christian Tregillis, C.P.A.  (See Defs. MTE 1.)  They argue that Mr. Tregillis's calculations of monetary remedies are unreliable because they depend on unsupported assumptions.  Specifically, Defendants assert that: (1) Mr. Tregillis relies on the flawed Cowan Survey to opine on consumers' purchasing behavior from August 2015 to December 2020 and inappropriately extrapolates consumer data from 2020 to the five-year period; (2) Mr. Tregillis opines, without verification of Monster's actual capacity, that Monster would have been able to sell several hundred million more cans but for Defendants' allegedly false advertising; and (3) Mr. Tregillis's damages estimate for Monster's trade secret misappropriation claim is untethered to any specific trade secret and applies a faulty methodology.  (Id. at 2–9.)

### 1.  Reliance on Cowan Survey

As the Court discusses below in Defendants' MTE No. 2, evidence of the Cowan Survey is admissible.  Further, whether Mr. Tregillis reasonably extended the Cowan Survey's results to reflect consumer preferences for years outside of the survey period goes to "methodology, survey design, [and] reliability," or the survey's weight.  Clicks Billiards, Inc., 251 F.3d at 1263.  Thus, the Court will not exclude Mr. Tregillis's opinions for its reliance on the Cowan Survey.[10]

### 2.  "Lost Profits" Calculations

Defendants' arguments pertaining to the assumptions Mr. Tregillis makes about Monster's ability to sell additional cans mirror Monster's arguments in its motion to exclude Mr. Voth, discussed above.  As with that motion, the Court finds that Mr. Tregillis's opinions have sufficient factual support.  He states that he developed his "lost profits" calculation based on "a

---

[10] Defendants also argue that Mr. Tregillis's opinions are unreliable because he does not identify a margin of error.  (Defs.' MTE 1 at 6.)  While a methodology's potential rate of error can be one factor used to determine the reliability of an expert's opinion, Kumho Tire Co., 526 U.S. at 149–50, it is not dispositive.  Defendants cite a case that concerned the expert's use of a "star power index," a novel technique that had not been subject to peer review, had not been used by other experts, and had no known comparable methodology—none of which is at issue here.  Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc., 205 WL 5955701, at *4 (S.D. Fla. Aug. 17, 2005).  Accordingly, Defendants' authority is distinguishable.

discussion with Monster's Tom Kelly (Chief Financial Officer) and Kyle Maurer to obtain an understanding of the costs and business, as well as my own analysis of the correlation between costs and quantities sold, over time, in Monster's historical accounting records." (Tregillis Report ¶ 202.) The credibility of Mr. Tregillis's interpretation of these records and assumptions about Monster's ability to produce and sell this quantity of cans is for the jury to decide.

### 3.  Trade Secrets Misappropriation Claim Damages

Defendants' remaining issue is Mr. Tregillis's calculations of damages for the trade secret misappropriation claim. As Defendants note, Mr. Tregillis did not analyze the impact of any particular misappropriated trade secret on Bang sales. However, he was not required to do so where Monster's "theory is that misappropriation of any one of the [alleged] trade secrets caused [Defendants' unjust enrichment]." Ice Corp. v. Hamilton Sundstrand Corp., 615 F. Supp. 2d 1256, 1264 (D. Kan. 2009); but see 02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc., 399 F. Supp. 2d 1064, 1076–77 (N.D. Cal. 2005) (finding that expert testimony about the value of certain information "regarding damages for misappropriation of all trade secret" failed to provide a reasonable basis for the jury's damages award on a trade secrets misappropriation claim when the jury had also found that only some trade secrets had been misappropriated). This seems to be the case here. (FAC ¶¶ 184–198.)

Mr. Tregillis's methodology focuses on the potential impact of one Georgia-based former Monster employee who had started working for VPX in Georgia and whom Monster alleges misappropriated trade secrets. To calculate the purported unjust enrichment resulting from this employee's misappropriation, Mr. Tregillis compared Bang's sales performance in the Georgia region with that of Bang's sales performance nationwide from the time of the alleged misappropriation to 2020 and measured the difference. (Tregillis Report ¶¶ 288–291.) Monster argues that this analysis reflects the "yardstick" methodology, while Defendants argue that Mr. Tregillis did not accurately apply the "yardstick" methodology. (Defs.' MTE 1 Opp'n at 13–15; Defs.' MTE 1 Reply at 6–7.)

A "yardstick" methodology purportedly analyzes a defendant' market share gained through allegedly misappropriated trade secrets by measuring performance in a comparable market unaffected by trade secret misappropriation. (Defs.' MTE 1 Opp'n 13.) The Ninth Circuit has described various ways to apply the "yardstick" methodology in the antitrust context, such as by: "(1) comparing the plaintiff's profits before or after the alleged anticompetitive activity with the profits made while the plaintiff was subjected to the anticompetitive activity; (2) examining the profits of a business comparable to the plaintiff's business which was not affected by the anticompetitive activity; or (3) projecting the market share which the plaintiff would have attained absent the anticompetitive activity, and then projecting plaintiff's profits accordingly." Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc., 773 F.2d 1506, 1511 (9th Cir. 1985); see also Image Tech. Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1221 (9th Cir. 1997).

//
//

Here, Monster's analogy to the yardstick methodology is imperfect.  Mr. Tregillis has not conducted a comparison of Bang's sales performance in Georgia before and after the alleged misappropriation or compared Bang's sales performance with that of a comparable business.  However, unlike in antitrust cases, which pertains to a plaintiff's "exclu[sion] from the relevant market by anticompetitive activity," Dolphin Tours, Inc., 773 F.2d at 1511, a comparable market is less relevant to trade secret misappropriation cases.  Since the basis of Mr. Tregillis's unjust enrichment estimate is the value of Defendants' increased sales using allegedly misappropriated trade secrets, the Court finds that Mr. Tregillis's yardstick methodology is sufficiently reliable.  Accordingly, the Court DENIES Defendants' MTE No. 1.

