LAW OFFICES OF OLAF J. MULLER
Olaf J. Muller, State Bar Number 247372
olaf@olafmullerlaw.com
939 S. Broadway, Suite 805
Los Angeles, CA 90015
Telephone: (424) 999-4747
Facsimile: (424) 378-6331

QUARLES & BRADY LLP
Daniel M. Janssen (*admitted pro hac vice*)
daniel.janssen@quarles.com
David P. Muth (*admitted pro hac vice*)
david.muth@quarles.com
411 E. Wisconsin Ave., Suite 2400
Milwaukee, WI 53202
Telephone: (414) 277-5495
Facsimile: (414) 978-8942

Attorneys for Defendant

VITAL PHARMACEUTICALS, INC., D/B/A VPX SPORTS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONSTER ENERGY COMPANY, a Delaware Corporation,<br><br>                Plaintiff,<br><br>   vs.<br><br>VITAL PHARMACEUTICALS, INC., d/b/a VPX Sports, a Florida corporation; and JOHN H. OWOC a.k.a. JACK OWOC, an individual<br><br>          Defendants. | CASE NO. 5:18-cv-01882-JGB-SHK<br><br>**DEFENDANT VITAL PHARMACEUTICALS INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR EQUITABLE RELIEF, FEES, AND COSTS**<br><br>Judge:   Hon. Jesus G. Bernal<br>Place:   Courtroom 1<br>Trial:   August 9, 2022<br>Verdict: September 29, 2022 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1

ARGUMENT ....................................................................... 3

I.     THE SECOND PHASE OF THIS BIFURCATED TRIAL MUST INVOLVE THE PRESENTATION OF TESTIMONY AND OTHER EVIDENCE. ................................................................. 3

II.    MONSTER IS NOT ENTITLED TO ANY FURTHER RELIEF WITH RESPECT TO ITS FALSE ADVERTISING CLAIMS. ................... 5

       A.    Monster's request for injunctive relief is duplicative and flawed. ....... 5

             1.    Vital has fully briefed and documented its well-founded objections in its response to Monster's motion filed under the Lanham Act. ............................................. 5

             2.    Monster cannot show future harm as required by California law. .................................................. 6

             3.    The balance of harms does not support an injunction. .............. 9

             4.    Corrective advertising is neither justified nor necessary .......... 10

             5.    The scope of Monster's proposed injunction is unworkable and unjustified. ................................... 11

       B.    The equitable remedy of disgorgement is not warranted. ................... 11

             1.    Disgorgement is an equitable remedy subject to the traditional defenses raised in equity, including unclean hands and laches. ........................................ 11

             2.    A proper calculation of Vital's profits caused by the marketing of Super Creatine is not possible on the current written record. ............................................ 15

             3.    The testimony of Monster's experts relevant to disgorgement was suspect. ..................................... 17

             4.    Disgorgement is improper where, as here, there is no evidence that Vital traded off Monster's name or goodwill. .................................................. 19

             5.    The adequacy of other remedies forecloses Monster's attempt to obtain lost profits piled atop its own alleged lost profits. .......................................... 20

       C.    Monster is not entitled to enhanced damages. ....................... 22

**TABLE OF CONTENTS**

Page

1.    Enhancement is an exceptional remedy not justified on this record. ............................................................. 23

2.    The Court should not conclude that Monster is suffering any ongoing loss, and certainly should not address the issue prior to receiving further proof. ....................... 25

3.    Monster presents no proof of so-called "lingering misimpressions." ...................................................... 25

D.    Monster is not entitled to prejudgment interest in the amounts it seeks. ................................................................ 26

1.    Prejudgment interest should not be awarded prior to the return of the verdict. ......................................... 26

2.    An appropriate interest rate should be no more than 1.17%. ............................................................ 28

E.    This dispute in not exceptional and Monster is not entitled to an award of its attorneys' fees. ................................. 29

1.    Monster cites the wrong test to the Court. ................ 29

2.    This was not an exceptional case. ............................ 30

III.    MONSTER HAS NOT ESTABLISHED A RIGHT TO FURTHER RELIEF INSOFAR AS ITS TRADE SECRET CLAIMS ARE CONCERNED .......................................................... 31

A.    Monster's trial evidence of trade secret misappropriation was thin. .................................................................. 31

B.    Monster cannot establish the elements necessary for injunctive relief, and particularly the existence of irreparable harm. .......... 33

1.    Irreparable harm does not exist. ............................. 33

2.    Monster's monetary relief was more than adequate. ....... 34

C.    Monster's proposed permanent injunction is unworkable. ........ 34

D.    Monster is not entitled to exemplary damages on its trade secret claims. .............................................................. 36

E.    Monster should not be awarded its fees. ........................... 37

F.    The Court should not award prejudgment interest at the amount sought by Monster. ................................................. 38

# TABLE OF CONTENTS

Page

IV.   MONSTER SHOULD NOT BE PERMITTED FURTHER RELIEF
      INSOFAR AS ITS SHELF SPACE CLAIMS ARE CONCERNED. .......... 38

      A.   A permanent injunction is not warranted. ........................................... 38

           1.   Monster has suffered no damage, much less irreparable
                harm. ................................................................................................ 39

           2.   Monster has unclean hands that the Court should examine
                in the second phase of this bifurcated trial. .............................. 41

           3.   Monster's proposed form of injunction should be rejected ...... 41

      B.   Monster is not entitled to punitive damages. ....................................... 42

      C.   Monster is not entitled to costs and prejudgment interest. ................. 43

V.    MONSTER SHOULD NOT BE AWARDED ITS ATTORNEYS'
      FEES. ............................................................................................................. 43

      A.   Monster's requested hours are not reasonable. ................................... 44

           1.   The requested hours are too vague and the documentation
                is inadequate. ................................................................................. 44

           2.   The requested attorneys' fees application contains
                hundreds of thousands of dollars for recent college
                graduate work. ............................................................................... 46

           3.   Numerous courts have declined or reduced Hueston
                Hennigan's inflated fee applications. ......................................... 46

      B.   Monster's requested rates are not reasonable. .................................... 47

VI.   NON-TAXABLE COSTS SHOULD BE DENIED. .................................... 49

CONCLUSION .................................................................................................... 50

QUARLES & BRADY LLP
ATTORNEYS AT LAW
OFFICE ADDRESS

# TABLE OF AUTHORITIES

**Page**

**CASES**

02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.,
399 F. Supp. 2d 1064 (N.D. Cal. 2005) ................................................................37

Acad. of Motion Picture Arts & Scis. v. GoDaddy, Inc.,
2015 WL 12697732 (C.D. Cal. 2015)....................................................................5

ADG Concerns, Inc. v. Tsalevich LLC,
2018 WL 4241967 (N.D. Cal. 2018) ...................................................................42

Agency Sols. Com., LLC v. TriZetto Grp., Inc.,
819 F. Supp. 2d 1001 (E.D. Cal. 2011)...............................................................35

Airwair Int'l Ltd. v. ITX USA LLC,
2022 WL 161895 (N.D. Cal. 2022) .....................................................................31

Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton,
96 Cal. App. 4th 1017 (2002)..............................................................................43

Anhing Corp. v. Thuan Phong Co., Ltd.,
2016 WL 6661178 (C.D. Cal. 2016)....................................................................31

Apple Hill Growers v. El Dorado Orchards, Inc.,
2022 WL 1506205 (E.D. Cal. 2022) ...................................................................15

Apple Inc. v. Samsung Elecs. Co., Ltd.,
2014 WL 4145499 (N.D. Cal. 2014) ...................................................................31

Arcona, Inc. v. Farmacy Beauty, LLC,
2021 WL 2414856 (C.D. Cal. 2021)....................................................................50

Arminak Sols., LLC v. 7-Eleven, Inc.,
2017 WL 6888706 (C.D. Cal. 2017)....................................................................33

BillFloat, Inc. v. Collins Cash, Inc., et al.,
2023 WL 2333879 (N.D. Cal. 2023) ...................................................................49

Binder v. Disability Grp., Inc.,
772 F. Supp. 2d 1172 (C.D. Cal. 2011) ...............................................................26

Blizzard Ent. Inc. v. Ceiling Fan Software LLC,
28 F. Supp. 3d 1006 (C.D. Cal. 2013) .................................................................39

Blum v. Stenson,
465 U.S. 886 (1984)............................................................................................47

Brighton Collectibles, Inc. v. Coldwater Creek, Inc.,
2009 WL 160235 (S.D. Cal. 2009) ......................................................................23

QUARLES & BRADY LLP
ATTORNEYS AT LAW
MILWAUKEE

**TABLE OF AUTHORITIES**
(continued)

Page

Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.,
2009 WL 2513984 (S.D. Cal. 2009) ................................................. 31

Butte Fire Cases,
24 Cal. App. 5th 1150 (2018) ......................................................... 43

Caiz v. Roberts,
2017 WL 830386 (C.D. Cal. 2017) ................................................. 29

Camacho v. Bridgeport Fin., Inc.,
523 F.3d 973 (9th Cir. 2008) .......................................................... 43

Carson v. Billings Police Dep't,
470 F.3d 889 (9th Cir. 2006) .......................................................... 47

Choice-in-Education League v. Los Angeles Unified Sch. Dist.,
17 Cal. App. 4th 415 (1993) ............................................................. 6

Cisneros v. U.D. Registry, Inc.,
39 Cal. App. 4th 548 (1995) ............................................................. 6

Citcon USA, LLC, v. RiverPay Inc.,
2019 WL 2603219 (N.D. Cal. 2019) ............................................... 35

Clearline Techs. Ltd. v. Cooper B-Line, Inc.,
2014 WL 4185770 (S.D. Tex. 2014) ......................................... 19, 20

Cnty. of Solano v. Lionsgate Corp.,
126 Cal. App. 4th 741 (2005) ......................................................... 27

Colgan v. Leatherman Tool Grp., Inc.,
135 Cal. App. 4th 663 (2006) ........................................................... 6

Consumers Union of U.S., Inc. v. Alta-Dena Certified Dairy,
4 Cal. App. 4th 963 (1992) ............................................................. 10

Cortes v. Metro. Life Ins. Co.,
380 F. Supp. 2d 1125 (C.D. Cal. 2005) .......................................... 46

Cortez v. Purolator Air Filtration Prod. Co.,
23 Cal. 4th 163 (2000) ................................................................. 6, 9

Cutera, Inc. v. Lutronic Aesthetics, Inc.,
444 F. Supp. 3d 1198 (E.D. Cal. 2020) .......................................... 33

Direct Techs., LLC v. Elec. Arts Inc.,
2014 WL 12591847 (C.D. Cal. 2014) ............................................. 46

Diversified Silicone Prod. Corp. v. Elastapro Silicone Sheeting LLC,
2020 WL 4390380 (C.D. Cal. 2020) ............................................... 33

QUARLES & BRADY LLP
ATTORNEYS AT LAW
MILWAUKEE

# TABLE OF AUTHORITIES
(continued)

**Page**

Donald v. Café Royale, Inc.,
   218 Cal. App. 3d 168 (1990) ........................................................ 6

Duale v. Mercedes-Benz USA, LLC,
   148 Cal. App. 4th 718 (2007) ...................................................... 27

eBay, Inc. v. MercExchange, L.L.C.,
   547 U.S. 388 (2006) ...................................................................... 33

EHM Prods., Inc. v. Starline Tours of Hollywood, Inc.,
   2020 WL 10431815 (C.D. Cal. 2020) ...................................... 44, 47

El Dorado Stone LLC v. Renaissance Stone,
   2007 WL 3308099 (S.D. Cal. 2007) ............................................ 37

Enovsys LLC v. AT&T Mobility LLC,
   2016 WL 3460794 (C.D. Cal. 2016) ............................................ 30

Equate Media, Inc. v. Suthar,
   2022 WL 2824973 (C.D. Cal. 2022) ............................................ 35

Evanston Ins. Co. v. OEA, Inc.,
   566 F.3d 915 (9th Cir. 2009) ........................................................ 26

Farrar v. Hobby,
   506 U.S. 103 (1992) ...................................................................... 47

Feitelberg v. Credit Suisse First Boston, LLC,
   134 Cal. App. 4th 997 (2005) ........................................................ 6

Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.,
   778 F.3d 1059 (9th Cir. 2015) ................................................. 4, 20

Fitness Anywhere LLC v. WOSS Enters. LLC,
   2018 WL 6069511 (N.D. Cal. 2018) ............................................ 38

Franet v. Cnty. of Alameda Soc. Servs. Agency,
   2006 WL 8445938 (N.D. Cal. 2006) ............................................ 45

Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,
   826 F.2d 837 (9th Cir. 1987) ........................................................ 12

Gates v. Deukmejian,
   987 F.2d 1392 (9th Cir. 1992) ...................................................... 45

Gonzalez v. City of Maywood,
   729 F.3d 1196 (9th Cir. 2013) ...................................................... 44

Gracie v. Gracie,
   217 F.3d 1060 (9th Cir. 2000) ................................................ 45, 49

# TABLE OF AUTHORITIES
(continued)

**Page**

Grasshopper House, LLC v. Clean & Sober Media LLC,
  394 F. Supp. 3d 1073 (C.D. Cal. 2019) ............................................................. 3, 12

Grasshopper House, LLC v. Clean and Sober Media LLC,
  2021 WL 3702243 (9th Cir. 2021) ..................................................................... 3

Gucci Am., Inc. v. Pieta,
  2006 WL 4725707 (C.D. Cal. 2006) .................................................................. 45

Gutierrez v. Wells Fargo Bank, NA,
  589 Fed. App'x 824 (9th Cir. 2014) ................................................................... 11

Hensley v. Eckerhart,
  461 U.S. 424 (1983) ...................................................................................... 44, 45

Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.,
  736 F.3d 1239 (9th Cir. 2013) ........................................................................... 33

Herrera v. City of Ontario,
  2017 WL 11628154 (C.D. Cal. 2017) ................................................................ 28

InteliClear, LLC v. ETC Glob. Holdings, Inc.,
  978 F.3d 653 (9th Cir. 2020) ............................................................................. 35

Jarosch v. Am. Fam. Mut. Ins. Co.,
  837 F. Supp. 2d 980 (E.D. Wis. 2011) .............................................................. 34

JIPC Mgmt., Inc. v. Incredible Pizza Co., Inc.,
  2009 WL 8590607 (C.D. Cal. 2009) .................................................................. 14

K&N Eng'g, Inc. v. Spectre Performance,
  2012 WL 12893797 (C.D. Cal. 2012) ................................................ 21, 22, 23, 24

Klein v. City of Laguna Beach,
  810 F.3d 693 (9th Cir. 2016) ............................................................................. 44

Lahoti v. Vericheck, Inc.,
  636 F.3d 501 (9th Cir. 2011) ............................................................................. 29

Lindy Pen Co. v. Bic Pen Corp.,
  982 F.2d 1400 (9th Cir. 1993) ...................................................................... 16, 19

Martinez v. Longs Drug Stores, Inc.,
  2005 WL 3287233 (E.D. Cal. 2005) .................................................................. 46

