UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 18-1882 JGB (SHKx)** | Date | October 6, 2023 |
| Title | ***Monster Energy Company v. Vital Pharmaceuticals, Inc., et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:    **Order (1) DENYING Defendant's Motion for New Trial, Judgment
Notwithstanding the Verdict, or Remittitur (Dkt. No. 921);
(2) GRANTING-IN-PART Plaintiff's Motion for Equitable Relief, Fees,
and Costs (Dkt. No. 928); (3) DENYING Defendant's Request for
Clarification (Dkt. No. 1035); and (4) DENYING Defendant's
Application to File Supplemental Opposition Under Seal (Dkt. No. 1038)
(IN CHAMBERS)**

Before the Court are two post-trial motions: (1) Defendant Vital Pharmaceuticals, Inc's
motion for a new trial, judgment notwithstanding the verdict, or remittitur ("New Trial
Motion," Dkt. No. 921); and (2) Plaintiff Monster Energy Company's motion for equitable
relief, fees, and costs ("Fees Motion," Dkt. No. 928) (jointly, "Motions"). The Court finds
these matters appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15.
After considering the papers filed in support of and in opposition to the Motions, the Court
**DENIES** the New Trial Motion and **GRANTS-IN-PART and DENIES-IN-PART** the
Fees Motion.

## I. BACKGROUND

The parties are familiar with the extensive factual and procedural history of this case; the
Court relates only the background necessary to understand the Motions.

On September 4, 2018, Plaintiff Monster Energy Company ("Plaintiff" or "Monster")
initiated this action against Defendants Vital Pharmaceuticals, Inc. ("Vital" or "VPX") and John
H. Owoc ("Mr. Owoc") (jointly, "Defendants"). ("Complaint," Dkt. No. 1.) On April 3, 2019,

Monster filed a first amended complaint alleging twelve causes of action. ("FAC," Dkt. No. 61.) On May 20, 2019, the Court granted-in-part Defendants' motion to dismiss the FAC and dismissed the fourth, seventh, eighth, and ninth causes of action. ("MTD Order," Dkt. No. 95.)

On April 19, 2022, the Court (1) denied Monster's motion for partial summary judgment on its false advertising claim under the Lanham Act, 11 U.S.C. § 1125(a); (2) granted-in-part Vital's motion for summary judgment on the Lanham Act claim only with respect to false statements about the '466 Patent, granted Vital's motion on Monster's intentional interference of prospective economic advantage claim, and denied Vital's motion on all other claims; and (3) granted Mr. Owoc's motion for summary judgment on Monster's claims for intentional interference of prospective economic advantage, violation of the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, et seq., violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., and violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et seq., and denied Mr. Owoc's motion on all other claims. ("MSJ Order," Dkt. No. 740.)

On August 25, 2022, a jury trial began on Monster's remaining claims. (Dkt. No. 820.) On September 29, 2022, the jury returned a verdict for Monster. ("Verdict," Dkt. No. 890.) With respect to the false advertising claim, the jury found that Defendants are liable for false advertising under the Lanham Act, awarded $271,924,174 in damages to Monster, and found that Defendants' false advertising was willful and deliberate. (Id.) With respect to the intentional interference with contract claim, the jury found that Vital intentionally interfered with Monster's contracts with Circle K, AM PM, and Wal-Mart; awarded $18,000,000 in damages to Monster; and found that Vital acted maliciously, oppressively, fraudulently, or in reckless disregard of Monster's rights by intentionally interfering with Monster's contracts. (Id.) The jury found that Mr. Owoc did not intentionally interfere with Monster's contracts with Circle K, AM PM, and Wal-Mart. (Id.) With respect to the trade secret misappropriation claims, the jury found that Vital misappropriated Monster's trade secrets in violation of the DTSA and CUTSA, awarded $3,000,000 in damages to Monster, and found that Vital maliciously and willfully misappropriated Monster's trade secrets. (Id.) Finally, with respect to the CFAA claim, the jury found that Vital violated the CFAA and awarded $15,587 in damages to Monster. (Id.)

On December 8, 2022, Monster filed a motion for permanent injunction to enjoin Defendants' false advertising of "Super Creatine" and "creatine." ("PI Motion," Dkt. No. 901.) On April 12, 2023, the Court granted the PI Motion. ("PI Order," Dkt. No. 964.)

## A. Defendants' Post-Trial Motion

On February 23, 2023, Vital filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a) ("Rule 59(a)"), or in the alternative, judgment notwithstanding the verdict pursuant to Federal Rule of Civil Procedure 50(b) ("Rule 50(b)"), or in the alternative, remittitur. (New Trial Motion.) On the same day, Mr. Owoc joined the New Trial Motion. (Dkt. No. 922.) In support of its New Trial Motion, Vital submitted a declaration of David Muth

with attached exhibits.  ("Muth Decl.," Dkt. No. 923; "New Trial Motion Exs.," Dkt. Nos. 923-1–68.)

On March 23, 2023, Monster opposed the New Trial Motion.  ("New Trial Opposition," Dkt. No. 950.)  In support of its opposition, Monster submitted a declaration of Amber Munoz with attached exhibits.  ("Munoz Decl.," Dkt. No. 950-1; "New Trial Opp. Exs.," Dkt. Nos. 950-1–54.)

On April 10, 2023, Vital replied.  ("New Trial Reply," Dkt. No. 957.)  In support of its reply, Vital submitted a supplemental declaration of David Muth with attached exhibits.  ("Muth Supp. Decl.," Dkt. No. 958; "New Trial Reply Exs.," Dkt. Nos. 958-1–16.)

## B.  Plaintiff's Post-Trial Motion

On February 23, 2023, Monster filed a motion for equitable relief, fees, and costs. (Fees Motion.)  In support of its Fees Motion, Monster submitted a declaration of Allison L. Libeu with attached exhibits.  ("Libeu Decl.," Dkt. No. 929; "Fees Motion Exs.," Dkt. Nos. 929-1-121.)  In addition, Monster filed an unopposed application for leave to file under seal certain documents relating to the Fees Motion.[1]  (Dkt. No. 930.)

On March 23, 2023, Vital opposed the Fees Motion.  ("Vital Fees Opposition," Dkt. No. 945.)  In support of its opposition, Vital submitted a declaration of David Muth with attached exhibits.  ("Muth Fees Decl.," Dkt. No. 946; "Fees Opp. Exs.," Dkt. Nos. 946-1–98.)  In addition, Vital filed an application for leave to file under seal certain documents relating to the opposition.  (Dkt. No. 947.)  Monster submitted a declaration of Amber Munoz in support of the application to seal certain documents relating to the opposition.  (Dkt. No. 952.)

On April 10, 2023, Monster replied.  ("Fees Reply," Dkt. No. 959.)  In support of its reply, Monster submitted a declaration of Amber Munoz with attached exhibits.  ("Munoz Fees

---

[1] The parties apply to seal various documents filed in support of and in opposition to Monster's Fees Motion.  (See Dkt. Nos. 930, 947, 961.)  The parties apply to seal two categories of information.  The first category includes Hueston Hennigan's negotiated billing rates for Monster that "are competitively sensitive and not publicly known."  Mine O'Mine, Inc. v. Calmese, 2012 WL 1279827, at *4 (D. Nev. Apr. 16, 2012); see E & J Gallo Winery v. Proximo Spirits, Inc., 2012 WL 1635190, at *1 (E.D. Cal. May 8, 2012).  "Disclosure of these rates would harm Hueston Hennigan by providing current and prospective clients—and potentially its competitors—nonpublic information about its negotiated fee agreements for" Monster.  (Dkt. No. 930.)  The second category is Monster's confidential and proprietary business information. (See Dkt. Nos. 947, 952, 961); see, e.g., Coffelt v. Kroger Co., 2018 WL 6016133, at *2 (C.D. Cal. June 21, 2018) (sealing "sensitive business information" that "implicates policies, procedures, business practices, agreements, processes, and pricing information").  The Court has previously sealed the same or similar documents.  (See, e.g., Dkt. No. 899).  Accordingly, the Court **GRANTS** the applications to seal.  (Dkt. Nos. 930, 947, 961.)

---

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk mg

Decl.," Dkt. No. 960; "Fees Reply Exs.," Dkt. Nos. 960-1–9.)  In addition, Monster filed an application for leave to file under seal certain documents relating to the reply.  (Dkt. No. 961.)

On July 31, 2023, the Court became aware of news reports indicating that Monster may acquire some of Vital's assets.  ("July 31, 2023 Order," Dkt. No. 988.)  The Court ordered the parties to inform the Court in writing whether each party will withdraw their pending motion. (Id.)  On August 7, 2023, Monster and Vital stated that they do not intend to withdraw their motions.  ("Joint Statement," Dkt. No. 999.)  On August 8, 2023, Mr. Owoc stated that he does not intend to withdraw his joinder to Vital's New Trial Motion.  (Dkt. No. 1001.)

On August 30, 2023, Mr. Owoc requested clarification from the Court regarding its July 31, 2023 Order.  ("Request for Clarification," Dkt. No. 1035.)  In the Request for Clarification, Mr. Owoc explained that he did not anticipate that Vital and Monster would file a joint statement in response to the Court's July 31, 2023 Order.  (Id.)  "As it appears that Vital and Monster are cooperating, Mr. Owoc is concerned that Vital may reverse its position and withdraw the [New Trial] Motion."  (Id.)  Vital did not withdraw the New Trial Motion.  (See Joint Statement.) The Court **DENIES** Mr. Owoc's Request for Clarification.

On August 8, 2023, Mr. Owoc opposed the Fees Motion.  ("Owoc Fees Opposition," Dkt. No. 1002.)  In support of his opposition, Mr. Owoc submitted a declaration with attached exhibits.  ("Owoc Decl.," Dkt. No. 1029; "Owoc Exs.," Dkt. Nos. 1029-1–3.)  On August 15, 2023, Monster responded to Mr. Owoc's opposition to the Fees Motion, arguing that it is untimely.  ("Response to Owoc," Dkt. No. 1030).  In support of its response, Monster submitted a declaration of Allison L. Libeu with attached exhibits.  ("Libeu Resp. Decl.," Dkt. No. 1030-1; "Owoc Resp. Exs.," Dkt. Nos. 1030-2–12.)

On September 13, 2023, Mr. Owoc filed a supplemental opposition to the Fees Motion ("Owoc Supplemental Fees Opposition," Dkt. No. 1038-2) and applied to file it under seal ("Owoc Application to Seal," Dkt. No. 1038.)  In support of his application to seal his supplemental opposition, Mr. Owoc submitted a declaration (Dkt. No. 1039) and Monster submitted a declaration of Amber Munoz (Dkt. No. 1041).  On September 20, 2023, Monster filed a response to Mr. Owoc's supplemental opposition, arguing that it is untimely.  (Dkt. No. 1042.)  The Court agrees with Monster that Mr. Owoc's opposition and supplemental opposition are untimely.[2]  Thus, the Court **DECLINES** to consider the Owoc Fees Opposition and Owoc Supplemental Fees Opposition, and **DENIES** the Owoc Application to Seal.

---

[2] On December 12, 2022, the Court set a briefing schedule for the parties' post-trial motions.  ("Briefing Schedule," Dkt. No. 910.)  Pursuant to the Briefing Schedule, the parties' opposition briefs were due on March 23, 2023.  (Id.)  Mr. Owoc filed an opposition to Monster's Fees Motion more than *four months* after the Court's deadline, and inexplicably, a *supplemental* opposition one month after that.  See L.R. 7-12 ("The Court may decline to consider any memorandum or other document not filed within the deadline set by order[.]"); Mpoyo v. FIS Mgmt. Servs., LLC, 840 F. App'x 307, 308–09 (9th Cir. 2021) ("The district court did not abuse its discretion by striking [pro se plaintiff's] untimely opposition to the motion for summary

## II.   LEGAL STANDARD

### A.  Rule 59(a)

Federal Rule of Civil Procedure 59(a) authorizes new trials "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A court generally "must uphold a jury verdict if it is supported by substantial evidence." Guy v. City of San Diego, 608 F.3d 582, 585 (9th Cir. 2010). Substantial evidence is evidence "adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." Id. (quoting Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002)). Further, a court must uphold a jury's damages award unless the amount is "clearly not supported by the evidence, or only based on speculation or guesswork." Id. (quoting L.A. Mem'l Coliseum Comm'n v. Nat'l Football League, 791 F.2d 1356, 1360 (9th Cir. 1986)).

However, a court may grant a new trial if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent . . . a miscarriage of justice." United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir. 1999) (quoting Oltz v. St. Peter's Cmty. Hosp., 861 F.2d 1440, 1452 (9th Cir. 1998)). In considering a Rule 59(a) motion, the court is "not required to view the trial evidence in the light most favorable to the verdict." Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd., 762 F.3d 829, 842 (9th Cir. 2014). Instead, the court "can weigh the evidence and assess the credibility of the witnesses." Id.