## B.  Defendants' MTE No. 2: Dr. Gregory Carpenter

Defendants move to exclude all testimony and evidence from Monster's marketing expert Gregory S. Carpenter, Ph.D., including his expert report.  (See Defs.' MTE 2; "Carpenter Report," id., Ex. A.)  Monster retained Dr. Carpenter to review Defendants' marketing of Bang Energy drinks, including their use of the term "Super Creatine" and "sugar crash" claims, and to determine whether such marketing and promotion (a) impacted consumers' decision to purchase these drinks, and (b) harmed Monster.  (Carpenter Report ¶ 10.)  Defendants argue that Dr. Carpenter offers (1) medical, scientific, and legal opinions that he is unqualified to give, (2) speculative opinions about Bang consumers not grounded in sound methodology, research, or data, and (3) impermissible opinions about Defendants' state of mind.  (See Defs.' MTE 2.)  Monster contests these characterizations, arguing that Dr. Carpenter's opinions fall within his area of expertise in marketing and are reliable.  (See Defs.' MTE 2 Opp'n.)

As an initial matter, Defendants do not contest Dr. Carpenter's qualifications to testify on marketing.[11]  Dr. Carpenter is a professor of marketing at Northwestern University's Kellogg Graduate School of Management whose research examines how organizations develop marketing strategies and how consumers respond to those efforts, including for consumer goods.  (Id. ¶¶ 1–2.)  His research methods include surveys, econometric models, and social media analyses, and he has award-winning publications in leading marketing journals.  (Id. ¶¶ 3–4, 6.)  To the extent that Dr. Carpenter's opinions and testimony concern marketing principles and strategies, they are admissible.  See Montera v. Premier Nutrition Corp., 2022 WL 1225031, at *5 (N.D. Cal. Apr. 26, 2022) ("Courts regularly admit marketing testimony that explains what a company intended to convey through their marketing.").  The Court must consider whether the opinions Defendants challenge fall within this scope.

//
//
//
//
//



[11] While the Carpenter Report references Dr. Carpenter's curriculum vitae ("CV"), the Court notes that the CV is not attached to the report.  (Carpenter Report ¶ 9.)

**1.   Scientific or Medical Opinions**

Defendants first argue that Dr. Carpenter offers scientific and medical opinions outside of his marketing knowledge when he states that (1) Super Creatine is not creatine, (2) Super Creatine provides no health benefits, and (3) a "sugar crash" from consumption of Monster's energy drinks is unlikely.  (Defs.' MTE 2 at 6–10.)  Monster responds that Dr. Carpenter clearly would not opine on scientific or medical matters when he disclaimed any expertise in such areas.[12]  (Defs.' MTE 2 Opp'n at 9.)  It argues that the "opinions" about Super Creatine and sugar are just restatements of assumptions on which Dr. Carpenter relied to analyze Defendants' marketing strategies.  (Id. at 8–9.)

The Court disagrees with Monster's assertion that Dr. Carpenter has not offered scientific or medical opinions.  Throughout his report, Dr. Carpenter makes sweeping statements about the alleged health benefits of Bang Energy drinks and Super Creatine as part of his principal conclusions.  For example, he opines that:

- "…VPX promises consumers that Super Creatine will enhance mental functioning and improve physical capability, <u>even though Super Creatine provides no such benefits.</u>" (Carpenter Report ¶ 16(a) (emphasis added).)

- "…VPX claims that, unlike Bang Energy, competing energy drinks that contain sugar cause a sugar crash, <u>even though competing energy drinks such as Monster Green are highly unlikely to cause a sugar crash.</u>"  (Id. ¶ 16(c) (emphasis added).)

- "VPX promises that consumers of Bang Energy will enjoy enhanced mental functioning, improved physical capability, and a boost of energy without a sugar crash….<u>but Bang Energy drinks do not deliver the benefits VPX promises.</u>"  (Id. ¶ 16(d) (emphasis added).)

Dr. Carpenter is qualified to offer the statements that are not underlined, which reflect marketing opinions about what VPX promised or claimed to consumers.  <u>See</u> <u>Montera</u>, 2022 WL 1225031, at *5 (finding that a marketing professor could testify about "Defendant's intended message and target audience").  By contrast, the underlined statements are scientific and medical opinions that have no bearing on what Defendants "intended to convey through their marketing."  <u>Id.</u>

//
//
//



[12] Both parties note that Dr. Carpenter testified, "I am not a medical doctor," in his deposition.  (Carpenter Depo. 54:13-23.)  He also stated in his report that he "has no expertise in the chemical or biological properties of creatine, creatine monohydrate, creatyl-L-leucine, or sugar."  (Carpenter Report ¶ 14.)

Monster notes, and Dr. Carpenter acknowledges in his report, that these statements are based on certain assumptions Dr. Carpenter made to form his analysis. Specifically, he "[a]ccept[ed] the conclusions of [Monster's experts] Dr. Richard Kreider and Dr. Marc Hellerstein" and assumed the following:

- "CLL is not a source of creatine and provides none of the physiological effects of creatine." (Carpenter Report ¶ 14(f).)

- "A 'sugar crash,' or more precisely reactive hypoglycemia, occurs when the consumption of glucose or any glucose-containing carbohydrates is followed by a rise in blood glucose levels, a spike in insulin levels, and a reactive rapid fall in blood glucose to levels below the initial or baseline level, with symptoms characteristic of low blood glucose levels." (Id. ¶ 14(j).)

- "Consuming an energy drink with the same similar glucose content as Monster Green is highly unlikely to cause a 'sugar crash,' or in other words, reactive hypoglycemia." (Id. ¶ 14(k).)

According to Monster, Dr. Carpenter's discussion about Super Creatine or sugar simply reflects these assumptions. Monster argues that Dr. Carpenter may reasonably rely on Dr. Kreider's and Dr. Hellerstein's opinions as background material to form his own opinions about Defendants' marketing strategies. (Defs.' MTE 2 Opp'n at 8–9.)