Mattel, Inc. v. MGA Ent., Inc.,
  801 F. Supp. 2d 950 (C.D. Cal. 2011) ............................................................... 36

Memory Lane, Inc. v. Classmates, Inc.,
  646 F. App'x 502 (9th Cir. 2016) ...................................................................... 50

QUARLES & BRADY LLP
ATTORNEYS AT LAW
MILWAUKEE

## TABLE OF AUTHORITIES
### (continued)

**Page**

Miller v. Schmitz,
  2014 WL 68883 (E.D. Cal. 2014)........................................................28

Mock v. Mich. Millers Mut. Ins. Co.,
  4 Cal. App. 4th 306 (1992)...............................................................43

Moreno v. City of Sacramento,
  534 F.3d 1106 (9th Cir. 2008)...........................................................47

Neurovision Med. Prod., Inc. v. Nuvasive, Inc.,
  2014 WL 12567167 (C.D. Cal. 2014)..................................................31

Octane Fitness, LLC v. ICON Health & Fitness, Inc.,
  572 U.S. 545 (2014).........................................................................29

Oyster Software, Inc. v. Forms Processing, Inc.,
  2001 WL 1736382 (N.D. Cal. 2001)...................................................12

POM Wonderful LLC v. Purely Juice, Inc.,
  2008 WL 4222045 (C.D. Cal. 2008)...................................................20

POM Wonderful LLC v. Welch Foods, Inc.,
  737 F. Supp. 2d 1105 (C.D. Cal. 2010)...............................................14

Reno Air Racing Ass'n, Inc. v. McCord,
  452 F.3d 1126 (9th Cir. 2006)...........................................................41

Rimini St., Inc. v. Oracle USA, Inc.,
  139 S. Ct. 873 (2019).......................................................................50

Rivin v. Patrick K. Willis Co., Inc.,
  2021 WL 2980591 (C.D. Cal. 2021)...................................................42

San Diego Comic Convention v. Dan Farr Prods.,
  807 F. App'x 674 (9th Cir. 2020).......................................................50

Sentry Ins. v. Am. Nat'l Fire Ins. Co.,
  2007 WL 9705855 (C.D. Cal. 2007)...................................................26

SFA Sys., LLC v. Newegg Inc.,
  793 F.3d 1344 (Fed. Cir. 2015)..........................................................31

Singman v. IMDB.com,
  No. 20JMCV00748 (L.A. Cnty. Super. Ct.).........................................48

Sisley v. Sprint Commc'ns Co., L.P.,
  284 F. App'x 463 (9th Cir. 2008)..........................................................7

Sorenson v. Mink,
  239 F.3d 1140 (9th Cir. 2001)...........................................................44

**TABLE OF AUTHORITIES**
(continued)

**Page**

Stone Brewing Co., LLC v. MillerCoors LLC,
  445 F. Supp. 3d 1113 (S.D. Cal. 2020) ................................................. 14

Stonebrae L.P. v. Toll Bros., Inc.,
  2011 WL 1334444 (N.D. Cal. 2011) ...................................................... 27

Sun Microsystems, Inc. v. Microsoft Corp.,
  188 F.3d 1115 (9th Cir. 1999) ................................................................. 6

SunEarth, Inc. v. Sun Earth Solar Power Co.,
  839 F.3d 1179 (9th Cir. 2016) ....................................................... 16, 29

Talent Mobile Dev., Inc. v. Headios Grp.,
  382 F. Supp. 3d 953 (C.D. Cal. 2019) ................................................... 31

Taylor v. Superior Ct.,
  24 Cal. 3d 890 (1979) ............................................................................ 43

TMX Funding, Inc. v. Impero Techs., Inc.,
  2010 WL 1028254 (N.D. Cal. 2010) ...................................................... 33

Tomlin v. Walt Disney Prods.,
  18 Cal. App. 3d 226 (Ct. App. 1971) ..................................................... 11

Trafficschool.com, Inc. v. Edriver, Inc.,
  633 F. Supp. 2d 1063 (C.D. Cal. 2008) ................................................. 12

Transclean Corp. v. Bridgewood Servs., Inc.,
  290 F.3d 1364 (Fed. Cir. 2002) ............................................................. 36

Twin Rivers Eng'g, Inc. v. Fieldpiece Instruments, Inc.,
  2018 WL 6016990 (C.D. Cal. 2018) ...................................................... 46

Va. Panel Corp. v. MAC Panel Co.,
  133 F.3d 860 (Fed. Cir. 1997) ............................................................... 37

Van Gerwen v. Guarantee Mut. Life. Co.,
  214 F.3d 1041 (9th Cir. 2000) ............................................................... 44

Vital Pharm. v. PhD Mktg., Inc.,
  2022 WL 2952495 (C.D. Cal. 2022) ...................................................... 23

Vital Pharms., Inc. v. Orange Bang, Inc.,
  Case No. 5:20-cv-1464-DSF-SHK (C.D. Cal. 2022) ...................... 22, 47

Westinghouse Elec. Corp. v. Gen. Cir. Breaker & Elec. Supply Inc.,
  106 F.3d 894 (9th Cir. 1997) ................................................................... 7

Winter v. Nat. Res. Def. Council, Inc.,
  555 U.S. 7 (2008) ................................................................................... 33

QUARLES & BRADY LLP
ATTORNEYS AT LAW
MILWAUKEE

ix

# TABLE OF AUTHORITIES
(continued)

**Page**

**STATUTES**

15 U.S.C. § 1117(a) ..................................................................11, 23, 29, 43

15 U.S.C. § 1836 (b)(3)(D)................................................................43

28 U.S.C. § 1961................................................................................28

Cal. Bus. & Prof. Code § 17200 ........................................................5

Cal. Bus. & Prof. Code § 17500 ........................................................5

Cal. Civ. Code § 3294(a) ..................................................................42

Cal. Civ. Code § 3294(c)(1) ............................................................42

Cal. Civ. Code § 3426.3....................................................................36

Cal. Civ. Code § 3426.4....................................................................43


**RULES**

Fed. R. Civ. P. 39(c) ...........................................................................5

Fed. R. Civ. P. 52(a) ...........................................................................4


**OTHER AUTHORITIES**

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 37 (1995)..................................12

# **INTRODUCTION**

Vital Pharmaceuticals, Inc. ("Vital") is ready to schedule the second phase of this trial to the Court, where Vital expects that Monster Energy Company ("Monster") will fall short—far short—of its burden to prove it is entitled to further equitable relief. Such scheduling will be necessary if, and only if, the Court does not first grant Vital's request for a new trial (or the alternative request for remittitur)[1] based upon the numerous prejudicial errors occurring during the trial's first phase.

Monster appears to wrongly assume the Court will entertain no further presentation of testimony and other evidence. Apparently, Monster believes that the concept of "bifurcation" does not mean bifurcation at all; in its mistaken view, the parties were instead permitted to present evidence only in this trial's initial phase, and to simply submit written briefs regarding the considerable and consequential disputed fact questions that permeate the issues of disgorgement, enhancement, and the remaining requested equitable remedies.

The paper record before the Court is, and will always be, both disputed and incomplete with respect to the elements of Monster's claims as well as Vital's considerable defenses, some of which are newly applicable for the first time in equity (e.g., unclean hands). Much of the critical evidence simply was not presented during the first phase of the jury trial because the Court believed it wasn't relevant—until now. There is no possible non-prejudicial process by which the Court could presently guess how to resolve these factual questions and issue findings of fact, other than to promptly schedule a second phase bench trial involving the presentation of proof.

The Court should be aware: Monster will likely submit further "evidence" in connection with its reply brief. If history is any guide, Monster is saving what it probably believes to be its new and better evidence for its final filing, intending to deny Vital any further comment. When and if this happens, Monster's strategy will

---

[1] *See* Dkts. 921 and 921-1 (Def. Vital Pharms., Inc.'s Not. of Mot. and Mot. for JNOV, New Trial, and Remittitur, and Mem. of P. & A. in Supp.)

simply confirm the point Vital makes now—that both parties should be afforded the fundamental due process necessary to determine whether Monster's request should be given any further consideration. Particularly as that request involves the unthinkable additional sum of about $167 million, plus tens of millions more for its purported fees and costs.

Focusing on the written record so far, and as it currently stands, Monster surely has not met its burden for any further relief.

Regarding its false advertising claims, the fundamental question presented to the Court is whether, in its discretion, the evidence shows that Monster has been fully compensated by the jury's earlier award of $271,924,174, representing the full measure of its own lost profits. The Court should exercise that discretion and conclude that Monster has, in fact, been more than completely and fairly compensated by one of the largest Lanham Act verdicts in history (though procured through error). Further equitable awards of disgorgement and enhancement would represent, respectively, an improper windfall to Monster and equally improper punishment of Vital. Monster's own contemptable and unclean behavior, moreover, should bar it from being considered a candidate for any additional equity-based relief.

With respect to its trade secret and shelf space claims, the real focus ought to be on Monster's lack of proof at trial as described in Vital's earlier-filed motion for a new trial; wherein Vital explains how Monster was unable to present the jury with a single trade secret or even one retail account meeting the elements of its claims. Regardless, Monster's motion provides no basis for further awards of punitive damages (an issue the parties stipulated the Court would decide based upon the existing record) or the nonsensical injunctions that would be impossible for this or any other Court to enforce.

Vital is now in the process of a reorganization through the process of bankruptcy. At bottom, every dollar in undeserved enhanced or punitive damages awarded to Monster (or any recovery of the exorbitant fees and costs) is likely one

less dollar of value realized in the bidding and auction process approaching. The Court should not exercise its discretion in equity to compel the fundamentally inequitable results Monster is seeking to achieve.

## **ARGUMENT**

## I.   **THE SECOND PHASE OF THIS BIFURCATED TRIAL MUST INVOLVE THE PRESENTATION OF TESTIMONY AND OTHER EVIDENCE.**

It strains credulity for Monster to assume the Court, without further evidence, could even begin to consider awarding a cumulative and unconscionable sum of more than $167 million dollars, above and beyond the $271,924,174 awarded as the product of a fundamentally flawed trial. During the post-verdict equity phase of this trial, extensive factual disputes now require the Court to act as the finder-of-fact. Moreover, much of the evidence regarding Monster's (non-)entitlement to further relief, now relevant in equity, was neither presented to the jury nor heard by the Court during the trial's first phase. The Court should not be required to guess about the disputed issues presented by Monster's motion on an incomplete record. Instead, the Court must schedule further evidentiary proceedings to determine whether Monster is able to meet its burden of proof (it cannot) for disgorgement, enhancement, and the additional equitable relief it requests.

A bench trial that follows a jury trial is the common process in the Central District of California. For example, in <u>Grasshopper House, LLC v. Clean & Sober Media LLC</u>, 394 F. Supp. 3d 1073, 1082 (C.D. Cal. 2019), following the jury trial addressing the parties' Lanham Act claims, the District Court "held a bench trial … to determine issues of equitable relief, including injunctive relief and equitable monetary relief."[2] Once the second phase bench trial was complete, the District Court issued formal findings of fact and conclusions of law as required by Fed. R. Civ. P.

---

[2] On grounds not relevant, the matter was affirmed in part, vacated in part and remanded. <u>Grasshopper House, LLC v. Clean and Sober Media LLC</u>, 2021 WL 3702243 (9th Cir. 2021).

52(a). Id. at 1082–83. Though not necessary here, in other Lanham Act disputes courts have even permitted further discovery to aid the presentation of evidence regarding equitable claims. See, e.g., Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc., 778 F.3d 1059, 1067 (9th Cir. 2015).

The assertion of Vital's right to present further evidence is consistent with the earlier proceedings in this Court, including those occurring immediately before opening statements and following the return of the jury's flawed verdict. More specifically, the Court notified the parties prior to opening that it would bifurcate the trial between phase-two punitive damage amounts, if necessary, with liability and other damage issues determine in phase-one. (Ex.[3] 7 (8/25 Trial Tr. at 4:11–19.)[4] The Court indicated that equitable issues ("I will have to decide them") would be resolved in the second phase. (Id. at 4:18–21.)

After the jury returned its verdict, the parties placed a limited stipulation on the record. Specifically, that the Court would be empowered to determine one issue briefed and based solely upon the record presented to the jury: the amount—if any—of punitive damages to be awarded to Monster. (Ex. 20 (9/29 Trial Tr.) at 10:9–21.) The parties, however, never agreed, nor even suggested, that the Court could resolve the remaining considerable disputes of fact relevant to Monster's equitable claims solely on paper. As described in more detail below, an exclusively brief-based process is untenable—particularly in the context of the shocking amount of additional money Monster now requests.

It is worth noting that one equitable issue was presented to the jury. The third question on the Verdict Form asked the jury to determine whether the conduct of Vital and Mr. Owoc, with respect to the purported false advertising, was "willful and deliberate." (Dkt. 890 at 2.) The jury answered in the affirmative. (Id.) Willfulness is

---

[3] "Ex." refers to exhibits attached to the Declaration of David Muth in Opposition to Plaintiff's Motion for Equitable Relief, Fees, and Costs ("Muth Decl."), filed herewith.
[4] "Trial Tr. refers to the transcript of the trial in this case, the cited excerpts of which are attached to the Muth Declaration.

relevant only to the issues of disgorgement and enhancement, the equitable remedies that are the subject of the second phase of trial. Accordingly, under Fed. R. Civ. P. 39(c), the Court may consider the finding to be advisory or binding if the Court determines a record exists to find mutual consent. See Acad. of Motion Picture Arts & Scis. v. GoDaddy, Inc., 2015 WL 12697732, at *2 (C.D. Cal. 2015). Here, Vital explicitly objected to an advisory verdict and to the jury deciding remedies in equity. (Ex. 14 (9/15 Trial Tr.) at 7:15–23.)

## II.   MONSTER IS NOT ENTITLED TO ANY FURTHER RELIEF WITH RESPECT TO ITS FALSE ADVERTISING CLAIMS.

### A.   Monster's request for injunctive relief is duplicative and flawed.

Monster's request for an injunction under California's Unfair Competition Law ("UCL," Cal. Bus. & Prof. Code § 17200 et seq.) and False Advertising Law ("FAL," Cal. Bus. & Prof. Code § 17500 et seq.) should be denied for the same reasons as its identical request made under the Lanham Act (briefed separately). Monster concedes that its false advertising claims under the California state law causes of action turn on the same elements, conduct, and evidence as its Lanham Act claims. (Dkt. 928 (Pl.'s Post-Verdict Mot. for Equitable Relief) at 25.) Because the present motion is based upon the same analysis, and Monster seeks the same scope of injunctive relief, it should be denied for the same failures of proof.

### 1.   Vital has fully briefed and documented its well-founded objections in its response to Monster's motion filed under the Lanham Act.