### B.  Rule 50(b)

Under Federal Rule of Civil Procedure 50(b), courts may enter judgment as a matter of law after a jury trial if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." See Fed. R. Civ. P. 50(a)(1). "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951, 961 (9th Cir. 2009) (quoting Josephs v. Pac. Bell, 443 F.3d 1050, 1062 (9th Cir. 2006)). In considering a Rule 50(b) motion, unlike a Rule 59(a) motion, the court may not weigh the evidence or make credibility determinations. Id. (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Josephs, 443 F.3d at 1062.

Procedurally, a Rule 50(b) motion is "a renewed Rule 50(a) motion." E.E.O.C., 581 F.3d at 961. A party must first make a Rule 50(a) motion "before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). If the court denies or defers ruling on the motion for judgment as a matter of law, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b). Fed. R. Civ. P. 50(b). Because a Rule 50(b) motion is a renewed motion, a party "cannot raise arguments in its post-trial motion that it did not raise in its

judgment . . . ."). Mr. Owoc's excuses are not enough to justify his extraordinary delay. (See Owoc Decl. ¶ 24; Response to Owoc at 1–3.)

pre-verdict Rule 50(a) motion." Freund v. Nycomed Amersham, 347 F.3d 752, 761 (9th Cir. 2003) (citing Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment). The renewed Rule 50(b) motion "may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b).

## C. Attorneys' Fees

In general, courts apply the "American Rule," where "each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983). The Lanham Act authorizes an award of reasonable attorneys' fees to the prevailing party "in exceptional cases." 15 U.S.C. § 1117(a). An "exceptional case" is "one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." SunEarth, Inc. v. Sun Earth Solar Power Co., 839 F.3d 1179, 1180 (9th Cir. 2016) (quoting Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014)). The prevailing party must prove its entitlement to attorneys' fees by a preponderance of the evidence. See id. at 1181. The DTSA and CUTSA authorize an award of attorneys' fees to the prevailing party for willful and malicious trade secret misappropriation. See 18 U.S.C. § 1836(b)(3)(D); Cal. Civ. Code § 3426.4.

Once a party establishes its entitlement to attorneys' fees, "[i]t remains for the district court to determine what fee is 'reasonable.'" Hensley, 461 U.S. at 433. District courts use the lodestar method to determine the reasonableness of attorneys' fees. See Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 978 (9th Cir. 2008). To calculate the lodestar, a court multiplies "the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." Id. (quoting Ferland v. Conrad Credit Corp., 244 F.3d 1145, 1149 n.4 (9th Cir. 2001)). In most cases, the lodestar figure is presumptively a reasonable fee award. See United Steelworkers of Am. v. Phelps Dodge Corp., 896 F.2d 403, 406 (9th Cir. 1990). "The district court may then adjust [the lodestar] upward or downward based on a variety of factors." Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008); Ketchum v. Moses, 24 Cal. 4th 1122, 1132 (2001) (same). These factors include: "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award." Ketchum, 24 Cal. 4th at 1132; see also Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 69–70 (9th Cir. 1975), abrogated on other grounds by City of Burlington v. Dague, 505 U.S. 557 (1992) (listing factors). "The burden is on the party seeking attorney fees to prove that the fees it seeks are reasonable." Vines v. O'Reilly Auto Enter., LLC, 289 Cal. Rptr. 3d 310, 318 (Cal. Ct. App. 2022) (internal alteration, quotation marks, and citation omitted).

//
//
//
//
//

## III.  DISCUSSION

### A.  Motion for New Trial, Judgment Notwithstanding Verdict, or Remittitur

Defendants move for a new trial on the grounds that the jury's verdict is "completely irrational, grossly excessive, and would create a miscarriage of justice if allowed to stand." (New Trial Motion at 9.)  Alternatively, Defendants move to reduce the jury's damages award to $828,530 for the false advertising claims and $1 in nominal damages for the tortious interference and trade secret claims.  (Id.)  Alternatively, Defendants move for judgment notwithstanding the verdict ("JNOV") as to the false advertising and tortious interference claims.  (Id.)  For the reasons below, the Court **DENIES** Defendants' New Trial Motion in its entirety.

#### 1.  New Trial

Defendants argue that the Court should grant a new trial because it improperly excluded certain evidence.  However, a "new trial is only warranted on the basis of an incorrect evidentiary ruling if the ruling ***substantially prejudiced*** a party."  United States v. 99.66 Acres of Land, 970 F.2d 651, 658 (9th Cir. 1992) (emphasis added).  Defendants do not meet this standard.  The Court's exclusion of certain evidence was neither erroneous nor substantially prejudicial.

##### a.  InfoScout Surveys

First, Defendants vigorously dispute the Court's ruling regarding the InfoScout surveys. (See New Trial Motion at 12–17.)  In 2018, InfoScout, a market research firm, conducted surveys about Bang Energy consumers' preferences.  (See New Trial Opposition at 4.)  InfoScout asked over four hundred shoppers what they believed was Bang's "most important" attribute.  (Id.) The most popular answers were "0 sugar, 0 calories, 0 carbs" (23% of respondents) and "healthier alternative to energy drinks" (18% of respondents).  (Id.)  Three percent of respondents identified Super Creatine as the most important attribute.  (Id.)  Defendants' consumer expert, Dr. Larry Chiagouris ("Dr. Chiagouris"), relied in part on the InfoScout surveys to form his opinions.

Before trial, Monster moved in limine to exclude any argument or evidence of third-party market research conducted by InfoScout.  (See Dkt. No. 622.)  Monster argued in part that the InfoScout surveys are inadmissible hearsay and that Defendants failed to meet their burden to show that the surveys were reliable.  (See id. at 4–7.)  On August 2, 2022, the Court agreed that the InfoScout surveys "contain hearsay" and lacked "sufficient guarantees of trustworthiness." (See "MIL Order," Dkt. No. 798, at 17.)  As the proponent of the evidence, Defendants had the burden to establish that the surveys were conducted "in accordance with generally accepted survey principles."  (Id.); see Keith v. Volpe, 858 F.2d 467, 480 (9th Cir. 1988).  Yet Defendants had not identified a single witness who could testify about the surveys' design or methodology. Accordingly, the Court excluded "standalone evidence" of the InfoScout surveys, but allowed the parties to use the surveys "to examine the basis of an expert's opinion."  (MIL Order at 18.)

Specifically, the Court held that the surveys "are admissible to examine Dr. Chiagouris on the basis of his opinions." (Id. at 16.)

During trial, Defendants attempted to introduce the InfoScout surveys through Dr. Chiagouris's direct examination. (See New Trial Motion Exs. 16 (9/21 Trial Tr.), 17 (9/22 Trial Tr.), 18 (9/23 Trial Tr.).) Monster objected. On September 21, 2022, Defendants explained that "[i]t was our understanding of the Court's motion in limine ruling that an expert who relied upon that data to form opinions, which Dr. Chiagouris did, would be entitled to explain the basis for the opinions." (New Trial Motion Ex. 16 (9/21 Trial Tr.) at 234:19–22.) Monster responded that the Court's MIL Order only allowed the parties to use the InfoScout surveys on cross-examination to question the basis of an expert's opinion. (See id. at 235:24–236:4.) Since the InfoScout surveys are inadmissible hearsay, Monster argued, Dr. Chiagouris may not introduce the evidence to the jury unless Defendants can show that the surveys' probative value substantially outweighs their prejudicial effect. (See id. at 236:5–11, 237:22–238:1.) The Court tentatively agreed with Monster: "[U]ltimately you cannot elicit hearsay statements from your own expert. You can examine the other side's expert on hearsay, but you can't elicit hearsay statements from your own expert." (Id. at 238:9–18.) Nevertheless, the Court granted the parties leave to file supplemental briefs on the scope of Dr. Chiagouris's direct examination. (See Dkt. Nos. 856, 857, 859.)

On September 22, 2022, after considering the parties' supplemental briefs, the Court upheld its tentative ruling:[3] "[I]nadmissible evidence does not come in by the proponent of the expert witness unless [the proponent] can establish that it's substantially more probative than prejudic[ial]." (See New Trial Motion Ex. 17 (9/22 Trial Tr.) at 5:1–20.) FRE 703 provides:

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. Although an expert witness may **rely** on inadmissible evidence, he may not **disclose** such evidence to the jury unless the evidence's probative value in helping the jury evaluate the expert's opinion substantially outweighs its prejudicial effect. (See New Trial Opposition at 7.) The InfoScout surveys are unquestionably inadmissible hearsay. The Court correctly found that the surveys' probative value in helping the jury evaluate Dr. Chiagouris's opinion does **not** substantially outweigh their prejudicial effect. The Court noted that "because

---

[3] A ruling on a motion in limine is always preliminary. (See New Trial Opp. Ex. 7 (9/23 Trial Tr.) at 104:1–4.) In its MIL Order, the Court stated that "[r]egardless of its initial decision on a motion in limine, a court may revisit the issue at trial." (MIL Order at 7); see also, e.g., Luce v. United States, 469 U.S. 38, 41–42 (1984); Massok v. Keller Indus., Inc., 147 F. App'x 651, 656 (9th Cir. 2005).

of [the evidence's] lack of reliability, [ ] it's not that probative." (New Trial Motion Ex. 17 (9/22 Trial Tr.) at 5:6–9.)

Further, the Court explained that "[t]he limitation against disclosure applies only to the proponent of the expert. Rule 703 does not restrict an opposing party [from] presenting those facts or data on cross-examination or from the proponent . . . using those facts or data on redirect examination after those facts have been revealed on cross-examination." (Id. at 5:14–20.) As such, the Court allowed the parties to introduce statements about the InfoScout surveys on cross-examination of an expert. (See MIL Order at 16–18; New Trial Motion Ex. 18 (9/23 Trial Tr.) at 105:8–25 ("It wasn't on my mind that the whole InfoScout study or the details of it would be introduced except on cross-examination because that's where hearsay statements can come in.").) Although the Court acknowledged that the MIL Order "could have been more clear" (New Trial Motion Ex. 18 (9/23 Trial Tr.) at 105:22), the Court did not "ignore[,]," "contraven[e]," or "reconsider" its ruling during trial (New Trial Motion at 13–15). The Court correctly held that the InfoScout surveys were not admissible through Dr. Chiagouris's ***direct*** examination. See, e.g., Wi-LAN Inc. v. Sharp Elec. Corp., 992 F.3d 1366, 1374–76 (Fed. Cir. 2021) (FRE 703 does not allow a party to use its expert as a substitute for a fact witness to circumvent the rules of evidence to admit otherwise inadmissible evidence); Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 136 (2d Cir. 2013) (FRE 703 does not allow a party to "call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony" (citation omitted)); United States v. Mest, 789 F.2d 1069, 1074 (4th Cir. 1986) (FRE 703 "does not compel the admission of any evidence desired by a litigant simply because that otherwise inadmissible evidence can be styled by one expert witness as something he relied upon in reaching his opinion"). Defendants could have used the InfoScout surveys to cross-examine Monster's ***expert*** witnesses, but chose not to do so.[4] (See New Trial Opposition at 6.)

Even if the Court erred in its interpretation of FRE 703, Defendants cannot show that they were substantially prejudiced. Defendants repeatedly told the jury that Monster commissioned a pre-litigation survey which revealed that only 3% of respondents believed Super Creatine was Bang's most important attribute. (See New Trial Opposition at 10–12.) For example, Dr. Chiagouris testified extensively that "there was no difference in the presence of or the absence of the word 'Super Creatine' on the can in terms of either group's expressed interest in . . . purchasing and consuming a can of Bang Energy drinks." (New Trial Opp. Ex. 6 (9/22 Trial Tr.) at 13:7–20.) When asked whether his conclusion was "corroborated by the non-litigation Monster survey research that you reviewed," he said, "It was corroborated, yes." (Id. at 13:21–24.) The Court explicitly allowed this testimony: "You can mention that [Dr. Chiagouris] relied on surveys including, if he knows, surveys conducted internally by Monster and that they form the basis for his opinion." (Id. at 8:11–13.) Dr. Chiagouris and

---

[4] Instead, Defendants attempted to introduce the InfoScout surveys on cross-examination of Monster's lay witnesses. (See New Trial Opposition at 8–9.) None of Monster's lay witnesses recalled the InfoScout surveys. (See id. at 9; New Trial Opp. Ex. 2 (Chad Henry) at 216:18–217:9; id. Ex. 3 (Mario Suarez) at 173:12–20; id. Ex. 4 (Emelie Tirre) at 62:23–63:22.)

Vital's damages expert, Mr. Drew Voth ("Mr. Voth"), both referenced and used the 3% figure in their demonstratives to the jury. (See New Trial Opposition at 11–12.) That Defendants could not introduce the InfoScout surveys themselves does not warrant a new trial. (Id. at 13.)