But Dr. Carpenter goes beyond background reliance: these assumptions are part of his self-described "principal conclusions." (Carpenter Report ¶ 8.) This is "parroting," which Rule 703 prohibits. Finjan, Inc. v. Sophos, Inc., 2016 WL 4560071, at *12 (N.D. Cal. Aug. 22, 2016); c.f. Fujifilm Corp. v. Motorola Mobility LLC, 2015 WL 1737951, at *4 (N.D. Cal. Apr. 8, 2015) (finding that expert was not parroting when he "opin[ed] not on whether the accused products infringe, but on the value of the asserted claims"). Because Dr. Carpenter is not qualified to offer scientific or medical opinions, his conclusions about Super Creatine and sugar are inappropriate.[13] See Finjan, Inc., 2016 WL 4560071, at *12 ("[C]ourts have precluded experts from parroting the opinions of other experts or wholesale adopting other experts' opinions without independent analysis.").

Dr. Carpenter provides additional scientific opinions about what consumers experience when they drink Bang Energy drinks. For example, Dr. Carpenter states, without any citations, that a consumer who drinks a can of Bang may feel energized due "to the caffeine in Bang Energy drink, a placebo effect, or some unrelated cause such as receiving an uplifting phone call." (Carpenter Report ¶ 117.) He goes on to opine that "[f]or a consumer, determining the actual cause of that sensation is scientifically impossible." (Id.; Id. ¶ 129.) He further opines that "[b]y

---

[13] The Court notes that the Carpenter Report purports to attach all "materials listed in the body and footnotes of this report" in "Appendix C." (Carpenter Report ¶ 13.) However, Appendix C is not attached to Monster's submission of the Carpenter Report.

drinking Bang Energy drink, consumers 'learn' that Super Creatine provides health benefits because their experience 'confirms' that it does, based on VPX's advertising, even when the consumer experience is entirely ambiguous." (Id. ¶ 118.) These statements are clearly outside of Dr. Carpenter's marketing expertise. He does not mention whether the opinions are based on his conversations with Dr. Krieder or Dr. Hellerstein. Accordingly, Dr. Carpenter may not opine on what consumers experience when they drink Bang or whether they can identify the cause of any effects they feel when they drink Bang.

### 2. Legal Opinions

Defendants also contend that Dr. Carpenter's description of VPX's advertisements and Mr. Owoc's statements as "false" or "misleading" are prohibited legal conclusions. (Defs.' MTE 2 at 10.) Monster claims that Dr. Carpenter's statements about "false" or "misleading" advertisements are marketing opinions. (Defs.' MTE 2 Opp'n at 10–12.)

The Court finds that Dr. Carpenter's claims that Defendants' advertising is "false" or "misleading" are not permitted. The Carpenter Report is replete with statements about whether a statement or advertisement is false and whether a consumer held a false belief. A few of these opinions, including in Dr. Carpenter's "principal conclusions," are listed below:

- "In its packaging design, advertising and promotion, trade shows, in-store displays, and on social media, …. VPX conflates creatine and Super Creatine, suggesting that Bang Energy drinks contain creatine or a form of creatine offering the same or superior benefits to creatine. These communications by VPX are misleading." (Carpenter Report ¶ 16(e) (emphasis added).)

- "In its advertising and communications VPX states that individuals consuming competing energy drinks will experience a sugar crash, while consumers of Bang Energy drinks will not. Such statements by VPX are misleading because energy drinks such as Monster Green are highly unlikely to cause a sugar crash." (Id. ¶ 16(f) (emphasis added).)

- "…Consumers are more likely to purchase an energy drink that contains Super Creatine compared to one that does not. Thus, the evidence suggests that VPX has successfully misled consumers about Super Creatine and its purported health benefits." (Id. ¶ 16(g) (emphasis added).)

- "By misleading consumers about the benefits of Super Creatine, VPX has created a competitive advantage over its rivals…." (Id. ¶ 16(h) (emphasis added).)

- "Bang Energy drinks contain no creatine, but this exchange is consistent with the advertising and promotional activities of VPX." (Id. ¶ 159 (emphasis added).)

//

These conclusions are premised entirely on his assumptions about Super Creatine and sugar. Dr. Carpenter states that VPX's statements are misleading "because energy drinks such as Monster Green are highly unlikely to cause a sugar crash." (Id. ¶ 16(f) (emphasis added).) His report does not highlight any marketing-based indicia of false or misleading advertising. He even testified in his deposition that he would have to "rethink" his opinion if Dr. Kreider's or Dr. Hellerstein's opinions were not true. (Carpenter Depo. 41:9-42:14, 58:2-60:23.) This record shows that Dr. Carpenter used Dr. Kreider's and Dr. Hellerstein's opinions as "substantive evidence of one of his ultimate conclusions," instead of "as data upon which an expert in his field would reasonably rely to form an opinion." Deutz Corp. v. City Light & Power, Inc., 2009 WL 2986415, at *6 (N.D. Ga. Mar. 21, 2009). As such, Dr. Carpenter's conclusions about Defendants' allegedly false or misleading advertising are not sufficiently reliable.

Stripped of the assumptions about Super Creatine and sugar, Dr. Carpenter's opinions about Defendants' allegedly false or misleading advertising fail to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). They amount to conclusory statements that an advertisement that conveys a false or misleading statement is a false or misleading advertisement. This is "common sense and well within the knowledge or experience of lay people." Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc., 829 F. Supp. 2d 802, 827 (D. Minn. 2011) (finding that "[a]n expert's testimony that pictures are important and convey product characteristics such as 'size, shape, colors, and how the product can be enjoyed,' does not assist the jury"). Therefore, Dr. Carpenter's descriptions of Defendants' statements as "false" or "misleading" constitute improper legal opinion that must be excluded. See Hangarter v. Provident Life & Acc. Ins. Co., 3737 F.3d 998, 1016 (9th Cir. 2004) ("[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law.") (emphasis in original); In re ConAgra Foods, Inc., 302 F.R.D. 537, 558 (C.D. Cal. 2014) ("'False' and 'deceptive' are judicially defined terms.").