The UCL and FAL do not provide grounds additional to, or different from, the Lanham Act, permitting the Court to issue injunctive relief. (Dkt. 942 at 6 (conceding that "the equitable [UCL and FAL] claims are just independent bases to issue the same injunction").) As described in Vital's Opposition to Monster's Motion for a Permanent Injunction under the Lanham Act (Dkt. 915, "Lanham Act Opposition"), Monster is not entitled to any permanent injunction—whether under state or federal

law. The supporting declarations and evidence filed earlier with the Court prove that the world has dramatically changed in the months since the jury's verdict, rendering Monster's request for an injunction unnecessary and unwarranted. (Dkt. 917 (Gerson Decl.) ¶¶ 5, 20; Dkt. 940-1 (Bukovi Decl.); Dkt. 941 (Supp. Oberhofer Decl.).) In short, Vital no longer sells and markets Bang Energy cans in the nearly decade-old manner presented to the jury. And Monster's evidence presented at trial, which focused on Vital's long-abandoned marketing campaigns, cannot support entitlement to forward-looking injunctive relief.

### 2. Monster cannot show future harm as required by California law.

The UCL and FAL do not mandate injunctive relief, even if an unfair business practice has been established. Cortez v. Purolator Air Filtration Prod. Co., 23 Cal. 4th 163, 179–80 (2000). Instead, the Court may only issue an injunction "in appropriate cases" if—and only if—Monster proves such relief is essential "to prevent future harm." Feitelberg v. Credit Suisse First Boston, LLC, 134 Cal. App. 4th 997, 1021 (2005) (citation omitted). That is, Monster must meet its burden of proving, during the next trial phase, there is a real threat that some wrongful conduct by Vital will continue. Colgan v. Leatherman Tool Grp., Inc., 135 Cal. App. 4th 663, 702 (2006), as modified on denial of reh'g (Jan. 31, 2006). Injunctive relief under California law is not available for Monster to simply inflict further punishment on Vital for past actions. Choice-in-Education League v. Los Angeles Unified Sch. Dist., 17 Cal. App. 4th 415, 422 (1993). It follows that, as here, "[a] change in circumstances, rendering injunctive relief moot or unnecessary, justifies the denial of an injunction." Cisneros v. U.D. Registry, Inc., 39 Cal. App. 4th 548, 573 (1995) (quoting Donald v. Café Royale, Inc., 218 Cal. App. 3d 168, 164 (1990)).

Ultimately, it is Monster's burden to prove that Vital is engaging in ongoing conduct that will continue in the future and cause harm. See Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115, 1123 (9th Cir. 1999) (district court erred shifting

burden to defendant to prove conduct would not recur). That burden cannot possibly be met, if at all, until the further presentation of evidence during phase two of this bifurcated trial.

Looking solely at Monster's brief, it has not met its burden under the UCL and FAL to show a "realistic threat of future injury." Sisley v. Sprint Commc'ns Co., L.P., 284 F. App'x 463, 467 (9th Cir. 2008). Monster's efforts to rely on the "very evidence" of past violations submitted to the jury is unavailing because Vital's advertising has changed. Westinghouse Elec. Corp. v. Gen. Cir. Breaker & Elec. Supply Inc., 106 F.3d 894, 903 (9th Cir. 1997) ("A plaintiff is not automatically entitled to an injunction simply because it proved its affirmative claims."). The purported "evidence" of deception, materiality and harm set forth in Monster's brief is not probative of circumstances as they exist today or going forward; rather, it is centered around Dr. Cowan's years-old, million-dollar, forty-eight-question survey, presenting—as its only actual stimulus no less—one legacy can of Bang Energy to a small group of survey respondents. (Ex. 12 (9/13 Trial Tr.) at 100:16–23, 106:19–21, 128:17–19, and 178:9–179:5; Dkt. 923-66; Dkt. 923-59; Dkt. 928 at 8–9 (citing survey results); Dkt. 915-12 (Ex. 11 (9/21 Trial Tr. (Chiagouris)) at 211:24–212:25, 214:1–217:11).)

More specifically, the supposed consumer perceptions Monster relies upon were based on the old Bang Energy can presented in Dr. Cowan's survey. Vital is moving away from the can. Advertising of the kind characterized by "#SuperCreatine" was discontinued by Vital years ago and has now been deleted. (Dkt. 940-1 (Bukovi Decl.), ¶¶ 13–22; Dkt. 915 at 12–14, 19–22; Ex. 9 (9/6 Trial Tr. (M. Owoc)) at 207:10–208:4, 208:16–210:7, 217:2–15, 228:12–229:15; see also, e.g., Dkt. 915-6 (Ex. 5 (9/7 Trial Tr. (M. Owoc)) at 35:13–39:8; Dkt. 915-5 (Ex. 4 (9/6 Trial Tr. (M. Owoc) at 235:10–236:3.)[5] As set forth in its Lanham Act

---

[5] Monster's supposed "evidence" of continuing consumer deception, consisting of isolated, random and anonymous comments Monster's lawyers found on the internet, make this point. (See Dkt. 929-22 (Libeu Decl., Ex. 22) at 6 (consumer comments to

Opposition and supporting Declarations, Vital has spent millions of dollars, and months of effort, to transition to its new "Fuel Your Destiny" inventory and advertising. (Dkt. 915 at 12–14, 19–22; Dkt. 917 (Gerson Decl.) ¶¶ 5, 20; Dkt. 940-1 (Bukovi Decl.).) It has revised its labels, advertising, and look, all while undertaking a reorganization and a public sale process that will soon be complete. Vital is not going to adopt the dated advertising that was the subject of the trial and, going forward, will not be selling or marketing Bang Energy as containing "Super Creatine"; Vital has committed this to its distributor and retail customers. (Dkt. 940-1 (Bukovi Decl.), ¶¶ 8, 25.) Indeed, it has a new, independent Board, a new interim boss, and an entirely new brand, and may soon have a new owner. (Id. ¶¶ 4–7.)

Objective evidence refutes Monster's speculative claim that it is likely to lose sales, customers, or market share to Vital going forward, during the brief and soon-ending period necessary to complete its transition. In recent years, Monster has not been losing market share or customers to Vital at all, let alone on account of any Super Creatine advertising. (See Dkt. 941 (Oberhofer Suppl. Decl.), ¶¶ 3, 5 & Exs. B (Dkt. 941-1) and C (Dkt. 941-2).)

In stark contrast, according to publicly reported data, Vital's market share has been declining since April of 2021, and since April of 2022 has fallen from 7.3% to 3.1% (or about 57.5% in less than a year). (Dkt. 941-1 at 7.) In its recent 2023 public statements, moreover, Monster emphasized to investors that it "continues to have market share leadership in the energy drink category in the United States." (Ex. 6 at 6.) Similarly, over the first thirteen weeks of 2023, Vital's sales fell by nearly 50%. (See Dkt. 941-2.) Sales for Monster and Reign, however, have continued to increase

---

Vital post promoting launch of new cans include "I heard this super creatine thing was a scam," "some legal class suit took them out of the gas stations for nutritional misconduct," Vital "lost another huge lawsuit due to lies about ingredients not present in your product"). Some of Monster's examples of recent "consumer deception" are not Bang Energy consumers at all. (Dkt. 929-23 (Libeu Decl., Ex. 23) at 3 (anonymous comment to third-party post that "Bang has a shit ton of creatine but tastes like shit").) Monster itself could have posted these online comments for all we know.

by double digits over this same period, just as they did over 2022. (<u>Id.</u>) Any hypothetical future harm from Vital's exhaustion of its existing legacy inventory over the next few months is speculative, and in any event is diminishing, of finite duration, and insubstantial. (<u>See</u> Dkt. 915 at 18–19; Dkt. 940-1, ¶¶ 8–15.)

At trial, moreover, Monster's evidence of deception, materiality and harm was based on references to Super Creatine on the legacy Bang Energy cans. (<u>See</u> Dkt. 915 at 22–23.) When Vital's legacy inventory is exhausted, the new cans will no longer contain such statements. (Dkt. 940-1, ¶¶ 8–12.) More specifically, Bang Energy will no longer be advertised as containing Super Creatine, and there is no lucid need or reason going forward to order Vital to undertake the massive burden of effectively scrubbing the internet of every last image of its legacy can or to issue corrective statements. (Dkt. 940-1, ¶¶ 21–22.)

### 3. The balance of harms does not support an injunction.

Under the UCL, an injunction may not issue "without consideration of the equities on both sides of a dispute." <u>Cortez</u>, 23 Cal. 4th at 180. Here, the realistic impact of any continuing harm to Monster from Vital's sales of its remaining legacy inventory over the next few months pales in comparison to the potential adverse effects on Vital of Monster's proposed injunction. (Dkt. 917 (Gerson Decl.), ¶¶ 10–12, 16–17, 22.) As a practical matter, it would require Vital to destroy and waste millions of dollars of valuable inventory; this includes inventory already sold to distributors and retailers, that consumers continue to purchase for reasons that have nothing to do with Super Creatine. (<u>Id.</u> ¶¶ 11–12; <u>see</u> Dkt. 915 at 24–26; Dkt. 915-12 (9/21 Trial Tr. (Chiagouris)) at 211:25–212:12, 214:9–217:11; Dkt. 915-27 at 5 (InfoScout).) The injunction proposed by Monster would (perhaps as intended by Monster) threaten Vital's existing relationships with distributors and retailers, and result in product unavailability and empty shelves. (Dkt. 915 at 24–26; Dkt. 917, ¶ 12.) The potential harm from such business disruption is self-evident, all in the midst of Vital's ongoing reorganization and public sale process. Monster faces no

1    comparable harm. (Dkt. 915 at 24–26.)

2        Any order compelling Vital to recall or destroy rather than sell its legacy

3    inventory could affect the value realized in a bankruptcy sale of Vital and, ultimately,

4    the funds available to creditors. Monster, itself a Vital creditor, should not be

5    permitted to secure such an unfair advantage going forward; and certainly not where,

6    as here, it has not offered any proof of future harm given the change in circumstances

7    since trial.[6]

8        **4.    Corrective advertising is neither justified nor necessary.**

9        Monster's contention that the UCL supports its request for injunctive relief to

10    correct "misperceptions" is unsupported by the authority it cites. In <u>Consumers</u>

11    <u>Union of U.S., Inc. v. Alta-Dena Certified Dairy</u>, for example, the court affirmed an

12    injunction that required the defendant to place a "warning statement" on its

13    advertisements for raw milk products. 4 Cal. App. 4th 963, 975 (1992). But this was

14    only after the plaintiffs established that, contrary to claims made in the defendant's

15    advertisements, its products could contain highly dangerous organisms, were less

16    safe than pasteurized milk, did not possess superior health and nutritional benefits,

17    and were not produced under the strictest health standards in the industry. <u>Id.</u> at 969–

18    71, 975. The sale of Bang Energy presents no such risks to health and safety. (<u>See</u>

19    Dkt. 915 at 26.)

20

21

22

23

_____

24    [6] Moreover, any order requiring Vital to destroy inventory would effect a

25    disproportionate harm on Vital. Even accepting, solely for the sake of argument, that Monster could show future harm based on the inflated historical survey evidence it purports to rely on, that would still mean that 65.9% of consumers would purchase

26    Bang Energy for reasons other than Super Creatine. (<u>See supra</u> at II.A.2.) Thus, an injunction would theoretically allow Monster, on its best day, to avoid a 34.1 cent

27    loss for every dollar in Bang Energy sales but result in a loss of 65.9 cents to Vital, its creditors, and other interested parties. Where, as here, damages are measurable, a

28    wasteful, burdensome injunction makes no mathematical sense, serves no useful purpose, and is unwarranted.

**5.      The scope of Monster's proposed injunction is unworkable and unjustified.**

Injunctions issued under the UCL or FAL, like the Lanham Act, must be "narrowly drawn" to require only "appropriate precautions to prevent public confusion." Tomlin v. Walt Disney Prods., 18 Cal. App. 3d 226, 235 (Ct. App. 1971). Such relief cannot be "more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." Gutierrez v. Wells Fargo Bank, NA, 589 Fed. App'x 824, 828 (9th Cir. 2014). As set forth in Vital's Lanham Act Opposition, Monster's proposed injunction here sweeps far too broadly. To the extent the Court determines any injunctive relief is appropriate, it should instead enter Vital's proposed alternative injunction. (Dkt. 915-35.)

**B.      The equitable remedy of disgorgement is not warranted.**

Whether decided solely on the briefs, or properly and correctly after receiving testimony and other evidence in phase two, the Court should not award Monster any sum by way of disgorging Vital's profits. Over the course of barely two pages in its fifty-page motion, Monster cavalierly suggests that the Court ought to award a "mere" $77,466,712 by way of disgorging the profits earned by Vital on its sales of Bang Energy—above and beyond the sum of $271,924,174 that was wrongly awarded by the jury for Monster's own lost profits purportedly arising under the Lanham Act.

How could this Court, or any court, award $78 million dollars without hearing the evidence? Or in Monster's case, the lack of evidence.

**1.      Disgorgement is an equitable remedy subject to the traditional defenses raised in equity, including unclean hands and laches.**

Disgorgement is an equitable remedy. The text of the Lanham Act itself provides that its available remedies, including "defendant's profits," are all "subject to the principles of equity." See 15 U.S.C. § 1117(a). Now, in the realm of equity,

VITAL'S OPPOSITION TO PLAINTIFF'S MOTION FOR EQUITABLE RELIEF

Monster's request for disgorgement "is particularly susceptible to the affirmative defenses of unclean hands and laches."[7] See, e.g., Trafficschool.com, Inc. v. Edriver, Inc., 633 F. Supp. 2d 1063, 1087 (C.D. Cal. 2008).[8] The "familiar concerns" of equity include Monster's conduct. Id., citing RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 37 (1995); and Oyster Software, Inc. v. Forms Processing, Inc., 2001 WL 1736382 at *7 (N.D. Cal. 2001). The Court should take evidence of these defenses in phase two.

**Unclean hands:** Unclean hands constitutes a defense to Monster's Lanham Act claims. See, e.g., Grasshopper House, LLC, 394 F. Supp. 3d at 1091; and Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 847 (9th Cir. 1987). At an evidentiary hearing, Vital would prove to the Court by clear and convincing evidence that (i) Monster's conduct was inequitable and (ii) the same conduct was closely related to the subject matter of Monster's Lanham Act claims. Id. at 1101.

By way of example, there is considerable evidence that Monster has itself grossly mislead distributors, retailers, and consumers in ways more pernicious than alleged against Vital. (Exs. 21–24, 27–37, 40–47, 51–78, TX-0007[9], TX-6121, TX-6295, TX-6438, TX-6458, TX-7139; see also Dkts. 923-25, 923-27, 923-31, 923-34, 923-35, and 923-65.) Before introducing its own Reign branded beverage, with 300 milligrams of caffeine, Monster's co-CEO Rodney Sacks approved a "caffeine fact sheet" to be widely distributed to Vital's retail level customers. (Dkt. 923-27 at 4.) Monster's intention was to scare them from selling "a small flanker brand VPX Bang that is encroaching on our shelf space." (Id.) Monster constructed an entire campaign to purportedly "educate retailers" that they would be subject to "[p]roduct liability" lawsuits should they dare sell Bang Energy with its caffeine content exactly equal to

---

[7] Both defenses were pled by Vital as its Tenth Affirmative Defense and Eleventh Affirmative Defense. (Dkt. 123 at 25.)