### b.  Rodent Study

Second, Defendants argue that Monster "opened the door" for Defendants to introduce evidence of a rodent study conducted by the Peking Union Medical College ("Rodent Study"). (See New Trial Motion at 17–20.) The "opening the door" doctrine allows parties "to introduce evidence on the same issue to rebut any *false* impression that might have resulted from the earlier admission." United States v. Sine, 493 F.3d 1021, 1037 (9th Cir. 2007) (quoting United States v. Whitworth, 856 F.2d 1268, 1285 (9th Cir. 1988)). However, the doctrine is "not so capacious as to allow the admission of *any* evidence made relevant by the opposing party's strategy, without regard to the Federal Rules of Evidence." Id.

On July 13, 2023, weeks before trial and more than a year after the close of expert discovery, Defendants disclosed the existence of the Rodent Study in a supplemental report of their expert, Dr. Keykavous Parang ("Dr. Parang"). (See Dkt. No. 788.) The Court found Defendants' decision to not inform Monster or the Court of the Rodent Study until after Dr. Parang had reviewed it and drafted a supplemental report a "flagrant breach[]" of the Federal Rules of Civil Procedure and "impermissible gamesmanship." (Id.) Before trial, on July 28, 2022, the Court excluded Dr. Parang's supplemental report and any testimony regarding the Rodent Study as untimely. (See id.)

During trial, Defendants argued that Monster opened the door to the Rodent Study when (1) Monster's counsel stated that the jury will see "[n]o studies proving that Super Creatine is creatine or provides the benefits of creatine" in his opening statement; and (2) when Monster asked Ms. Meg Owoc ("Ms. Owoc") whether she knew of "any studies [that] have been done on Super Creatine." (See New Trial Motion at 18; New Trial Motion Ex. 2 (8/26 Trial Tr.) at 55:11–16; id. Ex. 7 (9/6 Trial Tr.) at 160:17–18.) After a sidebar, Monster withdrew the question and clarified: "At the time that [Vital] posted this on Instagram, you didn't know if any studies had been done on Super Creatine, correct?" (See New Trial Motion Ex. 7 (9/6 Trial Tr.) at 162:19–21.) Ms. Owoc answered, "It's not something that the marketing department worries about. We're not responsible for studies. We do have a lot of studies." (Id. at 162:22–24.)

The Court allowed the parties to file supplemental briefs on whether Monster opened the door to the curative admissibility of the Rodent Study. (See Dkt. Nos. 842, 843, 845, 846, 848.) After considering the parties' submissions, the Court correctly held that Monster had not opened the door. (See New Trial Opp. Ex. 4 (8/31 Trial Tr.) at 81:5–82:8.) The Court observed that Monster's questions "have been very carefully tailored to not elicit impermissible testimony. There were numerous questions in which the plaintiff asked, 'Didn't you previously testify,' or 'Haven't you previously admitted,' or 'At the time of your deposition this or that.'" (Id. at 81:12–16.) The one "not very carefully framed" question to Ms. Owoc was withdrawn, and Defendants could not have been prejudiced by it because Ms. Owoc's "response to that question

did not specifically highlight [the Rodent] Study." (<u>Id.</u> at 81:21–82:3.)  The Court found that
Ms. Owoc's answer was "general[] enough to encompass admissible testimony."  (<u>Id.</u> at 82:3–4.)

      Defendants now repeat the same arguments they asserted during trial.  (<u>See</u> New Trial
Motion at 17–20.)  The Court remains unconvinced that Monster opened the door to the Rodent
Study, or that Defendants were substantially prejudiced by the exclusion of the Rodent Study.

### c.  Other Forms of Creatine

      Third, Defendants claim that the Court erred by excluding evidence of third-party
products that contain a "form of creatine."  (<u>See</u> New Trial Motion at 20–22.)  Defendants
contend that such evidence would have helped the jury understand that "the market contains
many alternative forms of creatine other than creatine monohydrate . . . with a large variance on
the molecular structure, makeup, compounds, and efficacy."  (<u>Id.</u>)  Although the Court
"permitted the introduction of a few other forms of creatine in the marketplace," Defendants
argue that "the inability to include *all* of the proffered forms severely limited Vital's defense."
(<u>Id.</u> at 21 (emphasis added).)  This argument has no merit.  Defendants were not entitled to
present evidence of all other forms of creatine, which would have resulted in mini-trials regarding
the efficacy of each variation.  <u>See, e.g.</u>, <u>United States v. Vazquez-Torres</u>, 92 F. App'x 502, 504
(9th Cir. 2004) ("[T]he district court was duly concerned about the potential to confuse the jury
and develop a mini-trial on an ancillary issue.").  Instead, the Court allowed Defendants' expert,
Dr. Parang, to testify regarding "specific other forms of creatine." (<u>See</u> New Trial Opp. Ex. 5
(9/21 Trial Tr.) at 58:3–6, 58:15–59:14; <u>see also</u> <u>id.</u> at 58:5–6 ("Just because he says there [are]
other forms doesn't mean he can talk about all the other forms.").)  Defendants also
cross-examined Monster's expert, Dr. Richard Kreider ("Dr. Kreider"), on other forms of
creatine.  (<u>See</u> New Trial Opp. Ex. 14 (8/31 Trial Tr.) at 163:9–164:24.)  As such, Defendants had
sufficient opportunity to convince the jury that there were "numerous creatine-derivatives in the
marketplace other than creatine monohydrate, and thus there was nothing false in
advertising/marketing a derivative form of creatine in Bang Energy."  (New Trial Motion at 21.)
The jury simply rejected this argument.

### d.  Reign as a "Copycat" Product

      Fourth, Defendants claim that the Court erred by excluding evidence that Monster's
Reign energy drink was a "copy-cat" product of Bang.  (<u>See</u> New Trial Motion at 22–24.)
Defendants contend that Monster developed Reign specifically to compete with Bang, and that
Reign has similar attributes as Bang except that Reign does not contain creatine.  (<u>See</u> <u>id.</u> at 22.)
This difference, Defendants argue, proves that Monster *knew* that Super Creatine was not
material to Bang consumers.  (<u>Id.</u>)  The Court correctly held that this evidence is not relevant to
Monster's false advertising claims.  (<u>See</u> MIL Order at 23–24.)  As the Court reasoned, "This
case is about the purported false advertisement of Bang, not Monster's products.  What Monster
believed set Bang apart from competitor energy drinks has little relevance to what consumers
believed set Bang apart from other energy drinks.  That Monster developed a product with the

goal of matching Bang's caffeine content, as opposed to Bang's Super Creatine, does not tend to show that Super Creatine was not material to Bang purchasers." (Id. at 24.)

During trial, the Court allowed Defendants to present evidence about Reign without arguing that it was a copy-cat product. For example, Defendants elicited testimony from Monster's witnesses acknowledging that Monster developed Reign to compete with Bang. (See New Trial Opp. Ex. 10 (Rodney Sacks) at 39:23–40:1 (admitting that Reign is the "counter to Bang"); id. Ex. 13 (Michael Trento) at 159:7–10 (testifying about a document that stated Reign is meant "to combat Bang in the marketplace"); id. Ex. 4 (Tirre) at 47:5–13 (testifying that Reign has been described as "the answer to Bang").) Defendants also elicited testimony about the similar attributes of Reign and Bang. (See id. Ex. 16 (8/30 Trial Tr.) at 133:19–20 (caffeine content in Reign); Ex. 8 (9/1 Trial Tr.) at 213:2–9 (similarities and differences in ingredients); Ex. 12 (9/8 Trial Tr.) at 146:17–147:6, 175:16–176:16, 205:6–15 (same).) Given that Defendants were able to present some evidence regarding Reign, Defendants cannot show that they were substantially prejudiced by the Court's ruling.

### e. Monster's Conduct

Finally, Defendants claim that the Court erred by excluding evidence that Monster attempted to scare stores from placing Bang on their shelves due to its high caffeine content. (See New Trial Motion at 24–25.) Defendants argue that the exclusion of this evidence prevented them "from explaining to the jury that Monster's actual motivation in bringing this lawsuit was to prevent an upstart competitor with a wildly successful product from continuing to gain market share." (Id. at 24.) However, Defendants have not shown that this evidence is relevant. (See MIL Order at 25.) Monster's intent in filing this lawsuit has nothing to do with whether Defendants engaged in false advertising. (See New Trial Opposition at 24–25.) Such evidence would have had little, if any, probative value. See U.S. Sec. & Exch. Comm'n v. Collector's Coffee Inc., 2021 WL 965795, at *3 (S.D.N.Y. Mar. 15, 2021) ("[The defendant] has not shown how the SEC's allegedly improper motives in bringing suit could ever be shown to constitute a defense to this action. This is because [the defendant] has not shown how those improper motives prejudiced him in conducting a defense.").

In sum, the Court's evidentiary rulings were neither erroneous nor substantially prejudicial. Thus, the Court **DENIES** Defendants' motion for a new trial.

### 2. Remittitur

Defendants request that the Court reduce the jury's "grossly excessive" damages award. (See New Trial Motion at 25–35.) "Remittitur is a procedure by which a court reduces the amount of damages awarded by a jury after finding the award to be excessive." Hill Phoenix v. Classic Refrigeration SoCal, Inc., 2021 WL 882085, at *4 (C.D. Cal. Dec. 12, 2021). The Ninth Circuit requires a court to give "substantial deference to a jury's finding of the appropriate amount of damages." Del Monte Dunes at Monterey, Ltd. v. City of Monterey, 95 F.3d 1422, 1435 (9th Cir. 1996). A court "must uphold the jury's finding unless the amount is grossly

excessive or monstrous, clearly not supported by the evidence, or based on speculation or guesswork." Id. If an award is reduced, the award should reflect "the maximum amount sustainable by the proof." Oracle Corp. v. SAP AG, 765 F.3d 1081, 1094 (9th Cir. 2014) (quoting D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co., 692 F.2d 1245, 1249 (9th Cir. 1982)).

### a.   False Advertising Damages

To support a damages award in a false advertising case, "there need only be substantial evidence to permit the jury to draw *reasonable inferences* and make a *fair and reasonable assessment*." Skydive Ariz., Inc. v. Quattrocchi, 673 F.3d 1105, 1112 (9th Cir. 2012). "[I]n assessing whether a damages award is grossly excessive, '[t]he fact that the jury may have agreed with [the plaintiff's expert] and rejected the defendant's contentions . . . does not render the verdict "grossly excessive or monstrous."'" Id. at 1115 (alterations in original) (quoting Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1192 (9th Cir. 2002)).

The evidence supports the jury's damages award of $271.9 million for Monster's false advertising claim. Monster's damages expert, Mr. Christian Tregillis ("Mr. Tregillis"), testified that between 2015 and 2022, Vital sold approximately $2.5 billion worth of Bang. (See New Trial Motion Ex. 13 (Tregillis) at 190:11–20.) Due to Defendants' false advertising of Super Creatine, Vital gained $173.8 million in additional profits, while Monster lost $271.9 million in profits. (See id. at 224:3–8.) Mr. Tregillis properly cabined his calculations in several ways:  For example, he used a "weighted average" to reflect "the mix of [Monster] products that people actually buy." (See New Trial Opp. Ex. 3 (Tregillis) at 277:17–279:1). His calculations included Monster products (such as Monster's zero-calorie product) whose sales "would go up" if Defendants had not falsely advertised, and excluded "products that are not mapped to be a potential [Monster] sale" (such as Monster's coffee-flavored beverages).[5] (See id. at 261:7–14.) Further, Mr. Tregillis estimated that only 34.1% of Bang sales are attributable to Defendants' false advertising of Super Creatine.[6] (See id. at 203:20–204:0.) The other 65.9% of sales are attributable to "other reasons, like flavors, zero sugar, zero calories, or other ingredients." (Id. at

---

[5] Contrary to Defendants' assertion that Bang "did not take sales from existing brands," Monster presented evidence that Defendants' false advertising harmed Monster's sales across its product portfolio. (See, e.g., New Trial Opp. Ex. 4 (Tirre) at 121:8–10 ("data from Walmart show[ed] that Bang was eating into Monster's sales"); id. Ex. 2 (Scot De Lorme) at 186:11–22 (Defendants' false advertising created a "disadvantage to everybody else that can't put [Super Creatine] in a product or advertise it on a can").) Vital's internal documents claimed that "Bang took share from Monster and Red Bull." (See, e.g., TX-3689 at 1.)

[6] Monster's survey expert, Dr. Charles Cowan ("Dr. Cowan"), testified that his survey demonstrated that "Super Creatine motivate[s] consumers to purchase Bang." (See New Trial Opp. Ex. 17 (Cowan) at 81:9–83:3.) Monster's marketing expert, Dr. Gregory Carpenter ("Dr. Carpenter"), analyzed consumers' comments and opined that Defendants' advertising of Super Creatine "made Bang Energy drinks more desirable." (See id. Ex. 2 (Carpenter) at 25:7–12, 50:6–13.) To be sure, some consumers purchased Bang for reasons other than Super Creatine, but this is adequately reflected in Mr. Tregillis's calculations.