Accordingly, the Court GRANTS Defendants' MTE No. 2 with respect to Dr. Carpenter's scientific, medical, and legal opinions. The Court EXCLUDES Dr. Carpenter's opinions and testimony about whether Super Creatine is creatine, whether Super Creatine provides health benefits, whether Monster's energy drinks are unlikely to cause a sugar crash, whether consumers can qualify their physical experience after they consume Bang energy drinks, and whether Defendants used "false" or "misleading" advertising.

### 3. Opinions about Bang Consumers

Defendants next seek to exclude Dr. Carpenter's opinions about the impact of Defendants' marketing strategies on Bang consumers. They argue that (1) Dr. Carpenter's review of social media posts is not sound methodology, and (2) his reliance on a consumer survey prepared by Monster's expert Charles D. Cowan ("Cowan Survey"), which Defendants assert is flawed, makes his opinions unreliable. (Defs.' MTE 2 at 10–13; see Defs.' MTE 2 Reply.) Monster contests each of these claims. (Defs.' MTE 2 Opp'n at 3–8.)

//

### a. Social Media Analysis

Defendants provides three arguments for why Dr. Carpenter's social media analysis is not the product of reliable principles and methods. They contend that Dr. Carpenter never describes his methodology, fails to show a nexus between the social media posts or sites and actual sales of Bang energy drinks, and provides no more than a factual narrative of various social media posts that includes impermissible speculation about consumers' beliefs. (Defs.' MTE 2 at 10–12.)

The Court finds that Dr. Carpenter's methodology is shaky at best. Dr. Carpenter primarily focuses on Defendants' and third-party posts on the social media platform Instagram as evidence of Defendants' marketing strategies and consumers' purported understanding of those claims. His reason for doing so is vague. He notes only that Defendants use Instagram "extensive[ly]" and that "Instagram has become an important advertising platform for companies, with its rising popularity among consumers." (Carpenter Report at ¶¶ 72–74, 76.) Dr. Carpenter fails to describe which Instagram posts he reviewed and why. He seems to have reviewed all of Mr. Owoc's and VPX's Instagram posts "that promote Super Creatine and/or creatine in posts that highlight Bang Energy drinks or promote the overall Bang Energy brand."[14] (Id. ¶¶ 36–37.) However, he does not provide a similar list for "consumer posts on social media" or those by purported social media influencers. (Id. ¶¶ 75, 139–142, 153, 159, 167.) For example, Dr. Carpenter notes that Defendants employ "hundreds" of social media influencers and brand ambassadors, including on Instagram, but only identifies posts from eight "VPX Influencers" and ambassadors. (Id. ¶¶ 87, 97–98, 122.)

Nevertheless, "[s]hakiness [ ] does not require exclusion." Gold v. Lumber Liquidators, Inc., 323 F.R.D. 280, 294 (N.D. Cal. 2017) (citing Primiano, 598 F.3d at 564). The above criticisms generally "go to 'weight' and not admissibility" of the Carpenter Report and Dr. Carpenter's testimony. Hadley v. Kellogg Sales Co., 2019 WL 4805662, at *24 (N.D. Cal. Aug. 13, 2019) (citing Primiano, 598 F.3d at 565). Dr. Carpenter holds experience in consumer research and social media analysis. (Carpenter Report ¶¶ 6–7.) While slim, his report points to some marketing principles—such as a "brand promise," "brand positioning," and "marketing"—to explain how Defendants' claims reflect those principles. (Id. ¶¶ 22–23.) See Montera, 2022 WL 1225031, at *5 (admitting marketing expert's testimony on "general marketing principles" and "the marketing strategies at play"). Accordingly, the Court finds that Dr. Carpenter's opinions regarding the Instagram posts "are based on his many years of marketing experience" and admissible. Hadley, 2019 WL 3804661, at *24. C.f. LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A., 209 F. Supp. 3d 612, 637–40, 644–47 (S.D.N.Y. 2016) (excluding opinions based on a review of social media posts when expert had no background in fashion marketing, lacked expertise in the methodology used, and failed to preserve the materials he reviewed).

---

[14] The Carpenter Report states that all "materials listed in the body and footnotes of this report" are in "Appendix C." (Carpenter Report ¶ 13.) He further sates that "[t]he text and associated metadata for all 533 posts are included in Appendix D." (Id. ¶ 36 n.51.) Neither Appendix C nor Appendix D is attached to the Carpenter Report.

Moreover, Dr. Carpenter is not required to show a nexus between the social media posts and actual sales. To prove its false advertising claim under the Lanham Act, Monster must show that a "statement actually deceived or has the tendency to deceive a substantial segment of its audience." Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997). Dr. Carpenter opines that Defendants make significant use of Instagram to convey certain claims with the intent of reaching audiences who follow or interact with Defendants' accounts and that members of the public on Instagram have repeated those claims. Though barely, this provides a sufficient nexus between Defendants' statements on Instagram and their impact on Defendants' intended audience. See Montera, 2022 WL 1225031, at *5 (admitting marketing expert's testimony on "Defendant's intended message and target audience").

However, the Court agrees with Defendants that Dr. Carpenter may not opine about the beliefs of the individuals whose social media posts he reviewed. The Carpenter Report points to various social media posts and states, "[t]hese consumers believe" or "[t]his consumer believes." (Carpenter Report ¶¶ 140, 142, 149–150, 168, 171.) While Dr. Carpenter may infer from his experience and the documents reviewed what "a reasonable consumer would expect" or believe from Defendants' advertising, Price v. L'Oreal USA, Inc., 2020 WL 4937464, at *4 (S.D.N.Y. Aug. 24, 2020), he lacks any basis for determining how a specific consumer "interpreted the intended message." Montera, 2022 WL 1225031, at *6. His opinion on the latter constitutes "nothing more than a factual narrative" of the social media posts reviewed. Johns v. Bayer Corp., 2013 WL 1498965, at *28 (S.D. Cal. Apr. 10, 2013). Accordingly, to the extent that Dr. Carpenter offers opinions about what a particular social media poster believed, such opinions and testimony must be excluded. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.").