[8] Aff'd in part, rev'd in part on other grounds, and remanded 653 F. 2d 820 (9th Cir. 2011).

[9] "TX" refers to exhibits admitted into evidence during trial in this case and are attached to the Muth Declaration.

1    Monster's subsequently developed Reign drink. (Dkt. 923-30.)

2        When Monster launched Reign, it engaged in a coordinated effort to literally

3    remove Bang Energy from store shelves. (Dkt. 921-1; Ex. 26.) The Court should read

4    and hear testimony regarding the shelf space interference conduct of Monster itself,

5    worse than the kind Monster has alleged against Vital. This includes, for example,

6    Monster's nationwide campaigns, directed by Monster's Regional Managers, to

7    "remove the B-enemy from our backyards." (Ex. 25.)

8        It would benefit the Court to hear Monster's Samantha Amundson explain

9    when and why she instructed Monster personnel as follows:

10            We want to see your best video of you kicking bang's ass

11            (taking down their POS; smashing cans, taking their

12            display off the floor, and stealing their cold space).

13                                . . .

14            The best video will be featured on the MAIN STAGE at

15            ASM this year - heyo!

16   (Ex. 26 at 1.)

17       This is but one of many—many—examples, representative of the kinds of

18   evidence that are extensive and probative of the despicable behavior directed by

19   Monster's decision-makers. Vital intends to present the Court with evidence of

20   Monster's other plainly tortious, and possibly criminal, behavior relating to the

21   allegations of this dispute. (See, e.g., Exs. 29, 38, 39, 48–50, and 79; see also Dkt.

22   923-30.)

23       The Court considered (only) some of this evidence regarding Monster's

24   unclean hands when ruling on the parties' motions in limine; it held (in error, Vital

25   contends) that Monster's "smear campaign" and other fraudulent actions were not

26   relevant to the false advertising allegations. (Dkt. 798 at 25.) Even if the Court's

27   ruling was correct, insofar as the scope of relevance during the jury trial was

28   concerned, the proposition surely is untrue with respect to the equitable remedy of

disgorgement. The standard of relevance is simply far broader in this second phase. As the District Court held in <u>JIPC Mgmt., Inc. v. Incredible Pizza Co., Inc.</u>, the "unclean hands defense places both parties' good or bad faith at issue in ways that are not relevant" to the merits of Monster's Lanham Act claims. 2009 WL 8590607 at *20 (C.D. Cal. 2009).

Precise similarity between Monster's claims and its own inequitable conduct is simply not required for the Court to deem it relevant in phase two equity. <u>Id</u>. Instead, the threshold is simply whether "some unconscionable act of [Monster] has immediate and necessary relation to the equity that [Monster] seeks in respect of the matter in litigation." <u>Id</u>., citations omitted. <u>See also</u>, <u>POM Wonderful LLC v. Welch Foods, Inc.</u>, 737 F. Supp. 2d 1105, 1110 (C.D. Cal. 2010) ("'precise' similarity is not required" with respect to unclean hands evidence).[10] Surely that broad scope of relevance includes Monster's inexcusable and illegal behaviors of the kind briefly previewed above.

In short, the jury was not permitted to see evidence defining Monster for who and what it really is. But the Court should see and hear such evidence now, as Monster feigns equity when seeking equity.

**Laches:** Laches is a defense "to both Lanham Act claims and related state law claims." <u>Stone Brewing Co., LLC v. MillerCoors LLC</u>, 445 F. Supp. 3d 1113, 1140 (S.D. Cal. 2020). Vital's laches defense has merit and should be evaluated in a second-phase equity trial as (i) Monster unreasonably delayed bringing the present suit and (ii) Vital suffered prejudice as a result. <u>Id</u>. While a presumption against the application of laches exists where Lanham Act claims are brought within California's four-year statute of limitations, the Court should evaluate when Monster knew—or should have known—of Vital's use of Super Creatine in its marketing material.

---

[10] The District Court did not permit the <u>POM Wonderful</u> defendant to present unclean hands evidence. Unlike Vital, the proponent of unclean hands evidence neither plead it as an affirmative defense nor established that its unclean hands claims were related to the allegations of the suit. <u>POM Wonderful</u>, 737 F. Supp. 2d at 1111.

QUARLES & BRADY LLP
ATTORNEYS AT LAW
MILWAUKEE

Monster filed its Complaint in this matter on September 4, 2018. (Dkt. 1.) Insofar as equitable concerns with delay are now at issue, red flags should have immediately been raised; Monster's economic loss expert, Christian Tregillis, opined that its purported losses with respect to false advertising began on August 1, 2015. This was presumably because, as he reported, Vital was marketing Bang Energy with Super Creatine as early as September of 2015.

Rather than swiftly filing suit, and while fully aware of Vital's conduct, Monster instead concentrated on bringing Reign to the market (to compete not with Super Creatine, but instead with 300 milligrams of caffeine). (Dkt. 923-21; Dkt. 923-26; Dkt. 923-26; Ex. 47; TX-6121.) Monster's highest executives, including chairman and co-chief executive officer Rodney Sacks and Vice President of the Americas, Emile Tirre, testified that Monster was a late entrant to the performance energy drink market. (Ex.11 (9/9 Trial Tr.) at 39:19–40:1; Ex. 16 (9/20 Trial Tr.) at 41:2–5, 151:5–8.) During that time, and to its enormous detriment, Vital spent tens of millions of dollars marketing and growing the Bang Energy brand as Monster watched and waited.

### 2. A proper calculation of Vital's profits caused by the marketing of Super Creatine is not possible on the current written record.

On the current record, it is not possible for the Court to ascertain a fair and equitable sum for disgorgement, even if Monster is otherwise entitled to the same. A two-step process is required, one that cannot be accomplished on the present record. First, Monster would need to meet its burden to prove Vital's gross profits—and specifically and only those gross profits that were attributable to advertising Super Creatine. Thereafter, Vital has the right to prove that its expenses were properly deducted from the gross revenue to arrive a profit figure. Apple Hill Growers v. El Dorado Orchards, Inc., 2022 WL 1506205, at *4 (E.D. Cal. 2022).

The critical flaw in Monster's analysis is its assertion that the jaw-dropping number suggested for disgorgement represents gross profits earned by Vital that were

attributable to the marketing of Super Creatine—and completely unrelated to literally dozens of other factors associated with the sale of Bang Energy.[11] This includes Vital's decision to produce Bang Energy without sugar, carbohydrates, and calories (Ex. 8 (8/30 Trial Tr. (Bukovi) at 77:15–22; Ex. 9 (9/6 Trial Tr. (M. Owoc)) at 234:2–11; Dkt. 923-56); the inclusion of 300 milligrams of caffeine, later copied by Monster in its Reign energy drinks (Dkt. 923-56; Exs. 85–86); canning the beverages in bright containers bearing fanciful names (Dkt. 923-49; Dkt. 923-67); and years of marketing Bang Energy with barely any references to Super Creatine other than being truthfully listed as an ingredient on the cans. (TX-5553; TX-5555; TX-5559; Exs. 80–84.)

It is impossible to disassociate the grave problems with Monster's causation evidence from the survey evidence presented by its witness, Charles Cowan. The flawed survey lacked any reference to the "thousand social media posts" that Monster claims to have introduced during the first phase of this trial. (Dkt. 928 at 5.) Not one—not even one—of these allegedly deceptive posts was included in Dr. Cowan's survey which forms the fundamental basis for Monster's calculation of disgorgement profits. (Ex. 12 (9/13 Trial Tr. (Cowan)) at 184:7–25 and 235:9–236:4; Ex. 14 (9/15 Trial Tr. (Tregillis)) at 195:15–25, 210:16–23, and 236:12–25; see also, Ex. 18 (9/23 Trial Tr. (Voth)) at 57:21–58:13 (confirming the only basis for apportionment of damages is Dr. Cowan's survey).) Instead, for reasons that were never credibly explained, Dr. Cowan's survey displayed only a photo of an out-of-date legacy Bang Energy can. (Ex. 12 (9/13 Trial Tr. (Cowan) at 184:23–25; Dkt. 923-59.) Vital has filed its own motion seeking post-verdict relief with respect to the Court's decision permitting the jury to determine whether the Lanham Act was violated with respect

---

[11] Guided by tort law principles, Lanham Act claims are subject to the rule that damages must be measured by evidence of causation with reasonable certainty. Courts have often denied monetary awards where weak evidence of causation renders such an award too remote or speculative. See Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1407–08 (9th Cir. 1993), abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co., 839 F.3d 1179 (9th Cir. 2016) (collecting cases).

to any advertising other than the can itself.

It is equally unthinkable to determine causation for Monster's disgorgement claim without consideration of the InfoScout survey that the Court forbid Vital from showing the jury. This is Monster's survey concluding that just three percent of those purchasing Bang Energy did so because of its Super Creatine ingredient. (Dkt. 923-23 at 8.) Now that the Court is the decision-maker in this second phase, the Court itself should review and seriously consider (as the jury should have) the survey and the evidence undisputedly proving the survey was: (1) known to Monster's co-CEO Rodney Sacks (Dkt. 923-20; Dkt. 923-28); (2) paid for and approved by Monster (Dkt. 923-23; Dkt. 923-29); (3) adopted, accepted, utilized, and incorporated into Monster's business planning (Dkt. 923-21; Dkt. 923-26; Dkt. 923-31; Dkt. 923-32; Dkt. 923-33; Dkt. 923-36; Dkt. 923-37; Dkt. 923-38; Dkt. 923-40; Dkt. 923-41); (4) presented by Monster to its shareholder Coca-Cola (Dkt. 923-24); and (5) the impetus for Monster to challenge Vital with its Reign product containing all of Bang Energy's caffeine and none of its Super Creatine. (Dkt. 923-22; Dkt. 923-25.)

### 3.  The testimony of Monster's experts relevant to disgorgement was suspect.

There were significant evidentiary gaps underlying Monster's quantification of its alleged disgorgement damages in this case, the same gaps that plagued its claim for its own lost profits. Many of those are set forth in Vital's Memorandum of Points and Authorities in Support of Motion for JNOV, New Trial and Remittitur. (Dkt. 921-1 at 12–17, 20–23, 26–31.) Vital's arguments regarding InfoScout, Reign's copying of Vital's trade dress, drops in Bang Energy sales after the launch of Reign, delayed market entry by Reign, and the lack of competition between Monster's products and Bang Energy, all undermine Dr. Cowan's survey; which in turn, undermine Mr. Tregillis' conclusion that 34.1% of Vital's sales were made as a result of the alleged false advertising. Vital incorporates those arguments by reference.

In addition, there is a fundamental disqualifying problem with Mr. Tregillis' opinion that Vital made 34.1% of its Bang Energy sales due to alleged false advertising. Specifically, Mr. Tregillis did not tie his quantification of damages to the specific alleged false advertising in this case. Mr. Tregillis testified that his quantification of the 34.1% in this case was based on the combined data for two separate categories of alleged false advertisements: (1) Super Creatine claims, and (2) creatine content claims. (Ex. 14 (9/15 Trial Tr.) at 237:4-15.). He defined the "Super Creatine claims" as using the word Super Creatine to claim that Bang Energy contains creatine, for example, on the label. (Id. at 238:1–5.) He defined "Creatine content claims" as advertising the benefits of creatine, for example, in various social media posts. (Id. at 238:6–14.) The data Mr. Tregillis relied upon for his "Creatine content claims" is flawed and unsupported.

Mr. Tregillis confirmed that his "Creatine content claims" percentages were derived from Dr. Cowan's survey questions that address "the threshold of .03 grams or 2 percent daily maintenance dose and whether people expected to receive more or less." (Id. at 239:6–10). Mr. Tregillis acknowledged that those questions "do not ask about the benefits of creatine … they ask about the amount" of creatine. (Id. at 239:11–16.) Those questions do not ask "if someone would buy fewer cans if Bang Energy didn't provide increased cognition or anti-depressive effects or neuroprotectiveness" and "just dealt with a threshold and people's expectations about how much" creatine is contained in Bang. (Id. at 239:17–22.) This is fatal to Mr. Tregillis' calculations and Monster's quantification of disgorgement and lost profit damages.

To quantify the percentage of sales made by Vital as a result of alleged representations about the benefits of creatine, Mr. Tregillis should have relied upon survey evidence that addressed the benefits of creatine, not amounts. Mr. Tregillis acknowledged that Dr. Cowan's Question 10 asked specifically about the benefits someone might expect to receive from Super Creatine. (Id. at 238:15–22.) However,

the data from that question was "not used in the mathematical calculations." Id. In the absence of data regarding the impact of alleged false advertising regarding the benefits of creatine—Mr. Tregillis' self-defined "Creatine content claims"—his 34.1% calculation has absolutely no evidentiary support.

To be clear, Mr. Tregillis confirmed that the 34.1% was a much more complex analysis than simply combining the percentages for "Super Creatine claims" and "Creatine content claims." Mr. Tregillis did not "merely add them together" but "went through person by person to cap it at the higher of the two." (Id. at 240:9–13.) What Monster now describes as a "conservative" approach (Dkt. 928 at 17), is actually a fundamental analytical flaw. Because the survey evidence Mr. Tregillis relies upon does not apply to the benefits of creatine, the percentages may not be used at all. Without support for his 34.1% calculation, Mr. Tregillis' entire damages model falls apart and the Court should not accept the $272 million lost profits figure, let alone the $77.4 million disgorgement figure.

Monster has not offered evidence in this case sufficient to calculate lost profits and disgorgement damages using only the Super Creatine claims premised on the label. As such, the request for disgorgement damages should be denied.

### 4. Disgorgement is improper where, as here, there is no evidence that Vital traded off Monster's name or goodwill.

While Monster focuses on what it contends is Vital's willfulness, it loses sight of the specific conduct around which disgorgement is typically awarded. That is, willful behavior of a party who, unlike Vital, "seeks to exploit the advantage of an established mark" or who "attempt[s] to gain the value of an established name of another." Lindy Pen Co., 982 F.2d at 1406. This principle explains, for example, why the plaintiff in Clearline Techs. Ltd. v. Cooper B-Line, Inc., 2014 WL 4185770, at *4 (S.D. Tex. 2014), a decision cited by Monster, was awarded both its own lost profits and the disgorgement of the defendant's. The defendant in Clearline, a case decided under Fifth Circuit law, was found liable for trade dress infringement where

it was alleged to have sold confusingly similar roof-top products having the same non-functional shape, dimensions, color, and yellow striping as the plaintiff's product. Id.

Monster presented no evidence that Vital sought to exploit its name and marks, or to gain value from its established name. This trial was simply not that kind of false advertising case. Ironically, the evidence that was partially (though not fully) presented to the jury proved that Monster followed Vital into the better-for-you performance beverage market (Ex. 78; TX-6445; TX–6170; Dkt. 923-21; Dkt. 923-22; Dkt. 923-58; Dkt. 923-62); with Monster giving no thought to Super Creatine until after its caffeine-based threats to retailers proved futile. Monster's imitation came in the form of highly caffeinated Reign (recommended in Monster's InfoScout survey).