---

**CIVIL MINUTES—GENERAL**

204:10–16.)  Finally, Mr. Tregillis calculated that only 18.9% of Vital's sales "would have gone to Monster" absent Defendants' false advertising. (Id. at 212:10–24.)  Put differently, Mr. Tregillis excluded more than 80% of Vital's sales from his damages calculations.  (Id. at 200:4–201:7.)

The jury heard all of this testimony at trial.  The jury weighed the credibility of the parties' expert witnesses and ultimately believed Mr. Tregillis.  Based on substantial evidence presented at trial, the jury drew reasonable inferences and made a fair assessment as to the amount of profits that Monster lost due to Defendants' false advertising.  Although the damages award is significant, "[t]he mere fact that plausible arguments could be made that the jury's verdict is too high does not warrant reversal."  Skydive Ariz., 673 F.3d at 1113.  Here, "there is a quantifiable basis for the jury's award based upon [ ] historical sales data and reasonable inferences that [Monster] suffered the loss of some customers . . . ."  See Brighton Collectibles, Inc. v. Coldwater Creek Inc., 2009 WL 10671818, at *14–16 (S.D. Cal. Apr. 22, 2009); see also id. (denying remittitur because "[w]eighing the credibility of conflicting expert witness testimony is the province of the jury" (citation omitted)).  Thus, remittitur is not appropriate for the false advertising damages.

### b.  Tortious Interference Damages

The evidence supports the jury's damages award of $18 million for Monster's intentional interference with contract claim.  Monster presented evidence of its shelf space contracts with Circle K, AM PM, and Wal-Mart, which were each worth tens of millions of dollars.  (See New Trial Opp. Ex. 3 (Suarez) at 150:23–151:17 (Monster paid "around $23 million" per year for shelf space at Circle K); id. (Guillaume Weaver) at 82:24–83:5 (Monster paid $4.8 million per year for shelf space at Wal-Mart); TX-385 (2018 AM PM contract with "Total Funding" of over $200,000); TX-386 (same for 2019 AM PM contract).)[7]  Monster reasonably expected to earn hundreds of millions of dollars in profits from these contracts.  (See New Trial Opp. Ex. 3 (Suarez) at 151:18–23 (Monster expected to profit over $70 million from each Circle K contract); id. Ex. 13 (Robert Salerno) at 10:19–24 (Monster expected to profit over $11 million from each AM PM contract); id. Ex. 3 (Weaver) at 83:13–16 (Monster expected to profit over $100 million from Wal-Mart contract).)

Yet Vital engaged in a "widespread effort" to interfere with Monster's contracted shelf placements.  (See id. Ex. 16 (Eugene Bukovi) at 33:5–6.)  Several witnesses testified at trial about Vital's repeated interference with Monster's shelf space at various retailers.  For example, one Monster employee testified that he saw Bang in Monster's contracted space at AM PM at least five to ten times per month from 2017 to 2019.  (See id. Ex. 13 (Salerno) at 11:17–12:8.)  Another employee testified that he saw Bang in Monster's contracted space at Circle K at least eight to ten times per week in 2018 and 2019.  (See id. Ex. 3 (Suarez) at 152:21–153:3.)  A third employee testified that he saw Bang in Monster's contracted space at Walmart at least once per month. (See id. (Weaver) at 84:24–85:22.)  This testimony likely undercounted the rate at which Vital interfered with Monster's shelf space because there were many "additional instances" reported

---

[7] "TX" refers to exhibits admitted into evidence at trial.

by other employees.  (See id. Ex. 3 (Suarez) at 153:15–18; see also Ex. 13 (Salerno) at 11:13–16 (received "many reports from fellow Monster employees" of interference at AM PM); id. Ex. 3 (Weaver) at 85:16–86:14 ("100 times per month" was a "conservative estimate" of how often Bang occupied Monster's space at Walmart).)

Applying that conservative rate of interference to the profits Monster expected from each contract yielded total damages of over $21 million.  (Id. Ex. 11 (9/27 Trial Tr.) at 100:13-23.) The jury did not award Monster's entire requested amount; they awarded $18 million.  This suggests that the jury carefully weighed the evidence and made a fair assessment as to the amount that would compensate Monster for the harm caused by Vital's tortious interference.  See, e.g., Illumina, Inc. v. BGI Genomics Co., 2022 WL 899421, at *20 (N.D. Cal. Mar. 27, 2022) (denying request for remittitur where the jury awarded less than the total damages sought by the plaintiff).  Thus, remittitur is not appropriate for the tortious interference damages.

### c.   Trade Secret Misappropriation Damages

The evidence also supports the jury's damages award of $3 million for Monster's trade secret misappropriation claim.  Monster proved at trial that (1) Monster "possessed a trade secret," (2) Vital "misappropriated the trade secret," and (3) "the misappropriation caused or threatened damage to" Monster.  See InteliClear, LLC v. ETC Glob. Holdings, Inc., 978 F.3d 653, 657–58 (9th Cir. 2020); (see also New Trial Opposition at 34–36).  When a plaintiff seeks an award of a defendant's profits as a remedy for trade secret misappropriation, the plaintiff need only identify the defendant's sales reasonably at issue; the burden then falls on the defendant to establish any portion of the sales not attributable to the trade secret.  See, e.g., SPS Techs., LLC v. Briles Aerospace, Inc., 2021 WL 4913509, at *3 (C.D. Cal. Sept. 8, 2021); BladeRoom Grp. Ltd. v. Facebook, Inc., 2018 WL 1611835, at *2–3 (N.D. Cal. Apr. 3, 2018); see also Restatement (Third) of Unfair Competition § 45, cmt. f (1995) ("The plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted . . . .").

Monster's expert calculated that Vital's sales in Georgia overperformed the rest of the United States by $4.175 million in gross profits after Mr. Stephen Cohen ("Mr. Cohen") joined Vital.  (See New Trial Opp. Ex. 3 (Tregillis) at 221:1–222:15.)  These sales are reasonably at issue because many of the confidential documents Mr. Cohen stole related to Georgia.  (See, e.g., id. at 220:19–22 (many of "the documents appeared to be related to Georgia"); id. Ex. 7 (Voth) at 29:3–5 (admitting that "many of the documents on those USB drives relate specifically to Georgia").)  It was then Vital's burden to prove that the sales at issue were attributable to factors other than the misappropriated trade secrets.  Again, the jury did not award Monster's entire requested amount; they awarded $3 million.  This suggests that the jury carefully weighed the evidence and made a fair assessment as to the amount that would compensate Monster for the harm caused by Vital's trade secret misappropriation.  Thus, remittitur is not appropriate for the unjust enrichment award.

In sum, the Court upholds the jury's damages award.  The amount is not grossly excessive or monstrous, is clearly supported by the evidence, and is not based on speculation or guesswork.  The Court **DENIES** Defendants' request for remittitur.

**3.  JNOV**

Alternatively, Defendants move for JNOV on the false advertising and tortious interference claims.  (New Trial Motion at 35–49.)  JNOV is proper only "if the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." <u>Campagnolo S.R.L. v. Full Speed Ahead, Inc.</u>, 447 F. App'x 814, 815 (9th Cir. 2011).  "A jury's verdict must be upheld if it is supported by substantial evidence," "even if it is also possible to draw a contrary conclusion from the same evidence." <u>Johnson v. Paradise Valley Unified Sch. Dist.</u>, 251 F.3d 1222, 1227 (9th Cir. 2001).  A court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." <u>See id.</u> (quoting <u>Reeves</u>, 530 U.S. at 150).

Rule 50(b) imposes a higher standard of proof than Rule 59.  For the same reasons that Defendants cannot meet the Rule 59(a) standard for a new trial, they cannot meet the Rule 50(b) standard for JNOV.  In addition, the Court rejects Defendants' renewed argument that Monster should be limited to the advertising on the Bang label because Dr. Cowan's survey only asked respondents about the can.  (<u>See</u> New Trial Motion at 36–44; <u>see also</u> New Trial Motion Ex. 18 (9/23 Trial Tr.) at 107:6–118:10; Dkt. Nos. 861, 864, 867.)  As the Court found on summary judgment and directed verdict, Monster "has sufficient basis in the evidence for them to be able to argue" non-can advertising.  (<u>See</u> New Trial Motion Ex. 19 (9/27 Trial Tr.) at 50:16–19.)  Dr. Cowan's survey asked respondents questions *before* showing them the Bang label.  (<u>See, e.g.</u>, New Trial Opp. Ex. 17 (Cowan) at 65:11–67:23 (29% of consumers chose creatine and Super Creatine as important to decision to purchase energy drinks), 68:11–24 (Bang consumers three times more likely to select "creatine" and five times more likely to select "Super Creatine" than non-Bang consumers), 71:11–20 (Bang consumers expect Super Creatine to "help [with] muscle strength," "cognition/brain health," and dementia more than non-Bang consumers).)  That more Bang consumers believed Bang provides benefits than non-Bang consumers showed that non-label advertising likely influenced purchasing decisions.  (<u>Id.</u> at 72:12–73:8.)  Defendants' false claims about creatyl-L-leucine ("CLL") appeared both on the Bang label and in non-label advertisements such that the subject matter overlapped.  Viewing the evidence in the light most favorable to the nonmoving party, the Court finds that Monster established all elements of a Lanham Act claim at trial.  (<u>See</u> New Trial opposition at 43–46.)  The Court **DENIES** JNOV.

//
//
//
//
//
//
//

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk <u>mg</u>

**B. Motion for Equitable Relief, Fees, and Costs**

Monster seeks the following relief:

| Claim | Relief Sought |
|---|---|
| False Advertising in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq. and California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, et seq. | Judgment in Monster's favor and against Defendants Vital and Mr. Owoc.<br><br>Permanent injunction as requested in Monster's Motion for Permanent Injunction to Enjoin Defendants' False Advertising of "Super Creatine" and Creatine. |
| False Advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) | Disgorgement of Defendants' unjust profits in the amount of $77,466,712.<br><br>Enhanced damages in the amount of $56,670,142.75 to date, plus an additional $189,532.25 per day hereafter until Defendants are required to comply with any permanent injunction.<br><br>Prejudgment interest in the amount of $38,877,859.63 to date plus an additional $37,771.39 for every day hereafter until entry of judgment. |
| Intentional Interference with Contracts | Permanent injunction preventing Vital from interfering with Monster's contracted-for shelf space at all retail locations.<br><br>Punitive damages in the amount of $3 million.<br><br>Prejudgment interest in the amount of $507,452.05 to date, plus an additional $3,452.05 per day hereafter through entry of judgment. |
| Trade Secret Misappropriation in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., and the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, et seq. | Permanent injunction requiring Vital to identify and quarantine Monster's trade secrets in its possession and preventing Vital from disclosing or using Monster's trade secrets.<br><br>Exemplary damages in the amount of $3 million. |

|  | Expert witness expenses in the amount of $101,028.60.<br><br>Prejudgment interest in the amount of $84,574.98 to date, plus an additional $575.34 per day hereafter through entry of judgment. |
|---|---|
| Attorneys' Fees under the Lanham Act, DTSA, and CUTSA | Attorneys' fees in the amount of $20,972,953.90. |
| Costs under all claims | Costs in the amount of $6,709,552.18. |

(Fees Motion.)  For the reasons below, the Court **GRANTS-IN-PART and DENIES-IN-PART** Monster's Fees Motion.

As a preliminary matter, the Court denies Vital's request for a second phase of trial on the equitable claims.  (See Vital Fees Opposition at 3–5.)  Before trial, the Court ordered the parties to present any additional evidence on the equitable issues to the jury.  (See Fees Reply Ex. 7 (8/25 Trial Tr.) at 5:3–9 (Court confirming that the equitable claims will "be presented alongside [the legal claims] because we're not going to have a whole separate trial just for the bench").)  Vital is not entitled to a separate bench trial on the equitable claims.  See Anhing Corp. v. Viet Phu, Inc., 671 F. App'x 956, 958 (9th Cir. 2016) (finding no right to a bench trial).  "Where legal and equitable claims are based on the same set of facts, the Seventh Amendment requires the court to follow the jury's implicit or explicit factual determinations."  Allen v. Hyland's, Inc., 2022 WL 1500795, at *1 (9th Cir. May 12, 2022) (alteration and internal quotation marks omitted) (quoting Sanders v. City of Newport, 657 F.3d 772, 783 (9th Cir. 2011)).  Here, the legal and equitable claims arise from the same facts and involve common issues such that the Court need not consider new evidence.  See Copart, Inc. v. Sparta Consulting, Inc., 339 F. Supp. 3d 959, 973 (E.D. Cal. 2018) ("[T]he court follows Ninth Circuit authority and considers new evidence only 'where the legal and equitable claims do not involve common issues.' (quoting Granite State Ins. Co. v. Smart Modular Techs., Inc., 76 F.3d 1023, 1027 (9th Cir. 1996)).).