**b. Cowan Survey**

Defendants contend that Dr. Carpenter's reliance on the Cowan Survey dooms his report. (Defs.' MTE 2 at 13.) The Court disagrees. For reasons discussed below with respect to Defendants' motion to exclude Dr. Cowan's opinions and testimony, the Court finds that the Cowan Survey is admissible. Moreover, Dr. Carpenter may rely on other experts' surveys to form his opinions. Fujifilm Corp., 2015 WL 1737951, at *5–6 (admitting expert's opinion partly based on a survey that was not his own). Nor is he required to conduct his own survey. Butler v. Home Depot, Inc., 984 F. Supp. 1257, 1261 (N.D. Cal. 1997) (accepting expert opinion based on "qualitative research" methods); Price, 2020 WL 4937464, at *5 (noting that "expert reports regarding consumer perception need not be based on scientific surveys, but [ ] experts may testify based on their own experience"). This argument, therefore, fails.

Accordingly, the Court GRANTS IN PART Defendants' MTE No. 2 and EXCLUDES Dr. Carpenter's opinions and testimony about any specific consumer's beliefs. The Court DENIES Defendants' MTE No. 2 as to Dr. Carpenter's remaining opinions about consumers' response to Defendants' advertising based on his social media analysis or the Cowan Survey.

### 4. State of Mind Opinion

Defendants finally seek to exclude the Carpenter Report on the basis that Dr. Carpenter offers impermissible opinions about Defendants' state of mind.  (Defs.' MTE 2 at 13–14.) Monster argues that Dr. Carpenter has not offered any state of mind opinions.  (Defs.' MTE 2 Opp'n at 12–14.)

"Courts routinely exclude expert testimony as to intent, motive, or state of mind as issues better left to a jury." Gold, 323 F.R.D. at 294.  The Court finds that Dr. Carpenter's statements about what VPX or Mr. Owoc "believed" constitutes state of mind opinions that must be excluded.  (See, e.g., Carpenter Report ¶¶ 36, 37.)  However, the Court finds that Dr. Carpenter's statements about what VPX or Mr. Owoc implied, communicated, or suggested through their social media posts are permissible opinions about Defendants' marketing strategies. Accordingly, the Court GRANTS IN PART Defendants' MTE No. 2 and EXCLUDES opinions and testimony about Defendants' beliefs.  The Court DENIES Defendants' MTE No. 2 with respect to the other challenged paragraphs in the Carpenter Report.[15]

In sum, the Court GRANTS IN PART Defendants' MTE No. 2.  The following opinions and testimony are EXCLUDED:

(1) Dr. Carpenter's opinions and testimony about whether Super Creatine is creatine, whether Super Creatine provides health benefits, whether Monster's energy drinks are unlikely to cause a sugar crash, whether consumers can qualify their physical experience after they consume Bang energy drinks, and whether Defendants used "false" or "misleading" advertising;

(2) Dr. Carpenter's opinions and testimony about any specific consumer's beliefs; and

(3) Dr. Carpenter's opinions and testimony about Defendants' beliefs.

The Court DENIES the rest of Defendants' MTE No. 2.

## C. Defendants' MTE No. 3: Dr. Charles D. Cowan

Defendants next move to exclude all testimony and evidence from Monster's expert Dr. Charles D. Cowan, including (1) his March/April 2020 consumer survey ("Cowan Survey"), and (2) opinions in his April 2021 expert report ("Cowan Report").  (See Defs. MTE 3.) Monster had retained Dr. Cowan, a statistician, to measure the materiality of Defendants' challenged statements and advertising on consumers.  (Id. at 1; Defs. MTE 2 Opp'n at 1.)  Dr. Cowan conducted a survey in 2020, as well as related statistical analyses.  (Id.)

---

[15] Defendants only identify five paragraphs as state of mind opinions.  (Carpenter MTE at 14 (citing Carpenter Report ¶¶ 36, 37, 40, 51, 108).)

Defendants do not contest Dr. Cowan's qualifications.  Instead, they argue that the Cowan Survey is irrelevant because it does not capture Bang consumers' preferences between 2012 (when VPX first began selling Bang) and 2019.  (Id. at 3–5; Defs.' MTE 3 Reply at 3.)  They assert that the Cowan Survey also suffers from bias and methodological flaws and that the Cowan Report contains speculative beliefs about Bang consumers.  (Id. at 5–8.)  Defendants finally contend that Dr. Cowan's testimony should be excluded because he did not disclose his billing and invoice records to them.  (Id. at 8–9.)

As discussed above, courts in the Ninth Circuit generally admit "surveys in trademark cases … as long as they are conducted according to accepted principles," E. & J. Gallo Winery, 967 F.2d at 1292, and "is relevant."  Fortune Dynamic, Inc., 618 F.3d at 1036.  Here, the Cowan Survey is relevant to Monster's false advertising claim.  Even if it only captured consumers' preferences in 2020, the Cowan Survey is probative of whether Defendants' allegedly false statements, including "Super Creatine" on Bang cans, has the tendency to deceive a substantial segment of its audience."  Southland Sod Farms, 108 F.3d at 1139.  The Cowan Survey is also relevant to the materiality of CLL to Bang purchasers.  Accordingly, its exclusion is appropriate only if the Cowan Survey was not conducted according to accepted survey principles.

### 1. Time Period

Defendants' first argument about the Cowan Survey's time period fails to demonstrate that the survey did not apply accepted principles.  Whether the Cowan Survey adequately represents consumers' preferences prior to 2020 is a challenge to "methodology, survey design, [and] reliability," which "go to the weight of the survey rather than its admissibility."  Clicks Billiards, Inc., 251 F.3d at 1263; see, e.g., Bern Unlimited, Inc. v. Burton Corp., 95 F. Supp. 3d 184, 203 (D. Mass. 2015) (finding that survey taken after "the time of first infringement" was admissible as it "would be absurd" to require "a company … to undertake a preemptive survey prior to the time they allegedly first infringe"); c.f. Quiksilver, Inc. v. Kymsta Corp., 247 F.R.D. 579, 585 (C.D. Cal. 2007) (rejecting motion to compel consumer survey results that were "conducted some 15 years after the fact" because they were not "probative").