### 5.    The adequacy of other remedies forecloses Monster's attempt to obtain lost profits piled atop its own alleged lost profits.

Monster wrongly suggests that courts award both lost profits and disgorgement profits in false advertising disputes.[12] In fact, the opposite proposition is true. An award of Vital's profits to Monster does not naturally follow a finding of Lanham Act liability, and the same is only granted (when granted at all) after a careful consideration of the equities. Fifty-Six Hope Road Music, 778 F.3d at 1073. Such consideration can only be accomplished with the presentation of evidence. Additionally, disgorgement may only be considered under circumstances where it constitutes compensation and not a penalty; and even then, the award cannot represent a windfall. See Stone Creek, Inc. v. Omnia Italian Design, Inc., 808 Fed. App'x 459, 460 (9th Cir. 2020).

---

[12] Monster cites POM Wonderful LLC v. Purely Juice, Inc. for this proposition. 2008 WL 4222045 (C.D. Cal. 2008), aff'd, 362 F. App'x 577 (9th Cir. 2008). While the District Court did award disgorgement, nothing in the decision suggests that equitable relief necessarily follows in advertising disputes. Moreover, the kind of fact-finding described in POM Wonderful supports Vital's position that the question of Monster's entitlement to equitable relief, and the calculation of Vital's profits, if needed, must be accomplished through the presentation of further testimony.

QUARLES & BRADY LLP
ATTORNEYS AT LAW
MILWAUKEE

The jury already (wrongly and mistakenly) awarded Monster every dollar it sought by way of its own lost profits. As such, Monster has been fully compensated for every sale that it claims was lost because of the advertising of Super Creatine. To add an additional award to further enrich Monster, beyond its current award for its profits on the sale of every lost can, could only be described as a penalty to Vital and a windfall for Monster.

Stated differently, Monster's calculation of damages in this matter is premised on the opinion that 34.1% of Vital's sales of Bang Energy were made as a result of purported Super Creatine and creatine advertising. (Ex. 14 (9/15 Trial. Tr.) at 203:18–204:4.) Utilizing that 34.1% figure, Monster's damage expert, Mr. Tregillis, opined that Vital earned $173.8 million dollars in profit from accused sales. (Id. at 208:21–25.) If the jury's verdict is upheld, Vital will be responsible for paying $272 million to Monster with respect to its purported lost profits, a figure that already dwarfs the $173.8 that Vital earned on sales of Bang Energy allegedly due to Super Creatine. Nonetheless, Monster now wants to add another $77.4 million to the calculation as it contends that Vital's profits were not captured by the jury's award of Monster's own lost profits. (Dkt. 928 at 28.)

In short, Monster now seeks a total lost profits award of $349.4 million. Stated differently, Monster asks the Court to make Vital responsible for more than two-times the profit that even Monster's own expert testified were attributable to accused sales. And this is prior to any consideration of enhancement, interest, statutory fees, non-statutory fees, attorneys' fees and other relief. All of this makes for an inequitable outcome of truly historic proportions.

Monster's proffer of K&N Eng'g, Inc. v. Spectre Performance, 2012 WL 12893797 (C.D. Cal. 2012), is a helpful foil for the present dispute, showing why Monster should not be awarded Vital's profits heaped on top of its own. The plaintiff in K&N prevailed on its false advertising claims and was awarded solely disgorgement damages in the form of defendant's lost profits. Id. at *6. Unlike

Monster here, the plaintiff was not doubly compensated with the additional award of its own lost profits. Additionally, both parties in K&N participated in a market that was essentially split between the two, and the defendant had engaged in comparative advertising. Under those differing circumstances, the District Court found that the defendant's lost profits served as a substitute for the plaintiff's unproven lost profits (if any). Id. ("a plaintiff will use the defendant's profits as a proxy for its injuries"). This is far different from the pending case, where Monster and Vital competed in a crowded market, and no evidence was presented that Vital engaged in comparative advertising with Monster.

Given the broad discretion permitted the Court, particularly in the name of equity, an earlier dispute involving Monster and Vital also warrants the Court's consideration. On September 29, 2022, Judge Dale S. Fischer entered judgment against Vital after confirming an earlier arbitration award—with Monster as one of the petitioners and Vital as respondent. Vital Pharms., Inc. v. Orange Bang, Inc., Case No. 5:20-cv-1464-DSF-SHK (C.D. Cal. 2022) (Judgment [Dkt. 127]). This included, among other relief, the disgorgement of $175,000,000 of profits earned by Vital from sales of Bang Energy containing Super Creatine. It had been alleged that Vital's use of the phrase Super Creatine on its Bang Energy drinks was wrongful, as Super Creatine did not constitute creatine monohydrate and did not contain enough Super Creatine to be "creatine-based." Remarkably, resulting in an outcome where Vital now risks being subjected to disgorging to Monster—twice in two different proceedings—the precisely identical profits it earned on cans of Bang Energy containing Super Creatine.

### C.   Monster is not entitled to enhanced damages.

Operating under the false assumption that it has not been fully compensated with $271,924,174 for its lost profits, plus its wrongful request of yet another $77,466,712 (said to represent Vital's own lost profits), Monster suggests an additional enhanced amount—of yet another $56,670,142 (and 75 cents)—may be

necessary for Monster to be made whole. While the Court has the discretion to consider this request, it surely would be mistaken in granting the same.

### 1.   Enhancement is an exceptional remedy not justified on this record.

Like disgorgement, the text of the Lanham Act provides that the equitable remedy of enhancement is not available where its imposition would constitute a penalty instead of compensation. See 15 U.S.C. § 1117(a). Arguments of the kind Monster makes for enhancement are routinely denied. For example, there is no basis for enhancement where its suggested purpose, as Monster clearly propounds, is to deter feared future conduct. See also, Brighton Collectibles, Inc. v. Coldwater Creek, Inc., 2009 WL 160235, at *6 (S.D. Cal. 2009). In such circumstances, enhancement serves only as penalty and not compensation. As the District Court held in Vital Pharm. v. PhD Mktg., Inc., 2022 WL 2952495, at *7 (C.D. Cal. 2022), "[e]nhancement based on Defendant's conduct alone would constitute a penalty, so the Court declines to enhance Plaintiff's award."

By way of exaggeration, Monster suggests that "courts (plural) award" damages between the time of verdict and the entry of an injunction, and that courts "typically project" the specific amount based upon lost profit allegations. (Dkt. 928 at 31(citing K&N Eng'g, Inc., 2012 WL 12893796, at *9.).) Monster's brief should more accurately read that a single court under atypical and inapposite circumstances awarded the category of relief it seeks. The decision provides no guidance here, particularly where Vital's sales in the period before and after the April 2022 damages cutoff date are not comparable at all.

In K&N, the court awarded a damages "enhancement" to compensate the plaintiff for damages incurred in Q3 and Q4 2011, after the damages cutoff date at trial but before the entry of a permanent injunction. K&N Eng'g, 2012 WL 12893796, at *9. The court found that the defendant's net sales (i.e., less deductible costs) in Q3 and Q4 were "were similar to the total sales in Q1 and Q2 for each [prior] year"

dating back to 2007, which the plaintiff had established at trial, and so "assume[d] the sales for Q3 and Q4 of 2011 [we]re the same as those for Q1 and Q2 of 2011." Id.

Here, Vital's sales after April 2022 were not "similar" to those over the prior period, and there is no basis to assume that Monster's damages after April 2022 would be "the same" as before. (See Dkt. 941-1; Dkt. 941-2.) Far from it, Bang Energy sales and market share have fallen by more than half since April 2022. (Dkt. 941-1.) Based on publicly reported data, and comparing the first 13 weeks of 2022 with the same period in 2023, Bang Energy's sales volumes have declined by 50 percent and its sales velocity has fallen by approximately one-third, while Monster and Reign's performance have only improved. (See id.) This case is nothing like K&N, which provides no support for the windfall "enhancement" Monster seeks.[13]

Additionally, the District Court in K&N rejected the premise for Monster's argument. Specifically, Monster mistakenly suggests that its entitlement to an enhancement exists because "Defendants have continued to falsely advertise Bang," much like the plaintiffs in K&N, argued that "there are still products with false advertisements on store shelves" that "may remain on store shelves for years." Id. at *9. The District Court rejected the argument, holding that the defendant's products would only remain in the market if the supposed false advertisements did not cause customers to purchase the products. Id. The same two potential paths present themselves here, and neither entitles Monster to an enhancement: either (i) Vital has stopped using Super Creatine on its cans and in its advertising, as the overwhelming evidence would prove in the second phase of this bifurcated trial, or (ii) some legacy cans would remain on store shelves for a period of time, proving the conclusions of Monster's InfoScout report that Super Creatine only matters to 3% of the public who

---

[13] Bang Energy's average unit price is also about 10% ($0.28) higher in 2023 (Dkt. 941-2), and therefore any deductible costs have changed (but there is no evidence in the record to show what they are). Here, moreover, Monster is seeking enhanced damages over a period that is more than twice as long as in K&N Eng'g, 2012 WL 12893796, at *9.

purchase Bang Energy.

### 2. The Court should not conclude that Monster is suffering any ongoing loss, and certainly should not address the issue prior to receiving further proof.

As the Court might expect, having secured a verdict against one of its two primary competitors, and putting that competitor into bankruptcy, Monster's business has flourished. Its publicly traded stock price was about $88 per share at the time the jury rendered the verdict. The share price skyrocketed immediately at the conclusion of the trial. Over the last six months, the price has been up nearly 15% and, as of March 21, 2023, the price has increased to $103.79 per share. (Muth Decl., ¶¶ 13–14, Exs. 4–5.) Vital will provide considerable further evidence of Monster's fortunes during the next phase of this trial.

In stark contrast, because of its bankruptcy reorganization and down-sizing challenges, Vital's market share is now a fraction of its share at the time this suit was filed by Monster. As described above, Vital's 8.2% share of the energy drink market in 2021 was reduced to 5.9% last year, and currently stands at 3.1% year-to-date. (Dkt. 941-1 at 1.) In its fourth quarter 2022 earnings call, on February 28, 2023, Monster reported that sales of its Monster brand had increased in the convenience store and gas station channel by 13% over the prior year; notably Monster's Reign brand, developed specifically to take market share from Vital with its 300 milligrams of caffeine was up 26.7%. (Ex. 6 at 6.) Monster also noted: "VPX Bang sales decreased 48%." (Id.) In short, Monster's business is stronger than ever, and the imposition of an enhancement would be the very definition of inequity.

### 3. Monster presents no proof of so-called "lingering misimpressions."

There are no "lingering misimpressions" about Bang Energy that, according to Monster, would justify enhanced compensation. Since the date of the verdict, the market has been saturated with news about the verdict; the historical size of the

verdict; the grounds for the verdict; and the changes at Vital as a result of the verdict, including the bankruptcy filing. (Dkt. 917, ¶ 27.) If Monster possesses any evidence that is contrary to the information its executives provided on recent earnings calls, then it should present the same to the Court in phase two.

This was the obvious process followed in the primary decision cited by Monster. In Binder v. Disability Grp., Inc., 772 F. Supp. 2d 1172 (C.D. Cal. 2011), the District Court did not award enhancement based solely upon the say-so of the plaintiff's lawyers (the approach Monster apparently prefers). Instead, the entitlement to enhanced damages was determined after the District Court "received evidence, heard testimony, observed the manner and demeanor of the witnesses, and considered the declarations and deposition testimony of various persons." Id. at 1174.

### D.   Monster is not entitled to prejudgment interest in the amounts it seeks.

The Lanham Act does not expressly authorize prejudgment interest or mandate a post-verdict award of prejudgment interest. As such, it necessarily does not specify any particular rate of interest. All of these questions are subject to the sole discretion of the Court. For the reasons described below, if the Court is inclined to award any prejudgment interest at all (and it should not), the Court should at most award the sum of $1,281,321.61, as of February 23, 2023, with a daily per diem, if any, in the amount of $8,716.47 thereafter.

### 1.   Prejudgment interest should not be awarded prior to the return of the verdict.

When determining whether an award of prejudgment interest is appropriate, California's District Courts and the Ninth Circuit have held that the touchpoint is Section 3287(a) of the Civil Code, entitled "Interest as Damages." See Evanston Ins. Co. v. OEA, Inc., 566 F.3d 915, 920 (9th Cir. 2009); and Sentry Ins. v. Am. Nat'l Fire Ins. Co., 2007 WL 9705855, at * 3 (C.D. Cal. 2007). Yet, Monster only cites to Section 3287(a) when improperly seeking prejudgment interest on its trade secret and

shelf space claims. Monster makes no mention of the statute in the Lanham Act portion of its brief, where Monster mistakenly suggests it is entitled to receive nearly $39 million dollars of prejudgment interest, beginning to run eight years ago in 2015.

The reason for Monster's omission is obvious. Section 3287(a) prohibits the calculation of prejudgment interest, if any, until the date the jury rendered its verdict on September 29, 2022. More specifically, Section 3287(a) "does not authorize pre-judgment interest, as a matter of law, where the amount of damages depends upon a judicial determination based upon conflicting evidence." Id. See also, Duale v. Mercedes-Benz USA, LLC, 148 Cal. App. 4th 718, 729 (2007) ("where the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate") (citations omitted); and Cnty. of Solano v. Lionsgate Corp., 126 Cal. App. 4th 741, 753 (2005) (awarding prejudgment interest only from date of arbitration decision after resolution of parties' conflicting positions on damages).

Monster's damages, and obviously the fact of damages at all, were not certain until the jury's verdict was rendered. Monster cannot credibly claim—nor does it try to claim—that the damages for its false advertising claims were liquidated. Monster conceded this point years ago in its Amended Complaint, where it requested compensatory damages in an amount "to be proven at trial." (Dkt. 61 at 47.) In so pleading, Monster acknowledged the obvious: that its claimed damages were disputed among the parties and, as such, prejudgment interest could not be awarded (if at all) before the date of the verdict. See Stonebrae L.P. v. Toll Bros., Inc., 2011 WL 1334444, at *21 (N.D. Cal. 2011), aff'd 521 F. App'x 592 (9th Cir. 2013) (prejudgment interest not awarded where certainty and computation of damages was contested).

Monster and Vital each presented their own expert witnesses, testifying with respect to the purported, but uncertain, damages alleged by Monster under the Lanham Act. (Ex. 14 (9/15 Trial Tr.) at 187: 25–188:8, 217:14–218:4, 224:1–8; Ex. 17 (9/22 Trial Tr.) at 154:1–21, 165:19–166:6, 199:7–200:1.) Vital presented

evidence supporting a maximum Lanham Act damage award of no more than approximately $825,000 in compensatory damages. (Ex. 19 (9/27 Trial Tr.) at 189:23–193:5.) The amount of Monster's alleged damages, and whether damages were to be awarded at all, were all unknown until the moment the Court's clerk published the contents of the jury's Verdict Form on September 29, 2022. As such, prejudgment interest could not begin to accrue until that time.