1. **False Advertising Claims**

   a. **Injunctive Relief**

The jury determined that Defendants are liable for false advertising under the Lanham Act and that their false advertising was willful and deliberate.  (See Verdict.)  In so deciding, the jury necessarily found that Defendants' advertising of Super Creatine (1) is false or misleading; (2) deceives or is likely to deceive consumers; (3) is material to consumers' purchasing decisions; and (4) injured Monster.  (See Jury Instruction No. 25); see Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997) (elements of a false advertising claim).  "Courts apply the same analysis to Lanham Act, unfair competition, and false advertising claims where, as here,

they are based on the same alleged conduct." (MSJ Order at 20; see also Fees Motion at 9.) Accordingly, Defendants are also liable for false advertising under the UCL and FAL.

On April 12, 2023, the Court issued a permanent injunction under the Lanham Act prohibiting Defendants from falsely or deceptively claiming that Super Creatine is creatine, that Bang contains creatine, and that Bang or Super Creatine provide the physical, mental, health, or other benefits of creatine. (See PI Order at 12–13.) Injunctive relief is also available under the UCL and FAL. See, e.g., Colgan v. Leatherman Tool Grp., Inc., 38 Cal. Rptr. 3d 36, 63–64 (Cal. Ct. App. 2006). The standard for a permanent injunction under California law differs from the federal standard. See Haas Automation v. Denny, 2014 WL 2966989, at *9 (C.D. Cal. July 1, 2014). To qualify for a permanent injunction under California law, "the plaintiff must prove (1) the elements of a cause of action involving the wrongful act sought to be enjoined and (2) the grounds for equitable relief, such as, inadequacy of the remedy at law." Id. (quoting City of South Pasadena v. Dep't of Transp., 35 Cal. Rptr. 2d 113, 120 (Cal. Ct. App. 1994)). Monster satisfies the first prong because the jury found all of the elements for a false advertising claim. (See Verdict.) Monster satisfies the second prong because it suffers the irreparable harm of loss of prospective customers and market share—ongoing harms that cannot be fully compensated by an award of damages. (See PI Order at 3–9.) For the same reasons as stated in the PI Order, the Court orders the same injunctive relief under the UCL and FAL. (See id.)

### b. Disgorgement

Under the Lanham Act, a plaintiff is entitled, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). That is, a "plaintiff may also (and simultaneously) seek a defendant's profits on the basis that the defendant should not be allowed to retain its ill-gotten gains, regardless of the plaintiff's damages." Out of the Box Enter., LLC v. El Paseo Jewelry Exch., Inc., 2012 WL 12893524, at *7 (C.D. Cal. June 27, 2012); see also Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc., 778 F.3d 1059, 1075 (9th Cir. 2015) ("A claim for disgorgement of profits under § 1117(a) is equitable, not legal."). Monster requests that the Court order disgorgement of Vital's unjust profits in the amount of $77,466,712. (See Fees Motion at 12–14.) Monster claims that this is the amount that Defendants gained from their false advertising that was not captured by the jury's award of lost profits. (See Fees Motion Ex. 1 (Tregillis) at 219:7–11, 224:3–8.) Mr. Tregillis testified at trial that he looked "at both sides of the coin, the Monster losses as well as the VPX gains," and that the $77.5 million figure was "deduplicated" from Monster's losses. (See id.)

However, the Lanham Act also provides that "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a). "Such sum in either of the above circumstances shall constitute compensation and not a penalty." Id. The Lanham Act "has been construed to expressly forbid the award of damages to punish an infringer." Skydive Ariz., 673 F.3d at 1114 (citing BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1096 (7th Cir. 1994)). In BASF Corp., the court

stated that "[t]he variety of circumstances in which a court *may* award disgorgement by no means indicate that the district court is required to award disgorgement." 41 F.3d at 1096 (citing cases). "Contrary to [the plaintiff's] assertions that disgorgement of wrongful profits is the 'norm' in a Lanham Act case, disgorgement is most appropriate if damages are otherwise nominal." Id. (citations omitted). In contrast, the damages in this case are astronomical—$271.9 million—and reasonably compensates Monster for its lost profits. Awarding Monster an *additional* $77.5 million may constitute an inequitable windfall for Monster and an impermissible penalty against Vital. See Stone Creek, Inc. v. Omnia Italian Design, Inc., 808 F. App'x 459, 460–61 (9th Cir. 2020). Indeed, the Ninth Circuit has warned that a "district court ought to tread lightly when deciding whether to award increased profits, because granting an increase could easily transfigure an otherwise-acceptable compensatory award into an impermissible punitive measure." Fifty-Six Hope Rd. Music, 778 F.3d at 1077; see also Stone Creek, 808 F. App'x at 461 (district court did not abuse its discretion in denying disgorgement). Accordingly, the Court **DECLINES** to order disgorgement.

### c. Enhanced Damages

Monster seeks enhanced damages to compensate for its lost profits from April 30, 2022[8] through April 12, 2023, the effective date of the permanent injunction. (See PI Order.) The Lanham Act vests the Court with discretion to enhance the jury's damages award up to "three times such amount." 15 U.S.C. § 1117(a). Monster argues that the Court should award enhanced damages for three reasons: (1) to compensate Monster for lost profits not included in the jury's verdict, such as lost sales between the verdict and entry of a permanent injunction; (2) to compensate Monster for "intangible harms," such as "lingering misimpressions" or "loss of good will"; and (3) because Monster's lost profits calculations likely understated the harm caused by Defendants' misconduct. (See Fees Motion at 14–18.) In short, Monster asserts that enhanced damages will compensate it for its ongoing losses. (See id.)

The Court finds that enhanced damages are not necessary to "ensure that the plaintiff receives compensation." Skydive Ariz., 673 F.3d at 1114 (quoting BASF Corp., 41 F.3d at 1096) (reversing district court's enhancement as punitive). As discussed above, the jury's award of $271.9 million in lost profits reasonably compensates Monster and any enhancement may constitute an impermissible penalty against Vital. See 15 U.S.C. § 1117(a); Skydive Ariz., 673 F.3d at 1114; Vital Pharms. v. PhD Mktg., Inc., 2022 WL 2952495, at *7 (C.D. Cal. July 26, 2022); Brighton, 2009 WL 160235, at *6. Even if Monster has suffered ongoing losses since April 2022, it has not shown how much it has lost. The Court cannot simply presume that Monster's losses have remained the same month over month, especially since Vital represents that its market share has "fallen by more than half since April 2022." (Vital Fees Opposition at 24–25.) As such, the Court cannot determine an amount that would not unduly punish Vital. The Court **DECLINES** to award Monster enhanced damages.

---

[8] For trial, Monster calculated lost profits through April 30, 2022 because that is "the last [sales] information that [Vital] provided." (See Fees Motion Ex. 1 (9/15 Trial Tr.) at 191:5–10.)

### d. Prejudgment Interest

Monster seeks prejudgment interest on the false advertising damages. "While the Lanham Act does not mandate an award of prejudgment interest, 'federal common law authorizes the award of such interest in appropriate cases to victims of violations of federal law.'" Anhing Corp. v. Thuan Phong Co., 2016 WL 6661178, at *3 (C.D. Cal. Jan. 25, 2016) (quoting Cyclone USA, Inc. v. LL&C Dealer Servs., LLC, 2010 WL 2132378, at *1 (C.D. Cal. May 24, 2010)); see also Frank Music Corp. v. Metro-Goldwyn-Mayer Inc., 886 F.2d 1545, 1550 (9th Cir. 1989) ("[C]ourts may allow prejudgment interest even though the governing statute is silent."). "Prejudgment interest compensates the injured party for the loss of the use of money he would otherwise have had." Frank Music Corp., 886 F.2d at 1550. "Whether interest will be awarded is a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." Wessel v. Buhler, 437 F.2d 279, 284 (9th Cir. 1971).

Monster argues that prejudgment interest should be calculated from the fall of 2015, when Bang with Super Creatine was first sold, using the one-year Treasury rate of 5.07%. (See Libeu Decl. ¶¶ 24–28.) Vital does not dispute that Monster may recover prejudgment interest, but argues that prejudgment interest should be calculated from the date of the jury's verdict at an "annual average rate over the relevant time periods" of 1.17%. (See Muth Fees Decl. ¶¶ 4–5.)

The Court deems it appropriate to award Monster prejudgment interest from the date of the jury's verdict, on September 29, 2022, to the date of the entry of judgment at the current one-year treasury rate. Although Section 3287(a) of the California Civil Code does not govern the calculation of prejudgment interest under the Lanham Act, the Court finds the language and reasoning of the state statute instructive.[9] See Cal. Civ. Code § 3287(a) (a person is entitled to recover interest from the day on which the damages were "made certain"). Here, Monster's damages were not certain until the jury rendered its verdict. Cf. Duale v. Mercedes-Benz USA, LLC, 56 Cal. Rptr. 3d 19, 26 (Cal. Ct. App. 2007) ("[W]here the amount of damages cannot be resolved except by verdict or judgment, prejudgment interest is not appropriate." (citation omitted)). Until the jury accepted Mr. Tregillis's lost profits calculations, Monster had not proven its damages and Vital did not know the extent of its liability. It is equitable that interest should not accrue until the damages were "made certain."

As for the interest rate, the Ninth Circuit has confirmed that courts follow 28 U.S.C. § 1961, "unless the trial judge finds, on substantial evidence, that the equities of the particular case require a different rate." See Barnard v. Theobald, 649 F. App'x 414, 417 (9th Cir. 2016); Herrera v. City of Ontario, 2017 WL 11628154, at *2 (C.D. Cal. June 28, 2017). Section 1961 provides that "interest shall be calculated . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment."

---

[9] Monster's cited federal cases do not discuss *when* interest should begin to accrue. See Anhing Corp. v. Thuan Phong Co., 2016 WL 6661178, at *5 (ordering supplemental briefing on the amount of prejudgment interest); Fitness Anywhere LLC v. WOSS Enter. LLC, 2018 WL 6069511, at *7 (prejudgment interest was not opposed).

28 U.S.C. § 1961.  The equities of this case do not require a different rate.  Thus, the Court **AWARDS** Monster prejudgment interest on $271,924,174 as accrued from September 29, 2022 to the date of the entry of judgment at an interest rate of 5.07%.  (See Libeu Decl. ¶ 27.)  By the Court's calculation ($37,771.39 x 365 days), the prejudgment interest is **$13,786,557.30** as of September 29, 2023.  (Id.)

### e.  Attorneys' Fees

Under the Lanham Act, a court may award reasonable attorneys' fees to the prevailing party "in exceptional cases."  15 U.S.C. § 1117(a).  An "exceptional case" is "one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated."  SunEarth, Inc. v. Sun Earth Solar Power Co., 839 F.3d 1179, 1180 (9th Cir. 2016) (quoting Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014)).

The Court finds that under the "totality of the circumstances," this case is exceptional.  First, the jury unanimously found that Defendants' false advertising was "willful and deliberate," which reflects the substantive strength of Monster's position.  (See Verdict.)  Second, Defendants litigated this case in an unreasonable manner.  During trial, Mr. Owoc refused to cooperate at times and displayed a disrespect for the judicial process.  See Taylor Made Golf Co. v. Carsten Sports, Ltd., 175 F.R.D. 658, 663 (S.D. Cal. 1997) (finding that a defendant's lack of cooperation and disrespect for the judicial process constitute exceptional circumstances warranting an award of attorneys' fees).  He repeatedly tried to reference documents that the Court had excluded.  (See, e.g., Fees Motion Ex. 2 (J. Owoc) at 78:17–23, 110:17–111:9.)  He refused to answer straightforward questions during cross-examination, despite admonitions from the Court.  (See, e.g., id. at 10:24–11:12, 74:16–75:6, 82:14–24.)  He berated Monster's counsel and the Court had to instruct the jury to "disregard any disparaging remarks this witness has made against opposing counsel."  (See id. Ex. 28 (J. Owoc) at 171:16–20.)  According to Monster's counsel, Mr. Owoc contradicted his prior sworn testimony numerous times and Monster's counsel impeached him over 50 times.  (See Libeu Decl. ¶ 38.)  Given the strength of Monster's litigating position and the unreasonableness of Defendant's behavior, this case is exceptional.  The Court **AWARDS** Monster attorneys' fees, as discussed below.