### 2. Bias

By contrast, Defendants' bias argument may affect the validity of the Cowan Survey.  Courts routinely exclude surveys that are "so blatantly biased that the results are unreliable."  Brighton Collectibles, Inc. v. RK Tex. Leather Mfg., 923 F. Supp. 2d 1245, 1257 (S.D. Cal. 2013); see also Vital Pharms., Inc., 553 F. Supp. 3d at 1230–33 (excluding survey when its design "infected the entire study with an unacceptable degree of bias").

//
//
//
//

Here, however, the Court cannot find that the Cowan Survey is infected with blatant bias. Survey participants included the relevant audience: purchasers of energy drinks, including Bang. C.f. Kwan Software Eng'g, Inc. v. Foray Tech., LLC, 2014 WL 572290, at *5 (N.D. Cal. Feb. 11, 2014) (excluding survey that failed to "examine[] the proper universe of consumers"). The Cowan Survey did not misrepresent the challenged statements. C.f. Townsend, 303 F. Supp. 3d at 1030 (excluding survey that "omitted the word 'bad' from the 'big bad buzz' portion of the … statement" and "asked respondents what this shortened statement meant to them"). The Cowan Survey included control questions. C.f. Brighton Collectibles, Inc., 923 F. Supp. 2d at 1257–58 (noting bias issue "was exacerbated because [expert] did not use a control to test the accuracy of his survey"). It did not exaggerate product features that were not at issue. C.f. id. (excluding survey that used pictures "in which only one bag shares the most prominent and eye-catching features" when color was not an element of claimed trade dress); Vital Pharms., Inc., 553 F. Supp. 3d at 1230–32 (rejecting survey that used certain line-up of products, even though "[n]one of the trial evidence suggested that these energy drinks are ever sold together as they appeared in [the] survey"). Nor were the answers suggestively worded, as Defendants claim.

Defendants contend that the Cowan Survey is biased because it failed to rule out unfamiliar and unreliable respondents, asked open-ended questions, included other ingredients prominently featured on Bang cans, and used a control label in addition to a Bang label. (Defs. MTE 3 at 7–8; see also Chiagouris Report.) These critiques challenge "the basis of the test protocol used, the universe defined and tested, and the questions asked," which "go to the weight, not the admissibility of the survey." Stonefire Grill, Inc., 987 F. Supp. 2d at 1038; E. & J. Gallo Winery, 967 F.2d at 1292–93 (declining to exclude survey that defendant claimed had "slanted" questions). Defendants "can explore the weaknesses in [the Cowan Survey] through the traditional methods such as vigorous cross examination and by presenting their own expert testimony Brighton Collectibles, Inc., 923 F. Supp. 2d at 1258 (acknowledging that "sloppy questions are problematic," but did not rise to the level of a fatal flaw). Accordingly, the Court concludes that the Cowan Survey is not fundamentally unreliable.

### 3. Opinions about Consumers' Beliefs

Defendants' contention that the Cowan Report makes speculative opinions about consumers' beliefs is unavailing. As noted above, Dr. Cowan may infer from his experience and the documents reviewed what "a reasonable consumer would expect" or believe from Defendants' advertising. Price, 2020 WL 4937464, at *4. Unlike Dr. Carpenter, Dr. Cowan does not opine on any specific consumer's belief or interpretation of a message. Montera, 2022 WL 1225031, at *6. Accordingly, exclusion is not appropriate on this basis.

### 4. Billing Records

Defendants finally argue that Dr. Cowan's opinions and testimony should be excluded, regardless of the admissibility of his survey and expert report, because Monster failed to disclose his billing records to Defendants. (Defs. MTE 3 at 8–9.)

Under Federal Rule of Civil Procedure 26, an expert report must contain "a statement of the compensation to be paid for the study and testimony in the case." Fed. R. Civ. P. 26(a)(2)(B)(vi). Here, Dr. Cowan states that his "hourly rate is $775." (Cowan Report ¶ 12.) Therefore, he has complied with Rule 26's disclosure requirement. Defendants seem to assert that Dr. Cowan's final compensation cannot be explained by his hourly rate alone. (Defs. MTE 3 Reply at 12.) As Monster notes, however, Defendants offer no support for their position that Dr. Cowan must disclose the exact details of what Monster ultimately compensated him. That Monster did not provide Dr. Cowan's billing records pursuant to VPX's subpoena is outside the scope of Rule 26. Accordingly, the Court finds that Dr. Cowan has not violated Rule 26's disclosure requirements.

In sum, the Court DENIES Defendants' MTE No. 3.

**D. Defendants' MTE No. 4: Dr. Darren Candow**

Defendants also move to exclude opinions and testimony from one of Monster's creatine experts Dr. Darren Candow, who opines that CLL does not behave like creatine monohydrate. (See Defs.' MTE 4.) They argue that his opinions are unreliable because he did not conduct an independent study. (Id. at 1, 3.) They also contend that a study he relied on to form these opinions—a Monster-sponsored study performed by Biofortis Innovation Services ("Biofortis Study," id., Ex. B)—is not based on "scientifically valid principles" because it was litigation-driven and not published or subjected to peer review. (Id. at 3–7.) Accordingly, Defendants assert that Dr. Candow must be precluded from offering opinions related to or based on the Biofortis Study.

Defendants' first argument fails. As discussed above, an expert may rely on studies and tests that he or she did not conduct "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703; see also Southland Sod Farms, 108 F.3d at 1142 ("The fact that [the expert's] opinions are based on data collected by others immaterial" (citing Fed. R. Evid. 703).). Under this clear rule, Dr. Candow need not perform his own studies on CLL to offer reliable, expert opinions.

Defendants' other arguments are related. One factor to determine an expert's reliability "is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1317 (9th Cir. 1995). However, research that is not independent of the litigation does not require automatic exclusion. Instead, "the expert should point to other evidence that the testimony has a reliable basis, like peer-reviewed studies or a reputable source showing that the expert 'followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in the field.'" In re Roundup Prods. Liability Litig., 390 F. Supp. 3d 1102, 1112 (N.D. Cal. 2018). "[I]f the expert's research has not been subjected to peer review, then the expert must explain precisely how he went about reaching his conclusions and point to some objective source, a learned treatise, the policy statement of a professional association, a published article in

a reputable scientific journal or the like, to show that he has followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in his field." In re Novatel Wireless Sec. Litig., 846 F. Supp. 2d 1104, 1007 (S.D. Cal. 2012).