Notably, Monster cites no false advertising (or even any Lanham Act) decisions that suggest a right to prejudgment interest here, or that shed light on its claim for millions based on damages impossible to specify prior to the verdict. For example, Herrera v. City of Ontario, 2017 WL 11628154 (C.D. Cal. 2017), is a personal injury dispute. And Miller v. Schmitz, 2014 WL 68883 (E.D. Cal. 2014) addressed claims for malicious prosecution, where there was no disagreement as to the interest rate the Court used to calculate prejudgment interest.

### 2. An appropriate interest rate should be no more than 1.17%.

Monster proposes an inflated and exaggerated interest rate of 5.07%, based upon the current one-year treasury rate under 28 U.S.C. § 1961. An examination of the one-year treasury rate demonstrates current interest rates are the highest at any point in the last ten years. Often during this decade, including throughout most of 2020 and 2021, the one-year treasury interest rate varied between 0.05% and 0.18%. (Muth Decl., ¶¶ 3–4; Ex. 1.) Monster now asks for a windfall, literally a multiple of one-hundred-times that historical interest rate.

The correct rate the Court should use is 1.17%, which accurately reflects the actual prejudgment interest rate based upon the annual average rate over the relevant time periods. (Muth Decl., ¶¶ 4–5.) By calculating prejudgment interest from the date of verdict, until February 23, 2023, and using an interest rate of 1.17%, the result would be a prejudgment award on Monster's Lanham Act claim of $1,281,321.61

with a per diem of $8,716.47 thereafter.[14] This all naturally assumes Monster should receive prejudgment interest at all, and Vital contends it should not.

### E.     This dispute in not exceptional and Monster is not entitled to an award of its attorneys' fees.

Under the Lanham Act, reasonable attorneys' fees may only be awarded to a prevailing party in "exceptional cases." See 15 U.S.C. § 1117(a). Exceptional cases stand out from most Lanham Act disputes with respect to the substantive strength of one party's litigating position (considering both the governing law and the facts of the case) or the unreasonable way the case was litigated. Caiz v. Roberts, 2017 WL 830386, at *3 (C.D. Cal. 2017) (quoting Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014)). These factors do not support an award of fees here.

### 1.     Monster cites the wrong test to the Court.

The Court should review the "totality of the circumstances" to determine whether this Lanham Act case was exceptional, as opposed to the willfulness standard argued by Monster. Factors to consider include the "frivolousness, motivation, objective unreasonableness of the factual and legal components of the case and the need—in limited circumstances—to advance considerations of compensation and deterrence." Octane Fitness, 572 U.S. at 554 n.6 (citation omitted). Monster cites Lahoti v. Vericheck, Inc., 636 F.3d 501, 510 (9th Cir. 2011), but the willfulness standard used by the Ninth Circuit in Lahoti is no longer good law. The Court of Appeals, in Sun Earth, recognized that Octane Fitness "altered the analysis of fee applications under the Lanham Act." SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd., 839 F.3d 1179, 1181 (9th Cir. 2016).

---

[14] The proper calculation follows: $271,924,174 multiplied by the interest rate (1.17%), then divided by 365 days equals $8,716.47 per day. Multiplying that figure by the 147 days that have elapsed since the jury's verdict, Monster's total prejudgment interest award as of February 23, 2023, is $1,281,321.61 with a per diem of $8,716.47 thereafter

## 2. This was not an exceptional case.

Each of the reasons suggested by Monster, independently or together, do not merit an award of its fees. For example, while Mr. Owoc aggressively resisted attempts to elicit concessions on cross-examination, Monster's co-CEO (Rodney Sacks) was similarly uncooperative. The Court sustained motions to strike during Mr. Sacks' relatively brief cross-examination nearly forty times. (See e.g., Ex. 10 (9/8 Trial Tr.) at 12:14–19, 27:25–28:7, 31:12–18, 40:12–21, 43:1–5, 43:17–21, 44:3–8, 44:13–20, 165:4–12, 169:2–8, 171:21–172:3, 173:15–23, 174:12–19, 176:1–7.) Moreover, the Court permitted Monster an additional ten hours of trial time (Ex. 13 (9/14 Trial Tr.) at 282:21–25).

Monster's recitation of the background of Mr. Wilson's declaration is also unavailing. The record demonstrates that, at the time he signed his declaration, Vital had every good faith reason to believe that he agreed with its terms because Mr. Wilson ratified its contents by approving the final draft in writing before it was filed. (Dkt. 544.) There was no proof of deceit as, quite clearly, none was intended. The declaration caused no prejudice, and none was suggested by Monster.[15]

Vital offered reasonable and valid defenses to Monster's claims. As explained in its post-verdict brief, Vital was significantly hampered by certain evidentiary rulings from putting on a complete defense as to materiality, damages, and even as to the efficacy claims raised by Monster. "Courts applying the Octane Fitness standard have found that 'where a party has set forth some good faith argument in favor of its position, it will generally not be found to have advanced 'exceptionally meritless' claims.'" Enovsys LLC v. AT&T Mobility LLC, 2016 WL 3460794, at *6–7 (C.D. Cal. 2016) (citations omitted). It is the "substantive strength," not the correctness or eventual success, of a party's position that is relevant in determining that a case qualifies as "exceptional." SFA Sys., LLC v. Newegg Inc., 793 F.3d 1344,

---

[15] Monster's final argument on why this case is "exceptional" is that several discovery disputes between the parties warrant an award of fees. Unsurprisingly, Monster offers no authority in support of this claim.

1348 (Fed. Cir. 2015).

In sum, Vital presented evidence in good faith supporting its positions. Merely because the jury found in Monster's favor does not make this case exceptional. In fact, numerous courts have refused to find the prevailing party deserved an award of attorneys' fees in Lanham Act cases. And in most instances, as here, fees are simply denied. See, e.g., Airwair Int'l Ltd. v. ITX USA LLC, 2022 WL 161895, at *2 (N.D. Cal. 2022) (holding while "plaintiff ultimately prevailed at trial, the conclusion was not foreordained" and fees were denied). See also, Talent Mobile Dev., Inc. v. Headios Grp., 382 F. Supp. 3d 953 (C.D. Cal. 2019); Brighton Collectibles, Inc. v. Marc Chantal USA, Inc., 2009 WL 2513984 (S.D. Cal. 2009); Anhing Corp. v. Thuan Phong Co., Ltd., 2016 WL 6661178 (C.D. Cal. 2016); Neurovision Med. Prod., Inc. v. Nuvasive, Inc., 2014 WL 12567167 (C.D. Cal. 2014); and Apple Inc. v. Samsung Elecs. Co., Ltd., 2014 WL 4145499 (N.D. Cal. 2014). For all these reasons, the Court should deny Monster's request for attorneys' fees as to its Lanham Act claims.

## III.   MONSTER HAS NOT ESTABLISHED A RIGHT TO FURTHER RELIEF INSOFAR AS ITS TRADE SECRET CLAIMS ARE CONCERNED.

The evidence presented at trial—and cited by Monster in its motion—does not begin to support Monster's story and Monster should not be awarded punitive damages. It likewise is not entitled to the overbroad and unworkable permanent injunction proposed.

### A.    Monster's trial evidence of trade secret misappropriation was thin.

Monster never presented the jury with competent, preponderance of the evidence proof, that Vital recruited Stephen Cohen "to steal sensitive competitive information." (Dkt. 928 at 46.) As Mr. Cohen testified without contradiction, he never discussed any information possessed by Monster during his interview process with Vital, and no one threatened him that his potential job at Vital was contingent

upon him bringing over Monster information.[16] (Ex. 13 (9/14 Trial Tr. (Cohen)) at 266:22–267:5; Ex. 14 (9/15 Trial Tr. (Cohen)) at 13:3–5.)

Moreover, the information attributed to Mr. Cohen was never used, or at least Monster presented no proof it was used. Not a single witness testified, for example, that anyone associated with Vital accessed the "Monster Garage" database using Mr. Cohen's credentials. In fact, Monster itself couldn't say whether anyone accessed the Monster Garage using Mr. Cohen's credentials, and it never bothered to look, despite hiring a forensic expert (who did not testify at trial during the first phase). (Ex. 15 (9/16 Trial Tr. (Swift)) at 92:16–19, 93:6–16; Dkt. 485-6; Dkt. 647.) Nor does Monster have any proof, presented to the jury, that any trade secret information obtained via the Monster Garage "was used … by Vital to undercut Monster in any way." (Ex. 15 (9/16 Trial Tr. (Swift) at 95:4–8.)

As far as the USB drives are concerned, Monster's description of the circumstances surrounding Mr. Cohen's participation is incomplete and misleading. Vital's in-house counsel, Frank Massabki, reviewed the USB drives solely to determine whether they contained confidential information belonging to Vital—not Monster. (Ex. 15 (9/16 Trial Tr. (Massabki)) at 98:3.) Mr. Massabki testified he "may have opened all of" the files on the USB drive but didn't recall, and that "the whole process took [him] _five minutes_."[17] (Id. (emphasis added).) Mr. Massabki further testified that Vital did not retain any copies of the USB drives or the files on them, and Vital did not forensically image any of the USB drives. (Id.) Literally no evidence was presented by Monster to contradict his testimony.

---

[16] Gene Bukovi testified he never insisted anyone, including Mr. Cohen, bring over confidential or trade secret information from a former employer as a condition of employment. (Ex. 8 (8/30 Trial Tr. (Bukovi)) at 138:15–18.) Chad Henry testified he never received an offer contingent upon him bringing confidential information to Vital. (Ex. 13 (9/14 Trial Tr. (Henry)) at 201:22–202:1.)
[17] In stark contrast, Monster's witness, Mr. Swift, testified that it took him "many hours" to review the files on the USB drives. (Ex. 15 (9/16 Trial Tr. (Swift)) at 73:17–19.)

### B. Monster cannot establish the elements necessary for injunctive relief, and particularly the existence of irreparable harm.

"Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). Monster has not met its burden to show it will be irreparably harmed without a permanent injunction for several reasons. See eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

### 1. Irreparable harm does not exist.

"[T]he Ninth Circuit has yet to directly address the impact of eBay on courts' power to presume irreparable harm in trade secrets cases." Cutera, Inc. v. Lutronic Aesthetics, Inc., 444 F. Supp. 3d 1198, 1208 (E.D. Cal. 2020) (joining other "district courts who have declined to rely on a presumption in determining irreparable harm in the intellectual property context."). Monster cites TMX Funding, Inc. v. Impero Techs., Inc., 2010 WL 1028254, at * 8 (N.D. Cal. 2010), for the proposition that this district has presumed irreparable harm in trade secret misappropriation case. In fact, this Court has explicitly rejected the reasoning in TMX and declined to presume irreparable harm in trade secret cases. See Arminak Sols., LLC v. 7-Eleven, Inc., 2017 WL 6888706, at *2, n.1 (C.D. Cal. 2017). A trade-secret misappropriation plaintiff "seeking injunctive relief must proffer evidence sufficient to establish a likelihood of irreparable harm." Id. at * 2 (quoting Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc., 736 F.3d 1239, 1251 (9th Cir. 2013)). Monster has failed to do so.

Additionally, Monster waited too long to seek an injunction on the subject of its trade secrets. While Monster pled trade secret misappropriation in its First Amended Complaint, it failed to include the same claim in its unsuccessful motion for a preliminary injunction. Monster's delay in seeking injunctive relief "precludes a finding of irreparable injury." Diversified Silicone Prod. Corp. v. Elastapro Silicone Sheeting LLC, 2020 WL 4390380, at *3 (C.D. Cal. 2020) (seven-month delay in bringing preliminary injunction motion "further cuts against a finding of irreparable

harm.").

### 2.   Monster's monetary relief was more than adequate.

Monster's damage expert testified that Vital was unjustly enriched by $4.175 million *during Mr. Cohen's first year at Vital* (i.e., 2019). (Ex. 14 (9/15 Trial Tr. (Tregillis)) at 220:7–222:18.) At trial, Monster chose not to present further evidence of harm and alleged no additional damages or injuries in subsequent years. (Ex. 19 (9/27 Trial Tr.) at 104:4–15.) When presented with all of Monster's evidence supporting its trade secrets claim, the jury chose to award Monster considerably smaller damages ($3,000,000) than Monster claimed it had incurred in 2019. Thus, after considering Monster's trial "evidence" (the same evidence it relies on in its request for injunctive relief), the jury determined that more damages were unwarranted and, necessarily, that Monster's existing award was adequate to address any injuries.[18]

Monster's argument that it will face future harm, without a permanent injunction, rings hollow, is inconsistent with the theory of damages it presented at trial, and entirely unsupported in the record. The cited trial documents are from *more than five years ago* and stale. Following other courts, this Court should deny the request for an injunction as Monster has not proven that the trade secrets will likely provide a commercial advantage to Vital *years* after the supposed misappropriation. Jarosch v. Am. Fam. Mut. Ins. Co., 837 F. Supp. 2d 980, 1016 (E.D. Wis. 2011).

### C.   Monster's proposed permanent injunction is unworkable.

Monster's requested injunction is overly broad, unduly burdensome, and completely unworkable. "A party seeking injunctive relief 'has the burden to show that the information that was misappropriated constitutes a trade secret' and, to do so, must identify that information 'with sufficient particularity.'" Citcon USA, LLC,

---

[18] For example, Monster cites to a former Monster employee in Latin America having accessed "information and documents belonging to Monster" after joining Vital as an employee, but such information does not equate to a protectible trade secret that even warrants monetary damages, much less a permanent injunction. (TX-4749 at 17–18.)

v. RiverPay Inc., 2019 WL 2603219, at *2 (N.D. Cal. 2019) (quoting Agency Sols. Com., LLC v. TriZetto Grp., Inc., 819 F. Supp. 2d 1001, 1015, 1017 (E.D. Cal. 2011)).

Monster's proposed injunction fails to identify any of Monster's so-called trade secrets with sufficient particularity. It defines the "Trade Secret Information" as "Monster's confidential and proprietary pricing, marketing, strategy, and financial information []." (Dkt. 928-1, ¶ 3.) This is impermissibly broad and vague. "[I]n all cases, a plaintiff must 'clearly refer to tangible trade secret material' and 'not simply rely upon 'catchall' phrases or identify categories of trade secrets.'" Equate Media, Inc. v. Suthar, 2022 WL 2824973, at *3 (C.D. Cal. 2022) (quoting InteliClear, LLC v. ETC Glob. Holdings, Inc., 978 F.3d 653, 658 (9th Cir. 2020)). Monster's instruction that the Trade Secret Information "includes any information derived from or created by Monster except that which is demonstrably available to persons in the beverage industry" only exacerbates the problem. It fails to specify who has the burden of demonstrating whether any disputed material is "available to persons in the beverage industry." (Dkt. 928-1, ¶ 3.)

Notably, the parties have been down this path before. Vital moved for summary judgment on Monster's trade secret misappropriation claims, arguing that Monster failed to identify its alleged trade secrets with reasonable particularity. (Dkt. 438-1 at 27.) In its opposition brief, Monster cited to its trade secret disclosures, which "describe[d], in detail, 47 pricing and retail strategy trade secrets for North America and 28 market entry and market penetration trade secrets for South America." (Dkt. 468 at 20.) Monster further argued that "the descriptions for each trade secret directs VPX to a document that corresponds to Monster's description." (Id. at 20–21.) This Court denied Vital's motion, citing to Monster's briefing. (Dkt. 740 at 34.)