### 2.  Intentional Interference with Contract Claim

### a.  Injunctive Relief

The jury unanimously found that Vital intentionally interfered with Monster's shelf space contracts with Circle K, AM PM, and Wal-Mart and awarded $18 million in damages.  (See Verdict.)  The jury also found that Vital acted "maliciously, oppressively, fraudulently, or in reckless disregard of Monster's rights."  (Id.)  Monster now seeks injunctive relief to prevent future interference with Monster's contracts.  (See Fees Motion at 23–25.)  To qualify for a permanent injunction for a claim of tortious interference under California law, "the plaintiff must prove (1) the elements of a cause of action involving the wrongful act sought to be enjoined and

(2) the grounds for equitable relief, such as, inadequacy of the remedy at law."  See Haas Automation, 2014 WL 2966989, at *9 (quoting City of South Pasadena, 35 Cal. Rptr. 2d at 120); see also Cal. Civ. Code § 3422 (a final junction may be granted "[w]here pecuniary compensation would not afford adequate relief" and "[w]here the restraint is necessary to prevent a multiplicity of judicial proceedings").

Injunctive relief is appropriate here.  Monster satisfied the first prong by prevailing on its claim for intentional interference with contracts at trial.  (See Verdict.)  Monster satisfies the second prong because monetary damages is an inadequate remedy for Vital's misconduct and an injunction is necessary to prevent a multiplicity of judicial proceedings.  (See Fees Motion at 23–25.)  During trial, Monster's witnesses testified that Vital's interference hurt not only Monster's performance at specific retailers, but also Monster's brand overall.  (See, e.g., Fees Motion Ex. 1 (Weaver) at 91:13–92:4 (testifying that Vital's interference made Monster "look[] like we're not performing well in those stores"); id. (Suarez) at 157:15–21 (testifying that Vital was "interfer[ed] with our ability to provide product to consumers that are looking for it").)  Such evidence of threatened loss of prospective customers or goodwill supports a finding that monetary damages are an inadequate remedy for Monster's harm.  Cf. Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 841 (9th Cir. 2001) (affirming the district court's grant of preliminary injunction where district court found that plaintiff stood to "lose its newfound customers and accompanying goodwill and revenue"); Anhing Corp. v. Thuan Phong Co., 2015 WL 4517846, at *23 (C.D. Cal. July 24, 2015) ("Evidence of intangible injury, such as a loss of customers or damage to a party's goodwill, can constitute irreparable harm.").  "Injunctive relief is available to restrain unjustified interference with contractual relations when damages would not afford an adequate remedy."  Pac. Gas & Elec. Co. v. Bear Stearns & Co., 791 P.2d 587, 593 n.9 (Cal. 1990) (en banc).

Further, Vital's interference appeared to be a "widespread effort."  (Id. Ex. 9 (Bukovi) at 33:5–6.)  Several Monster employees personally observed Bang cans in Monster's contracted-for shelf space and heard reports of the same from other employees.  (See, e.g., id. Ex 1 (Weaver) at 84:21–23 ("Q. [H]ow did you learn about these instances? A. Some I saw myself, some were emailed to me, or text pictures[.]"); id. (Suarez) at 152:17–20 (learned about interference "through my own seeings out in the market and through my team communicating with me on what was going on"); id. Ex. 34 (Salerno) at 11:13–16 (saw interference "many times personally" and received "many reports from fellow Monster employees").)  Since it is impossible to identify every instance where Vital interferes with Monster's contracted-for shelf space, injunctive relief is necessary to prevent future misconduct.  Injunctive relief is also necessary to prevent a multiplicity of judicial proceedings arising from every instance of alleged interference.  Thus, the Court **GRANTS** Monster's request for a permanent injunction.[10]

---

[10] Federal Rule of Civil Procedure 65(d) requires a proposed injunction to "describe in reasonable detail . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(d).  Further, the Ninth Circuit requires that the language of the injunction provide "fair and well-defined notice" of whom or what it enjoins.  See Reno Air Racing Ass'n, Inc. v. McCord, 452 F.3d 1126, 1132 (9th Cir. 2006).  Monster's proposed permanent injunction with respect to the tortious

### b.   Punitive Damages

Monster seeks $3 million in punitive damages because the jury found that Vital acted "maliciously, oppressively, fraudulently, or in reckless disregard of Monster's rights by intentionally interfering with Monster's contracts." (See Fees Motion at 25–28; Verdict.) Section 3294(a) of the California Civil Code allows for punitive damages where "it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a).  In determining the amount of punitive damages to award, courts consider (1) the nature of the misconduct, (2) the amount of compensatory damages, and (3) the defendant's financial condition.  See Neal v. Farmers Ins. Exch., 582 P.2d 980, 990 (Cal. 1978); see also Adams v. Murakami, 813 P.2d 1348, 1351 (Cal. 1991) (en banc).

Applying these factors, the Court finds that punitive damages are not warranted because Vital's misconduct was not so egregious as to be despicable.  See, e.g., Rivin v. Patrick K. Willis Co., 2021 WL 2980591, at *2 (C.D. Cal. Feb. 23, 2021); Am. Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton, 117 Cal. Rptr. 2d 685, 710 (Cal. Ct. App. 2002) ("The conduct engaged in defendants in this case does not reach the level of despicability found in cases in which punitive damages were found to be proper.").  The jury found that Vital acted "maliciously, oppressively, fraudulently, *or* in reckless disregard."  (See Verdict (emphasis added)).  However, "mere reckless disregard or misconduct cannot be enough to sustain an award of punitive damages[.]" Butte Fire Cases, 235 Cal. Rptr. 3d 228, 236 (Cal. Ct. App. 2018).  "The central spirit of the exemplary damage statute, the demand for evil motive, is violated by an award founded upon recklessness alone."  Id. (quoting Taylor v. Superior Court, 598 P.2d 854, 856 (Cal. 1979)).  The Court finds that Vital's conduct was closer to "reckless disregard" than to "malice," especially since Vital offers evidence that Monster may have engaged in similar conduct. (See Vital Fees Opposition at 12–14 (asserting unclean hands defense); see also Fees. Opp. Ex. 26 at 1.)  In addition, the Court finds that the jury's compensatory damages award of $18 million sufficiently deters and punishes Vital for its misconduct.  See Neal, 582 P.2d at 990 (punitive damages should not "exceed[] the level necessary to properly punish and deter").  Thus, the Court **DECLINES** to award Monster punitive damages on the tortious interference claim.

### c.   Prejudgment Interest

Monster also seeks prejudgment interest on the tortious interference damages.  (See Fees Motion at 28–29.)  Monster is entitled to recover interest from the day on which damages were made certain.  Cal. Civ. Code § 3287(a).  Monster's damages became certain when the jury rendered its verdict on September 29, 2022.  California requires an interest rate of 7% for the calculation of prejudgment interest for tort claims.  See, e.g., Naranjo v. Spectrum Sec. Servs., Inc., 509 P.3d 956, 972 (Cal. 2022) ("Prevailing civil parties are entitled to this interest rate in the calculation of prejudgment interest absent a statute specifying a higher rate."); Yoon Chul

---

interference claim meets these requirements.  (See also PI Order at 21–23 (approving similar definition of "Enjoined Persons").)

<u>Yoo v. Arnold</u>, 2013 WL 12335872, at *11 (C.D. Cal. Mar. 25, 2013) ("Where tort damages are recovered, courts have generally applied a prejudgment interest rate of 7% per annum."). The Court **AWARDS** Monster prejudgment interest on $18 million as accrued from September 29, 2022 to the date of the entry of judgment at an interest rate of 7%. By the Court's calculation ($3,452.05 x 365 days), the prejudgment interest is **$1,259,998.25** as of September 29, 2023. (<u>See</u> Libeu Decl. ¶ 31.)

### 3. Trade Secret Misappropriation Claims

#### a. Injunctive Relief

The jury unanimously found that Vital misappropriated Monster's trade secrets in violation of the DTSA and CUTSA and awarded $3 million in damages. (<u>See</u> Verdict.) The jury also found that Vital "maliciously and willfully" misappropriated Monster's trade secrets. (<u>Id.</u>) Monster now seeks injunctive relief to "prevent any actual or threatened misappropriation" of trade secrets. <u>See</u> 18 U.S.C. § 1836(b)(3)(A); Cal. Civ. Code § 3426.2(a) ("Actual or threatened misappropriation may be enjoined."). To qualify for a permanent injunction, the plaintiff must prove: (1) irreparable injury; (2) inadequacy of legal remedies; (3) that the balance of hardships favors an injunction; and (4) that the public interest would not be disserved by a permanent injunction. <u>See</u> <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388, 391 (2006).

All four factors favor a permanent injunction enjoining Vital from using Monster's trade secret information. (<u>See</u> Fees Motion at 31–36.) Vital disputes the first and second factors. (<u>See</u> Vital Fees Opposition at 33–34.) "A finding of misappropriation is generally adequate for a finding of irreparable injury in trade secret cases." <u>Comet Techs. USA Inc. v. XP Power LLC</u>, 2022 WL 4625149, at *2 (N.D. Cal. Sept. 30, 2022). Although the Ninth Circuit has not reached the question of whether a court may presume irreparable harm in trade secret cases, district courts consistently conclude that a plaintiff will suffer irreparable harm if its proprietary information is misappropriated. <u>Id.</u> In this case, given the jury's finding that Vital maliciously and willfully misappropriated Monster's trade secrets, the Court finds that Monster suffers irreparable injury.

A trade secret plaintiff may also demonstrate irreparable injury through a loss in competitive advantage. <u>See, e.g.</u>, <u>Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.</u>, 2013 WL 890126, at *9 (N.D. Cal. Jan. 23, 2013) ("Commercial advantage is grounds for finding irreparable harm under the CUTSA."). As a result of Vital's misappropriation, Monster lost exclusivity of its trade secret information. (<u>See</u> TX-4269 (Mr. Cohen sharing Monster Garage link and password with Vital employee); Fees Motion Ex. 7 (Cohen) at 233:24–234:1, 234:9–12 (testifying that Monster Garage is an internal database for Monster employees that is not publicly available).) By accessing Monster Garage, where "all of [Monster's] vision and strategy" reside, Vital had access to Monster's competitive pricing strategies, innovative ideas, and "institutional knowledge" about Monster's bottlers that Vital could use to its advantage against Monster. (<u>See</u> Fees Motion Ex. 34 (Jeffrey Swift) at 58:8–18, 59:24–60:15; <u>see also</u> <u>id.</u> at 67:10–13, 67:16–22 (testifying that Vital's access to Monster's confidential information could allow it to undercut

Monster's pricing and strategies.).)  Vital's use of Monster's trade secret information gives it an unfair advantage in a competitive beverage industry.  See Brocade Commc'ns Sys., 2013 WL 890126, at *9.  "It is well established that the loss of market position and the disclosure of trade secrets can constitute irreparable harm."  WeRide Corp. v. Kun Huang, 379 F. Supp. 3d 834, 853–54 (N.D. Cal. 2019).  Monster has established irreparable injury.

Further, the Court finds that the jury's award of monetary damages compensated Monster for Vital's disproportionate success in Georgia, where Mr. Cohen worked, through March 2020.  (See Fees Motion Ex. 1 (Tregillis) at 220:7–222:18).  However, the damages did not compensate Monster for "the ways in which [Vital] was and is better equipped to sell against Monster having now seen hundreds of Monster's confidential pricing and strategy documents." (Fees Motion at 33.)  In other words, the jury's award "did not address ongoing or future harm from the future development of [Vital] products based on [Monster] trade secrets."  Comet Techs., 2022 WL 4625149, at *3.  An injunction may be used to "eliminate any unfair head start a defendant may have gained by improper use of confidential information" and to place the defendant in the position it would have occupied if the misconduct had not occurred.  See Netlist Inc. v. Diablo Techs. Inc., 2015 WL 153724, at *7 (N.D. Cal. Jan. 12, 2015), injunction terminated by 2015 WL 1925114 (N.D. Cal. Apr. 24, 2015).

The balance of hardships also favors a permanent injunction.  A permanent injunction "would not work any hardship on [Vital], which has no right to use the information in the first place."  Vinyl Interactive, LLC v. Guarino, 2009 WL 1228695, at *8 (N.D. Cal. May 1, 2009); see iBASEt v. Exacore, LLC, 2014 WL 12576816, at *5 ("Defendants cannot claim legitimate hardship resulting from an injunction prohibiting them from engaging in . . . misappropriation of trade secrets.").  Finally, a permanent injunction is in the public interest.  "Courts in trade secret cases have consistently held that the public interest favors the vindication of intellectual property rights."  Comet Techs., 2022 WL 4625149, at *3; see, e.g., WeRide Corp., 379 F. Supp. 3d at 854; Vinyl Interactive, 2009 WL 1228695, at *8.  There is no public interest in continuing to allow Vital to access Monster's trade secret information.

In sum, the Court concludes that Monster has shown that (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between Monster and Vital, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.