This is a close case. On the one hand, the Biofortis Study was not prepared before the instant lawsuit and it has not been peer-reviewed. Nor has it been published. As Defendants note, courts have excluded expert opinion and testimony on these grounds. (Defs.' MTE 4 Reply at 2–3.) Further, Defendants argue that they are unable to cross-examine any scientist who was directly involved in the Biofortis Study because Monster does not plan to call such a witness at trial. (Id. at 2.) On the other hand, Dr. Candow notes the general dearth of existing literature on CLL. (Candow Report ¶¶ 45, 51.) Monster adds that the lack of pre-litigation research is unsurprising given that Mr. Owoc holds the patent for CLL. (Defs.' MTE 4 Opp'n at 9 n.11.) The absence of peer review or publication, therefore, are not conclusive. See Daubert, 509 U.S. at 593 ("Some propositions, moreover, are too particular, too new, or of too limited interest to be published.").

Additional evidence, however, suggests the Biofortis Study was designed consistently with the scientific method. Dr. Candow reported that, like the Biofortis Study, a published study on Bang conducted a randomized, cross-over study, in which twenty subjects consumed Bang and a placebo after fasting to test whether Bang affected psychomotor vigilance. (Candow Report ¶ 46; Bifortis Study at 8–9.) He further testified in his deposition that the Biofortis Study uses reliable methods. (Candow Depo. 182:2-187:20.) Defendants' expert Dr. Guillermo Escalante evaluated the Biofortis Study and critiqued its use of a single-blind study design, as opposed to a double-blind study design, as well as other methodological choices. (Gallante Report ¶ 7.) However, he noted that other aspects of the Biofortis Study applied "good standard practice for a supplement intervention study." (Id. ¶¶ 12–13.) Under these facts, the Court finds that it is more likely than not that the Biofortis Study is based on generally accepted principles and reliable. Accordingly, because Dr. Candow may reasonably rely on the Biofortis Study to form his opinions on CLL, the Court DENIES Defendants' MTE No. 4.

## E. Defendants' MTE No. 5: Dr. Richard Kreider

Defendants move to exclude Monster's other creatine expert Dr. Richard Kreider for the same reasons as Dr. Candow. (See Defs.' MTE 5.) They again argue that Dr. Kreider's opinions and testimony are unreliable because he did not conduct independent, pre-litigation research. (Id. at 1–3.) They also challenge the five studies Dr. Kreider relied on to form his opinions, arguing that the studies are not based on "scientifically valid principles" and methodologically flawed. (Id. at 4–9.)

Monster does not dispute that all five studies at issue were prepared for the instant litigation and have not been published or peer-reviewed. However, as discussed above, whether Dr. Kreider conducted independent research or relies on post-litigation studies are not determinative under Daubert. Monster must demonstrate instead that the studies are reliable.

Here, Dr. Kreider reviewed and relied on five studies to form his opinions that CLL is not creatine or a source of creatine: (1) a study by KGK Science, in which healthy adults ingested a 5,000-milligram dose of CLL or creatine monohydrate to compare the effect on blood creatine levels ("KGK Study"); (2) an animal study by Dr. Robin da Silva and CARE Research LLC, in which rats were given either 4 grams/kg of creatine monohydrate, 6.56 grams/kg of CLL, or a control diet to observe whether CLL had an effect on blood, muscle, or brain creatine levels ("Da Silva Study"); (3) a magnetic resonance spectroscopy study by Dr. Sergej Ostojic of the University of Novi Sad in Serbia in which participants ingested 2,000 milligrams of CLL daily for 28 days to observe any effects on muscle or brain creatine content ("Ostojic Study"); (4) a muscle biopsy study by Dr. Nicholas Burd from the University of Illinois at Urbana-Champaign in which participants ingested 5,000 milligrams of either creatine monohydrate, CLL, or a placebo to observe effects on muscle creatine content ("Burd Study"); and (5) the Biofortis Study. (Defs' MTE 5 Opp'n at 2–3.) Because the Court has already determined above that the Biofortis Study is reliable, the Court only reviews the remaining four studies.

In his declaration, Dr. Kreider states that each of the above studies followed "well-designed, scientifically sound, reliable, and recommended methods for conducting spot nutrition research" that "are consistent" with similar studies. ("Declaration of Dr. Richard Kreider," id., Ex. 9, ¶ 6.) For example, three of the four studies—the KGK Study, Da Silva Study, and Burd Study—used creatine monohydrate as a comparator to CLL. Dr. Kreider declares that the use of creatine monohydrate as a comparator to CLL is reliable because it "is considered the gold standard by which other forms of creatine are compared." (Id. ¶ 7.) Dr. Kreider corroborates the four studies' respective designs and techniques by citing to published articles that show such methods are accurate, as well as practiced and accepted by scientists in relevant fields. (Id. ¶¶ 8–12, 8 n.4–12 n.13.) Defendants do not dispute any of these sources or principles, but instead reiterate that courts have excluded studies that were prepared for litigation and not subjected to peer review. (Defs. MTE 5 Reply at 3–4.) On this record, the Court finds that Monster has shown by a preponderance of the evidence that the KGK Study, Da Silva Study, Ostojic Study, and Burd Study are based on scientifically valid principles. Defendants' argument that the studies fail to use equimolar doses is a criticism of methodology that goes to the studies' weight and not admissibility. Dr. Kreider may reasonably rely on the five studies at issue to form his opinions about CLL. Accordingly, the Court DENIES Defendants' MTE No. 5.