But Monster failed to embark on a similar exercise at trial. And Monster now seeks to expand what once was a defined list of specific documents into a broad

definition that includes "any information derived from or created by Monster" that is not "demonstrably available to persons in the beverage industry." (Dkt. 928-1 at ¶ 3.)

Monster has not filed under seal (nor requested Vital to file under seal) several documents that would fall within Monster's proposed definition of Trade Secret Information. (See, e.g., (Dkt. 929-65 (document identified by Monster as containing confidential Monster information (Dkt. 928 at 51)); Dkt. 923-24; Dkt. 923-26; Dkt. 923-32).) This inconsistent and unpredictable approach to confidentiality designations only underscores the overly broad and unduly burdensome nature of Monster's proposed injunction.

### D.   Monster is not entitled to exemplary damages on its trade secret claims.

Exemplary damages in the amount of $3 million are not justified. Although the jury determined Vital willfully and maliciously misappropriated Monster's trade secrets, the automatic imposition of exemplary damages based on this finding "strips the Court of its independent obligation to consider the facts and calculate an equitable and constitutionally sound exemplary damages award, especially since the other two California common law factors (amount of compensatory damages and misappropriator's net worth) are objective facts." Mattel, Inc. v. MGA Ent., Inc., 801 F. Supp. 2d 950, 953 (C.D. Cal. 2011) (citation omitted). Rather, this Court is required to perform "an independent evaluation" of the nature of Vital's misconduct. Id. In so doing, the Court need not award any exemplary damages based on the nature of the conduct. See Cal. Civ. Code § 3426.3 ("If willful and malicious misappropriation exists, the court may award exemplary damages . . . .").

The actual evidence presented at trial falls woefully short of reprehensible conduct in misappropriating trade secrets for Vital's benefit in a willful or malicious way, as discussed above, the award of zero enhanced damages is warranted and well within the Court's discretion. See, e.g., Transclean Corp. v. Bridgewood Servs., Inc., 290 F.3d 1364, 1377 (Fed. Cir. 2002) (zero enhanced damages not abuse of discretion

1    despite jury finding of willfulness); <u>Va. Panel Corp. v. MAC Panel Co.</u>, 133 F.3d

2    860, 866 (Fed. Cir. 1997) (enhanced damages of ten per cent not abuse of discretion

3    despite jury finding of willfulness).

4        **E.    Monster should not be awarded its fees.**

5        The decision on whether to award Monster is attorneys' fees related to its trade

6    secret claims is not mandatory; rather, it is left entirely to the discretion of this Court.

7    <u>02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.</u>, 399 F. Supp. 2d 1064, 1080 (N.D.

8    Cal. 2005). The Court should exercise its discretion to deny Monster's request for

9    fees. Monster cannot even identify what trade secret it claims Vital misappropriated.

10   Nor has or can Monster show how any trade secret was used, let alone that Monster

11   was harmed from such undemonstrated use. For all of the reasons outlined above,

12   and in Vital's earlier filed motion, Monster's trade secret claim should be reduced

13   significantly, or a new trial should be required. But in no instance does this claim

14   merit an award of attorneys' fees.

15       Monster's reliance on <u>El Dorado Stone LLC v. Renaissance Stone</u>, 2007 WL

16   3308099 (S.D. Cal. 2007) is misplaced. In <u>El Dorado</u>, the court found the defendants'

17   misappropriation of plaintiff's trade secret information "was stunning in its

18   brazenness and scope." <u>Id.</u> at *1. The unreported case provided no specific detail with

19   respect to the defendants' misconduct beyond the Court's general assertion of the

20   same. <u>Id.</u> The facts before this Court are far different. Monster cannot identify what

21   trade secret it claims Vital misappropriated; cannot show how Vital used the trade

22   secret; cannot identify with whom Vital shared any trade secret; cannot show how

23   any of Monsters information was used for Vital's benefit or Monster's detriment;

24   cannot identify when any trade secret was used; cannot show where the trade secret

25   was used; and cannot show who at Vital used the trade secret.

26       Finally, even if the Court would find that Monster is entitled to an award of

27   attorneys' fees on its trade secret claim, such fees would be significantly less than the

28   approximately $21 million currently sought, which largely relate to Monster's

Lanham Act claims. Thus, if the Court would decide to award fees only on Monster's trade secret claims, Vital requests the Court order additional submissions and briefing as to the scope and reasonableness of any such award; as opposed to Monster's global fee claim. In the alternative, the Court should reduce the award to $1 million (one third of its total recovery from the jury).

### F.    The Court should not award prejudgment interest at the amount sought by Monster.

Monster correctly cites to section 3287(a) for its request for prejudgment interest under its Defend Trade Secrets Act claim ("DTSA"), 18 USC § 1836, et. seq. This section permits prejudgment interest from the date of verdict—exactly as Vital argues any award of prejudgment interest runs under Monster's Lanham Act Claim.

If the Court decides to award interest, the Court has discretion to determine the rate. Fitness Anywhere LLC v. WOSS Enters. LLC, 2018 WL 6069511, at * 7 (N.D. Cal. 2018). As described above, a rate of 1.17%, based upon actual interest rates during the relevant time, would prevent Monster from receiving an improper windfall. Using an interest rate of 1.17%, Monster's prejudgment interest as of February 23, 2023, would compute to $14,135.52, with a daily per diem of $96.16 ($3 million multiplied by 1.17%, divided by 365 days and multiplied by 147 days). (Muth Decl. ¶¶ 7–9.)

For the reasons outlined in Vital's post-verdict Motion (Dkt. 921-1), the Court should either grant a new trial as to Monster's trade secret claims or reduce the jury award to nominal damages of $1.00. Either path selected by the Court effectively moots Monster's claim for prejudgment interest as to its trade secret claim.

## IV.    MONSTER SHOULD NOT BE PERMITTED FURTHER RELIEF INSOFAR AS ITS SHELF SPACE CLAIMS ARE CONCERNED.

### A.    A permanent injunction is not warranted.

Monster must show all the traditional elements necessary for issuance of an injunction. In addition to an inadequate remedy at law, Monster must also prove

irreparable harm, a balancing of the harms in its favor and service of the public interest. See Blizzard Ent. Inc. v. Ceiling Fan Software LLC, 28 F. Supp. 3d 1006, 1018 (C.D. Cal. 2013). Whether such elements exist (they do not) are questions for the Court's determination during the second phase of trial, in its discretion. Id.

### 1. Monster has suffered no damage, much less irreparable harm.

It could hardly be argued that Monster has suffered irreparable harm, when it failed to demonstrate the existence of any causal damages whatsoever. This explains why the sole record citation in Monster's brief was to its counsel's closing argument. Throughout the trial, Monster elected not to present evidence of shelf space damages, presumably because such evidence did not exist and because Monster has no evidence that it had been damaged.

This much seemed to be clear to the Court during the parties' arguments between the close of evidence and closing arguments. The Court commented that Monster's case "barely" justified further consideration by the jury. (Ex. 18 (9/23 Trial Tr.) at 110:5.) The Court further noted: "Yeah, so, I think there's, you know, thin circumstantial evidence, you know, certain shelf space was interfered with at a rate really unknown for a period of time relatively unknown. They could award you $1 or 2.19, the value of a can of Monster, but I think there's something there." (Id. at 110:5–10.)

The three witnesses who testified on Monster's behalf really did not provide, in the Court's words, even "thin circumstantial evidence." (Id.) Not one testified that he ever saw a human being moving a can of Monster or a can of Bang Energy, let alone a human being associated with Vital. All testified, often relying upon plain hearsay statements, merely that cans of Monster were found on shelf "A" one day and subsequently on shelf "B" days later.

Monster's Mario Suarez was one of its three shelf space witnesses who failed to present evidence of even the fact of damages, much less an amount suffered by

Monster. He was asked with respect to the Circle K retail chain store:

> Q:    … you personally do not know whether Monster has actually lost any sales as a result of any alleged instance of Vital purporting to interfere with Monster's shelf space, correct?
>
> A:    That's correct.

(Ex. 14 (9/15 Trial Tr.) at 162:13–17.)

Mr. Suarez also did not know if Vital or anyone else moved the cans at Circle K (Ex. 14 (9/15 Trial Tr.) at 160:25–161:2); nor was he able to say how long cans were moved (Id. (9/15 (Trial Tr.) at 161:18–24); how many cans were moved, if any (Id. (9/15 Trial Tr.) at 161:25–162:4); or how many cans of Bang Energy were sold in place of Monster's energy drink. (Id.) He was not even the individual who personally observed the cans that purportedly were moved. (Id. (9/15 Trial Tr.) at 162:10–12.) All of these missing pieces of information take on added importance when you consider that Monster does not actually pay for specific shelf space at Circle K, where such determinations are based on Circle K's "fair market share" model of shelf space allocations. (Id. (9/15 Trial Tr.) at 162:24–163:4, 164:7–21.)

Monster's other two witnesses fared no better. For example, Guillaume Weaver, responsible for the Wal-Mart chain, was allowed to testify about photos he did not take, purporting to show Monster cans on different shelves at different points in time. (Id. (9/15 Trial Tr.) at 93:9–11.) When asked how often cans were moved at the stores depicted in Monster's photos, Mr. Weaver simply confessed, "I had personally never been in that Compton store." (Ex. 13 (9/14 Trial Tr.) at 94:15–19.) Testifying about his AM/PM chain accounts, Robert Salerno said he had never seen anyone moving cans of Monster that he could associate with Vital. (Ex. 15 (9/16 Trial Tr.) at 40:15–17.) And even if Vital had actually moved cans, a fact never presented to the jury, Mr. Salerno agreed it was impossible for him to identify how many additional cans of Bang Energy were sold in place of Monster's energy drink. (Id.

(9/16 Trial Tr.) at 24:5–11.)

### 2. Monster has unclean hands that the Court should examine in the second phase of this bifurcated trial.

As described above in Section II.B.1, the evidence of Monster's own interference with Vital's shelf space is extensive. While the full extent cannot be completely described here, Vital intends to present a fulsome case for the Court to reject the requested permanent injunction on the grounds of Monsters' unclean hands.

### 3. Monster's proposed form of injunction should be rejected.

The proposed form of injunction order proposed by Monster is hopelessly unclear. The submitted version clearly contravenes Rule 65(d) and its requirement that an order must "describe in reasonable detail … the act or acts restrained or required" and provide "fair and well-defined notice" of whom or what it enjoins. See Reno Air Racing Ass'n, Inc. v. McCord, 452 F.3d 1126, 1132 (9th Cir. 2006). Without a properly submitted order that fairly describes the relief to which Monster is entitled, if any, its motion should be denied.

By way of example, the jury was presented with evidence purporting to demonstrate interference with shelf space at three retail chain stores. Yet the proposed order suggests that the Court expand post-verdict relief beyond the scope of the evidence presented at trial to cover all "retail space" in all stores where Monster purports to have entered into shelf space contracts. All of these are unknown and undefined. Put simply, there is insufficient evidence in the record to extend an injunction as requested by Monster. Monster strategically chose to present testimony regarding only three stores—Circle K, Walmart, and AM/PM.

Another example is Monster's attempt to enjoin "other persons acting in concert with [Defendants] who receive actual notice of" the injunction (Dkt. 928-1 at 10), a formulation courts have rejected as "vague and overly broad," particularly because it "require[s] action (rather than inaction)" and "demand[s] an unknown number of persons to do something." See ADG Concerns, Inc. v. Tsalevich LLC,

QUARLES & BRADY LLP
ATTORNEYS AT LAW
MILWAUKEE

2018 WL 4241967, at *11 (N.D. Cal. 2018).

As written, the proposed injunction is susceptible to abuse by Monster, who will, itself, cause "a multiplicity of judicial proceedings" by filing suits, in the nature of contempt, each and every time a can of Bang Energy is unexplainably found on a shelf that Monster self-determines is one that is the subject of a contract.

**B.    Monster is not entitled to punitive damages.**

Monster misleadingly argues that Vital's actions were against "industry norms," knowing full-well that Vital was prevented (erroneously, from Vital's perspective) from offering evidence to the jury that Monster engaged in the same conduct it alleges against Vital. The argument highlights why Monster's demand for punitive damages is disingenuous and unwarranted. The fact that this is the leading point for Monster merely emphasizes the importance of the issue and the prejudice that befell Vital during the trial. <u>See also,</u> Section II.B.1. (describing numerous instances of Monster's unclean hands.)

Even if considered by the Court, Monster has not met its burden to show it is entitled to punitive damages. Section 3294(a) of the California Civil Code permits punitive damages only where "it is proven by clear and convincing evidence that the defendant the defendant has been guilty of oppression, fraud, or malice." The form of the jury's verdict asked to jury to merely determine if Vital acted "in reckless disregard of Monster's rights" option. That is not sufficient basis to award punitive damages under California law.

In <u>Rivin v. Patrick K. Willis Co., Inc.</u>, 2021 WL 2980591, at *2 (C.D. Cal. 2021), the District Court held that a party may recover punitive damages in actions "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). "Malice" describes "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1). "Despicable

conduct" is described as conduct that is "'so vile, base, contemptible, miserable ... that it would be looked down upon and despised by ordinary decent people.'" <u>Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton</u>, 96 Cal. App. 4th 1017, 1049 (2002) (quoting <u>Mock v. Mich. Millers Mut. Ins. Co.</u>, 4 Cal. App. 4th 306, 331 (1992). Next, a person acts with a conscious disregard of the rights or safety of others, when he is "aware of the probable dangerous consequences of his conduct" and "he willfully and deliberately fail[s] to avoid those consequences." <u>Taylor v. Superior Ct.</u>, 24 Cal. 3d 890, 895–96 (1979). The mere reckless disregard or misconduct is not enough to sustain an award of punitive damages because the central spirit of the statute demands evil motive. <u>Butte Fire Cases</u>, 24 Cal. App. 5th 1150, 1160 (2018).

### C.   Monster is not entitled to costs and prejudgment interest.

As with its other claims, Monster's damages, and obviously the fact of damages at all, concerning its shelf space claim was not certain until the jury's verdict was rendered. Monster concedes this point in its brief, indicating that it is only seeking interest amounts from the date the verdict was rendered until judgment is entered by the Court. Accordingly, Vital incorporates by reference the same arguments as set forth in Section III.F. above. However, the total prejudgment interest for Monster's trade secret claims should be, as of February 23, 2023, $14,135.52 with a per diem of $96.16 thereafter. (Muth Decl. ¶ 9.)

### V.   MONSTER SHOULD NOT BE AWARDED ITS ATTORNEYS' FEES.

For the reasons outlined above, this Court should deny Monster's request for attorneys' fees under both its Lanham Act and trade secrets claims. <u>Citing</u> <u>Camacho v. Bridgeport Fin., Inc.</u>, 523 F.3d 973, 978 (9th Cir. 2008), Monster implies that this Court "must" award Monster its fees. Thus, it bears repeating that any award of attorneys' fees under the Lanham Act and any of Monster's state law claims is permissive—not mandatory—and completely within the discretion of the Court. <u>See</u> 15 U.S.C. § 1117(a), § 1836 (b)(3)(D); Cal. Civ. Code § 3426.4.