As for the scope of a permanent injunction, a "district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction."  Lamb-Weston, Inc. v. McCain Foods, Ltd., 941 F.2d 970, 974 (9th Cir. 1991).  Injunctive relief must be tailored to remedy the specific harm alleged.  Id.  Monster's accompanying proposed permanent injunction requires Vital to search for and quarantine Monster's confidential and proprietary information. (See Fees Motion at 35.)  The Court agrees that Vital must "refrain from further access to and use of Monster's trade secrets," and "delete all of Monster's trade secrets."  (Id.)  However, Monster's proposed permanent injunction is too broad and burdensome.  The Court declines to

require Vital to engage an e-discovery vendor to identify and collect Monster's trade secret information from its servers and digital devices.  (See id. at 36.)  Presumably, Monster would have already collected such information through discovery.  Accordingly, the Court modifies the proposed injunction as follows:

3. The Enjoined Persons are permanently enjoined from possessing, accessing, reviewing, using, or disclosing Monster's confidential and proprietary pricing, marketing, strategy, and financial information (the "Trade Secret Information"). For avoidance of doubt, the Trade Secret Information includes any information derived from or created by Monster except that which is demonstrably available to persons in the beverage industry.

4. VPX is ordered to take the following steps to remove from its possession, custody, or control any Trade Secret Information:

a. ~~VPX shall engage an e-discovery vendor (the "Vendor") approved by Monster (with such approval not to be unreasonably withheld) to assist with the identification, collection, and removal of any Trade Secret Information;~~

b. ~~The Vendor~~ *VPX* shall identify and collect any property or information of Monster from all servers, email servers, computers, hard drives, devices, document management systems, files, and storage media (including, without limitation, USB drives, network-based storage, and cloud-based storage) in the possession, custody, or control of VPX, including, without limitation, any VPX-issued devices in the possession, custody, or control of any employee who joined VPX after working for Monster (the "Collected Information");

c. Within sixty (60) days of the effective date of this Permanent Injunction, ~~the Vendor~~ *VPX* shall provide Monster's outside counsel of record with a copy of the Collected Information;

d. Monster's outside counsel of record will review the Collected Information to identify any Trade Secret Information;

e. Within thirty (30) days of Monster's identification of the Trade Secret Information, ~~the Vendor~~ *VPX* shall: (i) remove all Trade Secret Information from VPX's possession; (ii) quarantine and preserve a copy of the Trade Secret Information to, among other things, preserve data in connection with the obligations of VPX and/or its employees in pending litigations.

**b.  Exemplary Damages**

Monster seeks $3 million in exemplary damages because the jury found that Vital maliciously and willfully misappropriated Monster's trade secrets.  (See Fees Motion at 36–38;

Verdict); see also 18 U.S.C. § 1836(b)(3)(C) ("if the trade secret is willfully and malicious misappropriated," a court may "award exemplary damages in an amount not more than 2 times the amount of the damages awarded"); Cal. Civ. Code § 3426.3(c) ("If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award[.]"). Although exemplary damages are permitted by statute, the Court has an "independent obligation to consider the facts and calculate an equitable and constitutionally sound exemplary damages award[.]" Mattel, Inc. v. MGA Ent., Inc., 801 F. Supp. 2d 950, 953 (C.D. Cal. 2011).

As discussed above, in determining the amount of exemplary damages to award, courts consider (1) the nature of the misconduct, (2) the amount of compensatory damages, and (3) the defendant's financial condition. Neal, 582 P.2d at 990. "The largest exemplary awards are reserved for the most reprehensible acts." Mattel, 801 F. Supp. 2d at 953. To determine if, and to what extent, misconduct is reprehensible, courts consider whether "(1) the misconduct caused physical harm; (2) the misconduct disregarded the health or safety of others; (3) the misconduct targeted a financially vulnerable party; (4) the misconduct was repeated; and (5) the harm resulted from intentional malice, trickery, or deceit, or mere accident." Id. at 953–54.

Applying these factors, the Court finds that exemplary damages are not warranted because Vital's misconduct was not particularly reprehensible. See id. at 956 ("[Defendant's] conduct does not represent the most reprehensible form of trade secret misappropriation imaginable."). The misconduct did not cause physical harm, disregard the health or safety of others, or target a financially vulnerable party. The evidence presented at trial fell short of reprehensible conduct: "It was silly, not evil, and it diminished" after 2019. Id. In addition, the Court finds that the jury's compensatory damages award of $3 million sufficiently deters and punishes Vital for its misconduct. See Neal, 582 P.2d at 990 (punitive damages should not "exceed[] the level necessary to properly punish and deter"). Thus, the Court **DECLINES** to award Monster exemplary damages on the trade secret misappropriation claims.

### c. Prejudgment Interest

Monster also seeks prejudgment interest on the trade secret misappropriation damages. (See Fees Motion at 40); see Cal. Civ. Code § 3287(a). For the same reasons as discussed above, the Court **AWARDS** Monster prejudgment interest on $3 million as accrued from September 29, 2022 to the date of the entry of judgment at an interest rate of 7%. By the Court's calculation ($575.34 x 365 days), the prejudgment interest is **$209,999.10** as of September 29, 2023. (See Libeu Decl. ¶ 34.)

### d. Expert Witness Expenses

The CUTSA permits the prevailing party to recover the sum of "services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration[.]" Cal. Civ. Code § 3426.4. Mr. Tregillis was Monster's damages expert who offered damages

calculations for all of Monster's claims.  (See, e.g., Fees Motion Ex. 1 (Tregillis) at 220:7–224:25).)  Monster now seeks to recover the cost of Mr. Tregillis's services only as to the CUTSA claim.  (See Fees Motion at 49–50.)  Monster reasonably estimates that 10% of Mr. Tregillis's total work related to calculating and presenting damages on Monster's trade secret misappropriation claim.  (See Libeu Decl. ¶ 22.)  Accordingly, the Court **AWARDS** Monster $101,028.60 for Mr. Tregillis's work on the CUTSA claim.

### 4.  Attorneys' Fees

The Lanham Act, DTSA, and CUTSA allow awards of reasonable attorneys' fees. See 15 U.S.C. § 1117(a); 18 U.S.C. § 1836(b)(3)(D); Cal. Civ. Code § 3426.4.  Monster requests an award of $20,972,953.90 in attorneys' fees.  (Libeu Decl. ¶ 19.)

### a.  Hours

The Court calculates an award for attorneys' fees using the lodestar method.  See Camacho, 523 F.3d at 978.  To determine the lodestar, a court "must start by determining how many hours were reasonably expended on the litigation."  Moreno, 534 F.3d at 1111.  A "reasonable" number of hours is the time that "could reasonably have been billed to a private client."  Id.  Monster seeks to recover the time Hueston Hennigan actually billed Monster for its work in prosecuting the Lanham Act false advertising and CUTSA and DTSA trade secret claims.  (See Fees Motion at 41–44.)  Specifically, Monster seeks recovery for hours billed by 20 attorneys and 9 legal professionals between December 2018, when Hueston Hennigan was retained, and January 31, 2023.  (See Libeu Decl. ¶¶ 18–20; see also Fees Motion Ex. A (contemporaneous time records)).  These contemporaneous time records reflect the hours Hueston Hennigan reasonably expended.  Cf. Hensley, 461 U.S. at 437 n.12 (prevailing parties are "not required to record in great detail how each minute of [their] time was expended").  Monster voluntarily removed billing entries that (1) implicate privilege issues; (2) relate solely to Monster's claims for interference with contractual relations and prospective economic advantage: (3) relate solely to the CFAA; (4) relate solely to sugar crash claims; and (5) relate solely to Monster's motion for a preliminary injunction.  (Libeu Decl. ¶ 21.)

The Court finds that Hueston Hennigan's requested hours are reasonable.  This case was "large and burdensome in scope."  Perfect 10, Inc. v. Giganews, Inc., 2015 WL 1746484, at *19 (C.D. Cal. Mar. 24, 2015).  Hueston Hennigan drafted and filed the First Amended Complaint in April 2019, the operative complaint in the case, and successfully defended Monster's Lanham Act, DTSA, and the CUTSA claims from dismissal. (Libeu Decl. ¶ 20.)  Hueston Hennigan then handled substantial and extensive fact and expert discovery, including 87 depositions, nearly half-a-million produced documents, over 1,000 discovery requests and responses per side, 19 opening and rebuttal expert reports, and numerous discovery disputes with oral and/or written motion practice.  (Id.)  The parties briefed and argued competing summary judgment motions, including Defendants' two summary judgment motions in which they moved on virtually every element of Monster's claims.  (Id.)  Preparation for trial was similarly extensive: Hueston Hennigan prepared and filed 13 Daubert motions and motions in limine; over 60 proposed jury

instructions; over 7,000 trial exhibits; deposition designations for over 30 witnesses; and nearly 100 listed witnesses on the parties' witness lists. (Id.)  These efforts culminated in a five-week jury trial with more than an hour of opening statements; 32 witnesses, and hundreds of admitted exhibits. (Id.)  Since trial, Hueston Hennigan has filed substantial briefing on post-verdict issues. (Id.)

Further, this case was novel and complex.  See Chalmers v. City of Los Angeles, 796 F.2d 1205, 1212 (9th Cir. 1986).  The Lanham Act claim centered around a proprietary chemical compound, CLL, whose efficacy had not been scientifically tested until litigation. (See Fees Motion at 43.)  This forced Monster to commission the first human and animal studies into the efficacy of the compound. (See Fees Motion Ex. 8 (Kreider) at 240:1–241:1.)  Similarly, the trade secret claims required forensic investigation and analysis of multiple digital devices. (See Fees Motion Ex. 34 (9/16 Trial Tr.) at 53:16–54:11.)

Ultimately, "the most critical factor in determining a fee award's reasonableness is the degree of success obtained[.]"  Farrar v. Hobby, 506 U.S. 103, 103 (1992).  This case was well-litigated.  The jury unanimously found Defendants liable for false advertising, tortious interference, and trade secret misappropriation. (See Verdict.)  The jury also awarded Monster nearly $300 million in damages.  Given Monster's resounding victory, it is appropriate for the Court to "defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won[.]"  Moreno, 534 F.3d at 1112.  In such a large, lengthy, and complex case, Hueston Hennigan reasonably expended tens of thousands of hours. See, e.g., In re Heritage Bond Litig., 2005 WL 1594389, at *9 (C.D. Cal. June 10, 2005) (basing attorneys' fees award on "approximately 35,000 hours of attorney and paralegal time over the three-and-a-half years the action has been pending").

**b.  Hourly Rates**

Next, the Court multiplies the number of hours expended by the prevailing local rate for an attorney of the skill required to perform the litigation.  See Moreno, 534 F.3d at 1111.  "In determining the reasonableness of an hourly rate, courts consider the experience, skill, and reputation of the attorney requesting fees."  Nguyen v. Regents of Univ. of Cal., 2018 WL 6112616, at *3 (C.D. Cal. May 18, 2018); see Gonzalez v. City of Maywood, 729 F.3d 1196, 1205 (9th Cir. 2013).  Reasonable hourly rates are calculated according to the prevailing market rates in the relevant legal community—here, the Central District of California.  See Gates v. Deukmejian, 987 F.2d 1392, 1405 (9th Cir. 1992); French v. City of Los Angeles, 2022 WL 2189649, at *18 (C.D. Cal. May 10, 2022).

The Court finds that Hueston Hennigan's hourly rates are reasonable. (See Libeu Decl. ¶¶ 5–13.)  These negotiated hourly rates are what Hueston Hennigan actually billed Monster for its work, not mere estimates.  See Amphastar Pharms, Inc. v. Aventis Pharma SA, 2020 WL 8680070, at *27 (C.D. Cal. Nov. 13, 2020) ("Gibson's hourly rates are reasonable for the additional reason that Defendants actually paid Gibson the rate Gibson seeks here, after all discounts were applied."); Perfect 10, 2015 WL 1746484, at 18 n.14 ("[E]vidence that an

institutional client in a competitive legal market was willing to pay the rates charged without any guarantee of reimbursement is important evidence that the rate was reasonable."). The fact that the fees have been paid "adds weight to the presumption of reasonableness." <u>Sazerac Co. v. Fetzer Vineyards, Inc.</u>, 2017 WL 6059271, at *11 (N.D. Cal. Dec. 7, 2017) (quoting <u>Stonebrae, L.P. v. Toll Bros., Inc.</u>, 2011 WL 1334444, at *6 (N.D. Cal. Apr. 7, 2011).