## F. Defendants' MIL No. 1: Mr. Owoc's Unpublished Book

Defendants move to exclude Mr. Owoc's unpublished book, tentatively titled The Bang Anti-Diet. (See Defs.' MIL 1.) They argue that an unpublished, draft book is not a commercial advertisement and lacks relevance to Monster's claims. (Id. at 1–2.) Any probative value is also substantially outweighed by the risk of unfair prejudice. (Id. at 2–3.) Monster argues that the draft book is relevant since Defendants featured it in their advertisements about Super Creatine and Bang. (Defs.' MIL 1 Opp'n at 3–5.) It contends that the book also shows Defendants' use of scientific imagery to bolster their Super Creatine claims, Mr. Owoc's knowledge that these claims were false, and his intent to mislead consumers. (Id. at 5–7.) Monster asserts that this probative value is not substantially outweighed by unfair prejudice. (Id. at 7–8.)

The parties seem to agree that the draft book is potentially relevant only to Monster's false advertising claims. However, that Defendants publicized the book <u>cover</u> with a short description in social media posts and other advertisements does not make the book's <u>contents</u> relevant. Monster must show that the draft book's contents "ha[ve] any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401(a)-(b). Monster fails to meet this test.

First, a book—let alone an unpublished, draft book—is not commercial advertisement or promotion. <u>William O'Neil & Co. v. Validea.com Inc.</u>, 202 F. Supp. 2d 1113, 1119 (C.D. Cal. 2002) (finding that a book is not commercial speech). This fact alone distinguishes Monster's cited case, which involved a "draft ad." <u>Fed. Trade Comm'n v. Directv, Inc.</u>, 2015 WL 7775274, at *6–7 (N.D. Cal. Dec. 3, 2015). Second, the court in Monster's case had found that a draft advertisement could show an intent to attract more customers—and mislead the public—because it contained disclosures that the final advertisement left out. <u>Id.</u> at *6. Here, no such connection exists between the draft book and Defendants' advertisements. Indeed, the intended audience of an unpublished, draft book is ambiguous. Even if the draft book seeks to influence the same customer base as that of Defendants' advertisements about Super Creatine and Bang, Monster never links the timing of the draft book with the publication of any specific advertisement. Therefore, Mr. Owoc's statements in the draft book fail to show knowledge or an intent to deceive with any of the advertisements at issue. For the same reason, Monster's argument—that comments by Defendants' expert Mr. Escalante critiquing some of Mr. Owoc's claims in the draft book are relevant—falls short. Such comments are also inadmissible hearsay. Third, the Court is unpersuaded that without the draft book, Monster cannot show that Defendants employed scientific imagery in their advertisements. The record demonstrates the availability of other evidence that has a tendency to make this fact more or less probable.

Moreover, the Court agrees with Defendants that whatever minimal probative value the draft book holds "is substantially outweighed by a danger of … unfair prejudice, confusing the issues, [and] misleading the jury." Fed. R. Evid. 403. Accordingly, the Court GRANTS Defendants' MIL No. 1 and EXCLUDES evidence of the contents of Mr. Owoc's draft book. However, to the extent that Monster seeks to admit evidence of social media posts and other advertisements that mention the book, such evidence is admissible.

## G. Defendants' MIL No. 2: VPX Workplace Evidence

Defendants finally move to exclude evidence of VPX's work environment, specifically regarding VPX employee terminations, human resources issues, and other personnel matters. (<u>See</u> Defs.' MIL 2.) They argue that Monster seeks to admit such evidence solely to show that Defendants have a propensity of bad behavior, which is an impermissible purpose. (<u>Id.</u> at 6–9.) Monster responds that evidence of Mr. Owoc's management style tends to show that VPX employees feared reprisal from him and furnishes a motive for why VPX employees may have allegedly misappropriated trade secrets, engaged in shelf space interference, or published false advertisements. (<u>See</u> Defs.' MIL 2 Opp'n.)

The Court notes that Defendants fail to identify the "workplace evidence," other than the deposition testimony of VPX's former general counsel Marc Kesten. (Defs.' MIL 2 at 6.) The Court cannot rule on such an overbroad category of evidence. While the Court could deny Defendants' MIL No. 5 on this basis, Monster has offered evidence it argues falls within this scope. Accordingly, the Court considers whether this evidence is admissible.

The Court agrees with Monster that evidence that Mr. Owoc terminated employees or threatened termination as retaliation for failure to engage in alleged misconduct may be relevant if it shows an employee's motive. See Fed. R. Evid. 404(b)(2) ("[E]vidence of [a prior act] may be admissible … to prov[e] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."). However, Monster's evidence does not show any employee who had been terminated because he or she had challenged or refused to comply with Mr. Owoc on the Super Creatine claims or any shelf space interference and trade secret misappropriation. Monster's evidence regarding Dr. Yu Zhao is hearsay. The testimony of Sam Wilson, VPX's former vice president of sales and distribution, that he was fired for asking about "a bonus payoff" fails to show that Mr. Wilson intended to question Defendants' alleged act of providing bonuses to employees who misappropriated trade secrets or even knew of the practice. Nor does Monster identify an employee who had allegedly engaged in false advertising, shelf space interference, or trade secret misappropriation out of fear of retaliation. Absent this kind of proof, the Court agrees that general evidence of Mr. Owoc's personality or his acts of firing employees is "[e]vidence of a person's character or character trait [that] is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a). Accordingly, the Court GRANTS Defendants' MIL No. 2. Monster may always re-raise the issue during trial for specific evidence it believes demonstrates motive.

## VI.   CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Pl.'s MTE No. 1; DENIES Pl.'s MTE No. 2; DENIES Pl.'s MTE No. 3; GRANTS IN PART AND DENIES IN PART Pl.'s MIL No. 1; DENIES Pl.'s MIL No. 2; GRANTS IN PART AND DENYIES IN PART Pl.'s MIL No. 3; GRANTS Pl.'s MIL No. 4; DENIES Defs.' MTE No. 1; GRANTS IN PART AND DENIES IN PART Defs. MTE No. 2; DENIES Defs. MTE No. 3; DENIES Defs. MTE No. 4; DENIES Defs. MTE No. 5; GRANTS Defs. MIL No. 1; and GRANTS Defs. MIL No. 2.

**IT IS SO ORDERED.**