### A.     Monster's requested hours are not reasonable.

If the Court determines an award of fees is proper, it "must then determine what fees are reasonable." <u>Klein v. City of Laguna Beach</u>, 810 F.3d 693, 698 (9th Cir. 2016) (citing <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 429 (1983)). The Court should conduct this analysis through the application of the "lodestar method," multiplying the "number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." <u>Klein</u>, 810 F.3d at 698 (quoting <u>Gonzalez v. City of Maywood</u>, 729 F.3d 1196, 1202 (9th Cir. 2013)).

In applying the lodestar method, the Court should "exclude from the lodestar amount hours that are not reasonably expended because they are 'excessive, redundant, or otherwise unnecessary.'" <u>Van Gerwen v. Guarantee Mut. Life. Co.</u>, 214 F.3d 1041, 1045 (9th Cir. 2000) (quoting <u>Hensley</u>, 461 U.S. at 434). Additionally, the Court should reduce an award for fees when "documentation of hours is inadequate." <u>Sorenson v. Mink</u>, 239 F.3d 1140, 1146 (9th Cir. 2001). If a request is erroneous and excessive, the Court should decline to award fees altogether or severely reduce it. <u>See</u> <u>EHM Prods., Inc. v. Starline Tours of Hollywood, Inc.</u>, 2020 WL 10431815, at *4 (C.D. Cal. 2020).

### 1.     The requested hours are too vague and the documentation is inadequate.

Monster's vague time entries are problematic; so vague, in fact, that neither Vital nor the Court may analyze whether the time spent was reasonable on any given task. Monster's counsel appears to have worked on any number of tasks—some of which refer to work performed on "related cases"—with no suggested reduction to the time entry. For example, Monster's time entries include the following examples:





(Dkt. 929-41 (Libeu Decl., Ex. A.).)

Further, Monster's time entries for the motion for summary judgment are not limited to the Lanham Act and trade secret claims. (See generally, Hensley, 461 U.S. at 452–480; which only refer to the summary judgment generally.) "[A] prevailing party in a case involving Lanham Act and non-Lanham Act claims can recover attorneys' fees only for work related to the Lanham Act claims." Gracie v. Gracie, 217 F.3d 1060, 1069 (9th Cir. 2000).

It follows that the Court should deduct a material percentage of the total fees requested by Monster because the entries are simply too general for Vital or the Court to confirm they relate only to the Lanham Act or trade secret claims. See Franet v. Cnty. of Alameda Soc. Servs. Agency, 2006 WL 8445938, at *1 (N.D. Cal. 2006) ("As the party seeking attorneys' fees, plaintiff bears the burden of submitting evidence to support the hours worked and rates claimed.").

Assuming the Court agrees to award Monster its fees for both the Lanham Act and trade secret claims, Vital proposes a 20% reduction. See Gates v. Deukmejian, 987 F.2d 1392, 1399–1400 (9th Cir. 1992) ("[T]he district court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure as a practical means of [excluding non-compensable hours] from a fee application."); e.g., Gucci Am., Inc. v. Pieta, 2006 WL 4725707, at *3 (C.D. Cal. 2006) (reducing fee award under Lanham Act by 20% based on plaintiff's partial success); Franet, 2006 WL 8445938, at *3 (reducing attorneys' fee award by

25% where documentation of hours was inadequate). In the event the Court only awards fees as to trade secrets, Vital purposes the Court either reduce the fees to $1 million (33% of the verdict amount for trade secrets) or schedule additional submissions and briefing limited solely to that claim.

### 2.   The requested attorneys' fees application contains hundreds of thousands of dollars for recent college graduate work.

Laying bare Monster's inexhaustible penchant for overreach, its fee request includes over █████ hours and over █████████ for "Trial Fellows," but does not include any description (legal, factual, or otherwise) why Vital should be charged for this time. (See generally Dkt. 928 (not even mentioning Trial Fellows); see also Dkt. 929 (Libeu Decl.), ¶ 16 (not providing any background or explanation for Trial Fellows).) According to the firm's web page, the "Trial Fellows" program is for "recent college graduates … interested in pursuing careers in law." (Muth Decl. ¶ 10; Ex. 2.) Monster should receive nothing for purported attorney work conducted literally by non-licensed individuals who have not even attended law school.

Moreover, the Trial Fellows' billing entries reveal they performed unrecoverable administrative and secretarial work. (Id.) California district courts have unanimously held that "filing and serving documents are secretarial tasks that cannot be billed at a paralegal [or attorney] rate, regardless of who performs them." Martinez v. Longs Drug Stores, Inc., 2005 WL 3287233, at *7 (E.D. Cal. 2005); see also Cortes v. Metro. Life Ins. Co., 380 F. Supp. 2d 1125, 1133 (C.D. Cal. 2005).

### 3.   Numerous courts have declined or reduced Hueston Hennigan's inflated fee applications.

Numerous courts have declined to award Hueston Hennigan its requested fees. See, e.g., Twin Rivers Eng'g, Inc. v. Fieldpiece Instruments, Inc., 2018 WL 6016990 (C.D. Cal. 2018) (court denied the defendant's request for attorneys' fees (which included Hueston Hennigan and other law firms) totaling $2,220,258.45; Direct Techs., LLC v. Elec. Arts Inc., 2014 WL 12591847 (C.D. Cal. 2014) (court denied

the defendant's motion for attorneys' fees even after the defendant prevailed on the merits); <u>EHM Prods., Inc.</u>, 2020 WL 10431815 (the court granted the petitioner's motion for attorneys' fees (which included Hueston Hennigan and other law firms) but reduced the requested amount from $150,777.20 to $66,873.25, in part due to the unreasonable amount of billing for certain tasks).

Monster also argues its fees are reasonable simply because the jury verdict was in Monster's favor. It cites no case in support of this proposition because the proposition is false. In <u>Farrar</u>, the Supreme Court denied the request for fees in a civil rights claim, even though the plaintiff was the prevailing party. <u>Farrar v. Hobby</u>, 506 U.S. 103, 114 (1992). The Court rejected the notion that the "prevailing party" status turned on the magnitude of the relief obtained. <u>Id.</u> In <u>Moreno v. City of Sacramento</u>, 534 F.3d 1106, 1111 (9th Cir. 2008), the Court held that since civil rights counsel take such cases on contingency, it would be atypical for a civil rights counsel to engage in churning. <u>Id.</u> at 1112. <u>Moreno</u> does not support the position that a party's fee application is reasonable simply because it was successful.

### B.   Monster's requested rates are not reasonable.

Monster must submit "satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." <u>Blum v. Stenson</u>, 465 U.S. 886, 895–96 n. 11 (1984). The determination of a reasonable hourly rate must be established by reference to the fees that private attorneys of an ability and reputation comparable to that of prevailing counsel charge their paying clients for legal work of similar complexity. <u>Carson v. Billings Police Dep't</u>, 470 F.3d 889, 892 (9th Cir. 2006).

Monster falsely claims that "numerous courts have approved Hueston Hennigan's rates, citing <u>Vital Pharms., Inc. v. Orange Bang, Inc.</u>, Case No. 5:20-cv-1464-DSF-SHK (C.D. Cal. 2022). On September 21, 2022, Judge Fischer denied Monster's fee motion without prejudice pending appeal of the arbitration award.

(Dkt. 125.) Monster's reliance on <u>Singman v. IMDB.com</u>, No. 20JMCV00748 (L.A. Cnty. Super. Ct.) is similarly misleading. (<u>See</u> Dkt. 929-64 (Libeu Decl., Ex. Z).) The matter involved a mandatory award of fees for an anti-SLAPP motion that was unopposed, with no one appearing for the plaintiff to dispute the fee application. As stated above, many courts have, in fact, denied or significantly reduced Hueston Hennigan's requested fee applications.

Monster also fails to carry its burden by referring to the rates charged by other, even more expensive firms. For example, Monster refers to the "Real Rate Report."[19] But Monster cites to the wrong category; Hueston Hennigan is not a "large firm" with 500 to 1,000 attorneys. (Muth Decl., ¶ 11; Ex. 3 at 62, 180; <u>compare</u> Dkt. 928 (Pl.'s Post-Verdict Mot. for Equitable Relief) at 62.) Nor should the Court credit surveys of rates of some of the most expensive firms in the country, like Gibson Dunn or Kirkland & Ellis, that have little bearing on prevailing market rates for boutique firms like Hueston Hennigan.

The 2021 Real Rate Report shows much lower rates for both general litigation at firms of comparable size to Hueston Hennigan, and for trademark litigation as a whole, which is typically associated with Lanham Act claims. (Muth Decl. ¶ 11; Ex. 3.)

Under the governing standard, the suggested hourly rates are excessive and should be reduced to the third quartile for general trademark litigation attorneys for partners, and the median for associates. Specifically, the rates should be reduced to $876 for partners and $424 for associates. After reducing Hueston Hennigan's excessive hourly rates, Monster's attorneys' fees total $13,997,964.40.[20] Then, by

---

[19] Wolters Kluwer, <u>2021 Real Rate Report: The Industry's Leading Analysis of Law Firm Rates, Trends, and Practices</u>, available at https://www.wolterskluwer.com/en/ solutions/enterprise-legal-management/legalview-analytics/real-rate-report. An excerpt of the report is included as Muth Decl., Ex. 3 ("2021 Real Rate Report").
[20] Muth Decl. ¶ 12 includes appropriate adjustments to Monster's hourly rates, and a summary of appropriate adjustments to Monster's request for attorneys' fees. This number excludes Monster's request for fees for its "Trial Fellows," which, as explained supra, is inappropriate and should be excluded in its entirety.

VITAL'S OPPOSITION TO PLAINTIFF'S MOTION FOR EQUITABLE RELIEF

reducing duplicative or vague changes by a discount of 20%, Monster's fees total, at most, $11,198,371.52.[21] Alternatively, as explained above, if the Court decides Monster should only recover its fees for its trade secret claims, then it should recover no more than $1 million in fees, which is 33% of the total recovery.

## VI.   NON-TAXABLE COSTS SHOULD BE DENIED.

Monster's demand for nearly $6,500,000 in non-taxable costs should be rejected out of hand. Monster's entire argument is based on a faulty premise: that the case is "exceptional" under the Lanham Act as a result of the jury's finding of willfulness. However, as discussed above, "willfulness" is not the proper standard under the Lanham Act in determining whether attorneys' fees and costs are available in "exceptional cases." Put simply, there is nothing "exceptional" about this case so as to warrant recovery of a staggering $6.5 million in non-taxable costs. BillFloat, Inc. v. Collins Cash, Inc., 2023 WL 2333879, at *8 (N.D. Cal. 2023) ("Because this case is not exceptional, Defendants may not recover non-taxable costs under the Lanham Act.") Accordingly, for the same reasons the Court should deny Monster's requests for attorneys' fees, the Court should similarly reject Monster's request for non-taxable costs.

Nevertheless, even if the Court were to consider Monster's demand for non-taxable costs, Monster fails to properly support its positions both legally and factually. Monster's demand claims to be seeking non-taxable costs through the Lanham Act, Defend Trade Secrets Act ("DTSA"), and/or the California Unfair Trade Secrets Act ("CUTSA"). Yet, Monster fails to apportion fully what non-taxable cost amounts are being sought under what claim(s) and under what theory. Since these claims are entirely distinct (i.e., not "intertwined"), Monster is required to apportion those amounts among the various claims and causes of action. See Gracie, 217 F.3d at 1069.[22]

---

[21] Muth Decl. ⁋ 12.

[22] Significantly undercutting any ability to investigate fully the claimed "reasonableness" of the asserted expenses, Monster fails to provide any actual

Courts across the country, including the Supreme Court, have consistently held "absent such express authority, courts may not award litigation expenses that are not specified in §§ 1821 and 1920." Rimini St., Inc. v. Oracle USA, Inc., 139 S. Ct. 873, 877 (2019); San Diego Comic Convention v. Dan Farr Prods., 807 F. App'x 674, 677 (9th Cir. 2020). Here, none of the non-taxable costs sought by Monster are expressly authorized under the Lanham Act and, thus, cannot support a basis for this Court to grant the same to Monster.[23] See, e.g., Memory Lane, Inc. v. Classmates, Inc., 646 F. App'x 502, 504 (9th Cir. 2016) (affirming rejection of significant e-discovery costs, noting that "the scope of 28 U.S.C. § 1920 is 'narrow,' 'limited,' and 'modest.'"); Arcona, Inc. v. Farmacy Beauty, LLC, 2021 WL 2414856, at *5 (C.D. Cal. 2021), aff'd, 2022 WL 1486822 (9th Cir. 2022) (rejecting recovery of costs for computerized research, messenger/delivery services, deposition videography, and travel as outside the parameters of the Lanham Act).

Unsurprisingly, the only support for Monster's bullet-pointed positions in its Opening Brief comes in cases that do not find their roots in the Lanham Act. For the reasons above, and because the Supreme Court has specifically rejected Monster's positions under the Lanham Act, the Court does not have authority to grant the requested non-taxable cost amounts to Monster in this case.

## CONCLUSION

For all the reasons described above, the Court should schedule the second phase of this bifurcated trial to determine whether Monster is able to meet its burden of proof with respect to its claims and Vital its defenses. On the existing record, Monster has failed to do so and should be awarded no further relief.

---

invoices to support the purported charges reflected in Exhibit B of the Libeau Declaration. (Dkt. 929-42.) Instead, Monster provides a summary chart and invites the Court (not Vital, of course) to seek the supporting information, presumably for *in camera* review, if the Court is so inclined. (Dkt. 929, ¶ 23.)

[23] Monster asserts an entirely separate argument with respect to Mr. Tregillis's time purportedly spent on the CUTSA claim where "reasonable" expert fees *may* be awarded to a prevailing party by statute. (See Dkt. 928 at 65–66.) However, it is entirely unclear how Monster arrives at its 10% apportionment when Monster failed to attach any actual invoices.

Dated:          March 23, 2023              QUARLES & BRADY LLP


By: */s/ David P. Muth*
                David P. Muth

*Attorneys for Defendant*
VITAL PHARMACEUTICALS, INC.,
D/B/A VPX SPORTS

1

## **L.R. 11-6.2. CERTIFICATE OF COMPLIANCE**

2

The undersigned, counsel of record for Defendant, certifies that pursuant to the

3

Court's order entered on January 4, 2023, this brief is exempt from the word limits

4

contained in L.R. 11-6.1 and instead complies with the Court's order that the brief

5

shall not exceed fifty (50) pages in length.

6

Dated:          March 23, 2023          QUARLES & BRADY LLP

7

8

By: */s/ David P. Muth*

9
          David P. Muth

10
          *Attorneys for Defendant*
          VITAL PHARMACEUTICALS, INC., D/B/A

11
          VPX SPORTS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

QUARLES & BRADY LLP
ATTORNEYS AT LAW
MILWAUKEE

52