Further, Hueston Hennigan's discounted hourly rates fall within the price ranges for similarly skilled attorneys. Hueston Hennigan has been recognized by national publications as one of the leading law firms and trial boutiques in the country. (<u>See</u> Libeu Decl. ¶¶ 2-3, 6–12 (more than half of the Hueston Hennigan attorneys who worked on this case have been individually recognized by industry publications).) The Court recognizes the Wolters Kluwer Real Rate Report ("RRR") as persuasive authority for prevailing market rates. <u>See, e.g.</u>, <u>French</u>, 2022 WL 2189649 at *18. Apart from John Hueston's ("Mr. Hueston") rate, all of Hueston Hennigan's requested rates fall below the RRR's top 25% hourly rate in 2021 for partners and associates. (<u>See</u> Fees Motion Ex. W ($1,042 for litigation partners and $806 for associates).) And Mr. Hueston's rate is reasonable because he is a founding partner of a recognized law firm. <u>See, e.g.</u>, <u>OpenGov, Inc. v. GTY Tech. Holdings, Inc.</u>, 2019 WL 2010707, at *5 (N.D. Cal. May 7, 2019) (approving billing rates of up to $1,500 for partners at Keker, Van Nest & Peters); <u>Fufillium, Inc. v. ReShape Med., Inc.</u>, 2018 WL 11343971, at *4 (C.D. Cal. Oct. 9, 2018) (approving billing rate of $1,365 as "not unreasonably high" for a partner at Irell & Manella). In general, Hueston Hennigan's requested rates track the "rate determinations in other cases" in California. <u>See, e.g.</u>, <u>In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.</u>, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (approving billing rates of up to $1,600 for partners, up to $790 for non-partner attorneys, and up to $490 for non-attorney professionals). Indeed, a court in this District recently approved Hueston Hennigan's rates. <u>See</u> <u>Vital Pharms., Inc. v. Orange Bang, Inc.</u>, Case No. 5:20-cv-1464-DSF-SHK (C.D. Cal. Apr. 6, 2022).

Overall, the Court concludes that Hueston Hennigan's requested hours and hourly rates are both reasonable. Monster's lodestar figure is $20,972,953.90, which is objectively large. (Libeu Decl. ¶ 19.) "But a fee award is not unreasonable simply because it involves a lot of money. The operative question isn't the dollar amount, the question is whether the rates charged and the hours spent are reasonable in light of the totality of the litigation." <u>Perfect 10</u>, 2015 WL 1746484, at *27. Here, the fee award comports with the Court's sense of "the amount of effort it took to successfully litigate this high-stakes action over the course of four years." <u>Id.</u> The Court **AWARDS** Monster $20,972,953.90 in attorneys' fees.

//
//
//
//
//
//
//

5.  **Costs**

a.  **Taxable Costs**

Federal courts can award taxable costs based on the "limitations set out in 28 U.S.C.
§ 1821 and § 1920." <u>Crawford Fitting Co. v. J.T. Gibbons, Inc.</u>, 482 U.S. 437, 445 (1987).
Monster seeks recovery of the following taxable costs:

- $186,270.47 for deposition transcripts and hearing transcripts (<u>see</u> Libeu Decl. ¶ 22),
  as authorized by 28 U.S.C. § 1920(2) ("fees for printed or electronically recorded
  transcripts necessarily obtained for use in the case");

- $74,872.57 in printing costs for exhibits and papers printed for trial (Libeu Decl.
  ¶ 22), as authorized by 28 U.S.C. § 1920(3) ("fees and disbursements for printing").

Vital does not challenge Monster's taxable costs.  Thus, the Court **AWARDS** Monster
$261,143.04 in taxable costs.

b.  **Non-Taxable Costs**

The Ninth Circuit allows "prevailing plaintiffs to recover non-taxable costs where
statutes authorize attorney's fees awards to prevailing parties."  <u>Grove v. Wells Fargo Fin. Cal.,
Inc.</u>, 606 F.3d 577, 580 (9th Cir. 2010).  The Lanham Act, DTSA, and CUTSA all authorize
attorneys' fees to Monster.  Monster can thus recover "reasonable out-of-pocket litigation
expenses that would normally be charged to a fee paying client, even if the court cannot tax these
expenses as 'costs' under 28 U.S.C. § 1920."  <u>Id.</u> at 851 (citation omitted); <u>see, e.g.</u>, <u>3M Co.
v. Solaryna Energy</u>, 2022 WL 2903160, at *11 (C.D. Cal. June 3, 2022) (awarding "'non-taxable'
costs [under Lanham Act]," such as "database costs"); <u>Wyatt Tech. Corp. v. Malvern
Instruments, Incorp.</u>, 2010 WL 11404472, at *2 (C.D. Cal. June 17, 2010) (awarding non-taxable
costs like mediator fees because under <u>Grove</u>, the Lanham Act and CUTSA fees provisions
"include recovery of nontaxable expenses if those expenses would normally be charged to the
client").  Monster seeks recovery of the following non-taxable costs:

- $4,218,072.21 for monthly data ingestion, hosting, processing, and production of
  electronic discovery, <u>see, e.g.</u>, <u>Mauss v. Nuvasive, Inc.</u>, 2018 WL 6421623, at *9 (S.D.
  Cal. Dec. 6, 2018) (approving costs for "data hosting");

- $119,087.44 for non-transcript deposition court reporting expenses, including costs
  for video depositions and recordings, <u>see, e.g.</u>, <u>Soler v. County of San Diego</u>, 2021
  WL 2515236, at *13 (S.D. Cal. June 18, 2021) ("District courts allow recoupment of
  video deposition expenses if those expenses were reasonably incurred.");

- $2,231.50 in messenger and delivery costs for chambers copies, <u>see, e.g.</u>, <u>Wyatt</u>, 2010
  WL 11404472, at *3 ("messenger and delivery costs" are recoverable "nontaxable
  costs");

- $14,496.00 in mediation fees, see, e.g., Wyatt, 2010 WL 11404472, at *3 ("mediator fees" are recoverable);

- $293,142.60 in costs for room and tax for hotel stays at trial, see, e.g., Harris v. Marhoefer, 24 F.3d 16, 19–20 (9th Cir. 1994) (affirming award of costs for "hotel bills"); In re Immune Response Sec. Litig., 497 F. Supp. 2d 1166, 1177–78 (S.D. Cal. 2007);

- $605,690.75 in costs charged by vendor TrialEdge for creating and presenting graphics during depositions and trial, see, e.g., Cornell Univ. v. Hewlett-Packard Co., 2009 WL 1405208, at *2 (N.D.N.Y. May 15, 2009) (awarding costs of "outside trial graphics vendor" because it provides "tremendous assistance"); and

- $1,195,688.64 in costs charged by labs that conducted the CLL studies that Monster presented at trial in support of its false advertising claim, see, e.g., Hernandez v. Spring Charter Inc., 2020 WL 1171121, at *9 (N.D. Cal. Mar. 11, 2020) (awarding costs for "investigation fees," including consultants who performed investigatory work for party).

In total, Monster's non-taxable costs equal $6,448,409.14. (Libeu Decl. ¶ 22.)  The Court finds the above expenses reasonable and necessary such that reimbursement is appropriate.  Thus, the Court **AWARDS** Monster $6,448,409.14 in non-taxable costs.

## IV.   CONCLUSION

For the reasons above, the Court **DENIES** the New Trial Motion and **GRANTS-IN-PART and DENIES-IN-PART** the Fees Motion.  The Court **ORDERS** the following relief:

| Claim | Relief |
|---|---|
| False Advertising in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq. and California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, et seq. | Judgment in Monster's favor and against Defendants Vital and Mr. Owoc.<br><br>Permanent injunction as requested in Monster's Motion for Permanent Injunction to Enjoin Defendants' False Advertising of "Super Creatine" and Creatine. |
| False Advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) | ~~Disgorgement of Defendants' unjust profits in the amount of $77,466,712.~~<br><br>~~Enhanced damages in the amount of $56,670,142.75 to date, plus an additional $189,532.25 per day hereafter until Defendants are required to comply with any permanent injunction.~~ |

| | Prejudgment interest in the amount of ~~$38,877,859.63 to date~~ ***$13,786.557.30 to September 29, 2023***, plus an additional $37,771.39 for every day thereafter until entry of judgment. |
|---|---|
| Intentional Interference with Contracts | Permanent injunction preventing Vital from interfering with Monster's contracted-for shelf space at all retail locations.<br><br>~~Punitive damages in the amount of $3 million.~~<br><br>Prejudgment interest in the amount of ~~$507,452.05 to date~~ ***$1,259,998.25 to September 29, 2023***, plus an additional $3,452.05 per day thereafter through entry of judgment. |
| Trade Secret Misappropriation in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., and the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426, et seq. | Permanent injunction requiring Vital to identify and quarantine Monster's trade secrets in its possession and preventing Vital from disclosing or using Monster's trade secrets.<br><br>~~Exemplary damages in the amount of $3 million.~~<br><br>Expert witness expenses in the amount of $101,028.60.<br><br>Prejudgment interest in the amount of ~~$84,574.98 to date~~ ***$209,999.10 to September 29, 2023***, plus an additional $575.34 per day hereafter through entry of judgment. |
| Attorneys' Fees under the Lanham Act, DTSA, and CUTSA | Attorneys' fees in the amount of $20,972,953.90. |
| Costs under all claims | Costs in the amount of $6,709,552.18. |

The Court **ENJOINS** Defendants as follows:

Defendant Vital Pharmaceuticals, Inc. ("VPX"), and all of VPX's officers, agents, distributors, servants, employees, consultants, representatives, parent companies, owners, subsidiaries, affiliates, attorneys, and other persons acting in

concert with them who receive actual notice of this Permanent Injunction by personal service or otherwise (together, the "Enjoined Persons") are hereby enjoined as follows:

1. The Enjoined Persons are permanently enjoined from:

a. Placing VPX products on or in any shelf, shelving unit, cooler vault, reach-in cooler, barrel cooler, rack, display unit, floor stand, countertop display, checkout display, point-of-sale display, store window display, gondola display unit, sidekick display unit, display case, endcap unit, aisle unit, wobbler, or other retail space (collectively, "Retail Space") that the Enjoined Persons know or have reason to know is secured by Monster through an existing contract;

b. Removing any Monster products from any Retail Space that the Enjoined Persons know or have reason to know is secured by Monster through an existing contract; and

c. Taking any action to conceal, cover up, obscure, hide, block, or otherwise keep from view any Monster products on or in any Retail Space that the Enjoined Persons know or have reason to know is secured by Monster through an existing contract.

2. The Enjoined Persons are permanently enjoined from causing, inducing, or attempting to cause or induce any retailer—including, but not limited to, Circle K, AM PM, and Walmart—and all employees or other persons under their respective direction, supervision, and/or control to:

a. Place VPX products on or in any Retail Space that the Enjoined Persons know or have reason to know is secured by Monster through an existing contract;

b. Remove any Monster products from any Retail Space that the Enjoined Persons know or have reason to know is secured by Monster through an existing contract; and

c. Take any action to conceal, cover up, obscure, hide, block, or otherwise keep from view any Monster products on or in any Retail Space that the Enjoined Persons know or have reason to know is secured by Monster through an existing contract.

3. The Enjoined Persons are permanently enjoined from possessing, accessing, reviewing, using, or disclosing Monster's confidential and proprietary pricing, marketing, strategy, and financial information (the "Trade Secret Information"). For avoidance of doubt, the Trade Secret Information includes any information derived from or created by Monster except that which is demonstrably available to persons in the beverage industry.

4. VPX is ordered to take the following steps to remove from its possession, custody, or control any Trade Secret Information:

a. VPX shall identify and collect any property or information of Monster from all servers, email servers, computers, hard drives, devices, document management systems, files, and storage media (including, without limitation, USB drives, network-based storage, and cloud-based storage) in the possession, custody, or control of VPX, including, without limitation, any VPX-issued devices in the possession, custody, or control of any employee who joined VPX after working for Monster (the "Collected Information");

c. Within sixty (60) days of the effective date of this Permanent Injunction, VPX shall provide Monster's outside counsel of record with a copy of the Collected Information;

d. Monster's outside counsel of record will review the Collected Information to identify any Trade Secret Information;

e. Within thirty (30) days of Monster's identification of the Trade Secret Information, VPX shall: (i) remove all Trade Secret Information from VPX's possession; (ii) quarantine and preserve a copy of the Trade Secret Information to, among other things, preserve data in connection with the obligations of VPX and/or its employees in pending litigations.

5. Within seven (7) business days of the issuance of this Permanent Injunction, VPX shall deliver a copy of this Permanent Injunction to all Enjoined Persons. VPX must deliver a copy of this Permanent Injunction to all new Enjoined Persons within seven (7) business days of the date on which such persons become Enjoined Persons (e.g., hiring).

6. VPX must file a signed, sworn declaration certifying compliance with Paragraphs 4 and 5 of this Permanent Injunction within seven (7) business days after the respective deadlines, with a detailed summary of each step taken to comply with Paragraphs 4 and 5.

Monster is **ORDERED** to submit a proposed judgment consistent with this order, previous orders, and the jury's verdict for the Court's signature no later than **October 13, 2023**.

**IT IS SO ORDERED.**